# EXHIBIT A

**BEFORE THE UNITED STATES JUDICIAL PANEL ON MULTIDISTRICT
LITIGATION**

| | |
|---|---|
| **IN RE:  DEERE REPAIR SERVICES ANTITRUST LITIGATION** | **MDL DOCKET NO. _____** |

**DEERE & COMPANY'S MOTION TO TRANSFER RELATED CASES FOR
CONSOLIDATED PRETRIAL PROCEEDINGS PURSUANT TO 28 U.S.C. § 1407**

Deere & Company ("Deere") is a defendant in six substantially similar cases pending in
federal courts throughout the country.  Deere hereby moves for an order for transfer and
consolidation pursuant to 28 U.S.C. § 1407 for the civil actions listed in the Schedule of Actions
filed concurrently herewith.

For the reasons set forth herein and in Deere's accompanying Brief in Support, Deere
respectfully requests that the Panel issue an Order transferring the six actions listed in the
accompanying Schedule of Actions, as well as all subsequently filed related actions, to the Hon.
Martha M. Pacold in the U.S. District Court for the Northern District of Illinois (Eastern
Division) in Chicago, Illinois for coordinated or consolidated pretrial proceedings.

Dated:  February 25, 2022

Respectfully submitted,

By: */s/ John M. Majoras*

John M. Majoras
jmmajoras@jonesday.com
JONES DAY
51 Louisiana Avenue, N.W.
Washington, DC 20001
Telephone: (202) 879-3939

Tiffany Lipscomb-Jackson
tdlipscombjackson@jonesday.com
JONES DAY
325 John H. McConnell Boulevard,
Suite 600
Columbus, OH 43215-2673
Telephone:  (614) 281-3876

Corey A. Lee
calee@jonesday.com
JONES DAY
North Point
901 Lakeside Avenue
Cleveland, Ohio 44114
Telephone: (216) 586-3939

Amanda B. Maslar
amaslar@jonesday.com
JONES DAY
77 West Wacker, Suite 3500
Chicago, IL  60601.1692
Telephone:  (312) 782-3939

*Counsel for Defendant Deere & Company*

**BEFORE THE UNITED STATES JUDICIAL PANEL ON MULTIDISTRICT LITIGATION**

| | |
|---|---|
| IN RE:  DEERE REPAIR SERVICES ANTITRUST LITIGATION | MDL DOCKET NO. _____ |

**BRIEF IN SUPPORT OF DEERE & COMPANY'S MOTION TO TRANSFER RELATED CASES FOR CONSOLIDATED PRETRIAL PROCEEDINGS PURSUANT TO 28 U.S.C. § 1407**

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................1

BACKGROUND AND STATUS OF LITIGATION.........................................2

LEGAL STANDARD..........................................................................................5

ARGUMENT .......................................................................................................5

I.      Transfer to a Single District for Centralized Pretrial  Proceedings Is Appropriate Under 28 U.S.C. § 1407.......................................................................................5

      A.      The Related Actions Involve Common Questions of Fact .........................5

      B.      Centralization Will Serve "The Convenience of the Parties and Witnesses" and "Promote the Just and Efficient Conduct of the Actions.".....................6

            1.      Centralization will reduce discovery burdens...................................7

            2.      Centralization will avoid inconsistent rulings..................................8

            3.      Establishing an MDL now is the most efficient way to advance the litigation ....................................................................................10

II.     The Actions Should Be Transferred to Judge Martha M.  Pacold in the Northern District of Illinois................................................................................................11

CONCLUSION...................................................................................................14

## <u>TABLE OF AUTHORITIES</u>

**Page**

CASES

*Cluck v. IKON Office Sols., Inc.*,
No. 11-05027-JSW, 2012 WL 1610789 (N.D. Cal. May 8, 2012)............................................7

*Comcast Corp. v. Behrend*,
569 U.S. 27 (2013)............................................6

*Daniel Brown v. Deere & Co.*,
No. 3:22-cv-50039 (N.D. Ill. Filed 02/11/2022)............................................3

*David Underwood v. Deere & Co.*,
4:22-cv-00005 (E.D. Tenn. Filed 02/03/2022) ............................................4

*Forest River Farms v. Deere & Co.*,
No. 1:22-cv-00188 (N.D. Ill. Filed 01/12/2022)............................................ passim

*In re: AIG Workers Comp. Ins. Policyholder Litig.*,
11 F. Supp. 3d 1349 (J.P.M.L. 2014)............................................12

*In re Digital Advert. Antitrust Litig.*,
No. MDL 3010, 2021 WL 3523450 (J.P.M.L. Aug. 10, 2021) ............................................9

*In re Enron Corp. Sec., Deriv. & ERISA Litig.*,
196 F. Supp. 2d 1375 (J.P.M.L. 2002)............................................7

*In re Equifax, Inc.*,
289 F. Supp. 3d 1322 (J.P.M.L. 2017)............................................11

*In re "Factor VIII or IX Concentrate Blood Products" Products Liability
Litigation*, 853 F. Supp. 454 (J.P.M.L. 1993)............................................12

*In re Generic Pharm. Pricing Antitrust Litig.*,
No. MDL 2724, 2017 WL 4582710 (J.P.M.L. Aug. 3, 2017) ............................................8, 9

*In re Hannaford Bros. Co. Customer Data Sec. Breach Litig.*,
559 F Supp. 2d 1405 (J.P.M.L 2008)............................................11

*In re Int'l House of Pancakes Franchise Litig.*,
374 F. Supp. 1406 (J.P.M.L. 1974)............................................10

*In re Jamster Marketing Litigation,*
    427 F. Supp. 2d 1366 (J.P.M.L. 2006)...................................................................11

*In re Ocean Fed. Bank FSB Mortg. Servicing Litig.,*
    314 F. Supp. 2d 1376 (J.P.M.L. 2004)...................................................................13

*In re Oxycontin Antitrust Litig.,*
    314 F. Supp. 2d 1388 (J.P.M.L. 2004)...................................................................10

*In re PepsiCo, Inc., Bottled Water Mktg. & Sales Practices Litig.,*
    560 F. Supp. 2d 1348 (J.P.M.L. 2008)...................................................................13

*In re Pineapple Antitrust Litig.,*
    342 F. Supp. 2d 1348 (J.P.M.L. 2004).....................................................................8

*In re Plumbing Fixture Cases,*
    298 F. Supp. 484 (J.P.M.L. 1968)............................................................................9

*In re Preferential Drug Products Pricing Antitrust Litigation,*
    429 F. Supp. 1027 (J.P.M.L. 1977)........................................................................11

*In re Ranbaxy Generic Drug Application Antitrust Litig.,*
    355 F. Supp. 3d 1382 (J.P.M.L. 2019).....................................................................8

*In re Realnetworks, Inc., Privacy Litigation,*
    2000 U.S. Dist. LEXIS 1458 (J.P.M.L. 2000) .......................................................12

*In re Schnuck Markets, Inc., Customer Data Sec. Breach Litig.,*
    978 F. Supp. 2d 1379 (J.P.M.L. 2013)...................................................................10

*In re: Skelaxin (Metaxalone) Antitrust Litig.,*
    856 F. Supp. 2d 1350 (J.P.M.L. 2012).....................................................................8

*In re Starmed Health Pers. FLSA Litig.,*
    317 F. Supp. 2d 1380 (J.P.M.L. 2004).....................................................................7

*In re Sugar Indus. Antitrust Litig.,*
    395 F. Supp. 1271 (J.P.M.L. 1975)..........................................................................8

*In re Trade Partners, Inc., Inv'rs Litig.,*
    493 F. Supp. 2d 1381 (J.P.M.L. 2007).....................................................................5

*In re Vytorin/Zetia Mktg.,*
    543 F Supp. 2d 1378 (J.P.M.L 2008).....................................................................11

*In re Wash. Mut., Inc.*,
536 F Supp. 2d 1377 (J.P.M.L 2008)...................................................................................11

*In re Zyprexa Prods. Liab. Litig.*,
314 F. Supp. 2d 1380 (J.P.M.L. 2004).................................................................................7

*Monty Ferrell v. Deere & Co.*,
5:22-cv-00157 (W.D. Okla. Filed 02/22/2022) ....................................................................4

*Plum Ridge Farms v. Deere & Co.*,
No. 3:22-cv-50030 (N.D. Ill. Filed 02/07/2022)....................................................................3

*Trinity Dale Wells v. Deere & Co.*,
No. 3:22-cv-00074 (N.D Ala. Filed 01/19/2022) ......................................................... passim

*Wal-Mart Stores, Inc. v. Dukes*,
564 U.S. 338 (2011)..................................................................................................6

**STATUTES**

28 U.S.C. § 1407 ................................................................................................ passim

Sherman Act.............................................................................................................1

**OTHER AUTHORITIES**

Fed. R. Civ. P. 23 .........................................................................................................6

## INTRODUCTION

Pursuant to 28 U.S.C. § 1407 and Judicial Panel on Multidistrict Litigation Rule 6.2(a), Defendant Deere & Company ("Deere") respectfully requests that the Panel transfer six related antitrust actions ("Related Actions"), which are currently pending in four different district courts, to a single district court for pretrial proceedings. Deere requests that these Related Actions be transferred to and consolidated before the Honorable Martha M. Pacold in the Eastern Division (Chicago) of the Northern District of Illinois, before whom the first-filed of these Related Actions is currently pending.

The Related Actions, pending in the Northern District of Illinois, the Northern District of Alabama, the Eastern District of Tennessee, and the Western District of Oklahoma, contain virtually identical allegations. Their central claim is that Deere deliberately monopolized an alleged market for repair and maintenance services of Deere-branded tractors and other equipment in violation of Sections 1 and 2 of the Sherman Act. In five of the six Related Actions, the named Plaintiffs purport to represent or seek relief on behalf of "[a]ll persons and entities residing in the United States who . . . purchased Deere Repair Services for Deere Tractors from Defendant or Deere's authorized Dealers and/or technicians." (Ex. 1, *Forest River Farms* (NDIL) Compl. ¶ 121; Ex. 2, *Plum Ridge Farms* (NDIL) Compl. ¶ 109; Ex. 3, *Brown* (NDIL) Compl. ¶ 117; Ex. 5, *Underwood* (EDTN) Compl. ¶ 117; Ex. 6, *Ferrell* (WDOK) Compl. ¶ 114.)[1] Although Deere vigorously disputes the allegations in the complaints, the Related Actions raise common questions of fact and law that warrant transfer and consolidation.

---

[1] The other Related Action alleges a similar but more limited class. *See* Ex. 4, *Wells* (NDAL) Compl. ¶ 107 ("All persons and entities residing in Alabama and Tennessee who, during the Class Period of January 12, 2018 to the present, purchased Deere Repair Services for Deere Tractors from Defendant or Deere's authorized Dealers and/or technicians.").

Moreover, transfer of these Related Actions before one forum for consolidated pretrial proceedings would be in the best interests of judicial economy and would lessen the risk of inconsistent judgments. It would be more efficient for the parties and the judiciary to consolidate pretrial proceedings in a single, geographically convenient forum close to Deere's headquarters in Moline, Illinois (where many of the key witnesses and other pieces of factual evidence are located) and centrally located with respect to the Related Actions filed thus far than for the Related Actions to be litigated in parallel in different courts across the country.

Because these Related Actions are premised on identical factual allegations, and because transfer under 28 U.S.C. § 1407 would be most convenient for the parties and would promote the just and efficient conduct of the litigation, Deere respectfully requests that the Panel transfer and consolidate the Actions, as well as any subsequent cases raising similar facts or claims, before Judge Martha M. Pacold in the U.S. District Court for the Northern District of Illinois.

## BACKGROUND AND STATUS OF LITIGATION

Deere manufactures, among other things, farming equipment that is sold around the world. Certain models of Deere's equipment are designed with proprietary software which helps the equipment run more effectively and efficiently. This equipment is sold by authorized Deere Dealers. Deere and authorized Deere Dealers sell replacement parts for this equipment, and Dealers also provide warranty, repair and maintenance services for this equipment.

Plaintiffs in all six Related Actions have claimed that Deere has monopolized an alleged market for repair and maintenance services for certain of its equipment by restricting purchasers' access to repair-related software and diagnostic tools. Plaintiffs in five of the six Related Actions purport to represent "[a]ll persons or entities residing in the United States . . . who purchased Deere Repair Services for Deere Tractors from Defendant or Deere's authorized Dealers and/or

technicians" from 2018 to the present. (Ex. 1, *Forest River Farms* (NDIL) Compl. ¶ 121; Ex. 2, *Plum Ridge Farms* (NDIL) Compl. ¶ 109; Ex. 3, *Brown* (NDIL) Compl. ¶ 117; Ex. 5, *Underwood* (EDTN) Compl. ¶ 117; Ex. 6, *Ferrell* (WDOK) Compl. ¶ 114).  Plaintiffs in the other action purport to represent persons or entities residing in Alabama or Tennessee who "purchased Deere Repair Services for Deere Tractors from Defendant or Deere's authorized Dealers and/or technicians." (Ex. 4, *Wells* Compl. (NDAL) ¶ 107).

The first case advancing this theory against Deere was filed in January 2022 in the Northern District of Illinois and assigned to Judge Martha M. Pacold.  (*See Forest River Farms v. Deere & Co.*, No. 1:22-cv-00188 (N.D. Ill.)).  Since then, new complaints containing materially indistinguishable allegations and nearly identical claims have been filed on an almost weekly basis. As of this filing, there are six complaints pending filed by a dozen different law firms.

The status of the suits pending against Deere is as follows:

      **a.**    **Northern District of Illinois**

**i.** *Forest River Farms v. Deere & Co.*, No. 1:22-cv-00188 (N.D. Ill. Filed 01/12/2022), assigned to Hon. Martha M. Pacold. ***Status:*** Deere was served with the complaint on January 18, 2022. Deere's deadline to answer or otherwise plead has been extended to April 11, 2022. No Case Management Order has been entered, and discovery has not commenced.

**ii.** *Plum Ridge Farms v. Deere & Co.*, No. 3:22-cv-50030 (N.D. Ill. Filed 02/07/2022), assigned to Hon. Iain D. Johnston. ***Status***: Deere was served with the complaint on February 18, 2022.  No Case Management Order has been entered, and discovery has not commenced.

**iii.** *Daniel Brown v. Deere & Co.*, No. 3:22-cv-50039 (N.D. Ill. Filed 02/11/2022), assigned to Hon. Iain D. Johnston.  ***Status***: Deere has not yet been served with the complaint.

    **b.**    **Northern District of Alabama**

i.    *Trinity Dale Wells v. Deere & Co.*, No. 3:22-cv-00074 (N.D Ala. Filed 01/19/2022), assigned to Hon. Liles C. Burke. ***Status***: Deere was served with the complaint on January 24, 2022. Deere's deadline to answer or otherwise plead has been extended to April 15, 2022. No Case Management Order has been entered, and discovery has not commenced.

    **c.**    **Eastern District of Tennessee**

i.    *David Underwood v. Deere & Co.*, 4:22-cv-00005 (E.D. Tenn. Filed 02/03/2022), assigned to Hon. Charles E. Atchley, Jr. ***Status***: Deere was served with the complaint on February 4, 2022. Deere's deadline to answer or otherwise plead has been extended to April 6, 2022. No Case Management Order has been entered, and discovery has not commenced.

    **d.**    **Western District of Oklahoma**

i.    *Monty Ferrell v. Deere & Co.*, 5:22-cv-00157 (W.D. Okla. Filed 02/22/2022), assigned to Hon. Charles Goodwin. ***Status***: Deere has not yet been served with the complaint.

These cases are listed in the attached Schedule of Actions (Exhibit A).

These suits substantially overlap both factually and legally. All the complaints name Deere as the sole defendant. The legal theories and causes of action asserted in the various complaints all center on the theory that Deere has monopolized the alleged market for repair and maintenance services of certain Deere-branded equipment with onboard central computers known as engine control units ("ECUs"). (*See, e.g.,* Ex. 1, *Forest River Farms* Compl. ¶¶ 34-42, 44-75; Ex. 4, *Wells* Compl. ¶¶ 34-42, 44-69). And Plaintiffs all allege the following antitrust violations against Deere: a) Group Boycott; b) Unlawful Tying; c) Monopolization; d) Attempted Monopolization; e) Conspiracy to Monopolize; and f) Unjust Enrichment. (*See, e.g.,* Ex. 1, *Forest River Farms* Compl. at Counts 2, 3, 4, 6, 7, and 10; Ex. 4, *Wells* Compl. at Counts 2, 3, 4, 6, 7, 10). For these claims, Plaintiffs seek materially identical relief, including treble damages, permanent injunctive relief, pre- and/or post-judgment interest, and attorneys' fees. (Ex. 1, *Forest River Farms* Compl.

¶¶ 215-221; Ex. 4, *Wells* Compl. ¶¶ 204-209).

Finally, all of these Related Actions are in the early stages of litigation.  As of today, in none of the cases have the forum courts taken any substantive action.  Nor have the parties initiated discovery or filed any substantive motions.

## LEGAL STANDARD

Transfer and consolidation is appropriate when actions pending in different judicial districts involve similar questions of fact such that consolidating pretrial proceedings would "promote the just and efficient conduct of such actions." 28 U.S.C. § 1407(a).  In relevant part, Section 1407 provides:

> When civil actions involving one or more common questions of fact are pending in different districts, such actions may be transferred to any district for coordinated or consolidated pretrial proceedings.  Such transfers shall be made by the judicial panel on multidistrict litigation authorized by this section upon its determination that transfers for such proceedings will be for the convenience of parties and witnesses and will promote the just and efficient conduct of such actions.

28 U.S.C. § 1407(a).

## ARGUMENT

## I.   TRANSFER TO A SINGLE DISTRICT FOR CENTRALIZED PRETRIAL PROCEEDINGS IS APPROPRIATE UNDER 28 U.S.C. § 1407.

Centralization of pretrial proceedings in a multidistrict litigation is appropriate if (1) actions pending in different federal courts involve "one or more common questions of fact"; and (2) centralization "will be for the convenience of parties and witnesses and will promote the just and efficient conduct of such actions." 28 U.S.C. § 1407(a).

Here, the Related Actions are premised on virtually identical factual allegations, and transfer under Section 1407 and consolidation before one court will serve the convenience of the parties and witnesses, promote just and efficient conduct of the actions, and avoid inconsistent

pretrial rulings, particularly with respect to class certification and dispositive issues.

### A.    The Related Actions Involve Common Questions of Fact.

The Related Actions "involve one or more questions of fact"[2] as they are premised on virtually identical factual allegations.  Indeed, the vast majority of allegations in the complaints track each other verbatim.  (*See* Exhibits 1-6).  Plaintiffs all claim they purchased Deere equipment and were harmed by alleged aftermarket restrictions on repairing it.  (*See, e.g.* Ex. 1, *Forest River Farms* Compl. ¶¶ 27,  59-75; Ex. 4, *Wells* Compl. ¶¶ 27, 57-69).  In particular, all cite the supposed difficulty of repairing their own equipment, Deere's alleged consolidation of the authorized repair services network, and the alleged restrictions on access to Deere's proprietary repair software. (*See, e.g.* Ex. 1, *Forest River Farms* Compl. ¶¶ 27,  59-75, 100-103; Ex. 4, *Wells* Compl. ¶¶ 27, 57-59, 97-102).   Though there are some allegations unique to each of the named Plaintiffs regarding their individual maintenance or repair issues (*see* Ex. 4, *Wells* Compl. ¶¶ 118-131), the central allegations in the complaints are the same and plainly satisfy the common-facts requirement.

### B.    Centralization Will Serve "The Convenience of the Parties and Witnesses" and "Promote the Just and Efficient Conduct of the Actions."

Centralization would also be more convenient for the parties and more efficient for the

---

[2] This inquiry is distinct from the class-certification inquiry under Rule 23.  *See, e.g.*, *In re Trade Partners, Inc., Inv'rs Litig.*, 493 F. Supp. 2d 1381 (J.P.M.L. 2007) (centralization under Section 1407 is appropriate even where individual questions of fact and law predominate for class-certification purposes).  Accordingly, Deere makes no admissions about, or takes any position on, the adequacy of any class pleadings or whether any plaintiff can ultimately meet Rule 23's class certification standards and expressly reserves all of its defenses to class certification, including the absence of common questions susceptible to common answers (*see Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011)), and the fact that common questions do not predominate over individualized questions.  *See* Fed. R. Civ. P. 23(b)(3); *Comcast Corp. v. Behrend*, 569 U.S. 27, 41 (2013).

courts.  It would reduce the burden of fact and expert discovery on both Deere and Plaintiffs by streamlining what are likely to be substantially overlapping document productions and avoiding the need for the same witnesses to be deposed multiple times.  Centralization would also avoid the potential for inconsistent rulings among these cases and ensure greater efficiency.  Equivalent benefits cannot be accomplished solely through informal coordination or by transferring individual cases under Section 1404.

### 1.    Centralization will reduce discovery burdens.

Discovery in the Related Actions will inevitably be duplicative, and litigating these cases separately would impose substantial discovery burdens.  The Panel has consistently held that transfer under Section 1407 is intended to prevent such duplication.  *See, e.g.*, *In re Starmed Health Pers. FLSA Litig.*, 317 F. Supp. 2d 1380, 1381 (J.P.M.L. 2004) (consolidating two actions in part because transfer was necessary to "eliminate duplicative discovery" and "conserve the resources of the parties").[3]

As noted, all six Related Actions involve the following antitrust claims against Deere: a) Group Boycott; b) Unlawful Tying; c) Monopolization; d) Attempted Monopolization in the Alternative; e) Conspiracy to Monopolize; and f) Unjust Enrichment.  (*See, e.g.,* Ex. 1, *Forest River Farms* Compl. at Counts 2, 3, 4, 6, 7, and 10; Ex. 4, *Wells* Compl. at Counts 2, 3, 4, 6, 7, 10).  Furthermore, the Related Actions seek the same relief, meaning that discovery in the Related

---

[3] *See also In re Zyprexa Prods. Liab. Litig.*, 314 F. Supp. 2d 1380, 1382 (J.P.M.L. 2004) ("[T]ransfer under Section 1407 will offer the benefit of placing all actions in this docket before a single judge who can structure pretrial proceedings to consider all parties' legitimate discovery needs while ensuring that common parties and witnesses are not subjected to discovery demands that duplicate activity that will occur or has already occurred in other actions."); *In re Enron Corp. Sec., Deriv. & ERISA Litig.*, 196 F. Supp. 2d 1375, 1376–77 (J.P.M.L. 2002) (consolidating multiple actions because of the cases' strong connection to the Southern District of Texas, where the defendant was headquartered, witnesses were located, and auditors performed their work).

Actions will necessarily overlap, involving many of the same witnesses and much of the same documentary evidence. "Allowing the witnesses to appear once in a single venue is more convenient than requiring them to appear multiple times in multiple venues." *Cluck v. IKON Office Sols., Inc.*, No. 11-05027-JSW, 2012 WL 1610789, at *2 (N.D. Cal. May 8, 2012). As the Panel has recognized, only centralization can achieve this goal: "informal coordination and cooperation among the parties and courts" is not "sufficient to eliminate the potential for duplicative discovery, inconsistent pretrial rulings, and conflicting discovery obligations." *In re Generic Pharm. Pricing Antitrust Litig.*, No. MDL 2724, 2017 WL 4582710, at *2 (J.P.M.L. Aug. 3, 2017).

**2. Centralization will avoid inconsistent rulings.**

Centralization is particularly appropriate where there is a risk of inconsistent class determinations and pretrial rulings on discovery, dispositive motions, and other pretrial matters. *See, e.g.*, *In re Pineapple Antitrust Litig.*, 342 F. Supp. 2d 1348, 1349 (J.P.M.L. 2004) (consolidating cases to "prevent inconsistent pretrial rulings, including those with respect to class certification."); *In re Sugar Indus. Antitrust Litig.*, 395 F. Supp. 1271, 1273 (J.P.M.L. 1975) (finding "the possibility of inconsistent class determinations" is a "highly persuasive reason" to consolidate cases).

Such a risk plainly exists here. All six Related Actions are brought as class actions on behalf of purchasers of Deere repair services. Plaintiffs in five of the six Related Actions seek to represent a nationwide class—namely "[a]ll persons and entities residing in the United States who . . . purchased Deere Repair Services for Deere Tractors from Defendant or Deere's authorized Dealers and/or technicians." (Ex. 1, *Forest River Farms* (NDIL) Compl. ¶ 121; Ex. 2, *Plum Ridge Farms* (NDIL) Compl. ¶ 109; Ex. 3, *Brown* (NDIL) Compl. ¶ 117; Ex. 5, *Underwood* (EDTN) Compl. ¶ 117; Ex. 6, *Ferrell* (WDOK) Compl. ¶ 114)—and the sixth seeks to represent a subset

of this class.  (Ex. 4, *Wells* (NDAL) Compl. ¶ 107 ("All persons and entities residing in Alabama and Tennessee who . . . purchased Deere Repair Services for Deere Tractors from Defendant or Deere's authorized Dealers and/or technicians.").  Transfer and consolidation will eliminate the possibility of inconsistent or overlapping class determinations, which tilts the balance sharply in favor of such consolidation.  *See, e.g., In re Ranbaxy Generic Drug Application Antitrust Litig.*, 355 F. Supp. 3d 1382, 1383 (J.P.M.L. 2019) (authorizing Section 1407 transfer to avoid redundant pretrial motion practice, including class certification); *In re: Skelaxin (Metaxalone) Antitrust Litig.*, 856 F. Supp. 2d 1350, 1352 (J.P.M.L. 2012) (granting order to transfer under Section 1407 since consolidation was necessary to prevent inconsistent pretrial rulings, including with respect to class certifications); *In re Plumbing Fixture Cases*, 298 F. Supp. 484, 493 (J.P.M.L. 1968) ("It is in the field of class action determinations in related multidistrict civil actions that the potential for conflicting, disorderly, chaotic judicial action is the greatest," and thus class action cases are particularly appropriate for consolidation under Section 1407).

Additionally, these Related Actions involve a significant number of overlapping factual allegations and legal claims.  For example, all of the cases include claims that Deere has monopolized or attempted to monopolize the alleged market for repair and maintenance services for certain Deere-branded equipment.  (*See, e.g.,* Ex. 1, *Forest River Farms* Compl. ¶¶ 34-42; Ex. 4, *Wells* Compl. ¶¶ 34-42).  Allowing the Related Actions to proceed separately through the pretrial process would create a significant risk of inconsistent pretrial rulings and outcomes on a wide range of issues arising from these claims, including rulings on discovery, expert, and dispositive issues.  Centralization would prevent such inconsistency. *See, e.g., In re Digital Advert. Antitrust Litig.*, No. MDL 3010, 2021 WL 3523450, at *2 (J.P.M.L. Aug. 10, 2021) ("Centralization will promote the just and efficient conduct of the litigation by eliminating duplicative discovery and

avoiding the risk of inconsistent rulings on pretrial matters, particularly on discovery disputes, *Daubert* issues, and dispositive motions.").

Transfer is particularly appropriate because these actions are still in the early stages of litigation.  Each of the six Related Actions were filed in the last six weeks.  No party has filed a substantive motion or initiated discovery.  There is therefore "ample scope to eliminate duplication and enhance the convenience of the parties, the witnesses, and the courts through coordinated proceedings in the MDL," and there are "benefits to coordinating pretrial motions, as none of the actions has advanced beyond motions to dismiss." *In re Generic Pharm.*, 2017 WL 4582710, at *2*; *see also, e.g.*, *In re Int'l House of Pancakes Franchise Litig.*, 374 F. Supp. 1406, 1407 (J.P.M.L. 1974) (noting that transfer is appropriate where discovery is not well-advanced).  Accordingly, consolidation of these duplicative and overlapping purported class actions would significantly improve efficiencies and preserve judicial resources.

### 3.     Establishing an MDL now is the most efficient way to advance the litigation.

It is appropriate to grant centralization now, given the efficiencies that would be gained, the ongoing filing of new actions, and the high likelihood of multiple follow-on actions being filed in the coming weeks or months. *In re Oxycontin Antitrust Litig.*, 314 F. Supp. 2d 1388, 1390 (J.P.M.L. 2004) ("Given that the number of related actions continues to grow, along with the potential need for additional motions to transfer venue, we find that transfer under Section 1407 is warranted.").

Moreover, because cases are pending in several different districts and are likely to be followed by additional actions, there is no "reasonable prospect" that a change of venue under Section 1404 would "eliminate," or "moot," "the multidistrict character of the litigation."  *In re Schnuck Markets, Inc., Customer Data Sec. Breach Litig.*, 978 F. Supp. 2d 1379, 1380–81

(J.P.M.L. 2013).

Accordingly, transfer of the Related Actions to a single district court for consolidated or coordinated pretrial proceedings is appropriate.

## II.     THE ACTIONS SHOULD BE TRANSFERRED TO JUDGE MARTHA M. PACOLD IN THE NORTHERN DISTRICT OF ILLINOIS.

Given the propriety of consolidation of these actions under Section 1407, Deere respectfully requests that the Related Actions be transferred to the Northern District of Illinois (Eastern Division) and consolidated before Judge Martha M. Pacold for pretrial proceedings. Judge Pacold is presiding over *Forest River Farms v. Deere*, the first-filed of the Related Actions.

The Panel balances a number of factors in determining the transferee forum, including: the experience, skill, and caseloads of the available judges; the number of cases pending in the jurisdiction; the convenience of the parties; the location of the witnesses and evidence; whether the district is in an accessible metropolitan location; and the minimization of cost and inconvenience to the parties.  *See In re Jamster Marketing Litigation*, 427 F. Supp. 2d 1366, 1368 (J.P.M.L. 2006); *In re Preferential Drug Products Pricing Antitrust Litigation*, 429 F. Supp. 1027, 1029 (J.P.M.L. 1977).  Among these considerations, the Panel often puts particular emphasis on the central location of documents and witnesses, as that location typically provides the most convenient forum for the litigation.

Here, the Northern District of Illinois (Eastern Division) in Chicago, Illinois is the most convenient forum for the parties and the witnesses.  Many key witnesses and documents are likely located at Deere's headquarters in Moline, Illinois, which is within the Northern District of Illinois and only 163 miles (less than a three-hour drive) from Chicago.  This alone weighs heavily in favor of centralizing the litigation there.  *See, e.g.*, *In re Equifax, Inc.*, 289 F. Supp. 3d 1322 (J.P.M.L. 2017) (transferring actions to the Northern District of Georgia, where the main defendant

is headquartered as "relevant documents and witnesses thus likely will be found there."); *In re Vytorin/Zetia Mktg.*, 543 F Supp. 2d 1378 (J.P.M.L 2008) (centralizing cases in District of New Jersey because two of the defendants had their corporate headquarters in New Jersey and, thus, relevant discovery could be found there); *In re Hannaford Bros. Co. Customer Data Sec. Breach Litig.*, 559 F Supp. 2d 1405 (J.P.M.L 2008) (finding District of Maine was appropriate transferee district because, among other reasons, defendant had its headquarters in that district and, thus, relevant documents and witnesses would be found there); *In re Wash. Mut., Inc.*, 536 F Supp. 2d 1377 (J.P.M.L 2008) (centralizing litigation in Western District of Washington where defendant was headquartered there and witnesses and documents were located there).

Additionally, Plaintiffs are spread across multiple jurisdictions and, in all but one of the Related Actions, purport to represent a nationwide class.  There is thus no district that has a comparative advantage regarding discovery to be taken from Plaintiffs.  This makes the Northern District of Illinois, which is central to all the parties, witnesses and documents, most appropriate. *See, e.g.*, *In re Realnetworks, Inc., Privacy Litigation*, 2000 U.S. Dist. LEXIS 1458, *4 (J.P.M.L. 2000) (transferring actions to the Northern District of Illinois as most convenient, noting that "the geographic location of the Northern District of Illinois makes it a convenient forum for parties located throughout the United States."); *In re "Factor VIII or IX Concentrate Blood Products" Products Liability Litigation*, 853 F. Supp. 454, 455 (J.P.M.L. 1993) ("Chicago is a geographically central location for . . . nationwide litigation").  The Northern District of Illinois (Eastern Division) in Chicago also allows for easy access for all litigants and witnesses.  Chicago is a major metropolitan area with hotels and public transportation to accommodate visiting attorneys and witnesses.  It is also conveniently located for travelers, given its close proximity to Chicago's two international airports, which have direct, frequent, and economical flights available from almost

all major cities in the United States.[4]

For these reasons, the Panel has transferred and consolidated numerous cases before the Northern District of Illinois when an action was already pending there. *E.g., In re: AIG Workers Comp. Ins. Policyholder Litig.*, 11 F. Supp. 3d 1349, 1350 (J.P.M.L. 2014) ("The Northern District of Illinois is a centrally located and convenient forum."); *In re Ocean Fed. Bank FSB Mortg. Servicing Litig.*, 314 F. Supp. 2d 1376, 1379 (J.P.M.L. 2004) (ordering transfer because of the District's "geographically central[]" location and because actions already were pending in the Northern District of Illinois).

This forum makes particular sense here because three of the five Related Actions against Deere—including the first—are already pending in the Northern District of Illinois. *See, e.g., In re PepsiCo, Inc., Bottled Water Mktg. & Sales Practices Litig.*, 560 F. Supp. 2d 1348, 1349 (J.P.M.L. 2008). And while two are pending in the Western Division, its location in Rockford, Illinois is not as conveniently located or as accessible to travelers as Chicago. Indeed, while Rockford has an airport, it is much smaller than either of Chicago's airports and has only a limited number of flights in or out each day.[5]

Compared to the Western Division, the Eastern Division also has greater resources to

---

[4] Both O'Hare International Airport and Midway International Airport offer flights from all the major airlines to cities across the U.S. *Chicago O'Hare International (ORD)*, Bureau of Transportation Statistics, *available at* https://www.transtats.bts.gov/airports.asp?20=E; *Chicago Midway International (MDW)*, Bureau of Transportation Statistics, *available at* https://www.transtats.bts.gov/airports.asp?20=E. Over 282,000 flights departed from O'Hare in 2021, and nearly 62,000 flights departed from Midway in 2021. *Id.*

[5] For example, only one passenger airline (Allegiant Air) serves passengers out of Rockford International Airport, and only 8,000 flights departed from Rockford in 2021. *Rockford International (RFD)*, Bureau of Transportation Statistics, *available at* https://www.transtats.bts.gov/airports.asp?20=E&Nv42146=eSQ&Nv42146_anzr=e1pxs14q,%20VY:%20Puvpnt1/ e1pxs14q%20V06r40n6v10ny&pn44vr4=SNPgf. Additionally, Allegiant Air only offers flights to a limited number of destinations, including to Las Vegas, Phoenix, and five cities in Florida. *See* Destinations, Rockford International Airport, *available at* https://flyrfd.com/destinations-list/. *Compare with* statistics on O'Hare International Airport and Midway International Airport, *supra* n.4.

effectively manage this multidistrict litigation.[6]  Judge Pacold, who is already presiding over the first-filed case (*Forest River Farms*), has presided over numerous antitrust class action cases and is not currently handling a multidistrict case.  Deere is confident that Judge Pacold is more than capable of handling this multidistrict litigation.

## CONCLUSION

For the foregoing reasons, Deere respectfully requests that this Panel enter an order transferring the actions listed on the attached Schedule of Actions for centralized pretrial proceedings before Judge Martha M. Pacold in the Northern District of Illinois (Eastern Division) in Chicago, Illinois.

---

[6] Of the more than 30 judges of the Northern District of Illinois, only two have chambers in the Western Division in Rockford, Illinois.  *See* Judge Information, Northern District of Illinois, *available at* https://www.ilnd.uscourts.gov/Judges.aspx?eFRCR82Cx5Y= .

Dated: February 25, 2022                    Respectfully submitted,


                                            By: */s/ John M. Majoras*

                                            John M. Majoras
                                            jmmajoras@jonesday.com
                                            JONES DAY
                                            51 Louisiana Avenue, N.W.
                                            Washington, DC 20001
                                            Telephone: (202) 879-3939

                                            Tiffany Lipscomb-Jackson
                                            tdlipscombjackson@jonesday.com
                                            JONES DAY
                                            325 John H. McConnell Boulevard,
                                            Suite 600
                                            Columbus, OH 43215-2673
                                            Telephone:  (614) 281-3876

                                            Corey A. Lee
                                            calee@jonesday.com
                                            JONES DAY
                                            North Point
                                            901 Lakeside Avenue
                                            Cleveland, Ohio 44114
                                            Telephone: (216) 586-3939

                                            Amanda B. Maslar
                                            amaslar@jonesday.com
                                            JONES DAY
                                            77 West Wacker, Suite 3500
                                            Chicago, IL  60601.1692
                                            Telephone:  (312) 782-3939


                                            *Counsel for Defendant Deere & Company*

# EXHIBIT A

**BEFORE THE UNITED STATES JUDICIAL PANEL ON MULTIDISTRICT LITIGATION**

| | |
|---|---|
| **IN RE:  DEERE REPAIR SERVICES ANTITRUST LITIGATION** | **MDL DOCKET NO. _____** |

**<u>SCHEDULE OF ACTIONS</u>**

| No. | Case Caption | Court | Civil Action No. | Judge |
|-----|-------------|-------|------------------|-------|
| 1. | **Plaintiff:** Forest River Farms, *Individually and on behalf of all others similarly situated*<br><br>**Defendant:** Deere & Co. (d/b/a John Deere) | U.S.D.C. Northern District of Illinois (Eastern Division – Chicago) | No. 1:22-cv-00188 | Martha M. Pacold |
| 2. | **Plaintiff:** Plum Ridge Farms, Ltd., *Individually and on behalf of all others similarly situated*<br><br>**Defendant:** Deere & Co. (d/b/a John Deere) | U.S.D.C. Northern District of Illinois (Western Division – Rockford) | No. 3:22-cv-50030 | Iain D. Johnston |
| 3. | **Plaintiff:** Daniel Brown, D/B/A Otsego Forestry Services, *individually and on behalf of all others similarly situated*<br><br>**Defendant:** Deere & Co. (d/b/a John Deere) | U.S.D.C. Northern District of Illinois (Western Division – Rockford) | No. 3:22-cv-50039 | Iain D. Johnston |
| 5. | **Plaintiff:** Trinity Dale Wells, *Individually and on behalf of all others similarly situated*<br><br>**Defendant:** Deere & Co. (d/b/a John Deere) | U.S.D.C. Northern District of Alabama (Huntsville) | No. 3:22-cv-00074 | Liles C. Burke |
| 4. | **Plaintiff:** David Underwood, *Individually and on behalf of all others similarly situated*<br><br>**Defendant:** Deere & Co. (d/b/a John Deere) | U.S.D.C. Eastern District of Tennessee (Winchester Division – Chattanooga) | No. 4:22-cv-00005 | Charles E. Atchley, Jr. |
| 6. | **Plaintiff:** Monty Ferrell, *Individually and on behalf of all others similarly situated*<br><br>**Defendant:** Deere & Co. (d/b/a John Deere) | U.S.D.C. Western District of Oklahoma (Oklahoma City) | No. 5:22-cv-001157- | Charles B. Goodwin |

Dated:  February 25, 2022                          Respectfully submitted,


                                                   By: */s/ John M. Majoras*

                                                   John M. Majoras
                                                   jmmajoras@jonesday.com
                                                   JONES DAY
                                                   51 Louisiana Avenue, N.W.
                                                   Washington, DC 20001
                                                   Telephone: (202) 879-3939

                                                   Tiffany Lipscomb-Jackson
                                                   tdlipscombjackson@jonesday.com
                                                   JONES DAY
                                                   325 John H. McConnell Boulevard,
                                                   Suite 600
                                                   Columbus, OH 43215-2673
                                                   Telephone:  (614) 281-3876

                                                   Corey A. Lee
                                                   calee@jonesday.com
                                                   JONES DAY
                                                   North Point
                                                   901 Lakeside Avenue
                                                   Cleveland, Ohio 44114
                                                   Telephone: (216) 586-3939

                                                   Amanda B. Maslar
                                                   amaslar@jonesday.com
                                                   JONES DAY
                                                   77 West Wacker, Suite 3500
                                                   Chicago, IL  60601.1692
                                                   Telephone:  (312) 782-3939


                                                   *Counsel for Defendant Deere & Company*

**BEFORE THE UNITED STATES JUDICIAL PANEL ON MULTIDISTRICT LITIGATION**

| | |
|---|---|
| **IN RE:  DEERE REPAIR SERVICES ANTITRUST LITIGATION** | **MDL DOCKET NO. _____** |

## <u>REASONS WHY ORAL ARGUMENT SHOULD BE HEARD</u>

Deere & Company ("Deere") respectfully submits that oral argument would aid the Panel in resolving Deere's Motion to Transfer.  *See* 28 U.S.C. § 1407; Rule of Procedure of the Judicial Panel on Multidistrict Litigation 11.1(b).  Oral argument will provide all parties with the opportunity to address any questions the Panel may have regarding the factual similarities of the pending cases, the burdens and challenges that litigating the cases separately will impose, and the appropriate transferee district.  Further, as Deere anticipates that additional cases involving similar facts or claims will continue to be filed, oral argument will allow the parties to address how those cases impact whether and where to consolidate the pending cases.

Dated:  February 25, 2022

Respectfully submitted,

By: */s/ John M. Majoras*

John M. Majoras
jmmajoras@jonesday.com
JONES DAY
51 Louisiana Avenue, N.W.
Washington, DC 20001
Telephone: (202) 879-3939

Tiffany Lipscomb-Jackson
tdlipscombjackson@jonesday.com
JONES DAY
325 John H. McConnell Boulevard,
Suite 600
Columbus, OH 43215-2673
Telephone:  (614) 281-3876

Corey A. Lee
calee@jonesday.com
JONES DAY
North Point
901 Lakeside Avenue
Cleveland, Ohio 44114
Telephone: (216) 586-3939

Amanda B. Maslar
amaslar@jonesday.com
JONES DAY
77 West Wacker, Suite 3500
Chicago, IL  60601.1692
Telephone:  (312) 782-3939

*Counsel for Defendant Deere & Company*

# BEFORE THE UNITED STATES JUDICIAL PANEL ON MULTIDISTRICT LITIGATION

| | |
|---|---|
| IN RE:  DEERE REPAIR SERVICES ANTITRUST LITIGATION | MDL DOCKET NO. _____ |

## **PROOF OF SERVICE**

In compliance with Rule 4.1(a) of the Rules of Procedure for the United States Judicial Panel on Multidistrict Litigation, I hereby certify that on February 25, 2022 I caused to be electronically filed the following with the Clerk of the Court using the Judicial Panel on Multidistrict Litigation's CM/ECF system:

1) Deere & Company's Motion to Transfer Related Cases for Consolidated Pretrial Proceedings Pursuant to 28 U.S.C. § 1407;

2) Brief in Support of Deere & Company's Motion to Transfer Related Cases for Consolidated Pretrial Proceedings Pursuant to 28 U.S.C. § 1407;

3) Schedule of Actions, including docket sheets and complaints for all related actions; and

4) Oral Argument Statement.

I further certify that copies of the foregoing were served on all counsel and on the Clerk of the Court of each proposed transferor court, by email or First Class Mail, as follows:

| COURT CLERKS | |
|---|---|
| Clerk, Northern District of Illinois<br>Eastern Division, Chicago<br>Dirksen U.S. Courthouse<br>219 S. Dearborn Street<br>Chicago, IL 60604 | Clerk, Northern District of Illinois<br>Western Division, Rockford<br>Roszkowski U.S. Courthouse<br>327 S. Church Street<br>Rockford, IL 61101 |
| Clerk, Northern District of Alabama<br>United States District Court<br>101 Holmes Avenue<br>Huntsville, AL 35801 | Clerk, Eastern District of Tennessee<br>Winchester Division, Chattanooga Divisional Office<br>Joel W. Solomon Federal Building<br>900 Georgia Avenue<br>Chattanooga, Tennessee 37402 |
| Clerk, Western District of Oklahoma<br>William J. Holloway, Jr. U.S. Courthouse<br>200 NW 4th Street<br>Oklahoma City, OK 73102 | |

| COUNSEL/PARTIES | |
|---|---|
| *Forest River Farms v. Deere & Co.,* No. 1:22-cv-00188 (N.D. Ill.) | |
| Kenneth A. Wexler<br>Justin N. Boley<br>Tyler J. Story<br>Wexler Boley & Elgersma LLP<br>55 West Monroe Street, Suite 3300<br>Chicago, IL 60603<br>312-346-2222<br>Email: kaw@wbe-llp.com<br>Email: jnb@wbe-llp.com<br>Email: tjs@wbe-llp.com<br><br>**Counsel for Plaintiff** | Daniel E. Gustafson<br>Daniel C. Hedlund<br>Michelle J. Looby<br>Kaitlyn L. Dennis<br>Gustafson Gluek PLLC<br>120 South Sixth Street #2600<br>Minneapolis, MN 55402<br>612-333-8844<br>Email: dgustafson@gustafsongluek.com<br>Email: dhedlund@gustafsongluek.com<br>Email: mlooby@gustafsongluek.com<br>Email: kdennis@gustafsongluek.com<br><br>**Counsel for Plaintiff** |
| Adam J. Zapala<br>Elizabeth T. Castillo<br>James G. Dallal<br>Reid W. Gaa<br>Cotchett, Pitre & McCarthy LLP<br>840 Malcolm Road Burlingame, CA 94010<br>650-697-6000<br>Email: azapala@cpmlegal.com<br>Email: ecastillo@cpmlegal.com<br>Email: jdallal@cpmlegal.com<br>Email: rgaa@cpmlegal.com<br><br>**Counsel for Plaintiff** | |

| *Plum Ridge Farms v. Deere & Co.*, No. 3:22-cv-50039 (N.D. Ill.) | |
|---|---|
| Robert M. Foote<br>Kathleen C. Chavez<br>Matthew J. Herman<br>Elizabeth C. Chavez<br>Bret K. Pufahl<br>Foote, Mielke, Chavez & O'Neil LLC<br>10 W. State Street, Suite 200<br>Geneva, IL 60134<br>630-232-7450<br>Email: rmf@fmcolaw.com<br>Email: kcc@fmcolaw.com<br>Email: mjh@fmcolaw.com<br>ecc@fmcolaw.com<br>bkp@fmcolaw.com<br><br>**Counsel for Plaintiff** | Marc C. Gravino (6188531)<br>John J. Holevas (6193167)<br>WilliamsMcCarthy LLP<br>P.O. Box 219<br>Rockford, IL 61105<br>815-987-8936<br>Email: mgravino@wilmac.com<br>Email: jholevas@wilmac.com<br><br>**Counsel for Plaintiff** |
| *Brown v. Deere & Co.*, No. 3:22-cv-50039 (N.D. Ill.) | |
| Edward A. Wallace<br>Timothy E. Jackson<br>Jessica Wieczorkiewicz<br>Wallace Miller<br>111 W Jackson Blvd. Suite 1700<br>Chicago, IL 60604<br>312-261-6193<br>Email: eaw@wallacemiller.com<br>Email: tej@wallacemiller.com<br>Email: jw@wallacemiller.com<br><br>**Counsel for Plaintiff** | Jeffrey L. Kodroff<br>John A. Macoretta<br>Spector Roseman Kodroff, P.C.<br>2001 Market Street, Suite 3420<br>Philadelphia, PA 19103<br>215-496-0300<br>Email: jkodroff@srkattorneys.com<br>Email: jmacoretta@srkattorneys.com<br><br>**Counsel for Plaintiff** |
| Joseph Lyon<br>Clint Watson<br>The Lyon Firm, LLC<br>2754 Erie Ave.<br>Cincinnati, Ohio 45208<br>513-381-2333<br>Email: jlyon@thelyonfirm.com<br><br>**Counsel for Plaintiff** | |

| *Wells v. Deere & Co.*, No. 3:22-cv-000074-LCB (N.D. Ala.) | |
|---|---|
| Eric J. Artrip<br>D. Anthony Mastando<br>Mastando & Artrip, LLC<br>301 Washington St., Suite 302<br>Huntsville, Alabama 35801<br>256-532-2222<br>Email: artrip@mastandoartrip.com<br>Email: tony@mastandoartrip.com<br><br>**Counsel for Plaintiff** | Richard P. Rouco<br>Quinn, Connor, Weaver, Davies & Rouco LLP<br>2- 20th Street North, Suite 930<br>Birmingham, Alabama 35203<br>205-870-9989<br>Email: rrouco@qcwdr.com<br><br>**Counsel for Plaintiff** |
| Joe R. Whatley<br>Tucker Brown<br>Whatley Kallas, LLC<br>2001 Park Place Suite 1000<br>Birmingham, Alabama 35203<br>205-488-1200<br>Email: jwhatley@whatleykallas.com<br>Email: tbrown@whatleykallas.com<br><br>**Counsel for Plaintiff** | |
| *Underwood v. Deere & Co.*, No. 4:22-cv-00005-CEA-SKL (E.D. Tenn.) | |
| John Whitfield (TN 33123)<br>Gregory F. Coleman (TN 14092)<br>Milberg Coleman Bryson Phillips Grossman, PLLC<br>800 S. Gay Street, Suite 1100<br>Knoxville, Tennessee 37929<br>865-247-0080<br>Email: jwhitfield@milberg.com<br>Email: gcoleman@milberg.com<br><br>**Counsel for Plaintiff** | Peggy J. Wedgworth<br>Elizabeth McKenna<br>John D. Hughes<br>Blake Hunter Yagman<br>Michael Acciavatti<br>Milberg Coleman Bryson Phillips Grossman, PLLC<br>405 E. 50th Street<br>New York, New York 10022<br>212-594-5300<br>Email: pwedgworth@milberg.com<br>Email: emckenna@milberg.com<br>Email: jhughes@milberg.com<br>Email: byagman@milberg.com<br>Email: macciavatti@milberg.com<br><br>**Counsel for Plaintiff** |

| *Ferrell v. Deere & Co.*, No. 5:22-cv-000157-G (W.D. Okla.) | |
|---|---|
| Rex A. Sharp<br>Isaac L. Diel<br>Greg M. Bentz<br>Ruth Anne French-Hodson<br>Hammons Hepner<br>Sharp Law LLP<br>4820 W. 75th Street<br>Prairie Village, KS 66208<br>913-901-0505<br>Email: rsharp@midwest-law.com<br>Email: idiel@midwest-law.com<br>Email: gbentz@midwest-law.com<br>Email: rafrenchhodson@midwest-law.com<br>Email: hhepner@midwest-law.com<br><br>**Counsel for Plaintiff** | Kyle B. Hadwiger<br>Hadwiger & Jungman, PLLC<br>120 S. Grand<br>P.O. Box 306 Cherokee, OK 73728<br>580-596-3591<br>Email: kyle@hjoklaw.com<br><br>**Counsel for Plaintiff** |
| Tim Battin<br>BoiesBattin LLP<br>4041 University Drive, 5th Floor<br>Fairfax, VA 22030<br>703-764-8700<br>Email: tbattin@straus-boies.com<br><br>**Counsel for Plaintiff** | |

Dated: February 25, 2022                    Respectfully submitted,


                                            By: */s/ John M. Majoras*

                                            John M. Majoras
                                            jmmajoras@jonesday.com
                                            JONES DAY
                                            51 Louisiana Avenue, N.W.
                                            Washington, DC 20001
                                            Telephone: (202) 879-3939

                                            Tiffany Lipscomb-Jackson
                                            tdlipscombjackson@jonesday.com
                                            JONES DAY
                                            325 John H. McConnell Boulevard,
                                            Suite 600
                                            Columbus, OH 43215-2673
                                            Telephone:  (614) 281-3876

                                            Corey A. Lee
                                            calee@jonesday.com
                                            JONES DAY
                                            North Point
                                            901 Lakeside Avenue
                                            Cleveland, Ohio 44114
                                            Telephone: (216) 586-3939

                                            Amanda B. Maslar
                                            amaslar@jonesday.com
                                            JONES DAY
                                            77 West Wacker, Suite 3500
                                            Chicago, IL  60601.1692
                                            Telephone:  (312) 782-3939


                                            *Counsel for Defendant Deere & Company*

# Exhibit 1

# United States District Court
## Northern District of Illinois - CM/ECF LIVE, Ver 6.3.4 (Chicago)
## CIVIL DOCKET FOR CASE #: 1:22-cv-00188

| | |
|---|---|
| Forest River Farms v. Deere & Co. | Date Filed: 01/12/2022 |
| Assigned to: Honorable Martha M. Pacold | Jury Demand: Plaintiff |
| Cause: 15:1 Antitrust Litigation | Nature of Suit: 410 Anti-Trust |
| | Jurisdiction: Federal Question |

**Plaintiff**

**Forest River Farms**
*individually and on behalf of all others
similarly situated*

represented by **Kenneth A. Wexler**
Wexler Boley & Elgersma LLP
55 West Monroe
Suite 3300
Chicago, IL 60603
(312) 346-2222
Email: kaw@wbe-llp.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Adam John Zapala**
Cotchett, Pitre & Mccarthy
840 Malcolm Road
Burlingame, CA 94010
(650) 697-6000
Email: azapala@cpmlegal.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Elizabeth T. Castillo**
Cotchett Pitre & McCarthy LLP
840 Malcolm Road
Suite 200
Burlingame, CA 94010
(650) 697-6000
Email: ecastillo@cpmlegal.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**James Gerard Beebe Dallal**
Cotchett, Pitre & McCarthy LLP
840 Malcolm Road
Suite 200
Burlingame, CA 94010
(650) 697-6000
Email: jdallal@cpmlegal.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Justin Nicholas Boley**

Wexler Boley & Elgersma Llp
55 W. Monroe St.
Ste. 3300
Chicago, IL 60603
(312) 346-2222
Email: jnb@wbe-llp.com
*ATTORNEY TO BE NOTICED*

**Reid Wilson Wayman Gaa**
Cotchett Pitre & McCarthy LLP
840 Malcolm Road
Suite 200
Burlingame, CA 94010
(650) 697-6000
Email: rgaa@cpmlegal.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Tyler J. Story**
Wexler Boley Elgersma Llp
55 W. Monroe St.
Ste. 3300
Chicago, IL 60603
(312) 346-2222
Email: tjs@wbe-llp.com
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

| **Deere & Co.** | | | |
| doing business as | | represented by | **Amanda Balos Maslar** |
| John Deere | | | Jones Day |

**Deere & Co.**
*doing business as*
John Deere

represented by **Amanda Balos Maslar**
Jones Day
77 West Wacker
Chicago, IL 60601
(312) 269-4151
Email: amaslar@jonesday.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 01/12/2022 | 1 | COMPLAINT filed by Forest River Farms; Jury Demand. Filing fee $ 402, receipt number 0752-19048375. (Attachments: # 1 Civil Cover Sheet)(Wexler, Kenneth) (Entered: 01/12/2022) |
| 01/12/2022 | 2 | ATTORNEY Appearance for Plaintiff Forest River Farms by Kenneth A. Wexler (Wexler, Kenneth) (Entered: 01/12/2022) |
| 01/12/2022 | 3 | ATTORNEY Appearance for Plaintiff Forest River Farms by Justin Nicholas Boley (Boley, Justin) (Entered: 01/12/2022) |
| 01/12/2022 | 4 | ATTORNEY Appearance for Plaintiff Forest River Farms by Tyler J. Story (Story, Tyler) (Entered: 01/12/2022) |

| 01/12/2022 | | CASE ASSIGNED to the Honorable Martha M. Pacold. Designated as Magistrate Judge the Honorable Maria Valdez. Case assignment: Random assignment. (ey, ) (Entered: 01/12/2022) |
|---|---|---|
| 01/12/2022 | | CLERK'S NOTICE: Pursuant to Local Rule 73.1(b), a United States Magistrate Judge of this court is available to conduct all proceedings in this civil action. If all parties consent to have the currently assigned United States Magistrate Judge conduct all proceedings in this case, including trial, the entry of final judgment, and all post-trial proceedings, all parties must sign their names on the attached Consent To form. This consent form is eligible for filing only if executed by all parties. The parties can also express their consent to jurisdiction by a magistrate judge in any joint filing, including the Joint Initial Status Report or proposed Case Management Order. (ey, ) (Entered: 01/12/2022) |
| 01/13/2022 | | SUMMONS Issued as to Defendant Deere & Co. (cxr, ) (Entered: 01/13/2022) |
| 01/14/2022 | 5 | MOTION for Leave to Appear Pro Hac Vice Filing fee $ 150, receipt number 0752-19060453. (Zapala, Adam) (Entered: 01/14/2022) |
| 01/18/2022 | 6 | ORDER: Adam J. Zapala's motion for leave to appear pro hac vice on behalf of Plaintiff Forest River Farms 5 is granted. Signed by the Honorable Martha M. Pacold on 1/18/2022. Mailed notice (rp, ) (Entered: 01/18/2022) |
| 01/21/2022 | 7 | MOTION for Leave to Appear Pro Hac Vice Filing fee $ 150, receipt number 0752-19077946. (Castillo, Elizabeth) (Entered: 01/21/2022) |
| 01/21/2022 | 8 | MOTION for Leave to Appear Pro Hac Vice Filing fee $ 150, receipt number 0752-19077972. (Gaa, Reid) (Entered: 01/21/2022) |
| 01/21/2022 | 9 | SUMMONS Returned Executed by Forest River Farms as to Deere & Co. on 1/18/2022, answer due 2/8/2022. (Wexler, Kenneth) (Entered: 01/21/2022) |
| 01/24/2022 | 10 | MINUTE entry before the Honorable Martha M. Pacold: The parties are directed to file an initial joint status report by 2/15/2022. (Attachments: # 1 Initial Status Report outline) (rao, ) (Entered: 01/24/2022) |
| 01/24/2022 | 11 | ORDER: Elizabeth T. Castillo's motion for leave to appear pro hac vice on behalf of Plaintiff 7 is granted. Reid Wilson Wayman Gaa's motion for leave to appear pro hac vice on behalf of Plaintiff 8 is granted. Signed by the Honorable Martha M. Pacold on 1/24/2022. Mailed notice (rp, ) (Entered: 01/24/2022) |
| 02/03/2022 | 12 | ATTORNEY Appearance for Defendant Deere & Co. by Amanda Balos Maslar (Maslar, Amanda) (Entered: 02/03/2022) |
| 02/03/2022 | 13 | MOTION by Defendant Deere & Co. for extension of time *to Answer or Otherwise Plead (Unopposed)* (Maslar, Amanda) (Entered: 02/03/2022) |
| 02/03/2022 | 14 | NOTICE of Motion by Amanda Balos Maslar for presentment of extension of time 13 before Honorable Martha M. Pacold on 2/8/2022 at 09:30 AM. (Maslar, Amanda) (Entered: 02/03/2022) |
| 02/03/2022 | 15 | NOTIFICATION of Affiliates pursuant to Local Rule 3.2 by Deere & Co. (Maslar, Amanda) (Entered: 02/03/2022) |
| 02/04/2022 | 16 | MINUTE entry before the Honorable Martha M. Pacold: Defendant Deere & Co.'s unopposed motion for extension of time to answer or otherwise plead 13 is granted. Defendant to answer or otherwise plead to Plaintiff's complaint by 4/11/2022. The court will give the parties until 4/18/2022 to file the initial joint status report. (Attachments: # 1 Initial Status Report outline) (rao, ) (Entered: 02/04/2022) |
| 02/10/2022 | 17 | MOTION for Leave to Appear Pro Hac Vice Filing fee $ 150, receipt number 0752- |

| | | 19144206. (Dallal, James) (Entered: 02/10/2022) |
|---|---|---|
| 02/10/2022 | <u>18</u> | ORDER: James Gerard Beebe Dallal's motion for leave to appear pro hac vice on behalf of Plaintiff <u>17</u> is granted. Signed by the Honorable Martha M. Pacold on 2/10/2022. Mailed notice (jn, ) (Entered: 02/11/2022) |

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| FOREST RIVER FARMS, individually and on behalf of all others similarly situated,<br><br>                Plaintiff<br><br>v.<br><br>DEERE & CO. (d/b/a JOHN DEERE),<br><br>                Defendant. | Case No. _____<br><br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

# TABLE OF CONTENTS

I.     NATURE OF ACTION ................................................................................1

II.    JURISDICTION AND VENUE ..................................................................6

III.   PARTIES ...................................................................................................7

      A.    Plaintiff............................................................................................7

      B.    Defendant & Co-Conspirators ......................................................7

IV.   TRADE AND COMMERCE .......................................................................8

V.    RELEVANT MARKETS ...........................................................................8

VI.   FACTUAL ALLEGATIONS .....................................................................9

      A.    Technology in John Deere Tractors ............................................10

      B.    Deere's Longtime Strategy of Forced Dealership Consolidation. ...................14

      C.    Deere's Promise—and Failure— To Provide the Full Spectrum of Repair Tools. ...............................................................17

      D.    To the Extent Deere Has Made Diagnostic and Repair Tools Available, They Are Insufficient to Restore Competition to the Deere Repair Services Market.........................................................24

      E.    There Are No Legitimate Reasons to Restrict Access to Necessary Repair Tools. ...............................................................26

      F.    Deere Has Not Provided Farmers and Independent Repair Shops with the Necessary Software and Continues to Misrepresent the Issue. .......................28

      G.    Defendant's Monopolization of the Deere Repair Services Market Has Led to Artificially High Prices and Record Profits for John Deere...........................30

VII.   CLASS ACTION ALLEGATIONS ..........................................................31

VIII.  ANTITRUST INJURY .............................................................................34

IX.   CLAIMS FOR RELIEF ............................................................................35

X.    REQUEST FOR RELIEF ........................................................................46

XI.   JURY TRIAL DEMANDED ....................................................................47

Plaintiff alleges upon personal knowledge as to itself and its own actions, and upon information and belief, including the investigation of counsel as follows:

## I. NATURE OF ACTION

1. This case is about John Deere's monopolization of the repair service market for John Deere ("Deere") brand agricultural equipment with onboard central computers known as engine control units, or "ECUs." Farmers have traditionally had the ability to repair and maintain their own tractors as needed, or else have had the option to bring their tractors to an independent mechanic. However, in newer generations of its agricultural equipment, Deere has deliberately monopolized the market for repair and maintenance services of its agricultural equipment with ECUs ("Deere Repair Services") by making crucial software and repair tools inaccessible to farmers and independent repair shops. Furthermore, Deere's network of highly-consolidated independent dealerships (the "Dealerships") is not permitted through their agreements with Deere to provide farmers or repair shops with access to the same software and repair tools the Dealerships have. As a result of shutting out farmers and independent repair shops from accessing the necessary resources for repairs, Deere and the Dealerships have cornered the Deere Repair Services Market in the United States for Deere-branded agricultural equipment controlled by ECUs and have derived supracompetitive profits from the sale of repair and maintenance services.

2. This is an antitrust class action pursuant to Sections 1 and 2 of the Sherman Act (15 U.S.C. §§ 1, 2) brought by Plaintiff Forest River Farms on its own behalf and on behalf of a class of persons and entities similarly situated. Plaintiff seeks to represent those persons and entities who purchased repair services from Defendant Deere and Co. (d/b/a John Deere) and Deere-affiliated independent Dealerships and technicians in the Deere Repair Services Market for Deere agricultural equipment from January 12, 2018 to the present.

1

3.    John Deere is indisputably the biggest player in agricultural machinery markets in the United States. Deere wields significant economic power in the market for large tractors and combine tractors in North America[1] and has a larger market share than that of the next two biggest tractor makers, Case New Holland and Kubota Corp., combined.[2]

4.    Modern John Deere tractors, combines, and other agricultural equipment with ECUs (collectively referred to herein as "Tractors") have grown increasingly technologically advanced. Tractors manufactured in the last two decades now require proprietary software and associated repair tools (collectively referred to as "Software") to perform or complete many repairs. For example, an owner of a Tractor may be able to replace the transmission on their equipment, but that Tractor will not operate unless proprietary John Deere Software "approves" the newly-installed part. A farmer or mechanic may have the necessary mechanical parts, knowledge, and the skill to repair a Tractor, but without access to the Software, the repair is not recognized by the Tractor's ECU, making the repair ineffective and the Tractor still unable to function properly.

5.    Despite the use of, and access to, this Software being essential to the continued functionality of its Tractors, Deere has deliberately made this necessary Software unavailable to individual owners and independent repair shops. Instead, Deere makes the full Software available only to Deere Dealerships and technicians, who are not permitted by Deere to sell it.

---

[1] Jennifer Reibel, *Manufacturer Consolidation Reshaping the Farm Equipment Marketplace*, Farm Equipment (Aug. 29, 2018), https://www.farm-equipment.com/articles/15962-manufacturer-consolidation-reshaping-the-farm-equipment-marketplace.
[2] Peter Waldman & Lydia Mulvany, *Farmers Fight John Deere Over Who Gets to Fix an $800,000 Tractor*, Bloomberg Businessweek (Mar. 5, 2020), https://www.bloomberg.com/news/features/2020-03-05/farmers-fight-john-deere-over-who-gets-to-fix-an-800-000-tractor.

6.    Historically, farmers who owned Deere Tractors have had the option of repairing their Tractors themselves or taking them to an independent repair shop of their choosing. By making the Software, for all practical purposes, unavailable, Deere has succeeded in foreclosing competition in the multi-billion dollar Deere Repair Services Market.

7.    Deere and the Dealerships are highly motivated to prevent competition, either from independent repair shops selling Deere Repair Services, or from farmers with the knowledge and skills to perform their own repairs. Deere's business for its Repair Services is three to six times more profitable than its sales of original equipment.

8.    Deere's monopolization of the Deere Repair Services Market allows Deere and the Dealerships to charge and collect supracompetitive prices for its services every time a piece of equipment requires the Software to diagnose or complete a repair. Consequently, Plaintiff and Class members have paid millions of dollars more for the repair services than they would have paid in a competitive market.

9.    John Deere has demonstrated that it understands that farmers have a right to repair their own Tractors, while at the same time misleading the public regarding how easy it is for farmers or independent repair shops to perform repairs.

10.    After a trade group representing Deere made a highly-publicized promise in 2018 to make the necessary Software and tools available by January 2021, Deere has failed to follow through on this promise. In 2021, multiple investigative journalists attempted to determine whether the Software was available. The Dealerships' response was that they did not sell the Software, or

3

that it was only available to licensed dealers, and the Dealership was not allowed to sell it to anyone else.[3]

11.    Deere continues to exploit its relationship with customers who have purchased extremely expensive Tractors, locking customers into paying for expensive and inconvenient Repair Services from Deere and its Dealerships. Deere has created an effective tying arrangement, whereby the purchase of Deere Repair Services is tied to the initial purchase of Deere Tractors.

12.    The motive behind restricting access to the Software is simple: Deere and its Dealerships did not want their revenue stream from service and repair—a far more lucrative business than original equipment sales—to end when the equipment is purchased, as it often did in the past when owners could perform their own repairs or rely on individual repair shops.

13.    Deere's scheme to prevent independent repairs creates additional revenue for Deere over the entire useful life of every piece of equipment it sells.

14.    Deere unlawfully stifles competition by blocking independent repair shops and reducing consumer choice in what would otherwise be a robust and competitive repair aftermarket, thereby artificially increasing Deere Repair Services prices to supracompetitive levels.

15.    Deere's aggressive, forced consolidation of its Dealerships also was implemented with the intent of further limiting price competition for Deere Repair Services, even among Deere Dealerships.

16.    As a result of Deere's unlawful withholding of the necessary Software to perform repairs from farmers and independent repair shops and its forced consolidation of the Dealerships,

---

[3] Jason Koebler & Matthew Gault, *John Deere Promised Farmers It Would Make Tractors Easy to Repair. It Lied.*, Vice Motherboard (Feb. 18, 2021), https://www.vice.com/en/article/v7m8mx/john-deere-promised-farmers-it-would-make-tractors-easy-to-repair-it-lied.

Plaintiff and the Class paid artificially inflated prices for Deere Repair Services during the Class Period. Prices in the Repair Services Market exceeded the amount they would have paid if the prices had been determined by a competitive market. Plaintiff and Class members were therefore injured by Defendant's conduct.

17.     Deere's illegal monopoly of the Deere Repair Services Market should be enjoined and dismantled, and Plaintiff and the Class should be reimbursed by Deere for the amount they overpaid for Deere Repair Services.

18.     Deere violated Section 1 of the Sherman Act by forcing consolidation of its affiliated Dealerships to eliminate inter-brand competition for Repair Services. Deere also violated Section 1 of the Sherman Act through its arrangements with Co-conspirator Dealerships to not sell the Software to farmers and independent repair shops. Finally, Deere violated Section 1 of the Sherman Act through forcing Plaintiff and Class Members to purchase Deere Repair Services from Deere once they were locked in to ownership of an expensive Deere Tractor. Deere's tying arrangement between Deere Tractors and Repair Services had both the intent and effect of harming competition in the market for Deere Repair Services.

19.     Deere also violated Section 2 of the Sherman Act by monopolizing or attempting to monopolize the Deere Repair Services Market in a manner that harmed competition and injured the purchasers of such services by reducing choice and increasing prices in this market to supracompetitive levels. Deere has also leveraged its monopoly power over Deere Software to tie sales of its Tractors to sales of Deere Repair Services, in violation of Section 2 of the Sherman Act.

20. Deere has unjustly enriched itself by profiting from Plaintiffs' payment of supracompetitive prices for Deere Repair Services in violation of the antitrust laws and should be made to disgorge these profits.

21. Plaintiff seeks declaratory and injunctive relief, treble and exemplary damages, costs, and attorneys' fees. As for equitable relief, Plaintiff seeks an order requiring Deere to make the necessary Software available, at reasonable cost, to individuals and repair shops.

## II.    JURISDICTION AND VENUE

22. Plaintiff brings this action on behalf of itself and the Class under Section 16 of the Clayton Act (15 U.SC. § 26) to secure injunctive relief against Defendant for violating Sections 1 and 2 of the Sherman Act (15 U.S.C. §§ 1 and 2), and to recover actual and compensatory damage, treble damages, interest, costs and attorneys' fee for the injury caused by Defendant's conduct.

23. This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331, 1337 and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26.

24. This Court also has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(d)(2) because sufficient diversity of citizenship exists between parties in this action, the aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs, and there are 100 or more members of the proposed class.

25. Venue is appropriate in this District pursuant to Sections 4, 12, and 16 of the Clayton Act, 15 U.S.C.  28 U.S.C. §15(a), and 28 U.S.C. § 1391(b), (c) and (d) because Defendant Deere & Company transacted business in this District, is licensed to do business or is doing business in this District, and because a substantial portion of the affected interstate commerce described herein was carried out in this District.

26.     The activities of Defendant as described herein, were within the flow of, were intended to, and did have direct, substantial, and reasonably foreseeable effects on the foreign and interstate commerce of the United States.

### III.     PARTIES

#### A.   Plaintiff

27.     Plaintiff Forest River Farms is corporation located in Forest River, North Dakota. Plaintiff Forest River Farms owns five John Deere Tractors and two John Deere Combines with ECUs. During the Class Period, Plaintiff Forest River Farms purchased Deere Repair Services in North Dakota from a John Deere dealership to diagnose and repair Tractor and Combine malfunctions and suffered antitrust injury as a result of Defendant's conduct alleged herein.

#### B.   Defendant & Co-Conspirators

28.     Deere & Co. is a publicly-traded company headquartered in Moline, Illinois.

29.     "Defendant" as used herein, includes, in addition to those identified specifically above, all of the named Defendant's predecessors, including companies that merged with or were acquired by the named Defendant, as well as Defendant's wholly-owned or controlled subsidiaries, dealerships, affiliated and/or authorized technicians, and/or Co-conspirators that sold Deere Repair Services in interstate commerce, directly or through its wholly-owned or controlled affiliates, to purchasers in the United States during the Class Period.

30.      Co-conspirators include independently-owned dealerships with agreements with Deere giving them the right to sell Deere Tractors and Deere Repair Services. Based on recent data, out of the 1,544 Dealerships affiliated with Deere, 91% of these Dealerships are owned by a "Big Dealer," i.e., a dealer that owns 5 or more individual locations. Although not an exhaustive list, the largest Dealership groups are Ag-Pro Companies (75 locations in 8 states), United Ag &

Turf (53 locations in 6 states), C&B Operations (36 locations in 6 states), Papé Machinery (35 locations in 5 states); RDO Equipment (32 locations in 9 states); Brandt Holdings (32 locations in 5 states); Greenway Equipment (31 locations in 2 states); Van Wall Group (31 locations in 4 states); and Quality Equipment (28 locations in 2 states).

## IV.    TRADE AND COMMERCE

31.    During the Class Period, Defendant, directly or through its subsidiaries or affiliated Dealerships, sold Deere Repair Services in the United States in a continuous and uninterrupted flow of interstate commerce and foreign commerce, including through and into this judicial district.

32.    During the Class Period, Defendant controlled all of the market for Deere Repair Services in the United States.

33.    Defendant's business activities substantially affected interstate trade and commerce in the United States and caused antitrust injury in the United States.

## V.    RELEVANT MARKETS

34.    **Deere Repair Services Market.** The principal relevant market to evaluate Defendant's anticompetitive conduct is the Deere Repair Services Market.

35.    The Deere Repair Services Market constitutes various services and labor to repair, maintain, and clear fault codes from Deere Tractors.[4]

36.    There are no available substitutes for Deere Repair Services, and Deere Repair Services are not interchangeable with any other manufacturers' service.

37.    The relevant geographic market is the United States.

---

[4] As defined *supra*, Deere "Tractors" for purposes of this litigation include all John Deere tractors, combines, and other agricultural equipment with ECUs.

38.     Defendant Deere has market and monopoly power in the relevant market through its control over access to the Software.

39.     Any independent repair shops who desire to compete with Deere in the Deere Repair Services Market would face insurmountable barriers. Defendant's effective total control of the Software means that independent repair shops are unable to access the necessary resources to be able to meaningfully compete with Deere. Similarly, any farmers who wish to perform their own repairs and/or maintenance are also unable to access the resources necessary to do so.

40.     Independent repair shops and farmers cannot compete effectively in the Deere Repair Services Market without access to the Software.

41.     **Deere Software Market.** As discussed above, Defendant maintains market and monopoly power over the market for Deere Software.  There is no available substitute for Deere Software, and it is not interchangeable with any other manufacturers' product.

42.     **Tractor Markets.** The Deere Repair Services market and the market for Tractors are distinct. The "Tractor Markets" include the United States product markets for agricultural farm tractors, which include 2WD Farm Tractors, Compact Tractors, 4WD Farm Tractors, Row Crop Tractors, Scraper Tractors, Specialty Tractors, Utility Tractors, and Self-Propelled Combines. Defendant Deere is the largest agricultural machinery company in the world and has appreciable economic power in the U.S. Tractor Markets.

## VI.    FACTUAL ALLEGATIONS

43.     Farmers traditionally and historically have been able to perform their own repairs on their own tractors. However, as software has becoming increasingly intertwined with basic operations of farming equipment, John Deere has restricted access to the necessary tools to make

repairs, thereby cutting out owners and independent repair shops from the ability to make repairs to newer equipment.

### A. Technology in John Deere Tractors

44. Modern Deere Tractors are technologically complex machines. These Tractors run firmware that is necessary for the Tractor to perform its basic functions. Without the firmware, the product is incomplete and will not run, making the firmware as vital a part to the basic functioning of a Tractor as a steering wheel or an engine. The code that runs the internal engine and the transmission components that are required to make the Tractor do anything are effectively part of the machine. The Tractors will not operate without that code.

45. The central computer on a Tractor is the Engine Control Unit, or "ECU." The ECU determines how—and if—the Tractor functions.

46. Like cars, John Deere Tractors use a large number of sensors throughout the equipment that are constantly monitored by the ECU. When a sensor notices an error, no matter how small or serious, it can put the machine into "limp mode," allowing farmers to move the machine slowly but not operate it fully. When the problem is diagnosed and repaired, the error code is cleared and the machine can continue working.[5]

47. According to a report from a U.S. Public Interest Research Group, the John Deere S760 combine harvester has 125 different computer sensors in it. If any one of those sensors throw an error code, the combine will enter limp mode.

48. Troubleshooting Deere Tractors—e.g., interpreting the error codes—requires Software that Deere refuses to make available to farmers.

---

[5] Koebler & Gault, *supra* note 3.

10

49. Since about 2000, Deere Tractors began using what is known as "CAN bus" systems in their machinery, standing for Controller Area Network. CAN bus is essentially a central electrical system that allows communications between different parts of the machinery. Sales manuals for Deere Tractors explain that an advantage of the system "allows the technician at the dealership to plug into the system using the Service ADVISOR™ computer program. The Service ADVISOR program links up to the tractor's electrical system to read the communications between the controllers to determine where the problem is located and how it can be fixed."[6]

50. Service ADVISOR, per John Deere's own sales manual materials, is

> a tool used by John Deere **dealerships** capable of providing technical and mechanical support for technicians and service managers through the use of a laptop computer. Service ADVISOR provides symptom-based diagnostics information, specific machine information, and electronic technical information. It also offers a connection to John Deere help and solutions through an extranet connection at the workshop and in the field.
>
> Service ADVISOR is a fast diagnostic testing system for all controller area network (CAN) bus tractors. This system is the cutting edge of service technology and will save time and money by faster equipment repair.

(emphasis added).

51. Even if the farmer is able to interpret the error code and determine what the problem is with the Tractor, it doesn't matter how tech-savvy or experienced a mechanic a farmer is; without access to the necessary software tools, farmers must call the dealership to repair, or clear fault codes for, their machine.

---

[6] *See* John Deere & Co Sales Manual, Electrical, CAN bus electrical system (2017), https://www.dot.state.oh.us/Divisions/ContractAdmin/Contracts/PurchDocs/207-19/DeerComp01/6110M%20Product%20Info.pdf.

52.     Farmers report their Tractors shutting down from computer faults and having to sit
and wait for a John Deere technician to arrive while they lose valuable time, which can lead to
expensive crop losses.

53.     Farmers in general face issues related to long wait times for Deere technicians, but
black farmers reported that they face disproportionately longer wait times. The National Black
Farmers Association (NBFA) stated that after NBFA members purchased from Deere, responses
for service on its equipment are followed upon more slowly compared to calls for service from
their white counterparts.[7]

54.     Without access to the Software and other tools needed to diagnose and repair the
error, farmers must rely on Deere dealerships and technicians to travel to where the equipment is,
plug in the necessary tools, and clear the error codes.

55.     Replacing parts on a Tractor also can result in "bricking" of the machine if the
proper Software is not used. After a new part is installed on a Tractor, a program called Service
Advisor needs to be connected to the ECU to authorize the new parts. If the new part is not
"authorized" by the Software, the engine of the Tractor will not start, rendering the Tractor useless
to its owner until the owner pays a Deere technician to authorize the repair and therefore restore
operation of the Tractor.

56.     During harvest time, when Tractors, including combines, are running at full throttle
for weeks on end, it's common for mechanical issues to arise. Farmers who try to solve problems
themselves or take their Tractors to more convenient repair shops are blocked from completing the

---

[7] *Black Farmers' Boycott Against John Deere Continues, Deere has Lied for Years According to Recent Article,* National Black Farmers Association (Feb. 25, 2021),
https://www.blackfarmers.org/blog/black-farmers-boycott-against-john-deere-continues-deere-has-lied-for-years-according-to-recent-article.

repairs without the necessary Software. For example, one customer who hired an independent agricultural equipment repair shop to replace a faulty moisture meter on a combine still had to wait and pay for the dealer to come out and use Software to authorize the part.[8]

57.     As of 2021, the reported cost for Repair Services from Deere or an authorized Dealer could range from $150–$180 per hour, with additional charges for travel and parts.

58.     Regardless of a farmer's own ability and knowledge regarding how to repair the Tractor they own, without the relevant Software, an authorized John Deere technician must be called to perform many repairs.

59.     Logistically, this is a nightmare for many farmers. When a farmer calls a dealer to perform a repair, the farmer is at the mercy of the dealer's schedule and must pay whatever the cost is—including travel expenses—even if the problem could be fixed in 15 minutes with access to the Software. Farmers also may work far away from the nearest dealership or technician, leading them to have to pay substantial amounts for travel time or the cost of having their equipment hauled to a dealership.

60.     Deere has made farmers dependent on Deere for repairs. Farmers, who often have a lifetime of skills built up enabling them to fix their own equipment, are forced to sit and wait for a service technician from Deere to arrive on site and charge $150 or more per hour for labor, on top of other costs.

61.     These additional costs paid to Deere by farmers cut into an already razor-thin profit margin on crops. Farmers in the United States are currently experiencing drastically increasing operating expenses while revenue and profits from crop yields remains stagnant. For example,

---

[8] Mae Anderson, *Without 'right to repair,' businesses lose time and money*, Associated Press (Aug. 10, 2021), https://apnews.com/article/technology-business-9f84a8b72bb6dd408cb642414cd28f5d.

between 1996 and 2020, total costs for growing corn increased by 193% while yields only increased by 13.7%. In that same period, costs for growing soybeans increased by 202% while yields increased only by 12.3%.

62.     As a result, farmers have had difficulty paying their outstanding operating debts—estimated at well over $400 billion in 2019—and the rate of farm bankruptcies has accelerated, with declared farm bankruptcies increasing by 24% from 2018 to 2019, the biggest yearly increase since the Great Recession.

63.     Furthermore, given farmers' investments in Deere Tractors, which can run upwards of half a million dollars, they have no reasonable choice but to pay for Deere's Repair Services. The farmers are locked in to using Deere Tractors, as switching costs are so high and farmers expect to be able to use a Tractor for decades.

64.     While some farmers own these expensive machines outright, many farmers lease the equipment. The leaseholder is often Deere itself, which has become the fifth-largest agricultural lender in the sector.[9]

**B.    Deere's Longtime Strategy of Forced Dealership Consolidation.**

65.     In addition to being forced to purchase Repair Services from Deere, farmers in many areas are faced with limited or nonexistent choice as to which Deere Dealership to purchase Repair Services from. This lack of meaningful choice is in large part due to Deere's concerted efforts to force Dealerships to consolidate or lose their affiliation with Deere.

---

[9] Jesse Newman & Bob Tita, *America's Farmers Turn to the Bank of John Deere*, Wall Street Journal (July 18, 2017), https://www.wsj.com/articles/americas-farmers-turn-to-bank-of-john-deere-1500398960.

14

66. Starting approximately in the early 2000s (and coinciding with when ECUs were first being widely used in Deere Tractors), Deere implemented an aggressive strategy that pressured Dealerships to consolidate.

67. In a series of meetings in Louisville, Kentucky, in the summer of 2002, Deere told dealers they should plan on a future in which they would either be a buyer or a seller.[10] One former owner of a dealership in Virginia reported that in 2002 he began receiving letters, emails, and visits from Deere officials almost monthly urging him to either acquire another dealer or cash out.[11]

68. Deere's strategy worked. In 1996, the total number of Deere Dealership locations was approximately 3,400. By 2007, this number had decreased to 2,984. In 2021, only 1,544 Dealership locations remained. Only 144 of these Dealerships are not owned by "Big Dealers," i.e., Dealerships that operate five or more individual Dealership locations. Very few single-location dealerships remain.

69. In 2009, a former owner of a Deere-affiliated dealership, Roy Dufault, reported to AgWeek, a weekly agricultural newspaper, that representatives from Deere pressured him to sell his small dealership in Fosston, Minnesota. Deere told him that for the large dealers in the area to continue to grow, Dufault needed to get out of the way, as his dealership was a hindrance to their profitability.[12] Deere's representatives told Dufault that there was no need for a location in Fosston, and that another dealership could cover the trade area remotely. At the time Deere terminated its dealer agreement with Dufault, customers expressed their concern about where they would have

---

[10] Ilan Brat & Timothy Aeppel, *Why Deere Is Weeding Out Dealers Even as Farms Boom*, Wall Street Journal (Aug. 14, 2007), https://www.wsj.com/articles/SB118705668767896842.
[11] *Id.*
[12] *John Deere leaves a dealer and his customers high and dry*, AgWeek (Sept. 21, 2009), https://www.agweek.com/news/3787513-john-deere-leaves-dealer-and-his-customers-high-and-dry.

15

their Deere equipment serviced. In 2021, there is not a Deere Dealership within 20 miles of Fosston, and none within 100 miles that are not owned by a Big Dealer.

70.     In 2013, a single-location Dealership in New Hampshire, R.N. Johnson Inc., had its dealer agreement with Deere canceled after being in business 84 years. The former owner said that this action was part of Deere's corporate philosophy of "eliminat[ing] all the single-location small dealers."[13] After Deere terminated the dealership agreement, farmers were forced to rely on a Dealership 60 miles away in Massachusetts to get their Tractors serviced.

71.     Similarly, in 2021, Deere terminated the contract of Tennessee's last remaining single-store Deere Dealership, Tri-County Equipment, which had operated as a Deere Dealership since 1977. Tri-County Equipment was the only single-store Dealership in Tennessee for four years prior to Deere's termination of the agreement. Deere reportedly had specified a single potential buyer for the store, but the dealer chose to operate the store as a non-Deere dealership instead of selling the business.

72.     In the last decade, the industry-wide number of agricultural equipment stores owned by Big Dealers increased by 59%.[14] And while this large degree of consolidation among agricultural stores in general is substantial, Deere is a noticeable outlier in number of affiliated Dealerships owned by Big Dealers. In the entire industry, the total percentage of Big Dealer-owned Agricultural Equipment Stores is around 35%, whereas a full 91% of Deere's "Independent" Dealerships are owned by Big Dealers.

---

[13] Meghan Foley, *Former John Deere Dealer Closing After 84 Years*, Farm Equipment (Feb. 28. 2013), https://www.farm-equipment.com/articles/8588-former-john-deere-dealer-closing-after-84-years.
[14] Kim Schmidt, *Big Dealers Continue to Get Bigger*, Ag Equipment Intelligence (Apr. 22, 2021), https://www.agequipmentintelligence.com/articles/4798-big-dealers-continue-to-get-bigger.

73.     The staggering amount of consolidation among Deere Dealerships is the result of Deere systematically picking off small Dealerships by coercing them to sell to a larger dealer. If a single-location Dealer wants to sell the business, Deere dictates who the purchaser can be, funneling Dealership sales to preferred Big Dealers. Deere will terminate its affiliation with the Dealership altogether if the Dealership refuses to sell to the specified buyers.

74.     One farmer complained: "I can go to a JD dealer 20 miles away. Or one 40 miles away in another direction. Or one 80 miles away in a different direction. But they all have the same name. All owned by the same franchise. So, I get 10 or 15 choices all of which are exactly the same."[15]

75.     Deere's consolidation has eliminated or reduced competition among Deere Dealerships, which charge for Repair Services with little fear of a competitor undercutting their rates. This lack of competition boosts profitability for the Dealerships, and therefore also for Deere. Deere benefits not only from forcing farmers to purchase Deere Repair Services from Deere Dealerships, but also from forcing farmers to buy these Repair Services in a market that Deere has painstakingly groomed to be less competitive.

## C.  Deere's Promise—and Failure— To Provide the Full Spectrum of Repair Tools.

76.     Because of how difficult and expensive Deere had made it for farmers to repair their Tractors, a growing "right to repair" movement began to focus on farmer's rights to repair John Deere agricultural equipment.

77.     Deere has a history of fighting customers' access to the onboard technology on Deere Tractors. In 2015, Deere argued that Section 1201 of the Digital Millennium Copyright Act

---

[15] *John Deere's poor dealership decision making IMO.*, post by Diggin It, TractorByNet Forum (Aug. 18, 2018), https://www.tractorbynet.com/forums/threads/john-deeres-poor-dealership-decision-making-imo.400429/page-5.

gave it power to prevent purchasers of Deere Tractors from bypassing Technical Protection Measures ("TPMs") "for the purposes of lawful diagnosis and repair, or aftermarket personalization, modification, or other improvement." This was, according to Deere, because the owners did not actually own the software that made the Tractor run. Deere argued that the owner only "receives an implied license for the life of the vehicle to operate the vehicle."[16]

78.     When this argument proved unconvincing to the U.S. Copyright Office and bypassing TPMs on agricultural equipment for the purpose of repair was deemed to be fair use, Deere took another approach to blocking farmers from accessing Tractor Software. In 2016, Deere issued an end-user "License Agreement for John Deere Embedded Software" that forbade customers from accessing, reverse-engineering, or modifying the software running on its Tractors (the "EULA").[17] Deere states it "may terminate the license [to the embedded Tractor software] granted under this License Agreement . . . if you violate any material term of this License Agreement. . ."[18]

79.     As public awareness of and frustration with increasingly prohibitive repair restrictions grew, state lawmakers began to act. As of 2021, 27 states have introduced some form of "right to repair" legislation. A proposed bill in Minnesota would require manufacturers to "make available, on fair and reasonable terms, documentation, parts, and tools, inclusive of any updates to information or embedded software, to any independent repair provider or to the owner

---

[16] Deere & Company, *Long Comment Regarding a Proposed Exemption Under 17 U.S.C. 1201*, https://copyright.gov/1201/2015/comments-032715/class%2021/John_Deere_Class21_1201_2014.pdf (last accessed Jan. 4, 2022).
[17] *License Agreement for John Deere Embedded Software*, https://www.deere.com/assets/pdfs/common/privacy-and-data/docs/agreement_pdfs/english/2016-10-28-Embedded-Software-EULA.pdf (last accessed Jan. 4, 2022).
[18] *Id.*

of digital electronic equipment manufactured by or on behalf of, or sold by, the original equipment manufacturer for purposes of diagnosis, maintenance, or repair."[19]

80.　　In September 2018, the Equipment Dealers Association ("EDA"), a trade and lobbying group that represents John Deere and other manufacturers and often acts as Deere's mouthpiece, made a promise intended to stave off increasing pressure from customers and lawmakers to pass similar "right to repair" legislation pending around the country.[20]

81.　　The EDA committed to make repair tools, Software, and diagnostics available to the public by January 1, 2021.[21]

82.　　The EDA went so far as to put out a "Statement of Principles," laying out this promise. In a heavily-publicized ceremony and photo op, the EDA signed a "Memorandum of Understanding" with the California Farm Bureau that enshrined this statement of principles.[22]

83.　　The Far West EDA president and CEO Joani Woelfel said in a 2018 press release that the statement of principles "says a lot about the relationship between dealers and their customers."

84.　　The statement of principles reads:

---

[19] Digital Fair Repair, HF 1138, 91st Leg., 2nd Engrossment (Minn. 2020), https://www.revisor.mn.gov/bills/text.php?number=HF1138&type=bill&version=2&session=ls91&session_year=2019&session_number=0.
[20] Koebler & Gault, *supra* note 3.
[21]*Agreement Streamlines Repair of High-Tech Farm Equipment*, Far West EDA (Sept. 9, 2018), https://fweda.com/industry-news/agreement-streamlines-repair-of-high-tech-equipment (last accessed Jan. 4, 2022).
[22] Koebler & Gault, *supra* note 3.

**STATEMENT OF PRINCIPLES:**

To the extent not already available, the maintenance, diagnostic and repair information listed below will be made available to end users through authorized agricultural dealers at fair and reasonable terms, beginning with tractors and combines put into service on or after January 1, 2021. End users will also be able to purchase or lease diagnostic tools through authorized agricultural dealers. Certain information and tools may be available earlier. Agricultural dealers are committed to provide access to:

- Manuals (Operator, Parts, Service)
- Product Guides
- Product Service Demonstrations, Training, Seminars or Clinics
- Fleet Management Information
- On-Board Diagnostics via diagnostics port or wireless interface
- Electronic Field Diagnostic Service Tools and training on how to use them
- Other publications with information on service, parts, operation and safety

Using this information and these tools, which will be available for purchase, lease or subscription from dealers, farmers will be able to identify and repair numerous problems they may encounter with their equipment. FWEDA and CFBF support equipment users' ability to maintain, diagnose and repair their machinery. However, the ability to diagnose and repair does not mean the right to modify. For safety, durability, environmental and liability reasons, diagnostic and repair information and tools will not permit consumers to do the following:

- Reset an immobilizer system or security-related electronic modules,
- Reprogram any electronic processing units or engine control units,
- Change any equipment or engine settings negatively affecting emissions or safety compliance,
- Download or access the source code of any proprietary embedded software or code

85.     As journalists from the magazine Vice noted, the commitment "did not promise to actually sell repair parts, and it also contains several carve-outs that allow tractor manufacturers to continue using software locks that could prevent repair."[23]

86.     Three years later in mid-2021, farmers still struggle to get anything promised in the agreement with the EDA.

87.     Posing as a customer, Right to Repair advocate Kevin O'Reilly called 12 John Deere dealerships in six states. Of those, 11 told Mr. O'Reilly that they don't sell diagnostic software, and the last one gave him an email of someone to ask for the tools. When Mr. O'Reilly sent an email to the individual identified, he did not receive a response.[24]

88.     Similarly, journalists from Vice who attempted to assess the availability of the Software called nine dealerships in seven states and were told by representatives that the things promised by the EDA were not available. The journalists called three dealerships in California;

---

[23] Jason Koebler, *Farmer Lobbying Group Sells Out Farmers, Helps Enshrine John Deere's Tractor Repair Monopoly*, Vice Motherboard (Sept. 11, 2018), https://www.vice.com/en/article/kz5qgw/california-farm-bureau-john-deere-tractor-hacking-right-to-repair.

[24] Koebler & Gault, *supra* note 3.

two said no immediately, and a third told the journalists that the repair software and tools could not be sold to the public and required the purchaser to be a licensed dealer.[25]

89.     A spokesperson for the AEM, another manufacturers' lobbying and trade group that often represents Deere, told Vice that, "Comprehensive repair and diagnostic information is now available for the vast majority of the tractor and combine market through authorized dealers." However, the spokesperson failed to respond when Vice asked if the spokesperson could point to a single instance where this is actually the case, or a single manufacturer that explains to farmers where they can get this information or these tools.

90.     Deere has continued to insist that much of the information is readily available, despite all evidence to the contrary, while emphatically paying lip service by agreeing that farmers have the right to repair their own equipment.[26]

91.     In response to Vice's article calling out Deere for its failure to make good on its commitment, Ag Equipment Intelligence, an agriculture industry magazine, interviewed Natalie Higgins, at the time a vice president of Government Relations at the EDA, and now currently employed by Deere as Manager for State Public Affairs. Higgins blamed the evident lack of availability of the resources on a "lack of communication," saying that "I think the rush on the technical side to get the products and resources for farmers to market led us to not take the time to really contemplate how we communicate the availability to our customers."[27]

92.     This absurd explanation—that the Software and tools only *appear* unavailable because the industry was too preoccupied with rushing to make it available to ever properly

---

[25] *Id.*
[26] *Id.*
[27] *John Deere Responds to Vice Article on Right to Repair*, Ag Equipment Intelligence (Mar. 30, 2021), https://www.agequipmentintelligence.com/articles/4738-john-deere-responds-to-vice-article-on-right-to-repair (hereinafter "Ag Equipment Intelligence").

communicate with its customers or dealers—is largely in line with the confusing positions Deere has taken on the issue. Over the last few years, Deere and industry spokespeople have taken inconsistent positions, equivocating regarding what tools and Software are actually required in order to make and complete repairs on Tractors. Deere and industry representatives have stated at various times that: (1) customers can do 98 precent of repairs on Deere Tractors without access to the tools that Right to Repair advocates have pushed for;[28] (2) the repair tools have been available to farmers and independent repair shops for years;[29] and, now most recently, that (3) the repair tools are *now* available, but Deere has not prioritized adequately communicating this to the dealerships or customers.[30]

93.     If these tools were actually available to farmers and independent repair shops, then it would be simple for Deere to point to where they could be accessed and where they could be purchased. Although it cannot point to any real-world examples where this is the case, the company and its industry representatives insist that these tools are available.

---

[28] Nilay Patel, *John Deere Turned Tractors Into Computers – What's Next?,* The Verge (June 15, 2021), https://www.theverge.com/22533735/john-deere-cto-hindman-decoder-interview-right-to-repair-tractors ("The statistics are real: 98 percent of the repairs that happen on a product can be done by a customer today.").

[29] Ag Equipment Intelligence, *supra* note 27 ("for many years, John Deere has supported our customers' right to repair their equipment…[w]e've offered a broad range of diagnostic, maintenance and repair tools for farmers that are available through John Deere dealers."); *see also* Deere & Co. Position Paper (uploaded by Vice Motherboard on Feb. 14, 2017), *available at* https://www.scribd.com/document/339340098/John-Deere-letter#from_embed ("John Deere [] provides access to service information and diagnostic information for both producer customers and non-producers. The format and cost of this access is similar to those charged our authorized John Deere dealers.").

[30] Ag Equipment Intelligence, *supra* note 27 (citing David Gilmore, Senior Vice President, Sales and Marketing Regions 3 & 4 at John Deere, stating that Deere had met all the requirements laid out in the Vice Article) ("we've met all of the commitments that we made to the industry and to our customers, in terms of providing them with the tools and the software that they need to not only maintain and diagnose but also repair their machines.").

94.     As one example, David Ward, a spokesperson for Association of Equipment Manufacturers (AEM), told Vice that comprehensive repair and diagnostic equipment is now available through authorized dealers. Ward did not return emails when Vice followed up, asking for a single instance of where this is actually the case, or a single manufacturer that explains to farmers where they can get the information or the tools.

95.     On the other hand, there are plenty of examples that demonstrate how the Software remains inaccessible, even to individuals and businesses who are by all accounts highly sophisticated parties familiar with the industry.

96.     In 2020, one owner of an independent equipment mechanic shop in Nebraska reported that about half of the repairs he sees involve code faults triggered by emission-control systems. The faults render vehicles inoperable, and while the shop can replace the exhaust filters and particulate traps that might throw a Tractor's code, the dealerships would not provide the Software necessary to restart the Tractor. This forced the owner or the shop to haul the machine to a Deere dealership or pay for a Deere mechanic to make a house call with the Software.[31]

97.     The EDA blamed a "lack of communication" as the culprit for why most farmers and media think the Software and tools remain unavailable and promised that industry organizations like the EDA would "step up to bridge that communication gap" by "educating dealers… focusing on the fundamentals like putting information on our websites and using social media to promote these resources."[32] Since the Ag Equipment Intelligence article was published quoting Higgins on March 30, 2021, the EDA has yet to post on their frequently-updated Twitter page about where farmers or independent repair shops could access these resources. Instead, the

---

[31] Waldman & Mulvany, *supra* note 2.
[32] Ag Equipment Intelligence, *supra* note 27.

only Twitter post by the EDA referencing "repair" in any way since March is a July 19, 2021 tweet advertising a webinar about reasons the EDA opposes Right to Repair.[33]

98.     Around that same time, Deere issued a company statement that "John Deere supports a customer's right to safely maintain, diagnose and repair their own equipment."[34] Deere is also quoted as stating "When customers buy from John Deere, they own the equipment and can choose to personally maintain or repair the product."[35]

99.     By implying that owning a Deere Tractor does not require farmers to rely on Dealerships for repairs, Deere intentionally obscures the fact that the Software is necessary for diagnosis and completion of a large number of these repairs. Deere's misleading statements fail to provide information on the scope of repairs and maintenance that can be accomplished without the Software, preventing farmers from being able to accurately assess the overall cost of owning a Deere Tractor.

### D. To the Extent Deere Has Made Diagnostic and Repair Tools Available, They Are Insufficient to Restore Competition to the Deere Repair Services Market.

100.     Beginning sometime around June 2021, John Deere quietly created a web page on their main company site[36] for a product called Customer Service ADVISOR, with a form to "request more info" about a subscription. One dealer website describes Customer Service ADVISOR as a way for customers to access "much of the same" technical and diagnostic

---

[33] EDA (@Equip_Dealers), Twitter (July 19, 2021, 2:00 PM), https://twitter.com/Equip_Dealers/status/1417197594388975620.
[34] Tyne Morgan, *AEM, John Deere Respond to Biden's Planned Executive Order Over Right to Repair Equipment*, AgWeb Farm Journal (July 7, 2021).
[35] *Id.*
[36] Customer Service ADVISOR™, John Deere, https://www.deere.com/en/parts-and-service/manuals-and-training/customer-service-advisor/ (last accessed Jan. 4, 2022).

information used by dealership technicians.[37] However, this pared-down system explicitly does not include every feature that dealers have access to, and costs *start at* $8,500 for the first year alone.[38] If Deere charges customers the same amount per year, in six years this would amount to an extra $51,000 paid by customers who want to perform their own repairs. Over the course of the lifetime use of a Deere Tractor, the cost to maintain access to the Software necessary to individually perform repairs could amount to the total price of the Tractor itself.

101.    Furthermore, there is no indication that Deere will provide sufficient repair tools to independent repair shops or, for that matter, even to customers. The only apparent way to access materials is to place a request with an individual dealership, and there is no guarantee or timeline of when Customer Service ADVISOR is available.

102.    It is also unclear if Deere is simply calling attention to the already-existing, extremely limited capability customer version of Service ADVISOR. This barebones version allows a customer to troubleshoot codes but offers minimal functionality otherwise. A farmer or independent repair shop is not able to use the software, for example, to replace a sensor and recalibrate a Tractor. As one employee of a Deere dealership described it in 2016, the customer version is "a waste of your money."[39] The same employee also described the version of Customer Service Advisor as "similar to [Service Advisor] but they really give you only enough to help your dealer cut down on the labor if you troubleshoot it yourself. If they let you calibrate, us dealer guys wouldn't have any work".[40]

---

[37] Customer Service Advisor, United Ag & Turf,
https://www.unitedagandturf.com/service/customer-service-advisor/ (last accessed Jan. 4, 2022).
[38] *Id.*
[39] *JD Service Advisor*, The Combine Forum, post by hake2651 (Feb. 26, 2016),
https://www.thecombineforum.com/threads/jd-service-advisor.253730/.
[40] *JD Service Advisor*, The Combine Forum, post by hake2651 (Feb. 29, 2016),
https://www.thecombineforum.com/threads/jd-service-advisor.253730/.

103.    Deere continues to carefully guard access to the Software necessary to make repairs, and to the extent it has made a watered-down version of it available to its customers, it has priced it so high that the access to the Software will be an unattractive option to most customers, even in comparison to the high cost of paying Deere for Repair Services. This arrangement thus allows Deere to claim it has provided repair and diagnostic materials to its customers while posing virtually no risk to Deere's monopoly in the Deere Repair Services Market.

**E.    There Are No Legitimate Reasons to Restrict Access to Necessary Repair Tools.**

104.    In May 2021, the FTC issued a report titled "Nixing the Fix: An FTC Report to Congress on Repair Restrictions" that examined, among other things, how repair restrictions implemented by various industries increase costs and limit consumer choice, and how these restrictions might implicate federal consumer protection and antitrust laws.[41]

105.    The report synthesized knowledge gained from a July 16, 2019 workshop, as well as public comments, responses to a Request for Empirical Research and Data, and independent research.[42] The FTC concluded there was "scant evidence to support manufacturers' justifications for repair restrictions" and that access to information, manuals, spare parts, and tools, were "well-supported by comments submitted for the record and testimony provided at the Workshop."[43]

106.    The FTC received research submissions and comments from the EDA and AEM, as well as "the full spectrum of interested parties."

---

[41] Federal Trade Commission, *Nixing the Fix: An FTC report to Congress on Repair Restrictions* (May 2021), *available at* https://www.ftc.gov/system/files/documents/reports/nixing-fix-ftc-report-congress-repair-restrictions/nixing_the_fix_report_final_5521_630pm-508_002.pdf (hereinafter "FTC Report").
[42] FTC Report, p. 3.
[43] FTC Report, p. 6.

107.     More specifically, the FTC noted that restricting repairs to authorized repair networks was not automatically justified just because of the existence of possible safety concerns. The FTC noted that manufacturers provided no factual support for their statements that "authorized repair persons are more careful or that individuals or independent repair shops fail to take appropriate safety precautions."[44]

108.     Similarly, the FTC pointed out that manufacturers had failed to offer evidence that providing access to the same tools made available to authorized service providers created additional security risks. The FTC concluded "[m]anufacturers can provide others with the same parts and tools that they provide to their authorized service providers. And, by providing access to individuals and independent repair shops, manufacturers would have greater confidence in the repair activities that occur outside of their authorized networks."[45]

109.     The FTC stated that, beyond bare assertions of liability exposure and reputational harm from allowing independent repairs, manufacturers "provided no empirical evidence to support their concerns about reputational harm or potential liability resulting from faulty third party repairs."[46] The report further noted that manufacturers' arguments regarding the "superior service" were anecdotal, whereas there was evidence that consumers were generally satisfied with repairs made by independent repair shops. The FTC concluded that "[t]he record does not establish that repairs conducted by independent repair shops would be inferior to those conducted by authorized repair shops if independent repair shops were provided with greater access to service manuals, diagnostic software and tools, and replacement parts as appropriate."[47]

---

[44] FTC Report, p. 28.
[45] FTC Report, p. 31.
[46] FTC Report, p. 33.
[47] FTC Report, p. 38.

110.    There is no defensible basis for Deere to withhold the full spectrum of Dealer-level Software that a farmer or independent repair shop would need to diagnose or perform repairs. In fact, the automotive industry is an example of manufacturers agreeing to do just that. Industrywide, vehicle owners and independent repair shops have had access to Dealer-level diagnostic and repair tools from the manufacturers for nearly eight years. In 2014, the automotive industry through representative trade organizations voluntarily agreed to

> make available for purchase by owners of motor vehicles manufactured by such manufacturer and by independent repair facilities **the same diagnostic and repair information**, including repair technical updates, **that such manufacturer makes available to its dealers** through the manufacturer's internet-based diagnostic and repair information system or other electronically accessible manufacturer's repair information system. All content in any such manufacturer's repair information system shall be **made available to owners and to independent facilities in the same form and manner and to the same extent as is made available to dealers** utilizing such diagnostic and repair information system for purchase by owners and independent repair facilities on a daily, monthly, and yearly subscription basis and upon fair and reasonable terms.[48]

**F.    Deere Has Not Provided Farmers and Independent Repair Shops with the Necessary Software and Continues to Misrepresent the Issue.**

111.    To the extent that Deere has made limited repair information and tools available, it has been insufficient to give farmers and independent repair shops the same opportunity to repair their Tractors and to open the Deere Repair Services Market to true competition.

112.    Deere must provide access to the same tools that the dealers have to both farmers and independent repair shops.

113.    Deere has also resisted making the Software and tools available to farmers and independent repair shops under the auspices of "ensur[ing] continued compliance with emissions,

---

[48] Memorandum of Understanding, Automotive Aftermarket Industry Association, Coalition for Auto Repair Equality, Alliance of Automobile Manufacturers, and Association of Global Automakers (Jan. 15, 2014) (emphasis added), https://www.autocare.org/docs/default-source/government-affairs/r2r-mou-and-agreement-signed.pdf.

operator safety and other regulatory requirements."[49] Deere's claims that providing access to Software and repair tools would allow farmers to bypass emissions and safety controls misrepresents what farmers are asking for.

114.    There is a clear difference between resetting an error code and ignoring or overriding safety codes. Overriding emissions or safety controls requires a different set of modification tools, which are *not* the tools used for diagnosis and repair. The FTC pointed out that data submitted by the EDA ostensibly showing that modifications of agricultural equipment affected emissions was inapposite, "because [the data] concerns modifications to equipment as opposed to repairs."[50] The FTC also noted conversations with AEM and EDA representatives confirmed the limitations of the submitted studies.[51]

115.    In order to override emission controls on a Tractor, the entire operating system on the machine would have to be erased and then replaced with new, modified software that either does not have emissions and safety controls or allows a farmer to ignore them.[52] This is an illegal practice separate from the issue of access to Software and is not what is being requested in this litigation.

116.    Deere and industry groups have latched onto this talking point—conflating "repair" and "modification"—in their successful attempt to foreclose others from the market and thereby maintain Deere's monopoly in the Deere Repair Services Market.

---

[49] Deere & Co Position Letter on Kansas HB 2122: Digital Electronic Repair Requirements, *available at* https://www.vice.com/en/article/mgxayp/source-apple-will-fight-right-to-repair-legislation.
[50] FTC Report, p. 38.
[51] FTC Report, p. 38, n. 205.
[52] Kevin O'Reilly, U.S. PIRG, *Deere in the Headlights: How software that farmers can't access has become necessary to tractor repair* (Feb. 2021), https://uspirg.org/feature/usp/deere-headlights.

**G. Defendant's Monopolization of the Deere Repair Services Market Has Led to Artificially High Prices and Record Profits for John Deere.**

117.    Deere has an obvious motive for restricting access to the Software and maintaining its unlawful tying arrangement and monopoly and attempted monopoly in the Deere Repair Services Market: money. For Deere and its Dealerships, parts and services are three to six times more profitable than sales of the original equipment, and the repair segment of Deere's business has also been growing faster than original equipment sales. From 2013 to 2019, Deere's annual parts sales went up 22%, while the company's total agricultural equipment sales went down 19% in this same period.[53]

118.    During this period where Deere's Tractors with ECUs reached greater market penetration and as Deere systematically eliminated small Dealerships that were creating competition and undercutting profits for Deere's Big Dealers, the company's income skyrocketed. In 2000, Deere's net income was around a half billion dollars. Deere's projected 2021 net income is $5.7B, over 11 times its income from 2000, and over twice its net income of $2.75B in 2020. Although Deere does not break down the income received from the Dealerships' sales of Repair Services in its company filings, sales of "parts and maintenance services" are reported to account for a fifth of Deere's sales.[54] In the last several years, the reported profit margins not associates with direct sales increased dramatically, and the company stated to investors in 2020 that it was betting on its parts and maintenance services business to contribute 50 basis points in added profits over the next two years.[55]

---

[53] Waldman & Mulvany, *supra* note 2.

[54] Rajesh Kumar Singh, *Deere bets on cost cuts, services push to boost profits*, Reuters (Jan. 8. 2020), https://www.reuters.com/article/us-deere-strategy/deere-bets-on-cost-cuts-services-push-to-boost-profits-idUSKBN1Z72TA.

[55] *Id.*

119.    Without access to the Software to perform repairs and clear fault codes, owners of Deere Tractors have been forced to give Deere and its Dealerships more money for Deere Repair Services that the farmers would have expended had they performed the repairs themselves or hired less expensive, and often more convenient, independent repair shops to perform. One farmer reported that he purchased a new Tractor for $300,000 and spent nearly $8000 into clearing fault codes over the course of a few years.[56]

120.    The money that farmers sink into paying Deere to clear fault codes and approve repairs that they could have performed themselves cut into an already thin profit margin.

## VII.    CLASS ACTION ALLEGATIONS

121.    Plaintiff brings this action on behalf of itself, and as a class action under the Federal Rules of Civil Procedure, Rule 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedures, seeking damages and equitable and injunctive relief on behalf of the following class (the "Class"):

> All persons and entities residing in the United States who, during the Class Period of January 12, 2018 to the present, purchased Deere Repair Services for Deere Tractors from Defendant or Deere's authorized Dealers and/or technicians.

122.    Specifically excluded from the Class are Deere and its employees, affiliates, subsidiaries, and joint venturers, whether or not named in this Complaint.

123.    **Class Identity**. The above-defined Class is readily identifiable and is one for which records should exist.

124.    **Numerosity**. Plaintiff does not know the exact number of class members because such information presently is in the exclusive control of Defendant. Plaintiff believes that due to the nature of the trade and commerce involved, there are thousands of class members

---

[56] *Id.*

geographically dispersed throughout the United States, such that joinder of all class members is impracticable.

125. **Typicality**. Plaintiff's claims are typical of the claims of the members of the Class because Plaintiff purchased Deere Repair Services from Defendant, and therefore Plaintiff's claims arise from the same common course of conduct giving rise to the claims of the Class and the relief sought is common to the Class.

126. **Common Questions Predominate**. There are questions of law and fact common to the Class, including, but not limited to:

A. Whether the United States Deere Repair Services Market constitutes a Relevant Market;

B. Whether Deere possesses market power in this Relevant Market;

C. Whether Deere colluded with Co-conspirator Dealerships to suppress competition for Deere Repair Services between Deere Dealerships in violation of Section 1 of the Sherman Act;

D. Whether Deere colluded with Co-conspirator Dealerships to prevent farmers and independent repair shops from having access to the Software in violation of Section 1 of the Sherman Act;

E. Whether Deere illegally tied the sale of Deere Repair Services to Deere Tractors in violation of Section 1 of the Sherman Act;

F. Whether Deere monopolized or attempted to monopolize the Deere Repair Services Market in the United States in violation of Section 2 of the Sherman Act;

G. Whether Deere engaged in monopoly leveraging by using its monopoly power in the Deere Software Market to gain or attempt to gain or maintain monopoly power in the Deere Repair Services Market in violation of Section 2 of the Sherman Act;

H. Whether Deere unjustly enriched itself to the detriment of the Plaintiff and the Class, thereby entitling Plaintiff and the Class to disgorgement of all benefits derived by Deere;

I. Whether the conduct of Defendant, as alleged in this Complaint, caused injury to the business or property of the Plaintiff and the other members of the Class;

J. The effect of Defendant's alleged monopolization or attempted monopolization on the prices of Deere Repair Services sold in the United States during the Class Period;

K. Whether Plaintiff and other members of the Class are entitled to, among other things, injunctive relief and if so, the nature and extent of such injunctive relief; and

L. The appropriate class-wide measure of damages.

These and other questions of law or fact, which are common to the members of the Class, predominate over any questions affecting only individual members of the Class.

127. **Adequacy**. Plaintiff will fairly and adequately protect the interests of the Class in that Plaintiff's interests are aligned with, and not antagonistic to, those of the other members of the Class who purchased Deere Repair Services from Defendant and Plaintiff has retained counsel competent and experienced in the prosecution of class actions and antitrust litigation to represent themselves and the Class.

128. **Superiority**. A class action is superior to other available methods for the fair and efficient adjudication of this controversy since individual joinder of all damaged members of the Class is impractical. Prosecution as a class action will eliminate the possibility of duplicative litigation. The relatively small damages suffered by individual members of the Class compared to the expense and burden of individual prosecution of the claims asserted in this litigation means that, absent a class action, it would not be feasible for members of the Class to seek redress for the violations of law herein alleged. Further, individual litigation presents the potential for inconsistent or contradictory judgments and would greatly magnify the delay and expense to all parties and to the court system. Therefore, a class action presents far fewer case management difficulties and will provide the benefits of unitary adjudication, economy of scale and comprehensive supervision by a single court.

129. The prosecution of separate actions by individual members of the Class would create the risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendant.

130.    Plaintiff brings this case on behalf of the Class and all persons and entities similarly situated pursuant to Rule 23, on behalf of all persons and entities that purchased Deere Repair Services that Defendant provided during the Class Period.

131.    Defendant has acted on grounds generally applicable to the Class, thereby making final injunctive relief appropriate with respect to the Class as a whole.

## VIII.    ANTITRUST INJURY

132.    Defendant's anticompetitive conduct had the following effects, among others:

A.  Price competition has been restrained or eliminated with respect to Deere Repair Services;

B.  The prices of Deere Repair Services have been fixed, raised, stabilized, or maintained at artificially inflated levels;

C.  Purchasers of Deere Repair Services have been deprived of free and open competition; and

D.  Purchasers of Deere Repair Services, including Plaintiff, paid artificially inflated prices.

133.    The purpose of Deere's conduct was to exclude competition and raise, fix, or maintain the price of Deere Repair Services. As a direct and foreseeable result, Plaintiff and the Class paid supracompetitive prices for Deere Repair Services during the Class Period.

134.    By reason of the alleged violations of the antitrust laws, Plaintiff and the Class have sustained injury to their businesses or property, having paid higher prices for Deere Repair Services than they would have paid in the absence of Deere's illegal conduct, and as a result have suffered damages.

135.    This is an antitrust injury of the type that the antitrust laws were meant to punish and prevent.

## IX.   CLAIMS FOR RELIEF

### COUNT ONE
### Violation of Section 1 of the Sherman Act
### Conspiracy in Restraint of Trade
### 15 U.S.C. § 1

136.    Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

137.    Beginning in or around 2000, Defendant entered into and engaged in unlawful contracts, combinations in the form of trust or otherwise, and/or conspiracies in restraint of trade and commerce with Co-conspirator Dealerships in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

138.    Defendant engaged in predatory and anticompetitive behavior by restricting competition among its affiliated Dealerships, which unfairly suppressed price competition for Deere Repair Services and unreasonably restrained trade.

139.    Defendant's conduct included concerted efforts, actions and undertakings among Defendant and the Co-conspirator Dealerships with the intent, purpose, and effect of artificially suppressing competition from smaller dealerships.

140.    Defendant perpetrated the scheme with the specific intent of reducing competition in the Deere Repair Services market to the benefit of Defendant and the Co-conspirator Dealerships.

141.    Defendant's conduct in furtherance of its contracts, combinations and/or conspiracies were authorized, ordered, or done by its respective officers, directors, agents, employees, or representatives while actively engaging in the management of Defendant's affairs.

142.    Plaintiff and Class Members paid higher rates for Deere Repair Services from Deere and its Co-Conspirator Dealerships than they otherwise would have in the absence of

Defendant's unlawful conduct, and, as a result, have been injured in their property and have suffered damages in an amount according to proof at trial.

143.    Defendant's contracts, combinations, and/or conspiracies are per se violations of Section 1 of the Sherman Act.

144.    In the alternative, Defendant is liable under a "quick look" analysis where an observer with a rudimentary understanding of economics could conclude that the arrangements in question would have an anticompetitive effect on customers and markets.

145.    Defendant's contracts, combinations, and/or conspiracies have had a substantial effect on interstate commerce.

146.    As a direct and proximate result of Defendant's contract, combination, and/or conspiracy to restrain trade and commerce, Plaintiff and Class Members have suffered injury to their business or property and will continue to suffer economic injury and deprivation of the benefit of free and fair competition.

## COUNT TWO
## Violation of Section 1 of the Sherman Act
## Group Boycott
## 15 U.S.C. § 1

147.    Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

148.    Beginning approximately in 2000 and continuing thereafter to the present, Defendant, by and through its officers, directors, employees, agents, or other representatives, have explicitly or implicitly colluded with Co-conspirator Dealerships to jointly boycott entities that would have introduced price-reducing sales of Deere Repair Services in the United States, in order to artificially raise, fix, maintain, and/or stabilize prices in the Deere Repair Services market, in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

36

149.     Defendant's and the Co-conspirator Dealerships' refusal to sell Software and repair tools to individual farmers and independent repair shops constitutes a per se violation of Section One of the Sherman Act.

150.     Defendant's and the Co-conspirator Dealerships' boycott cut off access to the Software, a necessary resource that would enable farmers and independent repair shops to compete in the Deere Repair Services market.

151.     Together, Defendant and the Co-conspirator Dealerships wholly control the market for Deere Repair Services.

152.     No plausible pro-competitive arguments exist for Defendant's and the Co-conspirator Dealerships' refusal to sell the Software to farmer or independent repair shops.

153.     As a direct and proximate result of Defendant's contract, combination, and/or conspiracy to restrain trade and commerce, Plaintiff and Class Members have suffered injury to their business or property and will continue to suffer economic injury and deprivation of the benefit of free and fair competition.

## COUNT THREE
### Violation of Section 1 of the Sherman Act
### Unlawful Tying Arrangement
### 15 U.S.C. § 1

154.     Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

155.     This cause of action is brough under Section 1 of the Sherman Act, 15 U.S.C. § 1.

156.     A tying arrangement exists when a seller exploits power over one product (the tying product) to force the buyer to accept a second product (the tied product). *Batson v. Live Nation Entm't*, 746 F.3d 827, 832 (7th Cir. 2014). Such an arrangement violates Section 1 of the Sherman

Act if the seller has appreciable economic power in the tying product market and the arrangement affects a substantial volume of commerce in the tied market. *Eastman Kodak Co. v. Image Tech. Servs. Inc.*, 504 U.S. 451, 462 (1992).

157.   Deere Tractors and Deere Repair Services are distinct and separate products and services.

158.   Plaintiff and Class members through their purchase of Deere Tractors were coerced into purchasing a second tied product, Deere Repair Services, from Defendant and its Co-Conspirator Dealerships.

159.   Defendant's aggressive consolidation of its affiliated Co-conspirator Dealerships also materially changed the dynamics of the Deere Repair Services Market, drastically reducing the pressure of pricing competition even among the Dealerships.

160.   Furthermore, Defendant represented to Plaintiffs and the Class that most necessary repair tools were available and that almost all repairs could be done on the Tractors without the Software. These misleading statements meant that Plaintiff and the Class could not, from Deere's representations, engage in accurate lifecycle pricing for Deere Tractors before they were locked into purchasing Deere Repair Services from Defendant and the Dealerships.

161.   As set out above, Defendant has appreciable economic power in the relevant Tractor Markets, i.e., the "tying" markets.

162.   This tying arrangement affected a substantial amount of interstate commerce.

163.   Defendant's conduct amounts to a per se tying violation, as Defendant has significant power in the tying markets which has led to a significant and actual impact on competition in the Deere Repair Services market.

164.   Alternatively, Defendant's conduct is illegal tying under the rule of reason, as

Defendant's actions to coerce farmers to purchase Deere Repair Services from Defendant is an unreasonable restraint on competition in the market for Deere Repair Services.

165.    There are no legitimate business justifications for Defendant's illegal tying arrangement.

166.    Defendant has a substantial economic interest in sales of Deere Repair Services.

### COUNT FOUR
### Violation of Section 2 of the Sherman Act
### Monopolization
### 15 U.S.C. § 2

167.    Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

168.    This cause of action is brough under Section 2 of the Sherman Act, 15 U.S.C. § 2, which prohibits "monopoliz[ation of] any part of the trade or commerce among the several states, or with foreign nations."

169.    Deere has monopoly power in the Deere Repair Services Market, including the power to control prices and exclude competition.

170.    Deere has willfully and intentionally engaged in anticompetitive conduct in order to unlawfully maintain its monopoly in this market, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

171.    Deere has unreasonably restrained, and further threatens to unreasonably restrain competition in the Deere Repair Services Market by:

    (a) restricting the availability of the Software necessary to perform diagnostics and repairs for Deere Tractors;

    (b) knowingly misrepresenting the availability and necessity of the Software necessary for diagnostics and repairs for Deere Tractors;

    (c) tying the purchase of Repair Services through Deere to the purchase of Deere Tractors; and

(d) limiting farmers' rights over their own Tractors through the terms of the 2016 EULA with the aim of restricting farmers' ability to choose to perform Deere Repair Services themselves or take their Tractor to an independent repair shop.

172.    While some of these anticompetitive acts themselves constitute an individual antitrust violation on a stand-alone basis, together they support a broader monopolization claim.

173.    As a direct and proximate result of Deere's anticompetitive and monopolistic conduct, Plaintiff and the Class have been damaged by, among other things: (i) the payment of supracompetitive prices for Deere Repair Services; and (ii) the lack of availability of independent Deere Repair Services and self-repair options.

## COUNT FIVE
### Violation of Section 2 of the Sherman Act
### Monopoly Leveraging
### 15 U.S.C. § 2

174.    Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

175.    As detailed above, Deere has monopoly power over Deere Software.

176.    Deere has willfully and intentionally used its monopoly power over Deere Software to gain or attempt to gain or maintain monopoly power in the Deere Repair Services Market, specifically, by tying purchases of Deere Tractors to Deere-provided Repair Services through deliberate restriction of access to the full spectrum of Software necessary to run diagnostics, approve repairs, and perform maintenance. Deere's actions cannot be justified on the basis of any legitimate consumer benefit.

177.    Furthermore, Deere also leveraged its monopoly power over Deere Software to effectuate the 2016 EULA, limiting farmers' ownership rights over their own Tractors and forcing farmers to purchase Deere-provided Repair Services. The EULA impermissibly restricts farmers' ability to perform Deere Repair Services themselves by prohibiting attempts to reverse engineer,

adapt, or otherwise circumvent the Software. Deere threatens that it may terminate the license to the Software—and therefore access to a functional Tractor—if a farmer interacts with the Software in a way that Deere deems to be a violation of the EULA.

178. Deere willfully has acquired or maintained monopoly power by the exclusionary conduct detailed above, rather than through legitimate business acumen, skill, efficiency, or legitimate innovation.

179. As a direct and proximate result of Deere's anticompetitive and monopolistic conduct, Plaintiff and the Class have been damaged by, among other things, (i) the payment of supracompetitive prices for Deere Repair Services; and (ii) the lack of availability of independent Deere Repair Services and self-repair options.

## COUNT SIX
### Violation of Section 2 of the Sherman Act
### Attempted Monopolization in the Alternative
### 15 U.S.C. § 2

180. Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

181. As detailed above, Deere has monopoly power, or at a minimum, a dangerous probability of success in acquiring monopoly power, in the Deere Repair Services Market, including the power to control prices and exclude competition.

182. Deere has willfully, knowingly, and with specific intent to do so, attempted to monopolize the Repair Services Markets, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

183. Deere's anticompetitive conduct alleged herein has been directed at accomplishing the unlawful objective of controlling prices and/or preventing competition in the Repair Services

Market. Deere's ongoing anticompetitive conduct presents a dangerous probability that Deere will succeed, to the extent it has not already, in its attempt to monopolize the Repair Service Market.

184.    As a direct and proximate result of Deere's anticompetitive and monopolistic conduct, Plaintiff and the Class have been damaged by, among other things, (i) the payment of supracompetitive prices for Deere Repair Services; and (ii) the lack of availability of independent Deere Repair Services and self-repair options.

## COUNT SEVEN
### Violation of Section 2 of the Sherman Act
### Conspiracy to Monopolize
### 15 U.S.C. § 2

185.    Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

186.    Beginning approximately in 2000 and continuing thereafter to the present, Defendant, by and through its officers, directors, employees, agents, or other representatives, have explicitly or implicitly conspired with Co-conspirator Dealerships to jointly boycott entities that would have introduced price-reducing sales of Deere Repair Services in the United States, in order to acquire monopoly power in the Deere Repair Services market, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

187.    Defendant's and the Co-conspirator Dealerships' boycott cut off access to the Software, a necessary resource that would enable farmers and independent repair shops to compete in the Deere Repair Services market.

188.    Deere and the Dealerships have willfully, knowingly, and with specific intent to do so, conspired to monopolize the Repair Services Markets, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

189.     No plausible pro-competitive arguments exist for Defendant's and the Co-conspirator Dealerships' refusal to sell the Software to farmer or independent repair shops.

190.     As a direct and proximate result of Deere and the Dealerships' conspiracy to restrain trade and commerce, Plaintiff and Class Members have suffered injury to their business or property and will continue to suffer economic injury and deprivation of the benefit of free and fair competition.

## COUNT EIGHT
### Violation of Sections 1 and 2 of the Sherman Act
### Declaratory and Injunctive Relief
### 15 U.S.C. §§ 1, 2

191.     Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

192.     Plaintiff seeks declaratory and injunctive relief under the federal antitrust laws.

193.     Plaintiff's allegations described herein constitute violations of Sections 1 and 2 of the Sherman Act.

194.     Deere effectuated an illegal tying arrangement and a scheme to restrain trade and monopolize a market.

195.     There is, and was, no legitimate, non-pretextual, pro-competitive business justification for Deere's conduct that outweighs its harmful effect.

196.     As a direct and proximate result of Deere's illegal tying arrangement and anticompetitive scheme, as alleged herein, Plaintiff and the Class were harmed.

197.     The goal, purpose, and/or effect of the tying arrangement and anticompetitive scheme was to prevent competition or self-repair in order to continue charging supracompetitive prices for Repair Services.

198.     Plaintiff and the Class have been injured in their business or property by reason of Deere's antitrust violations as alleged in this Complaint. Their injury consists of paying higher prices for Repair Services than they would have paid in the absence of those violations. These injuries will continue unless halted.

199.     Plaintiff and the Class, pursuant to Fed. R. Civ. P. 57 and 28 U.S.C. § 2201(a), hereby seek a declaratory judgment that Deere's conduct constitutes a violation of Sections 1 and 2 of the Sherman Act.

200.     Plaintiff and the Class further seek equitable and injunctive relief pursuant to § 16 of the Clayton Act, 15 U.S.C. § 26, and other applicable law, to correct the anticompetitive effects caused by Deere's unlawful conduct.

## COUNT NINE
### Promissory Estoppel

201.     Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

202.     Defendant made unambiguous promises through statements to Plaintiff and the Class that Deere Tractors could be repaired through software, tools, and resources made available by Deere and its Dealerships.[57]

203.     Plaintiff and the Class relied on Defendant's promise by purchasing, leasing, and continuing to use and operate Deere Tractors, and that reliance was both expected and foreseeable.

204.     Plaintiff and Class members' reliance on Defendant's promises were to their detriment. Plaintiff and the Class have paid, and continue to pay, much higher rates for Deere

---

[57] *See supra* Section VI.C.

Repair Services than they would have had Defendant fulfilled its promise to make necessary Software and resources to perform repairs available.

## COUNT TEN
## Unjust Enrichment

205.    Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

206.    Deere has benefitted from the monopoly profits on the sale of Repair Services resulting from the unlawful and inequitable acts alleged in this Complaint.

207.    Deere's financial benefit resulting from unlawful and inequitable conduct is traceable to overpayments for Repair Services by Plaintiff and the Class.

208.    Plaintiff and the Class have conferred upon Deere an economic benefit, in the nature of profits resulting from unlawful overcharges and monopoly profits, to the economic detriment of Plaintiff and the Class.

209.    The economic benefit of overcharges and unlawful monopoly profits derived by Deere through Plaintiffs' payment of supra-competitive and artificially inflated prices for Deere Repair Services is a direct and proximate result of Deere's unlawful practices.

210.    The financial benefits derived by Deere rightfully belong to Plaintiff and the Class, as Plaintiff and the Class paid anticompetitive and monopolistic prices during the Class Period, inuring to the benefit of Deere.

211.    It would be inequitable under unjust enrichment principles in the District of Columbia and each of the fifty states for Deere to be permitted to retain any of the overcharges for Repair Services derived from Deere's unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

212.     Deere is aware of and appreciated the benefits bestowed upon it by Plaintiff and the Class.

213.     Deere should be compelled to disgorge in a common fund for the benefit of Plaintiff and the Class all unlawful or inequitable proceeds it received.

214.     A constructive trust should be imposed upon all unlawful or inequitable sums received by Deere traceable to Plaintiff and the Class.

## X.     REQUEST FOR RELIEF

WHEREFORE, Plaintiff, on behalf of itself and the Class of all others so similarly situated, respectfully requests judgment against Defendant as follows:

215.     The Court determine that this action may be maintained as a class action under Rule 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, appoint Plaintiff as Class Representative and its counsel of record as Class Counsel, and direct that notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to the Class, once certified;

216.     The unlawful conduct herein be adjudged and decreed in violation of Section 1 and Section 2 of the Sherman Act.

217.     Plaintiff and the Class recover damages, to the maximum extent allowed, and that a joint and several judgment in favor of Plaintiff and the members of the Class be entered against Defendant in an amount to be trebled to the extent the laws permit;

218.     Defendant, its affiliates, successors, transferees, assignees and other officers, directors, partners, agents and employees thereof, and all other persons acting or claiming to act on their behalf or in concert with them, be permanently enjoined and restrained from in any manner continuing, maintaining or renewing the conduct alleged herein, or from engaging in other conduct

having a similar purpose or effect, and from adopting or following any practice, plan, program, or device having a similar purpose or effect;

219.    Plaintiff and the members of the Class be awarded pre- and post-judgment interest as provided by law, and that such interest be awarded at the highest legal rate from and after the date of service of this Complaint;

220.    Plaintiff and the members of the Class recover their costs of suit, including reasonable attorneys' fees, as provided by law; and

221.    Plaintiff and the members of the Class have such other and further relief as the case may require and the Court may deem just and proper.

## XI.    JURY TRIAL DEMANDED

222.    Plaintiff demands a trial by jury, pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, of all issues so triable.

Dated: January 12, 2022

/s/ Kenneth A. Wexler
Kenneth A. Wexler
Justin N. Boley
Tyler J. Story
**WEXLER BOLEY & ELGERSMA LLP**
55 West Monroe Street, Suite 3300
Chicago, IL 60603
Telephone: (312) 346-2222
kaw@wbe-llp.com
jnb@wbe-llp.com
tjs@wbe-llp.com

Daniel E. Gustafson
Daniel C. Hedlund
Michelle J. Looby
Kaitlyn L. Dennis
**GUSTAFSON GLUEK PLLC**
120 South Sixth Street #2600
Minneapolis, MN 55402
Telephone: (612) 333-8844
dgustafson@gustafsongluek.com

dhedlund@gustafsongluek.com
mlooby@gustafsongluek.com
kdennis@gustafsongluek.com

Adam J. Zapala
Elizabeth T. Castillo
James G. Dallal
Reid W. Gaa
**COTCHETT, PITRE & McCARTHY, LLP**
840 Malcolm Road Burlingame, CA 94010
Telephone: (650) 697-6000
Facsimile: (650) 697-0577
azapala@cpmlegal.com
ecastillo@cpmlegal.com
jdallal@cpmlegal.com
rgaa@cpmlegal.com

*Attorneys for Plaintiff and the Putative Class*

# Exhibit 2

# United States District Court
## Northern District of Illinois - CM/ECF LIVE, Ver 6.3.4 (Rockford)
## CIVIL DOCKET FOR CASE #: 3:22-cv-50030

| | |
|---|---|
| Plum Ridge Farms, Ltd. v. Deere & Co. | Date Filed: 02/07/2022 |
| Assigned to: Honorable Iain D. Johnston | Jury Demand: Plaintiff |
| Referred to: Honorable Lisa A. Jensen | Nature of Suit: 410 Anti-Trust |
| Demand: $5,001,000 | Jurisdiction: Federal Question |
| Cause: 15:1 Antitrust Litigation | |

**<u>Plaintiff</u>**

**Plum Ridge Farms, Ltd.**
*individually and on behalf of all others similarly situated*

represented by **Bret Koch Pufahl**
Foote, Mielke, Chavez & O'neil, Llc
10 West State Street
Suite 200
Geneva, IL 60134
(630) 232-7450
Email: bkp@fmcolaw.com
*ATTORNEY TO BE NOTICED*

**Elizabeth Christine Chavez**
Foote, Mielke, Chavez & O'neil, Llc
10 W State Street
Suite 200
Geneva, IL 60134
(630) 232-7450
Email: ecc@fmcolaw.com
*ATTORNEY TO BE NOTICED*

**John James Holevas**
WilliamsMcCarthy
120 West State Street
PO Box 219
Rockford, IL 61105-0219
(815) 987-8900
Email: jholevas@wilmac.com
*ATTORNEY TO BE NOTICED*

**Kathleen Currie Chavez**
Foote, Mielke, Chavez & O'Neil LLC
10 West State Street
Suite 200
Geneva, IL 60134
(630) 232-4480
Email: kcc@fmcolaw.com
*ATTORNEY TO BE NOTICED*

**Marc Charles Gravino**
WilliamsMcCarthy LLP
120 W. State Street

PO Box 219
Rockford, IL 61105-0219
(815) 987-8900
Email: mgravino@wilmac.com
*ATTORNEY TO BE NOTICED*

**Matthew J. Herman**
Foote, Mielke, Chavez & O'Neil LLC
10 West State Street
Suite 200
Geneva, IL 60134
(630) 232-7450
Email: mjh@fmcolaw.com
*ATTORNEY TO BE NOTICED*

**Robert M. Foote**
Foote, Mielke, Chavez & O'Neil LLC
10 West State Street
#200
Geneva, IL 60134
(630) 232-7450
Email: rmf@fmcolaw.com
*ATTORNEY TO BE NOTICED*

V.

**<u>Defendant</u>**

**Deere & Co.**
*doing business as*
John Deere

| Date Filed | # | Docket Text |
|---|---|---|
| 02/07/2022 | 1 | COMPLAINT filed by Plum Ridge Farms, Ltd.; Jury Demand. Filing fee $ 402, receipt number 0752-19129442. (Attachments: # 1 Civil Cover Sheet)(Foote, Robert) (Entered: 02/07/2022) |
| 02/07/2022 | 2 | ATTORNEY Appearance for Plaintiff Plum Ridge Farms, Ltd. by Robert M. Foote (Foote, Robert) (Entered: 02/07/2022) |
| 02/07/2022 | 3 | ATTORNEY Appearance for Plaintiff Plum Ridge Farms, Ltd. by Elizabeth Christine Chavez (Chavez, Elizabeth) (Entered: 02/07/2022) |
| 02/07/2022 | 4 | ATTORNEY Appearance for Plaintiff Plum Ridge Farms, Ltd. by Bret Koch Pufahl (Pufahl, Bret) (Entered: 02/07/2022) |
| 02/07/2022 | 5 | ATTORNEY Appearance for Plaintiff Plum Ridge Farms, Ltd. by Matthew J. Herman (Herman, Matthew) (Entered: 02/07/2022) |
| 02/07/2022 | 6 | ATTORNEY Appearance for Plaintiff Plum Ridge Farms, Ltd. by Kathleen Currie Chavez (Chavez, Kathleen) (Entered: 02/07/2022) |
| 02/07/2022 | | CASE ASSIGNED to the Honorable Iain D. Johnston and Honorable Lisa A. Jensen. Designated as Magistrate Judge the Honorable Lisa Jensen. Case assignment: Random assignment. (pg, ) (Entered: 02/07/2022) |

| 02/07/2022 | | CLERK'S NOTICE: Pursuant to Local Rule 73.1(b), a United States Magistrate Judge of this court is available to conduct all proceedings in this civil action. If all parties consent to have the currently assigned United States Magistrate Judge conduct all proceedings in this case, including trial, the entry of final judgment, and all post-trial proceedings, all parties must sign their names on the attached Consent To form. This consent form is eligible for filing only if executed by all parties. The parties can also express their consent to jurisdiction by a magistrate judge in any joint filing, including the Joint Initial Status Report or proposed Case Management Order. (pg, ) (Entered: 02/07/2022) |
|---|---|---|
| 02/07/2022 | | SUMMONS Issued as to Defendant Deere & Co. (ak, ) (Entered: 02/07/2022) |
| 02/09/2022 | 7 | MINUTE entry before the Honorable Lisa A. Jensen: The parties shall jointly complete the PDF fillable initial status report form found on Judge Jensen's webpage at www.ilnd.uscourts.gov under Initial Status Conferences and Reports and file by 4/8/2022. Plaintiff is directed to notify any party filing an appearance to the entry of this order. Mailed notice. (vk) (Entered: 02/09/2022) |
| 02/17/2022 | 8 | ATTORNEY Appearance for Plaintiff Plum Ridge Farms, Ltd. by Marc Charles Gravino (Gravino, Marc) (Entered: 02/17/2022) |
| 02/17/2022 | 9 | ATTORNEY Appearance for Plaintiff Plum Ridge Farms, Ltd. by John James Holevas (Holevas, John) (Entered: 02/17/2022) |
| 02/22/2022 | 10 | CERTIFICATE of Service by Plaintiff Plum Ridge Farms, Ltd. (Pufahl, Bret) (Entered: 02/22/2022) |

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**WESTERN DIVISION**

| | |
|---|---|
| PLUM RIDGE FARMS, LTD., individually and on behalf of all others similarly situated, | Case No. _____ |
| Plaintiff | **CLASS ACTION COMPLAINT** |
| v. | **JURY TRIAL DEMAND** |
| DEERE & CO. (d/b/a JOHN DEERE), | |
| Defendant. | |

1

# TABLE OF CONTENTS

I.      NATURE OF ACTION……………………………………………………………3

II.     JURISDICTION AND VENUE…………………………………………….…...7

III.    PARTIES………………………………………………………………………8

        A.      Plaintiff………………………………………………………………8

        B.      Defendant & Co-Conspirators………………………………………9

IV.     TRADE AND COMMERCE……………………………………………………...9

V.      RELEVANT MARKETS……………………………………………………....10

VI.     FACTUAL ALLEGATIONS…………………………………………………11

        A.      Technology in John Deere Tractors…………………………………...11

        B.      Deere's Promise – and Failure – To Provide the Full Spectrum of Repair
                Tools………………………………………………………………….....16

        C.      To the Extent Deere Has Made Diagnostic and Repair Tools Available,
                They Are Insufficient to Restore Competition to the Deere Repair Services
                Market……………………………………………………………….…..22

        D.      There Are No Legitimate Reasons to Restrict Access to Necessary Repair
                Tools………………………………………………………………….24

        E.      Deere Has Not Provided Farmers and Independent Repair Shops with
                the Necessary Software and Continues to Misrepresent the Issue………......26

        F.      Defendant's Monopolization of the Deere Repair Services Market Has
                Led to Artificially High Prices and Record Profits for John Deere………....27

VII.    CLASS ACTION ALLEGATIONS…………………………………………......29

VIII.   ANTITRUST INJURY……………………………………………….…...31

IX.     CLAIMS FOR RELIEF……………………………………………………32

X.      REQUEST FOR RELIEF……………………………………………………...41

XI.     JURY TRIAL DEMANDED…………………………………………….…...43

Plaintiff alleges upon personal knowledge as to itself and its own actions, and upon information and belief, including the investigation of counsel as follows:

## I. NATURE OF ACTION

1.        This case is about John Deere's monopolization of the repair service market for John Deere ("Deere") brand agricultural equipment with onboard central computers known as engine control units, or "ECUs." Farmers have traditionally had the ability to repair and maintain their own tractors as needed, or else have had the option to bring their tractors to an independent mechanic. However, in newer generations of its agricultural equipment, Deere has deliberately monopolized the market for repair and maintenance services of its agricultural equipment with ECUs ("Deere Repair Services") by making crucial software and repair tools inaccessible to farmers and independent repair shops. Furthermore, Deere's network of highly-consolidated independent dealerships (the "Dealerships") is not permitted through their agreements with Deere to provide farmers or repair shops with access to the same software and repair tools the Dealerships have. As a result of shutting out farmers and independent repair shops from accessing the necessary resources for repairs, Deere and the Dealerships have cornered the Deere Repair Services Market in the United States for Deere-branded agricultural equipment controlled by ECUs and have derived supracompetitive profits from the sale of repair and maintenance services.

2.        This is an antitrust class action pursuant to Sections 1 and 2 of the Sherman Act (15 U.S.C. §§ 1, 2) brought by Plaintiff Plum Ridge Farms, Ltd. on its own behalf and on behalf of a class of persons and entities similarly situated. Plaintiff seeks to represent those persons and entities who purchased repair services from Defendant Deere and Co. (d/b/a John Deere) and Deere- affiliated independent Dealerships and technicians in the Deere Repair Services Market for Deereagricultural equipment from February 7, 2018 to the present.

3.     John Deere is indisputably the biggest player in agricultural machinery markets in the United States. Deere wields significant economic power in the market for large tractors and combine tractors in North America[1] and has a larger market share than that of the next two biggest tractor makers, Case New Holland and Kubota Corp., combined.[2]

4.     Modern John Deere tractors, combines, and other agricultural equipment with ECUs (collectively referred to herein as "Tractors") have grown increasingly technologically advanced. Tractors manufactured in the last two decades now require proprietary software and associated repair tools (collectively referred to as "Software") to perform or complete many repairs. For example, an owner of a Tractor may be able to replace the transmission on their equipment, but that Tractor will not operate unless proprietary John Deere Software "approves" the newly-installed part. A farmer or mechanic may have the necessary mechanical parts, knowledge, and the skill to repair a Tractor, but without access to the Software, the repair is not recognized by the Tractor's ECU, making the repair ineffective and the Tractor still unable to function properly.

5.     Despite the use of, and access to, this Software being essential to the continued functionality of its Tractors, Deere has deliberately made this necessary Software unavailable to individual owners and independent repair shops. Instead, Deere makes the full Software available only to Deere Dealerships and technicians, who are not permitted by Deere to sell it or to provide it.

---

[1] Jennifer Reibel, *Manufacturer Consolidation Reshaping the Farm Equipment Marketplace*, Farm Equipment (Aug. 29, 2018), https://www.farm-equipment.com/articles/15962-manufacturer-consolidation-reshaping-the-farm-equipment-marketplace.
[2] Peter Waldman & Lydia Mulvany, *Farmers Fight John Deere Over Who Gets to Fix an $800,000 Tractor*, Bloomberg Businessweek (Mar. 5, 2020), https://www.bloomberg.com/news/features/2020-03-05/farmers-fight-john-deere-over-who-gets-to-fix-an-800-000-tractor.

6.      Historically, farmers who owned Deere Tractors have had the option of repairing their Tractors themselves or taking them to an independent repair shop of their choosing. By making the Software unavailable, for all practical purposes, Deere has succeeded in foreclosing competition in the multi-billion dollar Deere Repair Services Market.

7.      Deere is highly motivated to prevent competition, either from independent repair shops selling Deere Repair Services, or from farmers with the knowledge and skills to perform their own repairs. Deere's business for its Repair Services is three to six times more profitable than its sales of original equipment.

8.      Deere's monopolization of the Deere Repair Services Market allows Deere and the Dealerships to charge and collect supracompetitive prices for its services every time a piece of equipment requires the Software to diagnose or complete a repair. Consequently, Plaintiff and Class members have paid millions of dollars more for the repair services than they would have paid in a competitive market.

9.      John Deere has demonstrated that it understands that farmers have a right to repair their own Tractors, while at the same time misleading the public regarding how easy it is for farmers or independent repair shops to perform repairs.

10.     After a trade group representing Deere made a highly-publicized promise in 2018 to make the necessary Software and tools available by January 2021, Deere has failed to follow through on this promise. In 2021, multiple investigative journalists attempted to determine whether the Software was available. The Dealerships' response was that they did not sell the Software, or that it was only available to licensed dealers, and the Dealership was not allowed to sell it to anyone else.[3]

---

[3] Jason Koebler & Matthew Gault, *John Deere Promised Farmers It Would Make Tractors Easy to Repair. It Lied.*, Vice Motherboard (Feb. 18, 2021),

11.     Deere continues to exploit its relationship with customers who have purchased extremely expensive Tractors, locking customers into paying for expensive and inconvenient Repair Services from Deere and its Dealerships. Deere has created an effective tying arrangement, whereby the purchase of Deere Repair Services is tied to the initial purchase of Deere Tractors.

12.     The motive behind restricting access to the Software is simple: Deere and its Dealerships did not want their revenue stream from service and repair—a far more lucrative business than original equipment sales—to end when the equipment is purchased, as it often did in the past when owners could, and did, perform their own repairs or rely on individual repair shops.

13.     Deere's scheme to prevent independent repairs creates additional revenue for Deere over the entire useful life of every piece of equipment it sells.

14.     Deere unlawfully stifles competition by blocking independent repair shops and reducing consumer choice in what would otherwise be a robust and competitive repair aftermarket, thereby artificially increasing Deere Repair Services prices to supracompetitive levels.

15.     As a result of Deere's unlawful withholding of the necessary Software to perform repairs from farmers and independent repair shops. Plaintiff and the Class paid artificially inflated prices for Deere Repair Services during the Class Period. Prices in the Repair Services Market exceeded the amount they would have paid if the prices had been determined by a competitive market. Plaintiff and Class members were therefore injured by Defendant's conduct.

16.     Deere's illegal monopoly of the Deere Repair Services Market should be enjoined and dismantled, and Plaintiff and the Class should be reimbursed by Deere for the amount they overpaid for Deere Repair Services.

---

https://www.vice.com/en/article/v7m8mx/john-deere-promised-farmers-it-would-make-tractors-easy-to-repair-it-lied.

17.     Deere violated Section 1 of the Sherman Act through its arrangements with Co-conspirator Dealerships to not sell the Software to farmers and independent repair shops. Deere also violated Section 1 of the Sherman Act through forcing Plaintiff and Class Members to purchase Deere Repair Services from Deere once they were locked into ownership of an expensive Deere Tractor. Deere's tying arrangement between Deere Tractors and Repair Services had both the intent and effect of harming competition in the market for Deere Repair Services.

18.     Deere also violated Section 2 of the Sherman Act by monopolizing or attempting to monopolize the Deere Repair Services Market in a manner that harmed competition and injured the purchasers of such services by reducing choice and increasing prices in this market to supracompetitive levels. Deere has also leveraged its monopoly power over Deere Software to tie sales of its Tractors to sales of Deere Repair Services, in violation of Section 2 of the Sherman Act.

19.     Deere has unjustly enriched itself by profiting from Plaintiffs' payment of supracompetitive prices for Deere Repair Services in violation of the antitrust laws and should be made to disgorge these profits.

20.     Plaintiff seeks declaratory and injunctive relief, treble and exemplary damages, costs, and attorneys' fees. As for equitable relief, Plaintiff seeks an order requiring Deere to make the necessary Software available, at reasonable cost, to individuals and repair shops.

## II.     JURISDICTION AND VENUE

21.     Plaintiff brings this action on behalf of itself and the Class under Section 16 of the Clayton Act (15 U.SC. § 26) to secure injunctive relief against Defendant for violating Sections 1 and 2 of the Sherman Act (15 U.S.C. §§ 1 and 2), and to recover actual and compensatory damage, treble damages, interest, costs and attorneys' fees for the injury caused by Defendant's conduct.

22.     This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331, 1337 and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26.

23.     This Court also has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(d)(2) because sufficient diversity of citizenship exists between parties in this action in the class members are disbursed throughout the United States, the aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs, and there are 100 or more members of the proposed class.

24.     Venue is appropriate in this District pursuant to Sections 4, 12, and 16 of the Clayton Act, 15 U.S.C. 28 U.S.C. §15(a), and 28 U.S.C. § 1391(b), (c) and (d) because Defendant Deere & Company transacted business in this District, is licensed to do business or is doing business in this District, and because a substantial portion of the affected interstate commerce described herein was carried out in this District.

25.     The activities of Defendant as described herein, were within the flow of, were intended to, and did have direct, substantial, and reasonably foreseeable effects on the foreign and interstate commerce of the United States.

### III.   PARTIES

#### A.  Plaintiff

26.     Plaintiff Plum Ridge Farms, Ltd. is an Illinois corporation located Elizabeth, Illinois. Plaintiff Plum Ridge Farms, Ltd. owns four John Deere tractors with ECUs: a 8R400, a 8320R, a 6155M, and a 8235R. During the Class Period, Plaintiff Plum Ridge Farms, Ltd. purchased Deere Repair Services in Illinois, specifically this District, from a John Deere dealership to diagnose and repair Tractor malfunctions and suffered antitrust injury as a result of Defendant's conduct alleged herein.

### B. Defendant & Co-Conspirators

27.    Deere & Co. is a publicly-traded company headquartered in Moline, Illinois.

28.    "Defendant" as used herein, includes, in addition to those identified specifically above, all of the named Defendant's predecessors, including companies that merged with or were acquired by the named Defendant, as well as Defendant's wholly-owned or controlled subsidiaries, dealerships, affiliated and/or authorized technicians, and/or Co-conspirators that sold Deere Repair Services in interstate commerce, directly or through its wholly-owned or controlled affiliates, to purchasers in the United States during the Class Period.

29.    Co-conspirators include independently-owned dealerships with agreements with Deere giving them the right to sell Deere Tractors and Deere Repair Services. Based on recent data, out of the 1,544 Dealerships affiliated with Deere, 91% of these Dealerships are owned by a "Big Dealer," i.e., a dealer that owns 5 or more individual locations. Although not an exhaustive list, the largest Dealership groups are Ag-Pro Companies (75 locations in 8 states), United Ag & Turf (53 locations in 6 states), C&B Operations (36 locations in 6 states), Papé Machinery (35 locations in 5 states); RDO Equipment (32 locations in 9 states); Brandt Holdings (32 locations in 5 states); Greenway Equipment (31 locations in 2 states); Van Wall Group (31 locations in 4 states); and Quality Equipment (28 locations in 2 states).

### IV.    TRADE AND COMMERCE

30.    During the Class Period, Defendant, directly or through its subsidiaries or affiliated Dealerships, sold Deere Repair Services in the United States in a continuous and uninterrupted flow of interstate commerce and foreign commerce, including through and into this judicial district.

31.    During the Class Period, Defendant controlled all of the market for Deere Repair

Services in the United States.

32.    Defendant's business activities substantially affected interstate trade and commerce in the United States and caused antitrust injury in the United States.

## V.    RELEVANT MARKETS

33.    **Deere Repair Services Market.** The principal relevant market to evaluate Defendant's anticompetitive conduct is the Deere Repair Services Market.

34.    The Deere Repair Services Market constitutes various services and labor to repair, maintain, and clear fault codes from Deere Tractors.[4]

35.    There are no available substitutes for Deere Repair Services, and Deere Repair Services are not interchangeable with any other manufacturers' service.

36.    The relevant geographic market is the United States.

37.    Defendant Deere has market and monopoly power in the relevant market through its control over access to the Software.

38.    Any independent repair shops who desire to compete with Deere in the Deere Repair Services Market would face insurmountable barriers. Defendant's effective total control of the Software means that independent repair shops are unable to access the necessary resources to be able to meaningfully compete with Deere. Similarly, any farmers who wish to perform their own repairs and/or maintenance are also unable to access the resources necessary to do so.

39.    Independent repair shops and farmers cannot compete effectively in the Deere Repair Services Market without access to the Software.

---

[4] As defined *supra*, Deere "Tractors" for purposes of this litigation include all John Deere tractors, combines, and other agricultural equipment with ECUs.

40. **Deere Software Market.** As discussed above, Defendant maintains market and monopoly power over the market for Deere Software. There is no available substitute for Deere Software, and it is not interchangeable with any other manufacturers' product.

41. **Tractor Markets.** The Deere Repair Services market and the market for Tractors are distinct. The "Tractor Markets" include the United States product markets for agricultural farm tractors, which include 2WD Farm Tractors, Compact Tractors, 4WD Farm Tractors, Row Crop Tractors, Scraper Tractors, Specialty Tractors, Utility Tractors, and Self-Propelled Combines. Defendant Deere is the largest agricultural machinery company in the world and has appreciable economic power in the U.S. Tractor Markets.

## VI. FACTUAL ALLEGATIONS

42. Farmers traditionally and historically have been able to perform their own repairs on their own tractors. However, as software has becoming increasingly intertwined with basic operations of farming equipment, John Deere has restricted access to the necessary tools to make repairs, thereby cutting out owners and independent repair shops from the ability to make repairs to newer equipment.

### A. Technology in John Deere Tractors

43. Modern Deere Tractors are technologically complex machines. These Tractors run firmware that is necessary for the Tractor to perform its basic functions. Without the firmware, the product is incomplete and will not run, making the firmware as vital a part to the basic functioning of a Tractor as a steering wheel or an engine. The code that runs the internal engine and the transmission components that are required to make the Tractor do anything are effectively part of the machine. The Tractors will not operate without that code.

44. The central computer on a Tractor is the Engine Control Unit, or "ECU." The ECU

determines how—and if—the Tractor functions.

45. Like cars, John Deere Tractors use a large number of sensors throughout the equipment that are constantly monitored by the ECU. When a sensor notices an error, no matter how small or serious, it can put the machine into "limp mode," allowing farmers to move the machine slowly but not operate it fully. When the problem is diagnosed and repaired, the error code is cleared and the machine can continue working.[5]

46. According to a report from a U.S. Public Interest Research Group, the John Deere S760 combine harvester has 125 different computer sensors in it. If any one of those sensors throws an error code, the combine will enter limp mode.

47. Troubleshooting Deere Tractors—e.g., interpreting the error codes—requires Software that Deere refuses to make available to farmers or independent repair shops.

48. Since about 2000, Deere Tractors began using what is known as "CAN bus" systems in their machinery, standing for Controller Area Network. CAN bus is essentially a central electrical system that allows communications between different parts of the machinery. Sales manuals for Deere Tractors explain that an advantage of the system "allows the technician at the dealership to plug into the system using the Service ADVISOR™ computer program. The Service ADVISOR program links up to the tractor's electrical system to read the communications between the controllers to determine where the problem is located and how it can be fixed."[6]

49. Service ADVISOR, per John Deere's own sales manual materials, is:

> a tool used by John Deere **dealerships** capable of providing technical and mechanical support for technicians and service managers through the use of a laptop computer. Service ADVISOR provides symptom-based diagnostics

---

[5] Koebler & Gault, *supra* note 3.
[6] *See* John Deere & Co Sales Manual, Electrical, CAN bus electrical system (2017), https://www.dot.state.oh.us/Divisions/ContractAdmin/Contracts/PurchDocs/207-19/DeerComp01/6110M%20Product%20Info.pdf.

information, specific machine information, and electronic technical information. It also offers a connection to John Deere help and solutions through an extranet connection at the workshop and in the field.

Service ADVISOR is a fast diagnostic testing system for all controller area network (CAN) bus tractors. This system is the cutting edge of service technology and will save time and money by faster equipment repair.

(emphasis added).

50.     Even if the farmer is able to interpret the error code and determine what the problem is with the Tractor, it doesn't matter how tech-savvy or experienced a mechanic the farmer is; without access to the necessary software tools, the farmer must call the dealership to repair, or clearfault codes for, their machine.

51.     Farmers report their Tractors shutting down from computer faults and having to sit and wait for a John Deere technician to arrive while they lose valuable time, which can lead to expensive crop losses.

52.     Farmers in general face issues related to long wait times for Deere technicians, but black farmers reported that they face disproportionately longer wait times. The National Black Farmers Association (NBFA) stated that after NBFA members purchased from Deere, responses for service on its equipment are followed upon more slowly compared to calls for service from their white counterparts.[7]

53.     Without access to the Software and other tools needed to diagnose and repair the error, farmers must rely on Deere dealerships and technicians to travel to where the equipment is, plug in the necessary tools, and clear the error codes.

---

[7] *Black Farmers' Boycott Against John Deere Continues, Deere has Lied for Years According to Recent Article,* National Black Farmers Association (Feb. 25, 2021), https://www.blackfarmers.org/blog/black-farmers-boycott-against-john-deere-continues-deere-has-lied-for-years-according-to-recent-article.

54.    Replacing parts on a Tractor also can result in "bricking" of the machine if the proper Software is not used. After a new part is installed on a Tractor, a program called Service Advisor needs to be connected to the ECU to authorize the new parts. If the new part is not "authorized" by the Software, the engine of the Tractor will not start, rendering the Tractor useless to its owner until the owner pays a Deere technician to authorize the repair and therefore restore operation of the Tractor.

55.    During harvest time, when Tractors, including combines, are running at full throttle for weeks on end, it's common for mechanical issues to arise. Farmers who try to solve problems themselves or take their Tractors to more convenient repair shops are blocked from completing the repairs without the necessary Software. For example, one customer who hired an independent agricultural equipment repair shop to replace a faulty moisture meter on a combine still had to wait and pay for the John Deere dealer to come out and use Software to authorize the part.[8]

56.    As of 2021, the reported cost for Repair Services from Deere or an authorized Dealer could range from $150–$180 per hour, with additional charges for travel and parts.

57.    Regardless of a farmer's own ability and knowledge regarding how to repair the Tractor they own, without the relevant Software, an authorized John Deere technician must be called to perform many repairs.

58.    Logistically, this is a nightmare for many farmers. When a farmer calls a dealer to perform a repair, the farmer is at the mercy of the dealer's schedule and must pay whatever the cost is—including travel expenses—even if the problem could be fixed in 15 minutes with access to the Software. Farmers also may work far away from the nearest dealership or technician, leading

---

[8] Mae Anderson, *Without 'right to repair,' businesses lose time and money*, Associated Press (Aug. 10, 2021), https://apnews.com/article/technology-business-9f84a8b72bb6dd408cb642414cd28f5d.

them to have to pay substantial amounts for travel time or the cost of having their equipment hauled to a dealership.

59.     Deere has made farmers dependent on Deere for repairs. Farmers, who often have a lifetime of skills built up enabling them to fix their own equipment, are forced to sit and wait for a service technician from Deere to arrive on site and charge $150 or more per hour for labor, on top of other costs.

60.     These additional costs paid to Deere by farmers cut into an already razor-thin profit margin on crops. Farmers in the United States are currently experiencing drastically increasing operating expenses while revenue and profits from crop yields remains stagnant. For example, between 1996 and 2020, total costs for growing corn increased by 193% while yields only increased by 13.7%. In that same period, costs for growing soybeans increased by 202% while yields increased only by 12.3%.

61.     As a result, farmers have had difficulty paying their outstanding operating debts—estimated at well over $400 billion in 2019—and the rate of farm bankruptcies has accelerated, with declared farm bankruptcies increasing by 24% from 2018 to 2019, the biggest yearly increase since the Great Recession.

62.     Furthermore, given farmers' investments in Deere Tractors, which can run upwards of half a million dollars, they have no reasonable choice but to pay for Deere's Repair Services. The farmers are locked in to using Deere Tractors, as switching costs are so high and farmers expect to be able to use a Tractor for decades.

63.     While some farmers own these expensive machines outright, many farmers lease the equipment. The leaseholder is often Deere itself, which has become the fifth-largest

agricultural lender in the sector.[9]

**B. Deere's Promise—and Failure— To Provide the Full Spectrum of Repair Tools.**

64.    Because of how difficult and expensive Deere had made it for farmers to repair their Tractors, a growing "right to repair" movement began to focus on farmer's rights to repair John Deere agricultural equipment.

65.    Deere has a history of fighting customers' access to the onboard technology on Deere Tractors. In 2015, Deere argued that Section 1201 of the Digital Millennium Copyright Act gave it power to prevent purchasers of Deere Tractors from bypassing Technical Protection Measures ("TPMs") "for the purposes of lawful diagnosis and repair, or aftermarket personalization, modification, or other improvement." This was, according to Deere, because the owners did not actually own the software that made the Tractor run. Deere argued that the owner only "receives an implied license for the life of the vehicle to operate the vehicle."[10]

66.    When this argument proved unconvincing to the U.S. Copyright Office and bypassing TPMs on agricultural equipment for the purpose of repair was deemed to be fair use, Deere took another approach to blocking farmers from accessing Tractor Software. In 2016, Deere issued an end-user "License Agreement for John Deere Embedded Software" that forbade customers from accessing, reverse-engineering, or modifying the software running on its Tractors (the "EULA").[11] Deere states it "may terminate the license [to the embedded Tractor software]

---

[9] Jesse Newman & Bob Tita, *America's Farmers Turn to the Bank of John Deere*, Wall Street Journal (July 18, 2017), https://www.wsj.com/articles/americas-farmers-turn-to-bank-of-john-deere-1500398960.

[10] Deere & Company, *Long Comment Regarding a Proposed Exemption Under 17 U.S.C. 1201*, https://copyright.gov/1201/2015/comments-032715/class%2021/John_Deere_Class21_1201_2014.pdf (last accessed Jan. 4, 2022).

[11] *License Agreement for John Deere Embedded Software*, https://www.deere.com/assets/pdfs/common/privacy-and-data/docs/agreement_pdfs/english/2016-10-28-Embedded-Software-EULA.pdf (last accessedJan. 4, 2022).

granted under this License Agreement . . . if you violate any material term of this License Agreement. . ."[12]

67.     As public awareness of and frustration with increasingly prohibitive repair restrictions grew, state lawmakers began to act. As of 2021, 27 states have introduced some form of "right to repair" legislation. A proposed bill in Minnesota would require manufacturers to "make available, on fair and reasonable terms, documentation, parts, and tools, inclusive of any updates to information or embedded software, to any independent repair provider or to the owner of digital electronic equipment manufactured by or on behalf of, or sold by, the original equipment manufacturer for purposes of diagnosis, maintenance, or repair."[13]

68.     In September 2018, the Equipment Dealers Association ("EDA"), a trade and lobbying group that represents John Deere and other manufacturers and often acts as Deere's mouthpiece, made a promise intended to stave off increasing pressure from customers and lawmakers to pass similar "right to repair" legislation pending around the country.[14]

69.     The EDA committed to make repair tools, Software, and diagnostics available to the public by January 1, 2021.[15]

70.     The EDA went so far as to put out a "Statement of Principles," laying out this promise. In a heavily-publicized ceremony and photo op, the EDA signed a "Memorandum of Understanding" with the California Farm Bureau that enshrined this statement of principles.[16]

---

[12] *Id.*
[13] Digital Fair Repair, HF 1138, 91st Leg., 2nd Engrossment (Minn. 2020), https://www.revisor.mn.gov/bills/text.php?number=HF1138&type=bill&version=2&session=ls91&session_year=2019&session_number=0.
[14] Koebler & Gault, *supra* note 3.
[15] *Agreement Streamlines Repair of High-Tech Farm Equipment*, Far West EDA (Sept. 9, 2018), https://fweda.com/industry-news/agreement-streamlines-repair-of-high-tech-equipment (last accessed Jan. 4, 2022).
[16] Koebler & Gault, *supra* note 3.

71.     The Far West EDA president and CEO Joani Woelfel said in a 2018 press release that the statement of principles "says a lot about the relationship between dealers and their customers."

72.     The statement of principles reads:

**STATEMENT OF PRINCIPLES:**

To the extent not already available, the maintenance, diagnostic and repair information listed below will be made available to end users through authorized agricultural dealers at fair and reasonable terms, beginning with tractors and combines put into service on or after January 1, 2021. End users will also be able to purchase or lease diagnostic tools through authorized agricultural dealers. Certain information and tools may be available earlier. Agricultural dealers are committed to provide access to:

- Manuals (Operator, Parts, Service)
- Product Guides
- Product Service Demonstrations, Training, Seminars or Clinics
- Fleet Management Information
- On-Board Diagnostics via diagnostics port or wireless interface
- Electronic Field Diagnostic Service Tools and training on how to use them
- Other publications with information on service, parts, operation and safety

Using this information and these tools, which will be available for purchase, lease or subscription from dealers, farmers will be able to identify and repair numerous problems they may encounter with their equipment. However, the ability to diagnose and repair does not mean the right to modify. For safety, durability, environmental and liability reasons, diagnostic and repair information and tools will not permit consumers to do the following:

- Reset an immobilizer system or security-related electronic modules,
- Reprogram any electronic processing units or engine control units,
- Change any equipment or engine settings negatively affecting emissions or safety compliance,
- Download or access the source code of any proprietary embedded software or code

73.     As journalists from the magazine Vice noted, the commitment "did not promise to actually sell repair parts, and it also contains several carve-outs that allow tractor manufacturers to continue using software locks that could prevent repair."[17]

74.     Three years later, as of mid-2021, farmers still struggled to get anything promised in the agreement with the EDA.

75.     Posing as a customer, Right to Repair advocate Kevin O'Reilly called 12 John Deere dealerships in six states. Of those, 11 told Mr. O'Reilly that they don't sell diagnostic software, and the last one gave him an email of someone to ask for the tools. When Mr. O'Reilly sent an email to the individual identified, he did not receive a response.[18]

---

[17] Jason Koebler, *Farmer Lobbying Group Sells Out Farmers, Helps Enshrine John Deere's Tractor Repair Monopoly*, Vice Motherboard (Sept. 11, 2018), https://www.vice.com/en/article/kz5qgw/california-farm-bureau-john-deere-tractor-hacking-right-to-repair.
[18] Koebler & Gault, *supra* note 3.

76.     Similarly, journalists from Vice who attempted to assess the availability of the Software called nine dealerships in seven states and were told by representatives that the things promised by the EDA were not available. The journalists called three dealerships in California; two said no immediately, and a third told the journalists that the repair software and tools could not be sold to the public and required the purchaser to be a licensed dealer.[19]

77.     A spokesperson for the AEM, another manufacturers' lobbying and trade group that often represents Deere, told Vice that, "Comprehensive repair and diagnostic information is now available for the vast majority of the tractor and combine market through authorized dealers." However, the spokesperson failed to respond when Vice asked if the spokesperson could point to a single instance where this is actually the case, or a single manufacturer that explains to farmers where they can get this information or these tools.

78.     Deere has continued to insist that much of the information is readily available, despite all evidence to the contrary, while emphatically paying lip service by agreeing that farmers have the right to repair their own equipment.[20]

79.     In response to Vice's article calling out Deere for its failure to make good on its commitment, Ag Equipment Intelligence, an agriculture industry magazine, interviewed Natalie Higgins, at the time a vice president of Government Relations at the EDA, and now currently employed by Deere as Manager for State Public Affairs. Higgins blamed the evident lack of availability of the resources on a "lack of communication," saying that "I think the rush on the technical side to get the products and resources for farmers to market led us to not take the time to really contemplate how we communicate the availability to our customers."[21]

---

[19] *Id.*

[20] *Id.*

[21] *John Deere Responds to Vice Article on Right to Repair*, Ag Equipment Intelligence (Mar. 30, 2021), https://www.agequipmentintelligence.com/articles/4738-john-deere-responds-to-vice-

80. This absurd explanation—that the Software and tools only *appear* unavailable because the industry was too preoccupied with rushing to make it available to ever properly communicate with its customers or dealers—is largely in line with the confusing positions Deere has taken on the issue. Over the last few years, Deere and industry spokespeople have taken inconsistent positions, equivocating regarding what tools and Software are actually required in order to make and complete repairs on Tractors. Deere and industry representatives have stated at various times that: (1) customers can do 98 precent of repairs on Deere Tractors without access to the tools that Right to Repair advocates have pushed for;[22] (2) the repair tools have been available to farmers and independent repair shops for years;[23] and, now most recently, that (3) the repair tools are *now* available, but Deere has not prioritized adequately communicating this to the dealerships or customers.[24]

81. If these tools were actually available to farmers and independent repair shops, then it would be simple for Deere to point to where they could be accessed and where they could be purchased. Although it cannot point to any real-world examples where this is the case, its industry

---

article-on-right-to-repair (hereinafter "Ag Equipment Intelligence").

[22] Nilay Patel, *John Deere Turned Tractors Into Computers – What's Next?,* The Verge (June 15, 2021), https://www.theverge.com/22533735/john-deere-cto-hindman-decoder-interview-right-to-repair-tractors ("The statistics are real: 98 percent of the repairs that happen on a product can be done by a customer today.").

[23] Ag Equipment Intelligence, *supra* note 27 ("for many years, John Deere has supported our customers' right to repair their equipment…[w]e've offered a broad range of diagnostic, maintenance and repair tools for farmers that are available through John Deere dealers."); *see also* Deere & Co. Position Paper (uploaded by Vice Motherboard on Feb. 14, 2017), *available at* https://www.scribd.com/document/339340098/John-Deere-letter#from_embed ("John Deere [] provides access to service information and diagnostic information for both producer customers and non-producers. The format and cost of this access is similar to those charged our authorized John Deere dealers.").

[24] Ag Equipment Intelligence, *supra* note 27 (citing David Gilmore, Senior Vice President, Sales and Marketing Regions 3 & 4 at John Deere, stating that Deere had met all the requirements laid out in the Vice Article) ("we've met all of the commitments that we made to the industry and to our customers, in terms of providing them with the tools and the software that they need to not only maintain and diagnose but also repair their machines.").

representatives insist that these tools are available.

82.    As one example, David Ward, a spokesperson for Association of Equipment Manufacturers (AEM), told Vice that comprehensive repair and diagnostic equipment is now available through authorized dealers. Ward did not return emails when Vice followed up, asking for a single instance of where this is actually the case, or a single manufacturer that explains to farmers where they can get the information or the tools.

83.    On the other hand, there are plenty of examples that demonstrate how the Software remains inaccessible, even to individuals and businesses who are by all accounts highly sophisticated parties familiar with the industry.

84.    In 2020, one owner of an independent equipment mechanic shop in Nebraska reported that about half of the repairs he sees involve code faults triggered by emission-control systems. The faults render vehicles inoperable, and while the shop can replace the exhaust filters and particulate traps that might trigger a Tractor's code, the dealerships would not provide the Software necessary to restart the Tractor. This forced the owner or the shop to haul the machine to a Deere dealership or pay for a Deere mechanic to make a house call with the Software.[25]

85.    The EDA blamed a "lack of communication" as the culprit for why most farmers and media think the Software and tools remain unavailable and promised that industry organizations like the EDA would "step up to bridge that communication gap" by "educating dealers… focusing on the fundamentals like putting information on our websites and using social media to promote these resources."[26] Since the Ag Equipment Intelligence article was published quoting Higgins on March 30, 2021, the EDA has yet to post on their frequently-updated Twitter page about where farmers or independent repair shops could access these resources. Instead, the

---

[25] Waldman & Mulvany, *supra* note 2.
[26] Ag Equipment Intelligence, *supra* note 27.

only Twitter post by the EDA referencing "repair" in any way since March is a July 19, 2021 tweet advertising a webinar about reasons the EDA opposes Right to Repair.[27]

86.     Around that same time, Deere issued a company statement that "John Deere supports a customer's right to safely maintain, diagnose and repair their own equipment."[28] Deere is also quoted as stating "When customers buy from John Deere, they own the equipment and can choose to personally maintain or repair the product."[29]

87.     By implying that owning a Deere Tractor does not require farmers to rely on Dealerships for repairs, Deere intentionally obscures the fact that the Software is necessary for diagnosis and completion of a large number of these repairs. Deere's misleading statements fail to provide information on the scope of repairs and maintenance that can be accomplished without the Software, preventing farmers from being able to accurately assess the overall cost of owning a Deere Tractor.

### C. To the Extent Deere Has Made Diagnostic and Repair Tools Available, They Are Insufficient to Restore Competition to the Deere Repair Services Market.

88.     Beginning sometime around June 2021, John Deere quietly created a web page on their main company site[30] for a product called Customer Service ADVISOR, with a form to "request more info" about a subscription. One dealer website describes Customer Service ADVISOR as a way for customers to access "much of the same" technical and diagnostic information used by dealership technicians.[31] However, this pared-down system explicitly does

---

[27] EDA (@Equip_Dealers), Twitter (July 19, 2021, 2:00 PM),
https://twitter.com/Equip_Dealers/status/1417197594388975620.
[28] Tyne Morgan, *AEM, John Deere Respond to Biden's Planned Executive Order OverRight to Repair Equipment*, AgWeb Farm Journal (July 7, 2021).
[29] *Id.*
[30] Customer Service ADVISOR™, John Deere, https://www.deere.com/en/parts-and-service/manuals-and-training/customer-service-advisor/ (last accessed Jan. 4, 2022).
[31] Customer Service Advisor, United Ag & Turf,
https://www.unitedagandturf.com/service/customer-service-advisor/ (last accessed Jan. 4, 2022).

not include every feature that dealers have access to, and costs *start at* $8,500 for the first year alone.[32] If Deere charges customers the same amount per year, in six years this would amount to an extra $51,000 paid by customers who want to perform their own repairs. Over the course of the lifetime use of a Deere Tractor, the cost to maintain access to the Software necessary to individually perform repairs could amount to the total price of the Tractor itself.

89.     Furthermore, there is no indication that Deere will provide sufficient repair tools to independent repair shops or, for that matter, even to customers. The only apparent way to access materials is to place a request with an individual dealership, and there is no guarantee or timeline of when Customer Service ADVISOR is available.

90.     It is also unclear if Deere is simply calling attention to the already-existing, extremely limited capability customer version of Service ADVISOR. This barebones version allows a customer to troubleshoot codes but offers minimal functionality otherwise. A farmer or independent repair shop is not able to use the software, for example, to replace a sensor and recalibrate a Tractor. As one employee of a Deere dealership described it in 2016, the customer version is "a waste of your money."[33] The same employee also described the version of Customer Service Advisor as "similar to [Service Advisor] but they really give you only enough to help your dealer cut down on the labor if you troubleshoot it yourself. If they let you calibrate, us dealer guys wouldn't have any work".[34]

91.     Deere continues to carefully guard access to the Software necessary to make repairs, and to the extent it has made a watered-down version of it available to its customers, it has

---

[32] *Id.*
[33] *JD Service Advisor*, The Combine Forum, post by hake2651 (Feb. 26, 2016),
https://www.thecombineforum.com/threads/jd-service-advisor.253730/.
[34] *JD Service Advisor*, The Combine Forum, post by hake2651 (Feb. 29, 2016),
https://www.thecombineforum.com/threads/jd-service-advisor.253730/.

priced it so high that the access to the Software will be an unattractive option to most customers, even in comparison to the high cost of paying Deere for Repair Services. This arrangement thus allows Deere to claim it has provided repair and diagnostic materials to its customers while posing virtually no risk to Deere's monopoly in the Deere Repair Services Market.

### D. There Are No Legitimate Reasons to Restrict Access to Necessary Repair Tools.

92. In May 2021, the FTC issued a report titled "Nixing the Fix: An FTC Report to Congress on Repair Restrictions" that examined, among other things, how repair restrictions implemented by various industries increase costs and limit consumer choice, and how these restrictions might implicate federal consumer protection and antitrust laws.[35]

93. The report synthesized knowledge gained from a July 16, 2019 workshop, as well as public comments, responses to a Request for Empirical Research and Data, and independent research.[36] The FTC concluded there was "scant evidence to support manufacturers' justifications for repair restrictions" and that access to information, manuals, spare parts, and tools, were "well-supported by comments submitted for the record and testimony provided at the Workshop."[37]

94. The FTC received research submissions and comments from the EDA and AEM, as well as "the full spectrum of interested parties."

95. More specifically, the FTC noted that restricting repairs to authorized repair networks was not automatically justified just because of the existence of possible safety concerns. The FTC noted that manufacturers provided no factual support for their statements that "authorized repair persons are more careful or that individuals or independent repair shops fail to take

---

[35] Federal Trade Commission, *Nixing the Fix: An FTC report to Congress on Repair Restrictions* (May 2021), *available at* https://www.ftc.gov/system/files/documents/reports/nixing-fix-ftc-report-congress-repair-restrictions/nixing_the_fix_report_final_5521_630pm-508_002.pdf (hereinafter "FTC Report").
[36] FTC Report, p. 3.
[37] FTC Report, p. 6.

appropriate safety precautions."[38]

96.     Similarly, the FTC pointed out that manufacturers had failed to offer evidence that providing access to the same tools made available to authorized service providers created additional security risks. The FTC concluded "[m]anufacturers can provide others with the same parts and tools that they provide to their authorized service providers. And, by providing access to individuals and independent repair shops, manufacturers would have greater confidence in the repair activities that occur outside of their authorized networks."[39]

97.     The FTC stated that, beyond bare assertions of liability exposure and reputational harm from allowing independent repairs, manufacturers "provided no empirical evidence to support their concerns about reputational harm or potential liability resulting from faulty third party repairs."[40] The report further noted that manufacturers' arguments regarding the "superior service" were anecdotal, whereas there was evidence that consumers were generally satisfied with repairs made by independent repair shops. The FTC concluded that "[t]he record does not establish that repairs conducted by independent repair shops would be inferior to those conducted by authorized repair shops if independent repair shops were provided with greater access to service manuals, diagnostic software and tools, and replacement parts as appropriate."[41]

98.     There is no defensible basis for Deere to withhold the full spectrum of Dealer- level Software that a farmer or independent repair shop would need to diagnose or perform repairs. In fact, the automotive industry is an example of manufacturers agreeing to do just that. Industrywide, vehicle owners and independent repair shops have had access to Dealer-level diagnostic and repair tools from the manufacturers for nearly eight years. In 2014, the automotive industry through

---

[38] FTC Report, p. 28.
[39] FTC Report, p. 31.
[40] FTC Report, p. 33.
[41] FTC Report, p. 38.

representative trade organizations voluntarily agreed to

> make available for purchase by owners of motor vehicles manufactured by such manufacturer and by independent repair facilities **the same diagnostic and repair information**, including repair technical updates, **that such manufacturer makes available to its dealers** through the manufacturer's internet-based diagnostic and repair information system or other electronically accessible manufacturer's repair information system. All content in any such manufacturer's repair information system shall be **made available to owners and to independent facilities in the same form and manner and to the same extent as is made available to dealers** utilizing such diagnostic and repair information system for purchase by owners and independent repair facilities on a daily, monthly, and yearly subscription basis and upon fair and reasonable terms.[42]

### E. Deere Has Not Provided Farmers and Independent Repair Shops with the Necessary Software and Continues to Misrepresent the Issue.

99.     To the extent that Deere has made limited repair information and tools available, it has been insufficient to give farmers and independent repair shops the same opportunity to repair their Tractors and to open the Deere Repair Services Market to true competition.

100.     Deere must provide access to the same tools that the dealers have to both farmers and independent repair shops.

101.     Deere has also resisted making the Software and tools available to farmers and independent repair shops under the auspices of "ensur[ing] continued compliance with emissions, operator safety and other regulatory requirements."[43] Deere's claims that providing access to Software and repair tools would allow farmers to bypass emissions and safety controls misrepresents what farmers are asking for.

102.     There is a clear difference between resetting an error code and ignoring or

---

[42] Memorandum of Understanding, Automotive Aftermarket Industry Association, Coalition for Auto Repair Equality, Alliance of Automobile Manufacturers, and Association of Global Automakers (Jan. 15, 2014) (emphasis added), https://www.autocare.org/docs/default-source/government-affairs/r2r-mou-and-agreement-signed.pdf.

[43] Deere & Co Position Letter on Kansas HB 2122: Digital Electronic Repair Requirements, *available at* https://www.vice.com/en/article/mgxayp/source-apple-will-fight-right-to-repair-legislation.

overriding safety codes. Overriding emissions or safety controls requires a different set of modification tools, which are *not* the tools used for diagnosis and repair. The FTC pointed out that data submitted by the EDA ostensibly showing that modifications of agricultural equipment affected emissions was inapposite, "because [the data] concerns modifications to equipment as opposed to repairs."[44] The FTC also noted conversations with AEM and EDA representatives confirmed the limitations of the submitted studies.[45]

103.    In order to override emission controls on a Tractor, the entire operating system on the machine would have to be erased and then replaced with new, modified software that either does not have emissions and safety controls or allows a farmer to ignore them.[46] This is an illegal practice separate from the issue of access to Software and is not what is being requested in this litigation.

104.    Deere and industry groups have latched onto this talking point—conflating "repair" and "modification"—in their successful attempt to foreclose others from the market and thereby maintain Deere's monopoly in the Deere Repair Services Market.

F.    **Defendant's Monopolization of the Deere Repair Services Market Has Led to Artificially High Prices and Record Profits for John Deere.**

105.    Deere has an obvious motive for restricting access to the Software and maintaining its unlawful tying arrangement and monopoly and attempted monopoly in the Deere Repair Services Market: money. For Deere and its Dealerships, parts and services are three to six times more profitable than sales of the original equipment, and the repair segment of Deere's business has also been growing faster than original equipment sales. From 2013 to 2019, Deere's annual

---

[44] FTC Report, p. 38.
[45] FTC Report, p. 38, n. 205.
[46] Kevin O'Reilly, U.S. PIRG, *Deere in the Headlights: How software that farmers can't access has become necessary to tractor repair* (Feb. 2021), https://uspirg.org/feature/usp/deere-headlights.

parts sales went up 22%, while the company's total agricultural equipment sales went down 19% in this same period.[47]

106.     During this period where Deere's Tractors with ECUs reached greater market penetration and as Deere systematically eliminated small Dealerships that were creating competition and undercutting profits for Deere's Big Dealers, the company's income skyrocketed. In 2000, Deere's net income was around a half billion dollars. Deere's projected 2021 net income is $5.7B, over 11 times its income from 2000, and over twice its net income of $2.75B in 2020. Although Deere does not break down the income received from the Dealerships' sales of Repair Services in its company filings, sales of "parts and maintenance services" are reported to account for a fifth of Deere's sales.[48] In the last several years, the reported profit margins not associates with direct sales increased dramatically, and the company stated to investors in 2020 that it was betting on its parts and maintenance services business to contribute 50 basis points in added profits over the next two years.[49]

107.     Without access to the Software to perform repairs and clear fault codes, owners of Deere Tractors have been forced to give Deere and its Dealerships more money for Deere Repair Services that the farmers would have expended had they performed the repairs themselves or hired less expensive, and often more convenient, independent repair shops to perform. One farmer reported that he purchased a new Tractor for $300,000 and spent nearly $8000 into clearing fault codes over the course of a few years.[50]

108.     The money that farmers sink into paying Deere to clear fault codes and approve

---

[47] Waldman & Mulvany, *supra* note 2.
[48] Rajesh Kumar Singh, *Deere bets on cost cuts, services push to boost profits*, Reuters (Jan. 8. 2020),     https://www.reuters.com/article/us-deere-strategy/deere-bets-on-cost-cuts-services-push-to-boost-profits-idUSKBN1Z72TA.
[49] *Id.*
[50] *Id.*

repairs that they could have performed themselves cut into an already thin profit margin.

## VII.  CLASS ACTION ALLEGATIONS

109.    Plaintiff brings this action on behalf of itself, and as a class action under the Federal Rules of Civil Procedure, Rule 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedures, seeking damages and equitable and injunctive relief on behalf of the following class (the "Class"):

> All persons and entities residing in the United States who, during the Class Period of February 7, 2018 to the present, purchased Deere Repair Services for Deere Tractors from Defendant or Deere's authorized Dealers and/or technicians.

110.    Specifically excluded from the Class are Deere and its employees, affiliates, subsidiaries, and joint venturers, whether or not named in this Complaint.

111.    **Class Identity**. The above-defined Class is readily identifiable and is one for which records should exist.

112.    **Numerosity**. Plaintiff does not know the exact number of class members because such information presently is in the exclusive control of Defendant. Plaintiff believes that due to the nature of the trade and commerce involved, there are thousands of class members geographically dispersed throughout the United States, such that joinder of all class members is impracticable.

113.    **Typicality**. Plaintiff's claims are typical of the claims of the members of the Class because Plaintiff purchased Deere Repair Services from Defendant, and therefore Plaintiff's claims arise from the same common course of conduct giving rise to the claims of the Class and the relief sought is common to the Class.

114.    **Common Questions Predominate**. There are questions of law and fact common to the Class, including, but not limited to:

A.  Whether the United States Deere Repair Services Market constitutes a Relevant

Market;

    B.   Whether Deere possesses market power in this Relevant Market;

    C.   Whether Deere colluded with Co-conspirator Dealerships to prevent farmers and independent repair shops from having access to the Software in violation of Section 1 of the Sherman Act;

    D.   Whether Deere illegally tied the sale of Deere Repair Services to Deere Tractors in violation of Section 1 of the Sherman Act;

    E.   Whether Deere monopolized or attempted to monopolize the Deere Repair Services Market in the United States in violation of Section 2 of the Sherman Act;

    F.   Whether Deere engaged in monopoly leveraging by using its monopoly power in the Deere Software Market to gain or attempt to gain or maintain monopoly power in the Deere Repair Services Market in violation of Section 2 of the Sherman Act;

    G.   Whether Deere unjustly enriched itself to the detriment of the Plaintiff and the Class, thereby entitling Plaintiff and the Class to disgorgement of all benefits derived by Deere;

    H.   Whether the conduct of Defendant, as alleged in this Complaint, caused injury to the business or property of the Plaintiff and the other members of the Class;

    I.   The effect of Defendant's alleged monopolization or attempted monopolization on the prices of Deere Repair Services sold in the United States during the Class Period;

    J.   Whether Plaintiff and other members of the Class are entitled to, among other things, injunctive relief and if so, the nature and extent of such injunctive relief; and

    K.   The appropriate class-wide measure of damages.

These and other questions of law or fact, which are common to the members of the Class, predominate over any questions affecting only individual members of the Class.

       115.   **Adequacy**. Plaintiff will fairly and adequately protect the interests of the Class in that Plaintiff's interests are aligned with, and not antagonistic to, those of the other members of the Class who purchased Deere Repair Services from Defendant and Plaintiff has retained counsel competent and experienced in the prosecution of class actions and antitrust litigation to represent themselves and the Class.

       116.   **Superiority**. A class action is superior to other available methods for the fair and efficient adjudication of this controversy since individual joinder of all damaged members of the Class is impractical. Prosecution as a class action will eliminate the possibility of duplicative

litigation. The relatively small damages suffered by individual members of the Class compared to the expense and burden of individual prosecution of the claims asserted in this litigation means that, absent a class action, it would not be feasible for members of the Class to seek redress for the violations of law herein alleged. Further, individual litigation presents the potential for inconsistent or contradictory judgments and would greatly magnify the delay and expense to all parties and to the court system. Therefore, a class action presents far fewer case management difficulties and will provide the benefits of unitary adjudication, economy of scale and comprehensive supervision by a single court.

117. The prosecution of separate actions by individual members of the Class would create the risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendant.

118. Plaintiff brings this case on behalf of the Class and all persons and entities similarly situated pursuant to Rule 23, on behalf of all persons and entities that purchased Deere Repair Services that Defendant provided during the Class Period.

119. Defendant has acted on grounds generally applicable to the Class, thereby making final injunctive relief appropriate with respect to the Class as a whole.

## VIII. ANTITRUST INJURY

120. Defendant's anticompetitive conduct had the following effects, among others:

A. Price competition has been restrained or eliminated with respect to Deere Repair Services;

B. The prices of Deere Repair Services have been fixed, raised, stabilized, or maintained at artificially inflated levels;

C. Purchasers of Deere Repair Services have been deprived of free and open competition; and

D. Purchasers of Deere Repair Services, including Plaintiff, paid artificially

31

inflated prices.

121.    The purpose of Deere's conduct was to exclude competition and raise, fix, or maintain the price of Deere Repair Services. As a direct and foreseeable result, Plaintiff and the Class paid supracompetitive prices for Deere Repair Services during the Class Period.

122.    By reason of the alleged violations of the antitrust laws, Plaintiff and the Class have sustained injury to their businesses or property, having paid higher prices for Deere Repair Services than they would have paid in the absence of Deere's illegal conduct, and as a result have suffered damages.

123.    This is an antitrust injury of the type that the antitrust laws were meant to punish and prevent.

### IX.    CLAIMS FOR RELIEF

### COUNT ONE
### Violation of Section 1 of the Sherman Act
### Group Boycott
### 15 U.S.C. § 1

124.    Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

125.    Beginning approximately in 2000 and continuing thereafter to the present, Defendant, by and through its officers, directors, employees, agents, or other representatives, have explicitly or implicitly colluded with Co-conspirator Dealerships to jointly boycott entities that would have introduced price-reducing sales of Deere Repair Services in the United States, in order to artificially raise, fix, maintain, and/or stabilize prices in the Deere Repair Services market, in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

126.    Defendant's and the Co-conspirator Dealerships' refusal to sell Software and repair tools to individual farmers and independent repair shops constitutes a per se violation of Section

32

One of the Sherman Act.

127.    Defendant's and the Co-conspirator Dealerships' boycott cut off access to the Software, a necessary resource that would enable farmers and independent repair shops to compete in the Deere Repair Services market.

128.    Together, Defendant and the Co-conspirator Dealerships wholly control the market for Deere Repair Services.

129.    No plausible pro-competitive arguments exist for Defendant's and the Co-conspirator Dealerships' refusal to sell the Software to farmer or independent repair shops.

130.    As a direct and proximate result of Defendant's contract, combination, and/or conspiracy to restrain trade and commerce, Plaintiff and Class Members have suffered injury to their business or property and will continue to suffer economic injury and deprivation of the benefit of free and fair competition.

<div align="center">

**COUNT TWO**
**Violation of Section 1 of the Sherman Act**
**Unlawful Tying Arrangement**
**15 U.S.C. § 1**

</div>

131.    Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

132.    This cause of action is brough under Section 1 of the Sherman Act, 15 U.S.C. § 1.

133.    A tying arrangement exists when a seller exploits power over one product (the tying product) to force the buyer to accept a second product (the tied product). *Batson v. Live Nation Entm't*, 746 F.3d 827, 832 (7th Cir. 2014). Such an arrangement violates Section 1 of the Sherman Act if the seller has appreciable economic power in the tying product market and the arrangement affects a substantial volume of commerce in the tied market. *Eastman Kodak Co. v. Image Tech. Servs. Inc.*, 504 U.S. 451, 462 (1992).

<div align="center">33</div>

134. Deere Tractors and Deere Repair Services are distinct and separate products and services.

135. Plaintiff and Class members through their purchase of Deere Tractors were coerced into purchasing a second tied product, Deere Repair Services, from Defendant and its Co-Conspirator Dealerships.

136. Defendant represented to Plaintiffs and the Class that most necessary repair tools were available and that almost all repairs could be done on the Tractors without the Software. These misleading statements meant that Plaintiff and the Class could not, from Deere's representations, engage in accurate lifecycle pricing for Deere Tractors before they were locked into purchasing Deere Repair Services from Defendant and the Dealerships.

137. As set out above, Defendant has appreciable economic power in the relevant Tractor Markets, i.e., the "tying" markets.

138. This tying arrangement affected a substantial amount of interstate commerce.

139. Defendant's conduct amounts to a per se tying violation, as Defendant has significant power in the tying markets which has led to a significant and actual impact on competition in the Deere Repair Services market.

140. Alternatively, Defendant's conduct is illegal tying under the rule of reason, as Defendant's actions to coerce farmers to purchase Deere Repair Services from Defendant is an unreasonable restraint on competition in the market for Deere Repair Services.

141. There are no legitimate business justifications for Defendant's illegal tying arrangement.

142. Defendant has a substantial economic interest in sales of Deere Repair Services.

**COUNT THREE**
**Violation of Section 2 of the Sherman Act**
**Monopolization**
**15 U.S.C. § 2**

143.    Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

144.    This cause of action is brough under Section 2 of the Sherman Act, 15 U.S.C. § 2, which prohibits "monopoliz[ation of] any part of the trade or commerce among the several states, or with foreign nations."

145.    Deere has monopoly power in the Deere Repair Services Market, including the power to control prices and exclude competition.

146.    Deere has willfully and intentionally engaged in anticompetitive conduct in order to unlawfully maintain its monopoly in this market, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

147.    Deere has unreasonably restrained, and further threatens to unreasonably restrain competition in the Deere Repair Services Market by:

(a) restricting the availability of the Software necessary to perform diagnostics and repairs for Deere Tractors;
(b) knowingly misrepresenting the availability and necessity of the Software necessary for diagnostics and repairs for Deere Tractors;
(c) tying the purchase of Repair Services through Deere to the purchase of Deere Tractors; and
(d) limiting farmers' rights over their own Tractors through the terms of the 2016 EULA with the aim of restricting farmers' ability to choose to perform Deere Repair Services themselves or take their Tractor to an independent repair shop.

148.    While some of these anticompetitive acts themselves constitute an individual antitrust violation on a stand-alone basis, together they support a broader monopolization claim.

149.    As a direct and proximate result of Deere's anticompetitive and monopolistic conduct, Plaintiff and the Class have been damaged by, among other things: (i) the payment of

supracompetitive prices for Deere Repair Services; and (ii) the lack of availability of independent Deere Repair Services and self-repair options.

**COUNT FOUR**
**Violation of Section 2 of the Sherman Act**
**Monopoly Leveraging**
**15 U.S.C. § 2**

150.     Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

151.     As detailed above, Deere has monopoly power over Deere Software.

152.     Deere has willfully and intentionally used its monopoly power over Deere Software to gain or attempt to gain or maintain monopoly power in the Deere Repair Services Market, specifically, by tying purchases of Deere Tractors to Deere-provided Repair Services through deliberate restriction of access to the full spectrum of Software necessary to run diagnostics, approve repairs, and perform maintenance. Deere's actions cannot be justified on the basis of any legitimate consumer benefit.

153.     Furthermore, Deere also leveraged its monopoly power over Deere Software to effectuate the 2016 EULA, limiting farmers' ownership rights over their own Tractors and forcing farmers to purchase Deere-provided Repair Services. The EULA impermissibly restricts farmers' ability to perform Deere Repair Services themselves by prohibiting attempts to reverse engineer, adapt, or otherwise circumvent the Software. Deere threatens that it may terminate the license to the Software—and therefore access to a functional Tractor—if a farmer interacts with the Software in a way that Deere deems to be a violation of the EULA.

154.     Deere willfully has acquired or maintained monopoly power by the exclusionary conduct detailed above, rather than through legitimate business acumen, skill, efficiency, or legitimate innovation.

155.     As a direct and proximate result of Deere's anticompetitive and monopolistic conduct, Plaintiff and the Class have been damaged by, among other things, (i) the payment of supracompetitive prices for Deere Repair Services; and (ii) the lack of availability of independent Deere Repair Services and self-repair options.

### COUNT FIVE
### Violation of Section 2 of the Sherman Act
### Attempted Monopolization in the Alternative15 U.S.C. § 2

156.     Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

157.     As detailed above, Deere has monopoly power, or at a minimum, a dangerous probability of success in acquiring monopoly power, in the Deere Repair Services Market, including the power to control prices and exclude competition.

158.     Deere has willfully, knowingly, and with specific intent to do so, attempted to monopolize the Repair Services Markets, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

159.     Deere's anticompetitive conduct alleged herein has been directed at accomplishing the unlawful objective of controlling prices and/or preventing competition in the Repair Services Market. Deere's ongoing anticompetitive conduct presents a dangerous probability that Deere will succeed, to the extent it has not already, in its attempt to monopolize the Repair Service Market.

160.     As a direct and proximate result of Deere's anticompetitive and monopolistic conduct, Plaintiff and the Class have been damaged by, among other things, (i) the payment of supracompetitive prices for Deere Repair Services; and (ii) the lack of availability of independent Deere Repair Services and self-repair options.

**COUNT SIX**
**Violation of Section 2 of the Sherman Act**
**Conspiracy to Monopolize**
**15 U.S.C. § 2**

161.    Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

162.    Beginning approximately in 2000 and continuing thereafter to the present, Defendant, by and through its officers, directors, employees, agents, or other representatives, have explicitly or implicitly conspired with Co-conspirator Dealerships to jointly boycott entities that would have introduced price-reducing sales of Deere Repair Services in the United States, in order to acquire monopoly power in the Deere Repair Services market, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

163.    Defendant's and the Co-conspirator Dealerships' boycott cut off access to the Software, a necessary resource that would enable farmers and independent repair shops to compete in the Deere Repair Services market.

164.    Deere and the Dealerships have willfully, knowingly, and with specific intent to do so, conspired to monopolize the Repair Services Markets, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

165.    No plausible pro-competitive arguments exist for Defendant's and the Co-conspirator Dealerships' refusal to sell the Software to farmer or independent repair shops.

166.    As a direct and proximate result of Deere and the Dealerships' conspiracy to restrain trade and commerce, Plaintiff and Class Members have suffered injury to their business or property and will continue to suffer economic injury and deprivation of the benefit of free and fair competition.

## COUNT SEVEN
### Violation of Sections 1 and 2 of the Sherman Act
### Declaratory and Injunctive Relief
### 15 U.S.C. §§ 1, 2

167.    Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

168.    Plaintiff seeks declaratory and injunctive relief under the federal antitrust laws.

169.    Plaintiff's allegations described herein constitute violations of Sections 1 and 2 of the Sherman Act.

170.    Deere effectuated an illegal tying arrangement and a scheme to restrain trade and monopolize a market.

171.    There is, and was, no legitimate, non-pretextual, pro-competitive business justification for Deere's conduct that outweighs its harmful effect.

172.    As a direct and proximate result of Deere's illegal tying arrangement and anticompetitive scheme, as alleged herein, Plaintiff and the Class were harmed.

173.    The goal, purpose, and/or effect of the tying arrangement and anticompetitive scheme was to prevent competition or self-repair in order to continue charging supracompetitive prices for Repair Services.

174.    Plaintiff and the Class have been injured in their business or property by reason of Deere's antitrust violations as alleged in this Complaint. Their injury consists of paying higher prices for Repair Services than they would have paid in the absence of those violations. These injuries will continue unless halted.

175.    Plaintiff and the Class, pursuant to Fed. R. Civ. P. 57 and 28 U.S.C. § 2201(a), hereby seek a declaratory judgment that Deere's conduct constitutes a violation of Sections 1 and 2 of the Sherman Act.

176. Plaintiff and the Class further seek equitable and injunctive relief pursuant to § 16 of the Clayton Act, 15 U.S.C. § 26, and other applicable law, to correct the anticompetitive effects caused by Deere's unlawful conduct.

## COUNT EIGHT
### Promissory Estoppel

177. Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

178. Defendant made unambiguous promises through statements to Plaintiff and the Class that Deere Tractors could be repaired through software, tools, and resources made available by Deere and its Dealerships.[51]

179. Plaintiff and the Class relied on Defendant's promise by purchasing, leasing, and continuing to use and operate Deere Tractors, and that reliance was both expected and foreseeable.

180. Plaintiff and Class members' reliance on Defendant's promises were to their detriment. Plaintiff and the Class have paid, and continue to pay, much higher rates for Deere Repair Services than they would have had Defendant fulfilled its promise to make necessary Software and resources to perform repairs available.

## COUNT NINE
### Unjust Enrichment

181. Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

182. Deere has benefitted from the monopoly profits on the sale of Repair Services resulting from the unlawful and inequitable acts alleged in this Complaint.

183. Deere's financial benefit resulting from unlawful and inequitable conduct is

---

[51] *See supra* Section VI.C.

traceable to overpayments for Repair Services by Plaintiff and the Class.

184. Plaintiff and the Class have conferred upon Deere an economic benefit, in the nature of profits resulting from unlawful overcharges and monopoly profits, to the economic detriment of Plaintiff and the Class.

185. The economic benefit of overcharges and unlawful monopoly profits derived by Deere through Plaintiffs' payment of supra-competitive and artificially inflated prices for Deere Repair Services is a direct and proximate result of Deere's unlawful practices.

186. The financial benefits derived by Deere rightfully belong to Plaintiff and the Class, as Plaintiff and the Class paid anticompetitive and monopolistic prices during the Class Period, inuring to the benefit of Deere.

187. It would be inequitable under unjust enrichment principles in the District of Columbia and each of the fifty states for Deere to be permitted to retain any of the overcharges for Repair Services derived from Deere's unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

188. Deere is aware of and appreciated the benefits bestowed upon it by Plaintiff and the Class.

189. Deere should be compelled to disgorge in a common fund for the benefit of Plaintiff and the Class all unlawful or inequitable proceeds it received.

190. A constructive trust should be imposed upon all unlawful or inequitable sums received by Deere traceable to Plaintiff and the Class.

## X. REQUEST FOR RELIEF

WHEREFORE, Plaintiff, on behalf of itself and the Class of all others so similarly situated, respectfully requests judgment against Defendant as follows:

191.    The Court determine that this action may be maintained as a class action under Rule 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, appoint Plaintiff as Class Representative and its counsel of record as Class Counsel, and direct that notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to the Class, once certified;

192.    The unlawful conduct herein be adjudged and decreed in violation of Section 1 and Section 2 of the Sherman Act.

193.    Plaintiff and the Class recover damages, to the maximum extent allowed, and that a joint and several judgment in favor of Plaintiff and the members of the Class be entered against Defendant in an amount to be trebled to the extent the laws permit;

194.    Defendant, its affiliates, successors, transferees, assignees and other officers, directors, partners, agents and employees thereof, and all other persons acting or claiming to act on their behalf or in concert with them, be permanently enjoined and restrained from in any manner continuing, maintaining or renewing the conduct alleged herein, or from engaging in other conduct having a similar purpose or effect, and from adopting or following any practice, plan, program, or device having a similar purpose or effect;

195.    Plaintiff and the members of the Class be awarded pre- and post-judgment interest as provided by law, and that such interest be awarded at the highest legal rate from and after the date of service of this Complaint;

196.    Plaintiff and the members of the Class recover their costs of suit, including reasonable attorneys' fees, as provided by law; and

197.    Plaintiff and the members of the Class have such other and further relief as the case may require and the Court may deem just and proper.

## XI.    JURY TRIAL DEMANDED

198.    Plaintiff demands a trial by jury, pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, of all issues so triable.

Respectfully submitted,

Dated: February 7, 2022

/s/ Robert M. Foote
Robert M. Foote, Esq. (3124325)
Kathleen C. Chavez, Esq. (6255735)
Matthew J. Herman, Esq. (6237297)
Elizabeth C. Chavez, Esq. (6323726)
Bret K. Pufahl, Esq. (6325814)
FOOTE, MIELKE, CHAVEZ & O'NEIL, LLC
10 W. State Street, Suite 200
Geneva, IL 60134
Tel. No.: (630) 232-7450
Fax No.: (630) 232-7452
Email: rmf@fmcolaw.com
kcc@fmcolaw.com
mjh@fmcolaw.com
ecc@fmcolaw.com
bkp@fmcolaw.com

Marc C. Gravino (6188531)
John J. Holevas (6193167)
WILLIAMSMCCARTHY LLP
P.O. Box 219
Rockford, IL 61105
(815) 987-8936
mgravino@wilmac.com
jholevas@wilmac.com

*Attorneys for Plaintiff and the Putative Class*

# Exhibit 3

2/24/22, 8:32 PM     Case Pending No. 67   CM/ECF LIVE, Ver 6.3.4 - U.S. District Court, Northern Illinois   Document 1-7   Filed 02/25/22   Page 2 of 53

JENSEN

# United States District Court
## Northern District of Illinois - CM/ECF LIVE, Ver 6.3.4 (Rockford)
## CIVIL DOCKET FOR CASE #: 3:22-cv-50039

Brown v. Deere & Co.            Date Filed: 02/11/2022
Assigned to: Honorable Iain D. Johnston     Jury Demand: Plaintiff
Referred to: Honorable Lisa A. Jensen     Nature of Suit: 410 Anti-Trust
Cause: 15:1 Antitrust Litigation       Jurisdiction: Federal Question

### Plaintiff

**Daniel Brown**            represented by    **Timothy Jackson**
*Individually And On Behalf Of All Others*          Wallace Miller
*Similarly Situated*                   111 West Jackson Blvd
*doing business as*                  Suite 1700
Ostego Forestry Services           Chicago, IL 60604
                                         312.589.6278
                                         Email: tej@wallacemiller.com
                                         *ATTORNEY TO BE NOTICED*

                                         **Edward A. Wallace**
                                         Wallace Miller
                                         111 West Jackson Blvd
                                         Suite 1700
                                         Chicago, IL 60604
                                         3122616193
                                         Email: eaw@wallacemiller.com
                                         *ATTORNEY TO BE NOTICED*

V.

### Defendant

**Deere & Co.**
*doing business as*
John Deere

| Date Filed | # | Docket Text |
|------------|-----|-------------|
| 02/11/2022 | 1 | COMPLAINT filed by Daniel Brown; Jury Demand. Filing fee $ 402, receipt number 0752-19149062. (Attachments: # 1 Civil Cover Sheet)(Wallace, Edward) (Entered: 02/11/2022) |
| 02/11/2022 | 2 | ATTORNEY Appearance for Plaintiff Daniel Brown by Edward A. Wallace (Wallace, Edward) (Entered: 02/11/2022) |
| 02/11/2022 | 3 | ATTORNEY Appearance for Plaintiff Daniel Brown by Timothy Jackson (Jackson, Timothy) (Entered: 02/11/2022) |
| 02/11/2022 | | CASE ASSIGNED to the Honorable Philip G. Reinhard and Honorable Lisa A. Jensen. Designated as Magistrate Judge the Honorable Lisa Jensen. Case assignment: Random assignment. (pg, ) (Entered: 02/11/2022) |

| 02/11/2022 | | CLERK'S NOTICE: Pursuant to Local Rule 73.1(b), a United States Magistrate Judge of this court is available to conduct all proceedings in this civil action. If all parties consent to have the currently assigned United States Magistrate Judge conduct all proceedings in this case, including trial, the entry of final judgment, and all post-trial proceedings, all parties must sign their names on the attached **Consent To** form. This consent form is eligible for filing only if executed by all parties. The parties can also express their consent to jurisdiction by a magistrate judge in any joint filing, including the Joint Initial Status Report or proposed Case Management Order. (pg, ) (Entered: 02/11/2022) |
| --- | --- | --- |
| 02/15/2022 | 4 | MINUTE entry before the Honorable Philip G. Reinhard: Judge Reinhard recuses himself from this case as he is exercising his authority not to take the case pursuant to 28 U.S.C. 294(b). Therefore, the court recommends to the Executive Committee that this case be reassigned to Judge Iain D. Johnston for all further matters. Electronic notice (sb, ) (Entered: 02/15/2022) |
| 02/15/2022 | 5 | EXECUTIVE COMMITTEE ORDER: IT IS HEREBY ORDERED that the Clerk of the Court reassign the above-captioned case as to Judge Iain D. Johnston in accordance with 28 U.S.C. 294 (b). Signed by Executive Committee on 2/15/2022. (jp, ) (Entered: 02/15/2022) |
| 02/15/2022 | 6 | MINUTE entry before the Honorable Lisa A. Jensen: The parties shall jointly complete the PDF fillable initial status report form found on Judge Jensen's webpage at www.ilnd.uscourts.gov under Initial Status Conferences and Reports and file by 4/8/2022. Plaintiff is directed to notify any party filing an appearance to the entry of this order. Mailed notice. (vk) (Entered: 02/15/2022) |

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### WESTERN DIVISION

| | |
|---|---|
| DANIEL BROWN, D/B/A OTSEGO FORESTRY SERVICES, individually and on behalf of all others similarly situated, | Case No. _3:22-cv-50039_ |
| Plaintiff | **CLASS ACTION COMPLAINT** |
| v. | **JURY TRIAL DEMANDED** |
| DEERE & CO. (d/b/a JOHN DEERE), | |
| Defendant. | |

## TABLE OF CONTENTS

I.      NATURE OF ACTION ...................................................................................1

II.    JURISDICTION AND VENUE ......................................................................6

III.   PARTIES ........................................................................................................7

      A.     Plaintiff.................................................................................................7

      B.     Defendant & Co-Conspirators .............................................................7

IV.   TRADE AND COMMERCE ..........................................................................8

V.    RELEVANT MARKETS ................................................................................8

VI.   FACTUAL ALLEGATIONS ..........................................................................9

      A.     Technology in John Deere Tractors ...................................................10

      B.     Deere's Longtime Strategy of Forced Dealership Consolidation ...................14

      C.     Deere's Promise—and Failure— To Provide the Full Spectrum of Repair Tools. ...................................................................................17

      D.     To the Extent Deere Has Made Diagnostic and Repair Tools Available, They Are Insufficient to Restore Competition to the Deere Repair Services Market ...................................................................................24

      E.     There Are No Legitimate Reasons to Restrict Access to Necessary Repair Tools. ...................................................................................26

      F.     Deere Has Not Provided Farmers and Independent Repair Shops with the Necessary Software and Continues to Misrepresent the Issue.........................28

      G.     Defendant's Monopolization of the Deere Repair Services Market Has Led to Artificially High Prices and Record Profits for John Deere ........................... 30

VII.  CLASS ACTION ALLEGATIONS ..............................................................31

VIII. ANTITRUST INJURY ................................................................................34

IX.   CLAIMS FOR RELIEF ...............................................................................35

X.    REQUEST FOR RELIEF ............................................................................46

XI.   JURY TRIAL DEMANDED .........................................................................47

Plaintiff, Daniel Brown, d/b/a Otsego Forestry Services, ("Plaintiff) alleges upon personal knowledge as to himself and his own actions and experience, and upon information and belief, including the investigation of counsel as follows:

## I. NATURE OF ACTION

1. This is an antitrust class action pursuant to Sections 1 and 2 of the Sherman Act (15 U.S.C. §§ 1, 2) brought by Plaintiff on his own behalf and on behalf of a class of persons and entities similarly situated. Plaintiff seeks to represent those persons and entities who purchased repair services from Defendant Deere and Co. (d/b/a John Deere) ("Deere") and/or Deere affiliated Dealerships and technicians in the Deere Repair Services Market for Deere tractors, combines, and other heavy equipment containing engine control units ("ECUs") from January 12, 2018 to the present.

2. John Deere wields significant economic power in the market for large agricultural and industrial heavy equipment in North America and has a larger market share than that of the next two biggest tractor makers, Case New Holland and Kubota Corp., combined. Over the past two decades, modern John Deere tractors, combines, dozers, and other Deere agricultural and industrial equipment ("Deere Tractors") have been manufactured with onboard central computers known as ECUs. The ECU requires proprietary software and associated repair tools (collectively referred to as " ECU Software") to perform or complete both routine and complex repair work.

3. This case is about John Deere's monopolization of the repair service market for Deere brand agricultural and industrial Tractors manufactured with the ECU Software. Deere Tractor owners have traditionally had the ability to repair their own Deere Tractors as needed, or else have had the option to bring their Deere Tractor to an independent mechanic. However, in newer generations of its Tractors that contain ECU Software, the Tractor owners no longer have the option of self-repair or selecting an independent mechanic.

4.  Rather, Deere has deliberately monopolized the repair services market by making crucial ECU Software and repair tools inaccessible to either the Tractor owner or independent mechanics. ("Deere Monopolized Repair Services"). A Tractor owner or non-Deere related third-party mechanic may have the necessary mechanical parts, knowledge, and the skill to make the desired repair, but without access to the ECU Software, the repair is not recognized by the ECU system, making the repair ineffective.

5.  Indeed, Deere precludes its network of highly-consolidated independent dealerships (the "Dealerships") from providing Tractor owners or repair shops with access to the critical ECU Software and repair tools. As a result, Tractor owners have no choice but to hire Deere Repair Services at a heighted and non-competitive price for services that historically could be performed independent of Deere and for less cost.

6.  The motive behind restricting access to the ECU Software is simple: Deere and its Dealerships did not want their revenue stream from service and repair—a far more lucrative business than original equipment sales—to end when the Tractor is purchased, as it often did in the past when owners could perform their own repairs or rely on individual repair shops.

7.  As a result of its monopolistic scheme, Deere's business for its Repair Services is three to six times more profitable than its sales of original equipment.  Deere and the Dealerships are, therefore, highly motivated to prevent competition, either from independent repair shops selling Deere Repair Services, or from Tractor owners with the knowledge and skills to perform their own repairs.

8.  Deere's monopolization of the Deere Repair Services Market allows Deere and the Dealerships to charge and collect supracompetitive prices for its services every time a piece of equipment requires the ECU Software to diagnose or complete a repair. Consequently, Plaintiff and Class members have paid millions of dollars more for the repair services than they would have paid

in a competitive market.

9.      Deere continues to exploit its relationship with customers who have purchased extremely expensive Tractors, locking customers into paying for expensive and inconvenient Repair Services from Deere and its Dealerships. Deere has created an effective tying arrangement, whereby the purchase of Deere Repair Services is tied to the initial purchase of Deere Tractors.

10.     John Deere has demonstrated that it understands that Tracker owners have a right to repair their own Tractors, while at the same time misleading the public regarding how easy it is for farmers or independent repair shops to perform repairs.

11.     After a trade group representing Deere made a highly-publicized promise in 2018 to make the necessary Software and tools available by January 2021, Deere has failed to follow through on this promise. In 2021, multiple investigative journalists attempted to determine whether the Software was available. The Dealerships' response was that they did not sell the Software, or that it was only available to licensed dealers, and the Dealership was not allowed to sell it to anyone else.

12.     Deere unlawfully stifles competition by blocking independent repair shops and reducing consumer choice in what would otherwise be a robust and competitive repair aftermarket, thereby artificially increasing Deere Repair Services prices to supracompetitive levels

13.     Deere's aggressive, forced consolidation of its Dealerships also was implemented with the intent of further limiting price competition for Deere Repair Services, even among Deere Dealerships.

14.     As a result of Deere's unlawful withholding of the necessary Software to perform repairs from farmers and independent repair shops and its forced consolidation of the Dealerships, Plaintiff and the Class paid artificially inflated prices for Deere Repair Services during the Class Period. Prices in the Repair Services Market exceeded the amount they would have paid if the prices had been

determined by a competitive market. Plaintiff and Class members were therefore injured by Defendant's conduct.

15.     Deere's illegal monopoly of the Deere Repair Services Market should be enjoined and dismantled, and Plaintiff and the Class should be reimbursed by Deere for the amount they overpaid for Deere Repair Services.

16.     Deere violated Section 1 of the Sherman Act by forcing consolidation of its affiliated Dealerships to eliminate inter-brand competition for Repair Services. Deere also violated Section 1 of the Sherman Act through its arrangements with Co-conspirator Dealerships to not sell the Software to farmers and independent repair shops. Finally, Deere violated Section 1 of the Sherman Act through forcing Plaintiff and Class Members to purchase Deere Repair Services from Deere once they were locked into ownership of an expensive Deere Tractor. Deere's tying arrangement between Deere Tractors and Repair Services had both the intent and effect of harming competition in the Deere Repair Services Market and creating a monopoly for the Deere Repair Services.

17.     Deere also violated Section 2 of the Sherman Act by monopolizing or attempting to monopolize the Deere Repair Services Market in a manner that harmed competition and injured the purchasers of such services by reducing choice and increasing prices in this market to supracompetitive levels. Deere has also leveraged its monopoly power over Deere Software to tie sales of its Tractors to sales of Deere Repair Services, in violation of Section 2 of the Sherman Act.

18.     Deere has unjustly enriched itself by profiting from Plaintiffs' payment of supracompetitive prices for Deere Repair Services in violation of the antitrust laws and should be made to disgorge these profits.

19.     Plaintiff seeks declaratory and injunctive relief, treble and exemplary damages, costs, and attorneys' fees. As for equitable relief, Plaintiff seeks an order requiring Deere to make the

necessary Software available, at reasonable cost, to individuals and repair shops.

## II.    JURISDICTION AND VENUE

20.    Plaintiff brings this action on behalf of itself and the Class under Section 16 of the Clayton Act (15 U.SC. § 26) to secure injunctive relief against Defendant for violating Sections 1 and 2 of the Sherman Act (15 U.S.C. §§ 1 and 2), and to recover actual and compensatory damage, treble damages, interest, costs and attorneys' fee for the injury caused by Defendant's conduct.

21.    This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331, 1337 and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26.

22.    This Court also has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(d)(2) because sufficient diversity of citizenship exists between parties in this action, the aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs, and there are 100 or more members of the proposed class.

23.    Venue is appropriate in this District pursuant to Sections 4, 12, and 16 of the Clayton Act, 15 U.S.C.  28 U.S.C. §15(a), and 28 U.S.C. § 1391(b), (c) and (d) because Defendant Deere & Company transacted business in this District, is licensed to do business or is doing business in this District, and because a substantial portion of the affected interstate commerce described herein was carried out in this District.

24.    The activities of Defendant as described herein, were within the flow of, were intended to, and did have direct, substantial, and reasonably foreseeable effects on the foreign and interstate commerce of the United States.

## III.    PARTIES

### A.  Plaintiff

25.    Plaintiff Daniel Brown is a resident and citizen of New York.  He is a sole proprietor doing business as Otsego Forestry Services.  He owns a Deere 450 Dover that was

manufactured with ECU and ECU software. During the Class Period, Plaintiff purchased Deere Repair Services in New York from a John Deere dealership to diagnose and repair the malfunctions and suffered antitrust injury as a result of Defendant's conduct alleged herein.

### B. Defendant & Co-Conspirators

26.     Deere & Co. is a publicly-traded company headquartered in Moline, Illinois.

27.     "Defendant" as used herein, includes, in addition to those identified specifically above, all of the named Defendant's predecessors, including companies that merged with or were acquired by the named Defendant, as well as Defendant's wholly-owned or controlled subsidiaries, dealerships, affiliated and/or authorized technicians, and/or Co-conspirators that sold Deere Repair Services in interstate commerce, directly or through its wholly-owned or controlled affiliates, to purchasers in the United States during the Class Period.

28.     Co-conspirators include independently-owned dealerships with agreements with Deere giving them the right to sell Deere Tractors and Deere Repair Services. Based on recent data, out of the 1,544 Dealerships affiliated with Deere, 91% of these Dealerships are owned by a "Big Dealer," i.e., a dealer that owns 5 or more individual locations. Although not an exhaustive list, the largest Dealership groups are Ag-Pro Companies (75 locations in 8 states), United Ag &

Turf (53 locations in 6 states), C&B Operations (36 locations in 6 states), Papé Machinery (35 locations in 5 states); RDO Equipment (32 locations in 9 states); Brandt Holdings (32 locations in 5 states); Greenway Equipment (31 locations in 2 states); Van Wall Group (31 locations in 4 states); and Quality Equipment (28 locations in 2 states).

## IV.    TRADE AND COMMERCE

29.    During the Class Period, Defendant, directly or through its subsidiaries or affiliated Dealerships, sold Deere Repair Services in the United States in a continuous and uninterrupted flow of interstate commerce and foreign commerce, including through and into this judicial district.

30.    During the Class Period, Defendant controlled all of the market for Deere Repair Services in the United States.

31.    Defendant's business activities substantially affected interstate trade and commerce in the United States and caused antitrust injury in the United States.

## V.    RELEVANT MARKETS

32.    **Deere Repair Services Market.** The principal relevant market to evaluate Defendant's anticompetitive conduct is the Deere Repair Services Market.

33.    The Deere Repair Services Market constitutes various services and labor to repair, maintain, and clear fault codes from Deere Tractors.[4]

34.    There are no available substitutes for Deere Repair Services, and Deere Repair Services are not interchangeable with any other manufacturers' service.

35.    The relevant geographic market is the United States.

---

[4] As defined *supra*, Deere "Tractors" for purposes of this litigation include all John Deere tractors, combines, and other agricultural equipment with ECUs.

36.     Defendant Deere has market and monopoly power in the relevant market through its control over access to the ECU Software.

37.     Any independent repair shops who desire to compete with Deere in the Deere Repair Services Market would face insurmountable barriers. Defendant's effective total control of the ECU Software means that independent repair shops are unable to access the necessary resources to be able to meaningfully compete with Deere. Similarly, any farmers who wish to perform their own repairs and/or maintenance are also unable to access the resources necessary to do so.

38.     Independent repair shops and farmers cannot compete effectively in the Deere Repair Services Market without access to the ECU Software.

39.     **Deere ECU Software Market.** As discussed above, Defendant maintains market and monopoly power over the market for Deere ECU Software. There is no available substitute for Deere ECU Software, and it is not interchangeable with any other manufacturers' product.

40.     **Tractor Markets.** The Deere Repair Services market and the market for Tractors are distinct. The "Tractor Markets" include the United States product markets for agricultural farm tractors, which include 2WD Farm Tractors, Compact Tractors, 4WD Farm Tractors, Row Crop Tractors, Scraper Tractors, Specialty Tractors, Utility Tractors, and Self-Propelled Combines. Defendant Deere is the largest agricultural machinery company in the world and has appreciable economic power in the U.S. Tractor Markets.

## VI.    FACTUAL ALLEGATIONS

41.     Farmers traditionally and historically have been able to perform their own repairs on their own tractors. However, as software has become increasingly intertwined with basic operations of farming equipment, John Deere has restricted access to the necessary tools to make

repairs, thereby cutting out owners and independent repair shops from the ability to make repairs to newer equipment.

### A. Technology in John Deere Tractors

42. Modern Deere Tractors are technologically complex machines. These Tractors run firmware that is necessary for the Tractor to perform its basic functions. Without the firmware, the product is incomplete and will not run, making the firmware as vital a part to the basic functioning of a Tractor as a steering wheel or an engine. The code that runs the internal engine and the transmission components that are required to make the Tractor do anything are effectively part of the machine. The Tractors will not operate without that code.

43. The central computer on a Tractor is the Engine Control Unit, or "ECU." The ECU determines how—and if—the Tractor functions.

44. Like cars, John Deere Tractors use a large number of sensors throughout the equipment that are constantly monitored by the ECU. When a sensor notices an error, no matter how small or serious, it can put the machine into "limp mode," allowing farmers to move the machine slowly but not operate it fully. When the problem is diagnosed and repaired, the error code is cleared and the machine can continue working.[5]

45. According to a report from a U.S. Public Interest Research Group, the John Deere S760 combine harvester has 125 different computer sensors in it. If any one of those sensors throw an error code, the combine will enter limp mode.

46. Troubleshooting Deere Tractors—e.g., interpreting the error codes—requires Software that Deere refuses to make available to farmers.

---

[5] Koebler & Gault, *supra* note 3.

47.     Since about 2000, Deere Tractors began using what is known as "CAN bus" systems in their machinery, standing for Controller Area Network. CAN bus is essentially a central electrical system that allows communications between different parts of the machinery. Sales manuals for Deere Tractors explain that an advantage of the system "allows the technician at the dealership to plug into the system using the Service ADVISOR™ computer program. The Service ADVISOR program links up to the tractor's electrical system to read the communications between the controllers to determine where the problem is located and how it can be fixed."[6]

48.     Service ADVISOR, per John Deere's own sales manual materials, is

a tool used by John Deere **dealerships** capable of providing technical and mechanical support for technicians and service managers through the use of a laptop computer. Service ADVISOR provides symptom-based diagnostics information, specific machine information, and electronic technical information. It also offers a connection to John Deere help and solutions through an extranet connection at the workshop and in the field.

Service ADVISOR is a fast diagnostic testing system for all controller area network (CAN) bus tractors. This system is the cutting edge of service technology and will save time and money by faster equipment repair.

(emphasis added).

49.     Even if the farmer is able to interpret the error code and determine what the problem is with the Tractor, it doesn't matter how tech-savvy or experienced a mechanic a farmer is; without access to the necessary software tools, farmers must call the dealership to repair, or clear fault codes for, their machine.

---

[6] *See* John Deere & Co Sales Manual, Electrical, CAN bus electrical system (2017), https://www.dot.state.oh.us/Divisions/ContractAdmin/Contracts/PurchDocs/207-19/DeerComp01/6110M%20Product%20Info.pdf.

50.     Farmers report their Tractors shutting down from computer faults and having to sit and wait for a John Deere technician to arrive while they lose valuable time, which can lead to expensive crop losses.

51.     Without access to the Software and other tools needed to diagnose and repair the error, farmers must rely on Deere dealerships and technicians to travel to where the equipment is, plug in the necessary tools, and clear the error codes.

52.     Replacing parts on a Tractor also can result in "bricking" of the machine if the proper Software is not used. After a new part is installed on a Tractor, a program called Service Advisor needs to be connected to the ECU to authorize the new parts. If the new part is not "authorized" by the Software, the engine of the Tractor will not start, rendering the Tractor useless to its owner until the owner pays a Deere technician to authorize the repair and therefore restore operation of the Tractor.

During harvest time, when Tractors, including combines, are running at full throttle for weeks on end, it's common for mechanical issues to arise. Farmers who try to solve problems themselves or take their Tractors to more convenient repair shops are blocked from completing the repairs without the necessary Software. For example, one customer who hired an independent agricultural equipment repair shop to replace a faulty moisture meter on a combine still had to wait and pay for the dealer to come out and use Software to authorize the part.[8]

---

[7] *Black Farmers' Boycott Against John Deere Continues, Deere has Lied for Years According to Recent Article,* National Black Farmers Association (Feb. 25, 2021), https://www.blackfarmers.org/blog/black-farmers-boycott-against-john-deere-continues-deere-has-lied-for-years-according-to-recent-article.

[8] Mae Anderson, *Without 'right to repair,' businesses lose time and money*, Associated Press (Aug. 10, 2021), https://apnews.com/article/technology-business-9f84a8b72bb6dd408cb642414cd28f5d.

53. As of 2021, the reported cost for Repair Services from Deere or an authorized Dealer could range from $150–$180 per hour, with additional charges for travel and parts.

54. Regardless of a farmer's own ability and knowledge regarding how to repair the Tractor they own, without the relevant Software, an authorized John Deere technician must be called to perform many repairs.

55. Logistically, this is a nightmare for many farmers. When a farmer calls a dealer to perform a repair, the farmer is at the mercy of the dealer's schedule and must pay whatever the cost is—including travel expenses—even if the problem could be fixed in 15 minutes with access to the Software. Farmers also may work far away from the nearest dealership or technician, leading them to have to pay substantial amounts for travel time or the cost of having their equipment hauled to a dealership.

56. Deere has made farmers dependent on Deere for repairs. Farmers, who often have a lifetime of skills built up enabling them to fix their own equipment, are forced to sit and wait for a service technician from Deere to arrive on site and charge $150 or more per hour for labor, on top of other costs.

57. These additional costs paid to Deere by farmers cut into an already razor-thin profit margin on crops. Farmers in the United States are currently experiencing drastically increasing operating expenses while revenue and profits from crop yields remains stagnant. For example,

---

[8] Mae Anderson, *Without 'right to repair,' businesses lose time and money*, Associated Press (Aug. 10, 2021), https://apnews.com/article/technology-business-9f84a8b72bb6dd408cb642414cd28f5d.

between 1996 and 2020, total costs for growing corn increased by 193% while yields only increased by 13.7%. In that same period, costs for growing soybeans increased by 202% while yields increased only by 12.3%.

58.     As a result, farmers have had difficulty paying their outstanding operating debts—estimated at well over $400 billion in 2019—and the rate of farm bankruptcies has accelerated, with declared farm bankruptcies increasing by 24% from 2018 to 2019, the biggest yearly increase since the Great Recession.

59.     Furthermore, given farmers' investments in Deere Tractors, which can run upwards of half a million dollars, they have no reasonable choice but to pay for Deere's Repair Services. The farmers are locked in to using Deere Tractors, as switching costs are so high and farmers expect to be able to use a Tractor for decades.

60.     While some farmers own these expensive machines outright, many farmers lease the equipment. The leaseholder is often Deere itself, which has become the fifth-largest agricultural lender in the sector.[9]

### B. Deere's Longtime Strategy of Forced Dealership Consolidation.

61.     In addition to being forced to purchase Repair Services from Deere, farmers in many areas are faced with limited or nonexistent choice as to which Deere Dealership to purchase Repair Services from. This lack of meaningful choice is in large part due to Deere's concerted efforts to force Dealerships to consolidate or lose their affiliation with Deere.

---

[9] Jesse Newman & Bob Tita, *America's Farmers Turn to the Bank of John Deere*, Wall Street Journal (July 18, 2017), https://www.wsj.com/articles/americas-farmers-turn-to-bank-of-john-deere-1500398960.

62. Starting approximately in the early 2000s (and coinciding with when ECUs were first being widely used in Deere Tractors), Deere implemented an aggressive strategy that pressured Dealerships to consolidate.

63. In a series of meetings in Louisville, Kentucky, in the summer of 2002, Deere told dealers they should plan on a future in which they would either be a buyer or a seller.[10] One former owner of a dealership in Virginia reported that in 2002 he began receiving letters, emails, and visits from Deere officials almost monthly urging him to either acquire another dealer or cash out.[11]

64. Deere's strategy worked. In 1996, the total number of Deere Dealership locations was approximately 3,400. By 2007, this number had decreased to 2,984. In 2021, only 1,544 Dealership locations remained. Only 144 of these Dealerships are not owned by "Big Dealers," i.e., Dealerships that operate five or more individual Dealership locations. Very few single-location dealerships remain.

65. In 2009, a former owner of a Deere-affiliated dealership, Roy Dufault, reported to AgWeek, a weekly agricultural newspaper, that representatives from Deere pressured him to sell his small dealership in Fosston, Minnesota. Deere told him that for the large dealers in the area to continue to grow, Dufault needed to get out of the way, as his dealership was a hindrance to their profitability.[12] Deere's representatives told Dufault that there was no need for a location in Fosston, and that another dealership could cover the trade area remotely. At the time Deere terminated its dealer agreement with Dufault, customers expressed their concern about where they would have

---

[10] Ilan Brat & Timothy Aeppel, *Why Deere Is Weeding Out Dealers Even as Farms Boom*, Wall Street Journal (Aug. 14, 2007), https://www.wsj.com/articles/SB118705668767896842.
[11] *Id.*
[12] *John Deere leaves a dealer and his customers high and dry*, AgWeek (Sept. 21, 2009), https://www.agweek.com/news/3787513-john-deere-leaves-a-dealer-and-his-customers-high-and-dry.

their Deere equipment serviced. In 2021, there is not a Deere Dealership within 20 miles of Fosston, and none within 100 miles that are not owned by a Big Dealer.

66.     In 2013, a single-location Dealership in New Hampshire, R.N. Johnson Inc., had its dealer agreement with Deere canceled after being in business 84 years. The former owner said  that this action was part of Deere's corporate philosophy of "eliminat[ing] all the single-location small dealers."[13] After Deere terminated the dealership agreement, farmers were forced to rely on a Dealership 60 miles away in Massachusetts to get their Tractors serviced.

67.     Similarly, in 2021, Deere terminated the contract of Tennessee's last remaining single-store Deere Dealership, Tri-County Equipment, which had operated as a Deere Dealership since 1977. Tri-County Equipment was the only single-store Dealership in Tennessee for four years prior to Deere's termination of the agreement. Deere reportedly had specified a single potential buyer for the store, but the dealer chose to operate the store as a non-Deere dealership instead of selling the business.

68.     In the last decade, the industry-wide number of agricultural equipment stores owned by Big Dealers increased by 59%.[14] And while this large degree of consolidation among agricultural stores in general is substantial, Deere is a noticeable outlier in number of affiliated Dealerships owned by Big Dealers. In the entire industry, the total percentage of Big Dealer-owned Agricultural Equipment Stores is around 35%, whereas a full 91% of Deere's "Independent" Dealerships are owned by Big Dealers.

---

[13] Meghan Foley, *Former John Deere Dealer Closing After 84 Years*, Farm Equipment (Feb. 28. 2013), https://www.farm-equipment.com/articles/8588-former-john-deere-dealer-closing-after-84-years.

[14] Kim Schmidt, *Big Dealers Continue to Get Bigger*, Ag Equipment Intelligence (Apr. 22, 2021), https://www.agequipmentintelligence.com/articles/4798-big-dealers-continue-to-get-bigger.

69.     The staggering amount of consolidation among Deere Dealerships is the result of Deere systematically picking off small Dealerships by coercing them to sell to a larger dealer. If a single-location Dealer wants to sell the business, Deere dictates who the purchaser can be, funneling Dealership sales to preferred Big Dealers. Deere will terminate its affiliation with the Dealership altogether if the Dealership refuses to sell to the specified buyers.

70.     One farmer complained: "I can go to a JD dealer 20 miles away. Or one 40 miles away in another direction. Or one 80 miles away in a different direction. But they all have the same name. All owned by the same franchise. So, I get 10 or 15 choices all of which are exactly the same."[15]

71.     Deere's consolidation has eliminated or reduced competition among Deere Dealerships, which charge for Repair Services with little fear of a competitor undercutting their rates. This lack of competition boosts profitability for the Dealerships, and therefore also for Deere. Deere benefits not only from forcing farmers to purchase Deere Repair Services from Deere Dealerships, but also from forcing farmers to buy these Repair Services in a market that Deere has painstakingly groomed to be less competitive.

**C.  Deere's Promise—and Failure— To Provide the Full Spectrum of Repair Tools.**

72.     Because of how difficult and expensive Deere had made it for farmers to repair their Tractors, a growing "right to repair" movement began to focus on farmer's rights to repair John Deere agricultural equipment.

73.     Deere has a history of fighting customers' access to the onboard technology on Deere Tractors. In 2015, Deere argued that Section 1201 of the Digital Millennium Copyright Act

---

[15] *John Deere's poor dealership decision making IMO.*, post by Diggin It, TractorByNet Forum (Aug. 18, 2018), https://www.tractorbynet.com/forums/threads/john-deeres-poor-dealership-decision-making-imo.400429/page-5.

gave it power to prevent purchasers of Deere Tractors from bypassing Technical Protection Measures ("TPMs") "for the purposes of lawful diagnosis and repair, or aftermarket personalization, modification, or other improvement." This was, according to Deere, because the owners did not actually own the software that made the Tractor run. Deere argued that the owner only "receives an implied license for the life of the vehicle to operate the vehicle."[16]

74.    When this argument proved unconvincing to the U.S. Copyright Office and bypassing TPMs on agricultural equipment for the purpose of repair was deemed to be fair use, Deere took another approach to blocking farmers from accessing Tractor Software. In 2016, Deere issued an end-user "License Agreement for John Deere Embedded Software" that forbade customers from accessing, reverse-engineering, or modifying the software running on its Tractors (the "EULA").[17] Deere states it "may terminate the license [to the embedded Tractor software] granted under this License Agreement . . . if you violate any material term of this License Agreement. . ."[18]

75.    As public awareness of and frustration with increasingly prohibitive repair restrictions grew, state lawmakers began to act. As of 2021, 27 states have introduced some form of "right to repair" legislation. A proposed bill in Minnesota would require manufacturers to "make available, on fair and reasonable terms, documentation, parts, and tools, inclusive of any updates to information or embedded software, to any independent repair provider or to the owner

---

[16] Deere & Company, *Long Comment Regarding a Proposed Exemption Under 17 U.S.C. 1201*, https://copyright.gov/1201/2015/comments-032715/class%2021/John_Deere_Class21_1201_2014.pdf (last accessed Jan. 4, 2022).

[17] *License Agreement for John Deere Embedded Software*, https://www.deere.com/assets/pdfs/common/privacy-and-data/docs/agreement_pdfs/english/2016-10-28-Embedded-Software-EULA.pdf (last accessed Jan. 4, 2022).

[18] *Id.*

of digital electronic equipment manufactured by or on behalf of, or sold by, the original equipment manufacturer for purposes of diagnosis, maintenance, or repair."[19]

76.     In September 2018, the Equipment Dealers Association ("EDA"), a trade and lobbying group that represents John Deere and other manufacturers and often acts as Deere's mouthpiece, made a promise intended to stave off increasing pressure from customers and lawmakers to pass similar "right to repair" legislation pending around the country.[20]

77.     The EDA committed to make repair tools, Software, and diagnostics available to the public by January 1, 2021.[21]

78.     The EDA went so far as to put out a "Statement of Principles," laying out this promise. In a heavily-publicized ceremony and photo op, the EDA signed a "Memorandum of Understanding" with the California Farm Bureau that enshrined this statement of principles.[22]

79.     The Far West EDA president and CEO Joani Woelfel said in a 2018 press release that the statement of principles "says a lot about the relationship between dealers and their customers."

---

[19] Digital Fair Repair, HF 1138, 91st Leg., 2nd Engrossment (Minn. 2020), https://www.revisor.mn.gov/bills/text.php?number=HF1138&type=bill&version=2&session=ls9 1&session_year=2019&session_number=0.
[20] Koebler & Gault, *supra* note 3.
[21]*Agreement Streamlines Repair of High-Tech Farm Equipment*, Far West EDA (Sept. 9, 2018), https://fweda.com/industry-news/agreement-streamlines-repair-of-high-tech-equipment (last accessed Jan. 4, 2022).
[22] Koebler & Gault, *supra* note 3.

80.   The Statement of Principles reads:

**STATEMENT OF PRINCIPLES:**

To the extent not already available, the maintenance, diagnostic and repair information listed below will be made available to end users through authorized agricultural dealers at fair and reasonable terms, beginning with tractors and combines put into service on or after January 1, 2021. End users will also be able to purchase or lease diagnostic tools through authorized agricultural dealers. Certain information and tools may be available earlier. Agricultural dealers are committed to provide access to:

- Manuals (Operator, Parts, Service)
- Product Guides
- Product Service Demonstrations, Training, Seminars or Clinics

- Fleet Management Information
- On-Board Diagnostics via diagnostics port or wireless interface

- Electronic Field Diagnostic Service Tools and training on how to use them

- Other publications with information on service, parts, operation and safety

Using this information and these tools, which will be available for purchase, lease or subscription from dealers, farmers will be able to identify and repair numerous problems they may encounter with their equipment. FWEDA and CFBF support equipment users' ability to maintain, diagnose and repair their machinery. However, the ability to diagnose and repair does not mean the right to modify. For safety, durability, environmental and liability reasons, diagnostic and repair information and tools will not permit consumers to do the following:

- Reset an immobilizer system or security-related electronic modules,

- Reprogram any electronic processing units or engine control units,

- Change any equipment or engine settings negatively affecting emissions or safety compliance,

- Download or access the source code of any proprietary embedded software or code

81.   As journalists from the magazine Vice noted, the commitment "did not promise to actually sell repair parts, and it also contains several carve-outs that allow tractor manufacturers to continue using software locks that could prevent repair."[23]

82.   Three years later in mid-2021, farmers still struggle to get anything promised in the agreement with the EDA.

83.   Posing as a customer, Right to Repair advocate Kevin O'Reilly called 12 John Deere dealerships in six states. Of those, 11 told Mr. O'Reilly that they don't sell diagnostic software, and the last one gave him an email of someone to ask for the tools. When Mr. O'Reilly sent an email to the individual identified, he did not receive a response.[24]

84.   Similarly, journalists from Vice who attempted to assess the availability of the Software called nine dealerships in seven states and were told by representatives that the things promised by the EDA were not available. The journalists called three dealerships in California;

---

[23] Jason Koebler, *Farmer Lobbying Group Sells Out Farmers, Helps Enshrine John Deere's Tractor Repair Monopoly*, Vice Motherboard (Sept. 11, 2018), https://www.vice.com/en/article/kz5qgw/california-farm-bureau-john-deere-tractor-hacking- right-to-repair.

[24] Koebler & Gault, *supra* note 3.

two said no immediately, and a third told the journalists that the repair software and tools could not be sold to the public and required the purchaser to be a licensed dealer.[25]

85.    A spokesperson for the AEM, another manufacturers' lobbying and trade group that often represents Deere, told Vice that, "Comprehensive repair and diagnostic information is now available for the vast majority of the tractor and combine market through authorized dealers." However, the spokesperson failed to respond when Vice asked if the spokesperson could point to a single instance where this is actually the case, or a single manufacturer that explains to farmers where they can get this information or these tools.

86.    Deere has continued to insist that much of the information is readily available, despite all evidence to the contrary, while emphatically paying lip service by agreeing that farmers have the right to repair their own equipment.[26]

87.    In response to Vice's article calling out Deere for its failure to make good on its commitment, Ag Equipment Intelligence, an agriculture industry magazine, interviewed Natalie Higgins, at the time a vice president of Government Relations at the EDA, and now currently employed by Deere as Manager for State Public Affairs. Higgins blamed the evident lack of availability of the resources on a "lack of communication," saying that "I think the rush on the technical side to get the products and resources for farmers to market led us to not take the time to really contemplate how we communicate the availability to our customers."[27]

88.    This absurd explanation—that the Software and tools only *appear* unavailable because the industry was too preoccupied with rushing to make it available to ever properly

---

[25] *Id.*

[26] *Id.*

[27] *John Deere Responds to Vice Article on Right to Repair*, Ag Equipment Intelligence (Mar. 30, 2021), https://www.agequipmentintelligence.com/articles/4738-john-deere-responds-to-vice-article-on-right-to-repair (hereinafter "Ag Equipment Intelligence").

communicate with its customers or dealers—is largely in line with the confusing positions Deere has taken on the issue. Over the last few years, Deere and industry spokespeople have taken inconsistent positions, equivocating regarding what tools and Software are actually required in order to make and complete repairs on Tractors. Deere and industry representatives have stated at various times that: (1) customers can do 98 precent of repairs on Deere Tractors without access to the tools that Right to Repair advocates have pushed for;[28] (2) the repair tools have been available to farmers and independent repair shops for years;[29] and, now most recently, that

(3) the repair tools are *now* available, but Deere has not prioritized adequately communicating this to the dealerships or customers.[30]

89.     If these tools were actually available to farmers and independent repair shops, then it would be simple for Deere to point to where they could be accessed and where they could be purchased. Although it cannot point to any real-world examples where this is the case, the company and its industry representatives insist that these tools are available.

---

[28] Nilay Patel, *John Deere Turned Tractors Into Computers – What's Next?,* The Verge (June 15, 2021), https://www.theverge.com/22533735/john-deere-cto-hindman-decoder-interview-right-to-repair-tractors ("The statistics are real: 98 percent of the repairs that happen on a product can be done by a customer today.").

[29] Ag Equipment Intelligence, *supra* note 27 ("for many years, John Deere has supported our customers' right to repair their equipment…[w]e've offered a broad range of diagnostic, maintenance and repair tools for farmers that are available through John Deere dealers."); *see also* Deere & Co. Position Paper (uploaded by Vice Motherboard on Feb. 14, 2017), *available at* https://www.scribd.com/document/339340098/John-Deere-letter#from_embed ("John Deere [] provides access to service information and diagnostic information for both producer customers and non-producers. The format and cost of this access is similar to those charged our authorized John Deere dealers.").

[30] Ag Equipment Intelligence, *supra* note 27 (citing David Gilmore, Senior Vice President, Sales and Marketing Regions 3 & 4 at John Deere, stating that Deere had met all the requirements laid out in the Vice Article) ("we've met all of the commitments that we made to the industry and to our customers, in terms of providing them with the tools and the software that they need to not only maintain and diagnose but also repair their machines.").

90.     As one example, David Ward, a spokesperson for Association of Equipment Manufacturers (AEM), told Vice that comprehensive repair and diagnostic equipment is now available through authorized dealers. Ward did not return emails when Vice followed up, asking for a single instance of where this is actually the case, or a single manufacturer that explains to farmers where they can get the information or the tools.

91.     On the other hand, there are plenty of examples that demonstrate how the Software remains inaccessible, even to individuals and businesses who are by all accounts highly sophisticated parties familiar with the industry.

92.     In 2020, one owner of an independent equipment mechanic shop in Nebraska reported that about half of the repairs he sees involve code faults triggered by emission-control systems. The faults render vehicles inoperable, and while the shop can replace the exhaust filters and particulate traps that might throw a Tractor's code, the dealerships would not provide the Software necessary to restart the Tractor. This forced the owner or the shop to haul the machine to a Deere dealership or pay for a Deere mechanic to make a house call with the Software.[31]

93.     The EDA blamed a "lack of communication" as the culprit for why most farmers and media think the Software and tools remain unavailable and promised that industry organizations like the EDA would "step up to bridge that communication gap" by "educating dealers… focusing on the fundamentals like putting information on our websites and using social media to promote these resources."[32] Since the Ag Equipment Intelligence article was published quoting Higgins on March 30, 2021, the EDA has yet to post on their frequently-updated Twitter page about where farmers or independent repair shops could access these resources. Instead, the

---

[31] Waldman & Mulvany, *supra* note 2.
[32] Ag Equipment Intelligence, *supra* note 27.

only Twitter post by the EDA referencing "repair" in any way since March is a July 19, 2021 tweet advertising a webinar about reasons the EDA opposes Right to Repair.[33]

94.    Around that same time, Deere issued a company statement that "John Deere supports a customer's right to safely maintain, diagnose and repair their own equipment."[34] Deere is also quoted as stating "When customers buy from John Deere, they own the equipment and can choose to personally maintain or repair the product."[35]

95.    By implying that owning a Deere Tractor does not require farmers to rely on Dealerships for repairs, Deere intentionally obscures the fact that the Software is necessary for diagnosis and completion of a large number of these repairs. Deere's misleading statements fail to provide information on the scope of repairs and maintenance that can be accomplished without the Software, preventing farmers from being able to accurately assess the overall cost of owning a Deere Tractor.

### D.    To the Extent Deere Has Made Diagnostic and Repair Tools Available, They Are Insufficient to Restore Competition to the Deere Repair Services Market.

96.    Beginning sometime around June 2021, John Deere quietly created a web page on their main company site[36] for a product called Customer Service ADVISOR, with a form to "request more info" about a subscription. One dealer website describes Customer Service ADVISOR as a way for customers to access "much of the same" technical and diagnostic

---

[33] EDA (@Equip_Dealers), Twitter (July 19, 2021, 2:00 PM), https://twitter.com/Equip_Dealers/status/1417197594388975620.
[34] Tyne Morgan, *AEM, John Deere Respond to Biden's Planned Executive Order Over Right to Repair Equipment*, AgWeb Farm Journal (July 7, 2021).
[35] *Id.*
[36] Customer Service ADVISOR™, John Deere, https://www.deere.com/en/parts-and-service/manuals-and-training/customer-service-advisor/ (last accessed Jan. 4, 2022).

information used by dealership technicians.[37] However, this pared-down system explicitly does not include every feature that dealers have access to, and costs *start at* $8,500 for the first year alone.[38] If Deere charges customers the same amount per year, in six years this would amount to an extra $51,000 paid by customers who want to perform their own repairs. Over the course of the lifetime use of a Deere Tractor, the cost to maintain access to the Software necessary to individually perform repairs could amount to the total price of the Tractor itself.

97.     Furthermore, there is no indication that Deere will provide sufficient repair tools to independent repair shops or, for that matter, even to customers. The only apparent way to access materials is to place a request with an individual dealership, and there is no guarantee or timeline of when Customer Service ADVISOR is available.

98.     It is also unclear if Deere is simply calling attention to the already-existing, extremely limited capability customer version of Service ADVISOR. This barebones version allows a customer to troubleshoot codes but offers minimal functionality otherwise. A farmer or independent repair shop is not able to use the software, for example, to replace a sensor and recalibrate a Tractor. As one employee of a Deere dealership described it in 2016, the customer version is "a waste of your money."[39] The same employee also described the version of Customer Service Advisor as "similar to [Service Advisor] but they really give you only enough to help your dealer cut down on the labor if you troubleshoot it yourself. If they let you calibrate, us dealer guys wouldn't have any work".[40]

---

[37] Customer Service Advisor, United Ag & Turf,
https://www.unitedagandturf.com/service/customer-service-advisor/ (last accessed Jan. 4, 2022).
[38] *Id.*
[39] *JD Service Advisor*, The Combine Forum, post by hake2651 (Feb. 26, 2016),
https://www.thecombineforum.com/threads/jd-service-advisor.253730/.
[40] *JD Service Advisor*, The Combine Forum, post by hake2651 (Feb. 29, 2016),
https://www.thecombineforum.com/threads/jd-service-advisor.253730/.

99.     Deere continues to carefully guard access to the Software necessary to make repairs, and to the extent it has made a watered-down version of it available to its customers, it has priced it so high that the access to the Software will be an unattractive option to most customers, even in comparison to the high cost of paying Deere for Repair Services. This arrangement thus allows Deere to claim it has provided repair and diagnostic materials to its customers while posing virtually no risk to Deere's monopoly in the Deere Repair Services Market.

### E.   There Are No Legitimate Reasons to Restrict Access to Necessary Repair Tools.

100.     In May 2021, the FTC issued a report titled "Nixing the Fix: An FTC Report to Congress on Repair Restrictions" that examined, among other things, how repair restrictions implemented by various industries increase costs and limit consumer choice, and how these restrictions might implicate federal consumer protection and antitrust laws.[41]

101.     The report synthesized knowledge gained from a July 16, 2019 workshop, as well as public comments, responses to a Request for Empirical Research and Data, and independent research.[42] The FTC concluded there was "scant evidence to support manufacturers' justifications for repair restrictions" and that access to information, manuals, spare parts, and tools, were "well-supported by comments submitted for the record and testimony provided at the Workshop."[43]

102.     The FTC received research submissions and comments from the EDA and AEM, as well as "the full spectrum of interested parties."

---

[41] Federal Trade Commission, *Nixing the Fix: An FTC report to Congress on Repair Restrictions* (May 2021), *available at* https://www.ftc.gov/system/files/documents/reports/nixing-fix-ftc-report-congress-repair-restrictions/nixing_the_fix_report_final_5521_630pm-508_002.pdf (hereinafter "FTC Report").
[42] FTC Report, p. 3.
[43] FTC Report, p. 6.

103.    More specifically, the FTC noted that restricting repairs to authorized repair networks was not automatically justified just because of the existence of possible safety concerns. The FTC noted that manufacturers provided no factual support for their statements that "authorized repair persons are more careful or that individuals or independent repair shops fail to take appropriate safety precautions."[44]

104.    Similarly, the FTC pointed out that manufacturers had failed to offer evidence that providing access to the same tools made available to authorized service providers created additional security risks. The FTC concluded "[m]anufacturers can provide others with the same parts and tools that they provide to their authorized service providers. And, by providing access to individuals and independent repair shops, manufacturers would have greater confidence in the repair activities that occur outside of their authorized networks."[45]

105.    The FTC stated that, beyond bare assertions of liability exposure and reputational harm from allowing independent repairs, manufacturers "provided no empirical evidence to support their concerns about reputational harm or potential liability resulting from faulty third party repairs."[46] The report further noted that manufacturers' arguments regarding the "superior service" were anecdotal, whereas there was evidence that consumers were generally satisfied with repairs made by independent repair shops. The FTC concluded that "[t]he record does not establish that repairs conducted by independent repair shops would be inferior to those conducted by authorized repair shops if independent repair shops were provided with greater access to service manuals, diagnostic software and tools, and replacement parts as appropriate."[47]

---

[44] FTC Report, p. 28.
[45] FTC Report, p. 31.
[46] FTC Report, p. 33.
[47] FTC Report, p. 38.

106.     There is no defensible basis for Deere to withhold the full spectrum of Dealer-level Software that a farmer or independent repair shop would need to diagnose or perform repairs. In fact, the automotive industry is an example of manufacturers agreeing to do just that. Industrywide, vehicle owners and independent repair shops have had access to Dealer-level diagnostic and repair tools from the manufacturers for nearly eight years. In 2014, the automotive industry through representative trade organizations voluntarily agreed to:

> make available for purchase by owners of motor vehicles manufactured by such manufacturer and by independent repair facilities **the same diagnostic and repair information**, including repair technical updates, **that such manufacturer makes available to its dealers** through the manufacturer's internet-based diagnostic and repair information system or other electronically accessible manufacturer's repair information system. All content in any such manufacturer's repair information system shall be **made available to owners and to independent facilities in the same form and manner and to the same extent as is made available to dealers** utilizing such diagnostic and repair information system for purchase by owners and independent repair facilities on a daily, monthly, and yearly subscription basis and upon fair and reasonable terms.[48]

**F.  Deere Has Not Provided Farmers and Independent Repair Shops with the Necessary Software and Continues to Misrepresent the Issue.**

107.     To the extent that Deere has made limited repair information and tools available, it has been insufficient to give farmers and independent repair shops the same opportunity to repair their Tractors and to open the Deere Repair Services Market to true competition.

108.     Deere must provide access to the same tools that the dealers have to both farmers and independent repair shops.

109.     Deere has also resisted making the Software and tools available to farmers and independent repair shops under the auspices of "ensur[ing] continued compliance with emissions,

---

[48] Memorandum of Understanding, Automotive Aftermarket Industry Association, Coalition for Auto Repair Equality, Alliance of Automobile Manufacturers, and Association of Global Automakers (Jan. 15, 2014) (emphasis added), https://www.autocare.org/docs/default-source/government-affairs/r2r-mou-and-agreement-signed.pdf.

operator safety and other regulatory requirements."[49] Deere's claims that providing access to Software and repair tools would allow farmers to bypass emissions and safety controls misrepresents what farmers are asking for.

110.     There is a clear difference between resetting an error code and ignoring or overriding safety codes. Overriding emissions or safety controls requires a different set of modification tools, which are *not* the tools used for diagnosis and repair. The FTC pointed out that data submitted by the EDA ostensibly showing that modifications of agricultural equipment affected emissions was inapposite, "because [the data] concerns modifications to equipment as opposed to repairs."[50] The FTC also noted conversations with AEM and EDA representatives confirmed the limitations of the submitted studies.[51]

111.     In order to override emission controls on a Tractor, the entire operating system on the machine would have to be erased and then replaced with new, modified software that either does not have emissions and safety controls or allows a farmer to ignore them.[52] This is an illegal practice separate from the issue of access to Software and is not what is being requested in this litigation.

112.     Deere and industry groups have latched onto this talking point—conflating "repair" and "modification"—in their successful attempt to foreclose others from the market and thereby maintain Deere's monopoly in the Deere Repair Services Market.

---

[49] Deere & Co Position Letter on Kansas HB 2122: Digital Electronic Repair Requirements, *available at* https://www.vice.com/en/article/mgxayp/source-apple-will-fight-right-to-repair-legislation.
[50] FTC Report, p. 38.
[51] FTC Report, p. 38, n. 205.
[52] Kevin O'Reilly, U.S. PIRG, *Deere in the Headlights: How software that farmers can't access has become necessary to tractor repair* (Feb. 2021), https://uspirg.org/feature/usp/deere-headlights.

### G. Defendant's Monopolization of the Deere Repair Services Market Has Led to Artificially High Prices and Record Profits for John Deere.

113.    Deere has an obvious motive for restricting access to the Software and maintaining its unlawful tying arrangement and monopoly and attempted monopoly in the Deere Repair Services Market: money. For Deere and its Dealerships, parts and services are three to six times more profitable than sales of the original equipment, and the repair segment of Deere's business has also been growing faster than original equipment sales. From 2013 to 2019, Deere's annual parts sales went up 22%, while the company's total agricultural equipment sales went down 19% in this same period.[53]

114.    During this period where Deere's Tractors with ECUs reached greater market penetration and as Deere systematically eliminated small Dealerships that were creating competition and undercutting profits for Deere's Big Dealers, the company's income skyrocketed. In 2000, Deere's net income was around a half billion dollars. Deere's projected 2021 net income is $5.7B, over 11 times its income from 2000, and over twice its net income of $2.75B in 2020. Although Deere does not break down the income received from the Dealerships' sales of Repair Services in its company filings, sales of "parts and maintenance services" are reported to account for a fifth of Deere's sales.[54] In the last several years, the reported profit margins not associates with direct sales increased dramatically, and the company stated to investors in 2020 that it was betting on its parts and maintenance services business to contribute 50 basis points in added profits over the next two years.[55]

---

[53] Waldman & Mulvany, *supra* note 2.
[54] Rajesh Kumar Singh, *Deere bets on cost cuts, services push to boost profits*, Reuters (Jan. 8, 2020), https://www.reuters.com/article/us-deere-strategy/deere-bets-on-cost-cuts-services-push-to-boost-profits-idUSKBN1Z72TA.
[55] *Id.*

115. Without access to the Software to perform repairs and clear fault codes, owners of Deere Tractors have been forced to give Deere and its Dealerships more money for Deere Repair Services that the farmers would have expended had they performed the repairs themselves or hired less expensive, and often more convenient, independent repair shops to perform. One farmer reported that he purchased a new Tractor for $300,000 and spent nearly $8000 into clearing fault codes over the course of a few years.[56]

116. The money that farmers sink into paying Deere to clear fault codes and approve repairs that they could have performed themselves cut into an already thin profit margin.

## VII. CLASS ACTION ALLEGATIONS

117. Plaintiff brings this action on behalf of itself, and as a class action under the Federal Rules of Civil Procedure, Rule 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedures, seeking damages and equitable and injunctive relief on behalf of the following class (the "Class"):

> All persons and entities residing in the United States who, during the Class Period of January 12, 2018 to the present, purchased Deere Repair Services for Deere Tractors from Defendant or Deere's authorized Dealers and/or technicians.

118. Specifically excluded from the Class are Deere and its employees, affiliates, subsidiaries, and joint venturers, whether or not named in this Complaint.

119. **Class Identity**. The above-defined Class is readily identifiable and is one for which records should exist.

120. **Numerosity**. Plaintiff does not know the exact number of class members because such information presently is in the exclusive control of Defendant. Plaintiff believes that due to the nature of the trade and commerce involved, there are thousands of class members

---

[56] *Id.*

geographically dispersed throughout the United States, such that joinder of all class members is impracticable.

    121.   **Typicality**. Plaintiff's claims are typical of the claims of the members of the Class because Plaintiff purchased Deere Repair Services from Defendant, and therefore Plaintiff's claims arise from the same common course of conduct giving rise to the claims of the Class and the relief sought is common to the Class.

    122.   **Common Questions Predominate**. There are questions of law and fact common to the Class, including, but not limited to:

    A.   Whether the United States Deere Repair Services Market constitutes a Relevant Market;

    B.   Whether Deere possesses market power in this Relevant Market;

    C.   Whether Deere colluded with Co-conspirator Dealerships to suppress competition for Deere Repair Services between Deere Dealerships in violation of Section 1 of the Sherman Act;

    D.   Whether Deere colluded with Co-conspirator Dealerships to prevent farmers and independent repair shops from having access to the Software in violation of Section 1 of the Sherman Act;

    E.   Whether Deere illegally tied the sale of Deere Repair Services to Deere Tractors in violation of Section 1 of the Sherman Act;

    F.   Whether Deere monopolized or attempted to monopolize the Deere Repair Services Market in the United States in violation of Section 2 of the Sherman Act;

    G.   Whether Deere engaged in monopoly leveraging by using its monopoly power in the Deere Software Market to gain or attempt to gain or maintain monopoly power in the Deere Repair Services Market in violation of Section 2 of the Sherman Act;

    H.   Whether Deere unjustly enriched itself to the detriment of the Plaintiff and the Class, thereby entitling Plaintiff and the Class to disgorgement of all benefits derived by Deere;

    I.   Whether the conduct of Defendant, as alleged in this Complaint, caused injury to the business or property of the Plaintiff and the other members of the Class;

    J.   The effect of Defendant's alleged monopolization or attempted monopolization on the prices of Deere Repair Services sold in the United States during the Class Period;

    K.   Whether Plaintiff and other members of the Class are entitled to, among other things, injunctive relief and if so, the nature and extent of such injunctive relief; and

    L.   The appropriate class-wide measure of damages.

These and other questions of law or fact, which are common to the members of the Class, predominate over any questions affecting only individual members of the Class.

123. **Adequacy**. Plaintiff will fairly and adequately protect the interests of the Class in that Plaintiff's interests are aligned with, and not antagonistic to, those of the other members of the Class who purchased Deere Repair Services from Defendant and Plaintiff has retained counsel competent and experienced in the prosecution of class actions and antitrust litigation to represent themselves and the Class.

124. **Superiority**. A class action is superior to other available methods for the fair and efficient adjudication of this controversy since individual joinder of all damaged members of the Class is impractical. Prosecution as a class action will eliminate the possibility of duplicative litigation. The relatively small damages suffered by individual members of the Class compared to the expense and burden of individual prosecution of the claims asserted in this litigation means that, absent a class action, it would not be feasible for members of the Class to seek redress for the violations of law herein alleged. Further, individual litigation presents the potential for inconsistent or contradictory judgments and would greatly magnify the delay and expense to all parties and to the court system. Therefore, a class action presents far fewer case management difficulties and will provide the benefits of unitary adjudication, economy of scale and comprehensive supervision by a single court.

125. The prosecution of separate actions by individual members of the Class would create the risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendant.

126. Plaintiff brings this case on behalf of the Class and all persons and entities similarly situated pursuant to Rule 23, on behalf of all persons and entities that purchased Deere Repair

Services that Defendant provided during the Class Period.

127.    Defendant has acted on grounds generally applicable to the Class, thereby making final injunctive relief appropriate with respect to the Class as a whole.

## VIII.    ANTITRUST INJURY

128.    Defendant's anticompetitive conduct had the following effects, among others:

A.  Price competition has been restrained or eliminated with respect to Deere Repair Services;

B.  The prices of Deere Repair Services have been fixed, raised, stabilized, or maintained at artificially inflated levels;

C.  Purchasers of Deere Repair Services have been deprived of free and open competition; and

D.  Purchasers of Deere Repair Services, including Plaintiff, paid artificially inflated prices.

129.    The purpose of Deere's conduct was to exclude competition and raise, fix, or maintain the price of Deere Repair Services. As a direct and foreseeable result, Plaintiff and the Class paid supracompetitive prices for Deere Repair Services during the Class Period.

130.    By reason of the alleged violations of the antitrust laws, Plaintiff and the Class have sustained injury to their businesses or property, having paid higher prices for Deere Repair Services than they would have paid in the absence of Deere's illegal conduct, and as a result have suffered damages.

131.    This is an antitrust injury of the type that the antitrust laws were meant to punish and prevent.

## IX.    CLAIMS FOR RELIEF

### COUNT ONE
### Violation of Section 1 of the Sherman Act
### Conspiracy in Restraint of Trade
### 15 U.S.C. § 1

132.    Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

133.    Beginning in or around 2000, Defendant entered into and engaged in unlawful contracts, combinations in the form of trust or otherwise, and/or conspiracies in restraint of trade and commerce with Co-conspirator Dealerships in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

134.    Defendant engaged in predatory and anticompetitive behavior by restricting competition among its affiliated Dealerships, which unfairly suppressed price competition for Deere Repair Services and unreasonably restrained trade.

135.    Defendant's conduct included concerted efforts, actions and undertakings among Defendant and the Co-conspirator Dealerships with the intent, purpose, and effect of artificially suppressing competition from smaller dealerships.

136.    Defendant perpetrated the scheme with the specific intent of reducing competition in the Deere Repair Services market to the benefit of Defendant and the Co-conspirator Dealerships.

137.    Defendant's conduct in furtherance of its contracts, combinations and/or conspiracies were authorized, ordered, or done by its respective officers, directors, agents, employees, or representatives while actively engaging in the management of Defendant's affairs.

138.    Plaintiff and Class Members paid higher rates for Deere Repair Services from Deere and its Co-Conspirator Dealerships than they otherwise would have in the absence of

36

Defendant's unlawful conduct, and, as a result, have been injured in their property and have suffered damages in an amount according to proof at trial.

139.     Defendant's contracts, combinations, and/or conspiracies are per se violations of Section 1 of the Sherman Act.

140.     In the alternative, Defendant is liable under a "quick look" analysis where an observer with a rudimentary understanding of economics could conclude that the arrangements in question would have an anticompetitive effect on customers and markets.

141.     Defendant's contracts, combinations, and/or conspiracies have had a substantial effect on interstate commerce.

142.     As a direct and proximate result of Defendant's contract, combination, and/or conspiracy to restrain trade and commerce, Plaintiff and Class Members have suffered injury to their business or property and will continue to suffer economic injury and deprivation of the benefit of free and fair competition.

<div align="center">

**COUNT TWO**
**Violation of Section 1 of the Sherman Act**
**Group Boycott**
**15 U.S.C. § 1**

</div>

143.     Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

144.     Beginning approximately in 2000 and continuing thereafter to the present, Defendant, by and through its officers, directors, employees, agents, or other representatives, have explicitly or implicitly colluded with Co-conspirator Dealerships to jointly boycott entities that would have introduced price-reducing sales of Deere Repair Services in the United States, in order to artificially raise, fix, maintain, and/or stabilize prices in the Deere Repair Services market, in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

145.     Defendant's and the Co-conspirator Dealerships' refusal to sell Software and repair tools to individual farmers and independent repair shops constitutes a per se violation of Section One of the Sherman Act.

146.     Defendant's and the Co-conspirator Dealerships' boycott cut off access to the Software, a necessary resource that would enable farmers and independent repair shops to compete in the Deere Repair Services market.

147.     Together, Defendant and the Co-conspirator Dealerships wholly control the market for Deere Repair Services.

148.     No plausible pro-competitive arguments exist for Defendant's and the Co-conspirator Dealerships' refusal to sell the Software to farmer or independent repair shops.

149.     As a direct and proximate result of Defendant's contract, combination, and/or conspiracy to restrain trade and commerce, Plaintiff and Class Members have suffered injury to their business or property and will continue to suffer economic injury and deprivation of the benefit of free and fair competition.

### COUNT THREE
### Violation of Section 1 of the Sherman Act
### Unlawful Tying Arrangement
### 15 U.S.C. § 1

150.     Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

151.     This cause of action is brough under Section 1 of the Sherman Act, 15 U.S.C. § 1.

152.     A tying arrangement exists when a seller exploits power over one product (the tying product) to force the buyer to accept a second product (the tied product). *Batson v. Live Nation Entm't*, 746 F.3d 827, 832 (7th Cir. 2014). Such an arrangement violates Section 1 of the Sherman

Act if the seller has appreciable economic power in the tying product market and the arrangement affects a substantial volume of commerce in the tied market. *Eastman Kodak Co. v. Image Tech. Servs. Inc.*, 504 U.S. 451, 462 (1992).

153. Deere Tractors and Deere Repair Services are distinct and separate products and services.

154. Plaintiff and Class members through their purchase of Deere Tractors were coerced into purchasing a second tied product, Deere Repair Services, from Defendant and its Co-Conspirator Dealerships.

155. Defendant's aggressive consolidation of its affiliated Co-conspirator Dealerships also materially changed the dynamics of the Deere Repair Services Market, drastically reducing the pressure of pricing competition even among the Dealerships.

156. Furthermore, Defendant represented to Plaintiffs and the Class that most necessary repair tools were available and that almost all repairs could be done on the Tractors without the Software. These misleading statements meant that Plaintiff and the Class could not, from Deere's representations, engage in accurate lifecycle pricing for Deere Tractors before they were locked into purchasing Deere Repair Services from Defendant and the Dealerships.

157. As set out above, Defendant has appreciable economic power in the relevant Tractor Markets, i.e., the "tying" markets.

158. This tying arrangement affected a substantial amount of interstate commerce.

159. Defendant's conduct amounts to a per se tying violation, as Defendant has significant power in the tying markets which has led to a significant and actual impact on competition in the Deere Repair Services market.

160. Alternatively, Defendant's conduct is illegal tying under the rule of reason, as

Defendant's actions to coerce farmers to purchase Deere Repair Services from Defendant is an unreasonable restraint on competition in the market for Deere Repair Services.

161.    There are no legitimate business justifications for Defendant's illegal tying arrangement.

162.    Defendant has a substantial economic interest in sales of Deere Repair Services.

**COUNT FOUR**
**Violation of Section 2 of the Sherman Act**
**Monopolization**
**15 U.S.C. § 2**

163.    Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

164.    This cause of action is brough under Section 2 of the Sherman Act, 15 U.S.C. § 2, which prohibits "monopoliz[ation of] any part of the trade or commerce among the several states, or with foreign nations."

165.    Deere has monopoly power in the Deere Repair Services Market, including the power to control prices and exclude competition.

166.    Deere has willfully and intentionally engaged in anticompetitive conduct in order to unlawfully maintain its monopoly in this market, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

167.    Deere has unreasonably restrained, and further threatens to unreasonably restrain competition in the Deere Repair Services Market by:

(a) restricting the availability of the Software necessary to perform diagnostics and repairs for Deere Tractors;
(b) knowingly misrepresenting the availability and necessity of the Software necessary for diagnostics and repairs for Deere Tractors;
(c) tying the purchase of Repair Services through Deere to the purchase of Deere Tractors; and

40

(d) limiting farmers' rights over their own Tractors through the terms of the 2016 EULA with the aim of restricting farmers' ability to choose to perform Deere Repair Services themselves or take their Tractor to an independent repair shop.

168.    While some of these anticompetitive acts themselves constitute an individual antitrust violation on a stand-alone basis, together they support a broader monopolization claim.

169.    As a direct and proximate result of Deere's anticompetitive and monopolistic conduct, Plaintiff and the Class have been damaged by, among other things: (i) the payment of supracompetitive prices for Deere Repair Services; and (ii) the lack of availability of independent Deere Repair Services and self-repair options.

## COUNT FIVE
### Violation of Section 2 of the Sherman Act
### Monopoly Leveraging
### 15 U.S.C. § 2

170.    Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

171.    As detailed above, Deere has monopoly power over Deere Software.

172.    Deere has willfully and intentionally used its monopoly power over Deere Software to gain or attempt to gain or maintain monopoly power in the Deere Repair Services Market, specifically, by tying purchases of Deere Tractors to Deere-provided Repair Services through deliberate restriction of access to the full spectrum of Software necessary to run diagnostics, approve repairs, and perform maintenance. Deere's actions cannot be justified on the basis of any legitimate consumer benefit.

173.    Furthermore, Deere also leveraged its monopoly power over Deere Software to effectuate the 2016 EULA, limiting farmers' ownership rights over their own Tractors and forcing farmers to purchase Deere-provided Repair Services. The EULA impermissibly restricts farmers' ability to perform Deere Repair Services themselves by prohibiting attempts to reverse engineer,

adapt, or otherwise circumvent the Software. Deere threatens that it may terminate the license to the Software—and therefore access to a functional Tractor—if a farmer interacts with the Software in a way that Deere deems to be a violation of the EULA.

174.    Deere willfully has acquired or maintained monopoly power by the exclusionary conduct detailed above, rather than through legitimate business acumen, skill, efficiency, or legitimate innovation.

175.    As a direct and proximate result of Deere's anticompetitive and monopolistic conduct, Plaintiff and the Class have been damaged by, among other things, (i) the payment of supracompetitive prices for Deere Repair Services; and (ii) the lack of availability of independent Deere Repair Services and self-repair options.

<div align="center">

**COUNT SIX**
**Violation of Section 2 of the Sherman Act**
**Attempted Monopolization in the Alternative**
**15 U.S.C. § 2**

</div>

176.    Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

177.    As detailed above, Deere has monopoly power, or at a minimum, a dangerous probability of success in acquiring monopoly power, in the Deere Repair Services Market, including the power to control prices and exclude competition.

178.    Deere has willfully, knowingly, and with specific intent to do so, attempted to monopolize the Repair Services Markets, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

179.    Deere's anticompetitive conduct alleged herein has been directed at accomplishing the unlawful objective of controlling prices and/or preventing competition in the Repair Services

Market. Deere's ongoing anticompetitive conduct presents a dangerous probability that Deere will succeed, to the extent it has not already, in its attempt to monopolize the Repair Service Market.

180.     As a direct and proximate result of Deere's anticompetitive and monopolistic conduct, Plaintiff and the Class have been damaged by, among other things, (i) the payment of supracompetitive prices for Deere Repair Services; and (ii) the lack of availability of independent Deere Repair Services and self-repair options.

### COUNT SEVEN
### Violation of Section 2 of the Sherman Act
### Conspiracy to Monopolize
### 15 U.S.C. § 2

181.     Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

182.     Beginning approximately in 2000 and continuing thereafter to the present, Defendant, by and through its officers, directors, employees, agents, or other representatives, have explicitly or implicitly conspired with Co-conspirator Dealerships to jointly boycott entities that would have introduced price-reducing sales of Deere Repair Services in the United States, in order to acquire monopoly power in the Deere Repair Services market, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

183.     Defendant's and the Co-conspirator Dealerships' boycott cut off access to the Software, a necessary resource that would enable farmers and independent repair shops to compete in the Deere Repair Services market.

184.     Deere and the Dealerships have willfully, knowingly, and with specific intent to do so, conspired to monopolize the Repair Services Markets, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

185.     No plausible pro-competitive arguments exist for Defendant's and the Co-conspirator Dealerships' refusal to sell the Software to farmer or independent repair shops.

186.     As a direct and proximate result of Deere and the Dealerships' conspiracy to restrain trade and commerce, Plaintiff and Class Members have suffered injury to their business or property and will continue to suffer economic injury and deprivation of the benefit of free and fair competition.

## COUNT EIGHT
### Violation of Sections 1 and 2 of the Sherman Act
### Declaratory and Injunctive Relief
### 15 U.S.C. §§ 1, 2

187.     Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

188.     Plaintiff seeks declaratory and injunctive relief under the federal antitrust laws.

189.     Plaintiff's allegations described herein constitute violations of Sections 1 and 2 of the Sherman Act.

190.     Deere effectuated an illegal tying arrangement and a scheme to restrain trade and monopolize a market.

191.     There is, and was, no legitimate, non-pretextual, pro-competitive business justification for Deere's conduct that outweighs its harmful effect.

192.     As a direct and proximate result of Deere's illegal tying arrangement and anticompetitive scheme, as alleged herein, Plaintiff and the Class were harmed.

193.     The goal, purpose, and/or effect of the tying arrangement and anticompetitive scheme was to prevent competition or self-repair in order to continue charging supracompetitive prices for Repair Services.

194.    Plaintiff and the Class have been injured in their business or property by reason of Deere's antitrust violations as alleged in this Complaint. Their injury consists of paying higher prices for Repair Services than they would have paid in the absence of those violations. These injuries will continue unless halted.

195.    Plaintiff and the Class, pursuant to Fed. R. Civ. P. 57 and 28 U.S.C. § 2201(a), hereby seek a declaratory judgment that Deere's conduct constitutes a violation of Sections 1 and 2 of the Sherman Act.

196.    Plaintiff and the Class further seek equitable and injunctive relief pursuant to § 16 of the Clayton Act, 15 U.S.C. § 26, and other applicable law, to correct the anticompetitive effects caused by Deere's unlawful conduct.

## COUNT NINE
### Promissory Estoppel

197.    Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

198.    Defendant made unambiguous promises through statements to Plaintiff and the Class that Deere Tractors could be repaired through software, tools, and resources made available by Deere and its Dealerships.[57]

199.    Plaintiff and the Class relied on Defendant's promise by purchasing, leasing, and continuing to use and operate Deere Tractors, and that reliance was both expected and foreseeable.

200.    Plaintiff and Class members' reliance on Defendant's promises were to their detriment. Plaintiff and the Class have paid, and continue to pay, much higher rates for Deere

---

[57] *See supra* Section VI.C.

Repair Services than they would have had Defendant fulfilled its promise to make necessary Software and resources to perform repairs available.

## COUNT TEN
### Unjust Enrichment

201.    Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

202.    Deere has benefitted from the monopoly profits on the sale of Repair Services resulting from the unlawful and inequitable acts alleged in this Complaint.

203.    Deere's financial benefit resulting from unlawful and inequitable conduct is traceable to overpayments for Repair Services by Plaintiff and the Class.

204.    Plaintiff and the Class have conferred upon Deere an economic benefit, in the nature of profits resulting from unlawful overcharges and monopoly profits, to the economic detriment of Plaintiff and the Class.

205.    The economic benefit of overcharges and unlawful monopoly profits derived by Deere through Plaintiffs' payment of supracompetitive and artificially inflated prices for Deere Repair Services is a direct and proximate result of Deere's unlawful practices.

206.    The financial benefits derived by Deere rightfully belong to Plaintiff and the Class, as Plaintiff and the Class paid anticompetitive and monopolistic prices during the Class Period, inuring to the benefit of Deere.

207.    It would be inequitable under unjust enrichment principles in the District of Columbia and each of the fifty states for Deere to be permitted to retain any of the overcharges for Repair Services derived from Deere's unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

208.     Deere is aware of and appreciated the benefits bestowed upon it by Plaintiff and the Class.

209.     Deere should be compelled to disgorge in a common fund for the benefit of Plaintiff and the Class all unlawful or inequitable proceeds it received.

210.     A constructive trust should be imposed upon all unlawful or inequitable sums received by Deere traceable to Plaintiff and the Class.

## X.     REQUEST FOR RELIEF

WHEREFORE, Plaintiff, on behalf of itself and the Class of all others so similarly situated, respectfully requests judgment against Defendant as follows:

211.     The Court determine that this action may be maintained as a class action under Rule 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, appoint Plaintiff as Class Representative and its counsel of record as Class Counsel, and direct that notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to the Class, once certified;

212.     The unlawful conduct herein be adjudged and decreed in violation of Section 1 and Section 2 of the Sherman Act;

213.     Plaintiff and the Class recover damages, to the maximum extent allowed, and that a joint and several judgment in favor of Plaintiff and the members of the Class be entered against Defendant in an amount to be trebled to the extent the laws permit;

214.     Defendant, its affiliates, successors, transferees, assignees and other officers, directors, partners, agents and employees thereof, and all other persons acting or claiming to act on their behalf or in concert with them, be permanently enjoined and restrained from in any manner continuing, maintaining or renewing the conduct alleged herein, or from engaging in other conduct

having a similar purpose or effect, and from adopting or following any practice, plan, program, or device having a similar purpose or effect;

215.    Plaintiff and the members of the Class be awarded pre- and post-judgment interest as provided by law, and that such interest be awarded at the highest legal rate from and after the date of service of this Complaint;

216.    Plaintiff and the members of the Class recover their costs of suit, including reasonable attorneys' fees, as provided by law; and

217.    Plaintiff and the members of the Class have such other and further relief as the case may require and the Court may deem just and proper.

## XI.    JURY TRIAL DEMANDED

218.    Plaintiff demands a trial by jury, pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, of all issues so triable.

Dated: February 11, 2022

*Attorneys for Plaintiff and the Putative Class*

*/s/ Edward A. Wallace*
Edward A. Wallace
Timothy E. Jackson
Jessica Wieczorkiewicz
WALLACE MILLER
111 W Jackson Blvd. Suite 1700
Chicago, IL 60604
T. (312) 261-6193
E. eaw@wallacemiller.com
   tej@wallacemiller.com
   jw@wallacemiller.com

Jeffrey L. Kodroff*
John A. Macoretta*
SPECTOR ROSEMAN KODROFF, P.C.
2001 Market Street, Suite 3420
Philadelphia, PA 19103
Telephone: (215) 496-0300
Facsimile:  (215) 496-6611

*jkodroff@srkattorneys.com*
*jmacoretta@srkattorneys.com*

Joseph Lyon
Clint Watson (ARDC No. 6334209)
THE LYON FIRM, LLC
2754 Erie Ave.
Cincinnati, Ohio 45208
Phone (513) 381-2333
*jlyon@thelyonfirm.com*

*Attorneys for Plaintiff and Putative Class*
\* Pro Hac Vice Application Forthcoming

ILND 44  (Rev. 04/13/16)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law,  except as provided by local rules of court.  This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.  *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a)  PLAINTIFFS

Daniel Brown, D/B/A Ostego Forestry Services

**DEFENDANTS**

Deere & CO. (d/b/a John Deere

**(b)**  County of Residence of First Listed Plaintiff   Cayuga County, NY
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant   Rock Island County, IL
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE:      IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)**  Attorneys *(Firm Name, Address, and Telephone Number)*

Edward A. Wallace, Wallace Miller, 111 W Jackson Blvd. Suite 1700, Chicago, IL 60604, (312) 261-6193

Attorneys *(If Known)*

## II.  BASIS OF JURISDICTION  *(Place an "X" in One Box Only)*

☐ 1   U.S. Government
Plaintiff

☐ 2   U.S. Government
Defendant

☐ 3   Federal Question
*(U.S. Government Not a Party)*

☑ 4   Diversity
*(Indicate Citizenship of Parties in Item III)*

## III.  CITIZENSHIP OF PRINCIPAL PARTIES  *(Place an "X" in One Box for Plaintiff*
*(For Diversity Cases Only)*                                                            *and One Box for Defendant)*

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☑ 4 |
| Citizen of Another State | ☑ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV.  NATURE OF SUIT  *(Place an "X" in One Box Only)*

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury - Product Liability | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 376 Qui Tam (31 USC 3729 (a)) |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | | | | ☐ 400 State Reapportionment |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | ☐ 367 Health Care/ Pharmaceutical Personal Injury Product Liability | | **PROPERTY RIGHTS** | ☑ 410 Antitrust |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | | | ☐ 820 Copyrights | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | | ☐ 368 Asbestos Personal Injury Product Liability | | ☐ 830 Patent | ☐ 450 Commerce |
| ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans) | ☐ 340 Marine | | | ☐ 840 Trademark | ☐ 460 Deportation |
| | ☐ 345 Marine Product Liability | **PERSONAL PROPERTY** | **LABOR** | **SOCIAL SECURITY** | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 153 Recovery of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 370 Other Fraud | ☐ 710 Fair Labor Standards Act | ☐ 861 HIA (1395ff) | ☐ 480 Consumer Credit |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 371 Truth in Lending | ☐ 720 Labor/Management Relations | ☐ 862 Black Lung (923) | ☐ 490 Cable/Sat TV |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 380 Other Personal Property Damage | ☐ 740 Railway Labor Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 195 Contract Product Liability | ☐ 362 Personal Injury - Medical Malpractice | ☐ 385 Property Damage Product Liability | ☐ 751 Family and Medical Leave Act | ☐ 864 SSID Title XVI | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | | | ☐ 790 Other Labor Litigation | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| | | | ☐ 791 Employee Retirement Income Security Act | | ☐ 893 Environmental Matters |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | | **FEDERAL TAX SUITS** | ☐ 895 Freedom of Information Act |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights | ☐ 510 Motions to Vacate Sentence | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 896 Arbitration |
| ☐ 220 Foreclosure | ☐ 441 Voting | **Habeas Corpus:** | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 530 General | | | |
| ☐ 240 Torts to Land | ☐ 443 Housing/ Accommodations | ☐ 535 Death Penalty | | | ☐ 950 Constitutionality of State Statutes |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities Employment | ☐ 540 Mandamus & Other | **IMMIGRATION** | | |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities Other | ☐ 550 Civil Rights | ☐ 462 Naturalization  Application | | |
| | ☐ 448 Education | ☐ 555 Prison Condition | ☐ 463 Habeas Corpus - Alien Detainee (Prisoner Petition) | | |
| | | ☐ 560 Civil Detainee - Conditions of Confinement | ☐ 465 Other Immigration Actions | | |

## V.  ORIGIN  *(Place an "X" in One Box Only)*

☑ 1  Original
Proceeding

☐ 2  Removed from
State Court

☐ 3  Remanded from
Appellate Court

☐ 4  Reinstated or
Reopened

☐ 5  Transferred from
Another District
*(specify)*

☐ 6  Multidistrict
Litigation

## VI.  CAUSE OF ACTION

(Enter U.S. Civil Statute under which you are filing and write a brief statement of cause.)

15 U.S.C. § 1, 2, & 26 - Antitrust class action pursuant to Sherman Act Sec. 1 & 2

## VII.  Previous Bankruptcy Matters

(For nature of suit 422 and 423, enter the case number and judge for any associated bankruptcy matter previously adjudicated by a judge of this Court. Use a separate attachment if necessary.)

## VIII.  REQUESTED IN COMPLAINT:

☑ CHECK IF THIS IS A CLASS ACTION
UNDER RULE 23, F.R.Cv.P.

DEMAND $

CHECK YES only if demanded in complaint:

JURY DEMAND:  ☑ Yes  ☐  No

## IX.  RELATED CASE(S) IF ANY

*(See instructions):*

JUDGE

DOCKET NUMBER

## X.  This case (check one box)  ☑ Is not a refiling of a previously dismissed action   ☐ is a refiling of case number _____   previously dismissed by Judge _____

DATE 2/11/2021                                          SIGNATURE OF ATTORNEY OF RECORD /s/ Edward A. Wallace

# Exhibit 4

# U.S. District Court
## Northern District of Alabama (Northwestern)
## CIVIL DOCKET FOR CASE #: 3:22-cv-00074-LCB

Wells v. Deere & Co
Assigned to: Judge Liles C Burke
Cause: 28:1331 Fed. Question

Date Filed: 01/19/2022
Jury Demand: Plaintiff
Nature of Suit: 890 Other Statutory Actions
Jurisdiction: Federal Question

**Plaintiff**

**Trinty Dale Wells**

represented by **Dennis A Mastando**
MASTANDO & ARTRIP LLC
301 Washington Street
Suite 302
Huntsville, AL 35801
256-532-2222
Email: tony@mastandoartrip.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Eric J Artrip**
MASTANDO & ARTRIP LLC
301 Washington Street
Suite 302
Huntsville, AL 35801
256-532-2222
Fax: 256-513-7489
Email: artrip@mastandoartrip.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Joe R Whatley , Jr**
WHATLEY KALLAS LLP
2001 Park Place North Suite 1000
Birmingham, AL 35203
205-488-1200
Fax: 800-922-4851
Email: jwhatley@whatleykallas.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Richard P Rouco**
QUINN CONNOR WEAVER DAVIES &
ROUCO LLP
Two North Twentieth Street
2 20th Street North
Suite 930
Birmingham, AL 35203
205-870-9989
Fax: 205-803-4143
Email: rrouco@qcwdr.com
*LEAD ATTORNEY*

*ATTORNEY TO BE NOTICED*

**W Tucker Brown**
WHATLEY KALLAS LLC
P.O. Box 10968
Birmingham, AL 35202-0968
205-488-1200
Fax: 800-922-4851
Email: tbrown@whatleykallas.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Deere & Co**
*doing business as*
John Deere

represented by **Harlan Irby Prater , IV**
LIGHTFOOT FRANKLIN & WHITE LLC
400 20th Street North
Birmingham, AL 35203
205-581-0700
Fax: 205-581-0799
Email: hprater@lightfootlaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Wesley B Gilchrist**
LIGHTFOOT FRANKLIN & WHITE LLC
400 20th Street North
Birmingham, AL 35203
205-581-0735
Fax: 205-380-9135
Email: wgilchrist@lightfootlaw.com
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 01/19/2022 | 1 | COMPLAINT with **JURY DEMAND** against Deere & Co filed by Trinty Dale Wells. (AHI) (Entered: 01/19/2022) |
| 01/20/2022 | | Filing Fee: Filing fee $ 402, receipt_number 1126-3997954 (B4601118060). related document 1 COMPLAINT with **JURY DEMAND** against Deere & Co filed by Trinty Dale Wells.(AHI). (Artrip, Eric) Modified on 1/21/2022 (AHI). (Entered: 01/20/2022) |
| 01/20/2022 | 2 | Summons Issued by the clerk and delivered to plaintiff for service as to Deere & Co. (AHI) (Entered: 01/20/2022) |
| 02/11/2022 | 3 | Unopposed MOTION for Extension of Time to File Answer *or Otherwise Plead* by Deere & Co. (Gilchrist, Wesley) (Entered: 02/11/2022) |
| 02/11/2022 | 4 | Corporate Disclosure Statement by Deere & Co. filed by Deere & Co (Gilchrist, Wesley) (Entered: 02/11/2022) |
| 02/11/2022 | 5 | TEXT ORDER granting 3 Motion for Extension of Time to Answer. The deadline for the defendant to respond to the complaint is extended to April 15, 2022. Signed by Judge Liles C Burke on 2/11/2022. (KBW) (Entered: 02/11/2022) |

FILED

2022 Jan-19 PM 04:10
U.S. DISTRICT COURT
N.D. OF ALABAMA

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ALABAMA**
**(Northwestern Division)**

| | | |
|---|---|---|
| TRINTY DALE WELLS, | ) | |
| | ) | |
| PLAINTIFF, | ) | |
| | ) | |
| v. | ) | CASE NO.: _____ |
| | ) | |
| DEERE & CO. (d/b/a JOHN DEERE | ) | |
| | ) | |
| DEFENDANTS. | ) | |

**COMPLAINT**

Plaintiff alleges upon personal knowledge as to itself and its own actions, and upon information and belief, including the investigation of counsel as follows:

## I.    NATURE OF ACTION

1.    This case is about John Deere's monopolization of the repair service market for John Deere ("Deere") brand agricultural equipment with onboard central computers known as engine control units, or "ECUs." Farmers have traditionally had the ability to repair and maintain their own tractors as needed, or else have had the option to bring their tractors to an independent mechanic. However, in newer generations of its agricultural equipment, Deere has deliberately monopolized the market for repair and maintenance services of its agricultural equipment with ECUs ("Deere Repair Services") by making crucial software and repair tools inaccessible to farmers and independent repair shops. Furthermore, Deere's network of highly-consolidated independent dealerships (the "Dealerships") is not permitted through their agreements with Deere to provide farmers or repair shops with access to the same software and repair tools the Dealerships have. As a result of shutting out farmers and independent repair shops from accessing the necessary resources for repairs, Deere and the Dealerships have cornered the Deere Repair Services Market

1

in the United States for Deere-branded agricultural equipment controlled by ECUs and have derived supracompetitive profits from the sale of repair and maintenance services.

2.     This is an antitrust class action pursuant to Sections 1 and 2 of the Sherman Act (15 U.S.C. §§ 1, 2) brought by Plaintiff Trinity Dale Wells on his behalf and on behalf of a class of persons and entities similarly situated. Plaintiff seeks to represent those persons and entities who purchased repair services from Defendant Deere and Co. (d/b/a John Deere) and Deere- affiliated independent Dealerships and technicians in the Deere Repair Services Market for Deere agricultural equipment from January 12, 2018 to the present.

3.     John Deere is indisputably the biggest player in agricultural machinery markets in the United States. Deere wields significant economic power in the market for large tractors and combine tractors in North America[1] and has a larger market share than that of the next two biggest tractor makers, Case New Holland and Kubota Corp., combined.[2]

4.     Modern John Deere tractors, combines, and other agricultural equipment with ECUs (collectively referred to herein as "Tractors") have grown increasingly technologically advanced. Tractors manufactured in the last two decades now require proprietary software and associated repair tools (collectively referred to as "Software") to perform or complete many repairs. For example, an owner of a Tractor may be able to replace the transmission on their equipment, but that Tractor will not operate unless proprietary John Deere Software "approves" the newly-installed part. A farmer or mechanic may have the necessary mechanical parts,

---

[1] Jennifer Reibel, *Manufacturer Consolidation Reshaping the Farm Equipment Marketplace*, Farm Equipment (Aug. 29, 2018), https://www.farm-equipment.com/articles/15962- manufacturer-consolidation-reshaping-the-farm-equipment-marketplace.

[2] 2 Peter Waldman & Lydia Mulvany, *Farmers Fight John Deere Over Who Gets to Fix an $800,000 Tractor*, Bloomberg Businessweek (Mar. 5, 2020), https://www.bloomberg.com/news/features/2020-03-05/farmers-fight-john-deere-over-who-gets- to-fix-an-800-000-tractor.

knowledge, and the skill to repair a Tractor, but without access to the Software, the repair is not recognized by the Tractor's ECU, making the repair ineffective and the Tractor still unable to function properly.

5.      Despite the use of, and access to, this Software being essential to the continued functionality of its Tractors, Deere has deliberately made this necessary Software unavailable to individual owners and independent repair shops. Instead, Deere makes the full Software available only to Deere Dealerships and technicians, who are not permitted by Deere to sell it.

6.      Historically, farmers who owned Deere Tractors have had the option of repairing their Tractors themselves or taking them to an independent repair shop of their choosing. By making the Software, for all practical purposes, unavailable, Deere has succeeded in foreclosing competition in the multi-billion dollar Deere Repair Services Market.

7.      Deere and the Dealerships are highly motivated to prevent competition, either from independent repair shops selling Deere Repair Services, or from farmers with the knowledge and skills to perform their own repairs. Deere's business for its Repair Services is three to six times more profitable than its sales of original equipment.

8.      Deere's monopolization of the Deere Repair Services Market allows Deere and the Dealerships to charge and collect supracompetitive prices for its services every time a piece of equipment requires the Software to diagnose or complete a repair. Consequently, Plaintiff and Class members have paid millions of dollars more for the repair services than they would have paid in a competitive market.

9.      John Deere has demonstrated that it understands that farmers have a right to repair their own Tractors, while at the same time misleading the public regarding how easy it is for

farmers or independent repair shops to perform repairs.[3]

10.     After a trade group representing Deere made a highly-publicized promise in 2018 to make the necessary Software and tools available by January 2021, Deere has failed to follow through on this promise. In 2021, multiple investigative journalists attempted to determine whether the Software was available. The Dealerships' response was that they did not sell the Software, or that it was only available to licensed dealers, and the Dealership was not allowed to sell it to anyone else.[3]

11.     Deere continues to exploit its relationship with customers who have purchased extremely expensive Tractors, locking customers into paying for expensive and inconvenient Repair Services from Deere and its Dealerships. Deere has created an effective tying arrangement, whereby the purchase of Deere Repair Services is tied to the initial purchase of Deere Tractors.

12.     The motive behind restricting access to the Software is simple: Deere and its Dealerships did not want their revenue stream from service and repair—a far more lucrative business than original equipment sales—to end when the equipment is purchased, as it often did in the past when owners could perform their own repairs or rely on individual repair shops.

13.     Deere's scheme to prevent independent repairs creates additional revenue for Deere over the entire useful life of every piece of equipment it sells.

14.     Deere unlawfully stifles competition by blocking independent repair shops and reducing consumer choice in what would otherwise be a robust and competitive repair aftermarket, thereby artificially increasing Deere Repair Services prices to supracompetitive levels.

15.     Deere's aggressive, forced consolidation of its Dealerships also was implemented

---

[3] Jason Koebler & Matthew Gault, *John Deere Promised Farmers It Would Make Tractors Easy to Repair. It Lied.*, Vice Motherboard (Feb. 18, 2021), https://www.vice.com/en/article/v7m8mx/john-deere-promised-farmers-it-would-make-tractors- easy-to-repair-it-lied.

with the intent of further limiting price competition for Deere Repair Services, even among Deere Dealerships.

16.     As a result of Deere's unlawful withholding of the necessary Software to perform repairs from farmers and independent repair shops and its forced consolidation of the Dealerships, Plaintiff and the Class paid artificially inflated prices for Deere Repair Services during the Class Period. Prices in the Repair Services Market exceeded the amount they would have paid if the prices had been determined by a competitive market. Plaintiff and Class members were therefore injured by Defendant's conduct.

17.     Deere's illegal monopoly of the Deere Repair Services Market should be enjoined and dismantled, and Plaintiff and the Class should be reimbursed by Deere for the amount they overpaid for Deere Repair Services.

18.     Deere violated Section 1 of the Sherman Act by forcing consolidation of its affiliated Dealerships to eliminate inter-brand competition for Repair Services. Deere also violated Section 1 of the Sherman Act through its arrangements with Co-conspirator Dealerships to not sell the Software to farmers and independent repair shops. Finally, Deere violated Section 1 of the Sherman Act through forcing Plaintiff and Class Members to purchase Deere Repair Services from Deere once they were locked into ownership of an expensive Deere Tractor. Deere's tying arrangement between Deere Tractors and Repair Services had both the intent and effect of harming competition in the market for Deere Repair Services.

19.     Deere also violated Section 2 of the Sherman Act by monopolizing or attempting to monopolize the Deere Repair Services Market in a manner that harmed competition and injured the purchasers of such services by reducing choice and increasing prices in this market to supracompetitive levels. Deere has also leveraged its monopoly power over Deere Software to tie

sales of its Tractors to sales of Deere Repair Services, in violation of Section 2 of the Sherman Act.

20.     Deere has unjustly enriched itself by profiting from Plaintiffs' payment of supracompetitive prices for Deere Repair Services in violation of the antitrust laws and should be made to disgorge these profits.

21.     Plaintiff seeks declaratory and injunctive relief, treble and exemplary damages, costs, and attorneys' fees. As for equitable relief, Plaintiff seeks an order requiring Deere to make the necessary Software available, at reasonable cost, to individuals and repair shops.

## II.    JURISDICTION AND VENUE

22.     Plaintiff brings this action on behalf of himself and the Class under Section 16 of theClayton Act (15 U.SC. § 26) to secure injunctive relief against Defendant for violating Sections 1and 2 of the Sherman Act (15 U.S.C. §§ 1 and 2), and to recover actual and compensatory damage, treble damages, interest, costs and attorneys' fee for the injury caused by Defendant's conduct.

23.     This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331, 1337 and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26.

24.     This Court also has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(d)(2) because sufficient diversity of citizenship exists between parties in this action, the aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs, and there are 100 or more members of the proposed class.

25.     Venue is appropriate in this District pursuant to Sections 4, 12, and 16 of the Clayton Act, 15 U.S.C.  28 U.S.C. §15(a), and 28 U.S.C. § 1391(b), (c) and (d) because Defendant Deere & Company transacted business in this District, is licensed to do business or is doing business in this District, and because a substantial portion of the affected interstate commerce

described herein was carried out in this District.

26.     The activities of Defendant as described herein, were within the flow of, were intended to, and did have direct, substantial, and reasonably foreseeable effects on the foreign and interstate commerce of the United States.

### III.     PARTIES

#### A.     Plaintiff.

27.     Plaintiff Trinity Dale "Trent" Wells is above the age of nineteen (19) years and is a resident of Franklin County, Alabama.

#### B.     Defendant and Co-conspirators.

28.     Deere & Co. is a publicly traded company headquartered in Moline, Illinois.

29.     "Defendant" as used herein, includes, in addition to those identified specifically above, all of the named Defendant's predecessors, including companies that merged with or were acquired by the named Defendant, as well as Defendant's wholly-owned or controlled subsidiaries, dealerships, affiliated and/or authorized technicians, and/or Co-conspirators that sold Deere Repair Services in interstate commerce, directly or through its wholly-owned or controlled affiliates, to purchasers in the United States during the Class Period.

30.     Co-conspirators include independently-owned dealerships with agreements with Deere giving them the right to sell Deere Tractors and Deere Repair Services. Based on recent data, out of the 1,544 Dealerships affiliated with Deere, 91% of these Dealerships are owned by a "Big Dealer," i.e., a dealer that owns 5 or more individual locations. Although not an exhaustive list, the largest Dealership groups are Ag-Pro Companies (75 locations in 8 states), United Ag & Turf (53 locations in 6 states), C&B Operations (36 locations in 6 states), Papé Machinery (35 locations in 5 states); RDO Equipment (32 locations in 9 states); Brandt Holdings (32 locations in

5 states); Greenway Equipment (31 locations in 2 states); Van Wall Group (31 locations in 4 states); Quality Equipment (28 locations in 2 states) and TriGreen Equipment (19 locations in 2 States). Plaintiff purchased his equipment and services from TriGreen Equipment which operates in Alabama and Tennessee.

## IV.  TRADE AND COMMERCE

31.     During the Class Period, Defendant, directly or through its subsidiaries or affiliated Dealerships, sold Deere Repair Services in the United States in a continuous and uninterrupted flow of interstate commerce and foreign commerce, including through and into this judicial district.

32.     During the Class Period, Defendant controlled all of the market for Deere Repair Services in the United States.

33.     Defendant's business activities substantially affected interstate trade and commerce in the United States and caused antitrust injury in the United States.

## V.  RELEVANT MARKETS

34.     **Deere Repair Services Market.** The principal relevant market to evaluate Defendant's anticompetitive conduct is the Deere Repair Services Market.

35.     The Deere Repair Services Market constitutes various services and labor to repair, maintain, and clear fault codes from Deere Tractors.[4]

36.     There are no available substitutes for Deere Repair Services, and Deere Repair Services are not interchangeable with any other manufacturers' service.

37.     The relevant geographic market is the United States.

---

[4]  As defined *supra*, Deere "Tractors" for purposes of this litigation include all John Deere tractors, combines, and other agricultural equipment with ECUs.

38. Defendant Deere has market and monopoly power in the relevant market through its control over access to the Software.

39. Any independent repair shops who desire to compete with Deere in the Deere Repair Services Market would face insurmountable barriers. Defendant's effective total control of the Software means that independent repair shops are unable to access the necessary resources to be able to meaningfully compete with Deere. Similarly, any farmers who wish to perform their own repairs and/or maintenance are also unable to access the resources necessary to do so.

40. Independent repair shops and farmers cannot compete effectively in the Deere Repair Services Market without access to the Software.

41. **Deere Software Market.** As discussed above, Defendant maintains market and monopoly power over the market for Deere Software. There is no available substitute for Deere Software, and it is not interchangeable with any other manufacturers' product.

42. **Tractor Markets.** The Deere Repair Services market and the market for Tractors are distinct. The "Tractor Markets" include the United States product markets for agricultural farm tractors, which include 2WD Farm Tractors, Compact Tractors, 4WD Farm Tractors, Row Crop Tractors, Scraper Tractors, Specialty Tractors, Utility Tractors, and Self-Propelled Combines. Defendant Deere is the largest agricultural machinery company in the world and has appreciable economic power in the U.S. Tractor Markets.

## VI.    FACTUAL ALLEGATIONS

43. Farmers traditionally and historically have been able to perform their own repairs on their own tractors. However, as software has becoming increasingly intertwined with basic operations of farming equipment, John Deere has restricted access to the necessary tools to make repairs, thereby cutting out owners and independent repair shops from the ability to make repairs

to newer equipment.

### A.   Technology in John Deere Tractors

44.     Modern John Deere Tractors are technologically complex machines. These Tractors run firmware that is necessary for the Tractor to perform its basic functions. Without the firmware, the product is incomplete and will not run, making the firmware as vital a part to the basic functioning of a Tractor as a steering wheel or an engine. The code that runs the internal engine and the transmission components that are required to make the Tractor do anything are effectively part of the machine. The Tractors will not operate without that code.

45.     The central computer on a Tractor is the Engine Control Unit, or "ECU." The ECU determines how—and if—the Tractor functions.

46.     Like cars, John Deere Tractors use a large number of sensors throughout the equipment that are constantly monitored by the ECU. When a sensor notices an error, no matter how small or serious, it can put the machine into "limp mode," allowing farmers to move the machine slowly but not operate it fully. When the problem is diagnosed and repaired, the error code is cleared and the machine can continue working.[5]

47.     According to a report from a U.S. Public Interest Research Group, the John Deere S760 combine harvester has 125 different computer sensors in it. If any one of those sensors throw an error code, the combine will enter limp mode.

48.     Troubleshooting Deere Tractors—e.g., interpreting the error codes—requires Software that Deere refuses to make available to farmers.

49.     Since about 2000, Deere Tractors began using what is known as "CAN bus"

---

[5]  Koebler & Gault, *supra* note 3.

systems in their machinery, standing for Controller Area Network. CAN bus is essentially a central electrical system that allows communications between different parts of the machinery. Sales manuals for Deere Tractors explain that an advantage of the system "allows the technician at the dealership to plug into the system using the Service ADVISOR™ computer program. The Service ADVISOR program links up to the tractor's electrical system to read the communications between the controllers to determine where the problem is located and how it can be fixed."[6]

50.     Service ADVISOR, per John Deere's own sales manual materials, is

> a tool used by John Deere **dealerships** capable of providing technical and mechanical support for technicians and service managers through the use of a laptop computer. Service ADVISOR provides symptom-based diagnostics information, specific machine information, and electronic technical information. It also offers a connection to John Deere help and solutions through an extranet connection at the workshop and in the field.
>
> Service ADVISOR is a fast diagnostic testing system for all controller area network (CAN) bus tractors. This system is the cutting edge of service technology and will save time and money by faster equipment repair.

(emphasis added).

51.     Even if the farmer is able to interpret the error code and determine what the problem is with the Tractor, without access to the necessary software tools, farmers must call the dealership to repair, or clear fault codes for, their machine.  Because of the integration of the firmware into the operation of the Tractor, an error code will render the Tractor inoperable.

52.     Without access to the Software and other tools needed to diagnose and repair the error, farmers must rely on Deere dealerships and technicians to travel to where the equipment is,

---

[6]   [6]   *See* John Deere & Co Sales Manual, Electrical, CAN bus electrical system (2017), https://www.dot.state.oh.us/Divisions/ContractAdmin/Contracts/PurchDocs/207-9/DeerComp01/6110M%20Product%20Info.pdf.

plug in the necessary tools, and clear the error codes.

53.    Replacing parts on a Tractor also can result in "bricking" of the machine if the proper Software is not used. After a new part is installed on a Tractor, a program called Service Advisor needs to be connected to the ECU to authorize the new parts. If the new part is not "authorized" by the Software, the engine of the Tractor will not start, rendering the Tractor useless to its owner until the owner pays a Deere technician to authorize the repair and therefore restore operation of the Tractor.

54.    During harvest time, when Tractors, including combines, are operating on a fulltime basis, it's common for mechanical issues to arise. Farmers who try to solve problems themselves or take their Tractors to more convenient repair shops are blocked from completing the necessary repairs without access to the Software. As noted below, the Plaintiff had a minor problem with his Tractor but he had to wait hours before a TriGreen technician arrived at this farm to clear an error code; a task that took less than five (5) minutes to accomplish.

55.    As of 2021, the reported cost for Repair Services from Deere or an authorized Dealer could range from $150–$180 per hour, with additional charges for travel and parts. As noted below, the Plaintiff paid $615 dollars for a service call the lasted less than five (5) minutes.

56.    Regardless of a farmer's own ability and knowledge regarding how to repair the Tractor they own, without the relevant Software, an authorized John Deere technician must be called to perform many simple repairs made necessary only by Deere's own software system.

57.    Logistically, this is a nightmare for many farmers. When a farmer calls a dealer to perform a repair, the farmer is at the mercy of the dealer's schedule and must pay whatever the cost is—including travel expenses—even if the problem could be fixed in 15 minutes with access to the Software. Farmers also may work far away from the nearest dealership or technician, leading

12

them to have to pay substantial amounts for travel time or the cost of having their equipment hauled to a dealership.

58.     Deere has made farmers dependent on Deere for repairs. Farmers, who often have a lifetime of skills built up enabling them to fix their own equipment, are forced to sit and wait for a service technician from Deere to arrive on site and charge $150 or more per hour for labor, on top of other costs.

59.     In a May 28, 2021 interview, a farmer named Shep Morris explained the problems with not having access to the diagnostic Software in the following manner: Morris said John Deere maintains proprietary control over much of the onboard computer systems and will only allow a John Deere-certified dealership mechanic to run a diagnostic test and do repairs. "The cost is one thing, but the timeliness is the huge thing," he said. "We have a very good mechanic here and he does an excellent job, but his boat is loaded."[7]

60.     Furthermore, given farmers' investments in Deere Tractors, which can run upwards of half a million dollars, they have no reasonable choice but to pay for Deere's Repair Services. The farmers are locked in to using Deere Tractors, as switching costs are high enough to deter replacement of the equipment and farmers expect to be able to use a tractor for decades.

## B.  Deere's Longtime Strategy of Forced Dealership Consolidation.

61.     In addition to being forced to purchase Repair Services from Deere, farmers in many areas are faced with limited or nonexistent choice as to which Deere Dealership to purchase Repair Services from. This lack of meaningful choice is in large part due to Deere's concerted efforts to force Dealerships to consolidate or lose their affiliation with Deere.

62.     Starting approximately in the early 2000s (and coinciding with when ECUs were

---

[7] https://www.cbs42.com/alabama-news/alabama-farmers-at-odds-with-manufacturers-over-right-to-repair-technology-driven-equipment/

first being widely used in Deere Tractors), Deere implemented an aggressive strategy that pressured Dealerships to consolidate.

63.     In a series of meetings in Louisville, Kentucky, in the summer of 2002, Deere told dealers they should plan on a future in which they would either be a buyer or a seller.[8] One former owner of a dealership in Virginia reported that in 2002 he began receiving letters, emails, and visits from Deere officials almost monthly urging him to either acquire another dealer or cash out.[9]

64.     Deere's strategy worked. In 1996, the total number of Deere Dealership locations was approximately 3,400. By 2007, this number had decreased to 2,984. In 2021, only 1,544 Dealership locations remained. Only 144 of these Dealerships are not owned by "Big Dealers," i.e., Dealerships that operate five or more individual Dealership locations. Very few single-location dealerships remain.

65.     In 2021, Deere terminated the contract of Tennessee's last remaining single-store Deere Dealership, Tri-County Equipment, which had operated as a Deere Dealershipsince 1977. Tri-County Equipment was the only single-store Dealership in Tennessee for four years prior to Deere's termination of the agreement. Deere reportedly had specified a single potential buyer for the store, but the dealer chose to operate the store as a non-Deere dealership instead of selling the business.

66.     In the last decade, the industry-wide number of agricultural equipment stores owned by Big Dealers increased by 59%.[10] And while this large degree of consolidation among agricultural stores in general is substantial, Deere is a noticeable outlier in number of affiliated

---

[8] Ilan Brat & Timothy Aeppel, *Why Deere Is Weeding Out Dealers Even as Farms Boom*, WallStreet Journal (Aug. 14, 2007),  https://www.wsj.com/articles/SB118705668767896842.
[9] *Id.*
[10]  Kim Schmidt, *Big Dealers Continue to Get Bigger*, Ag Equipment Intelligence (Apr. 22, 2021), https://www.agequipmentintelligence.com/articles/4798-big-dealers-continue-to-get- bigger.

14

Dealerships owned by Big Dealers. In the entire industry, the total percentage of Big Dealer-owned Agricultural Equipment Stores is around 35%, whereas a full 91% of Deere's "Independent" Dealerships are owned by Big Dealers.

67.     The staggering amount of consolidation among Deere Dealerships is the result of Deere systematically picking off small Dealerships by coercing them to sell to a larger dealer. If a single-location Dealer wants to sell the business, Deere dictates who the purchaser can be, funneling Dealership sales to preferred Big Dealers. Deere will terminate its affiliation with the Dealership altogether if the Dealership refuses to sell to the specified buyers.

68.     One farmer complained: "I can go to a JD dealer 20 miles away. Or one 40 miles away in another direction. Or one 80 miles away in a different direction. But they all have the same name. All owned by the same franchise. So, I get 10 or 15 choices all of which are exactly the same."[11]

69.     Deere's consolidation has eliminated or reduced competition among Deere Dealerships, which charge for Repair Services with little fear of a competitor undercutting their rates. This lack of competition boosts profitability for the Dealerships, and therefore also for Deere. Deere benefits not only from forcing farmers to purchase Deere Repair Services from Deere Dealerships, but also from forcing farmers to buy these Repair Services in a market that Deere has painstakingly groomed to be less competitive.

**C.  Deere's Promise—and Failure— To Provide the Full Spectrum of Repair Tools.**

70.     Because of how difficult and expensive Deere had made it for farmers to repair their Tractors, a growing "right to repair" movement began to focus on farmer's rights to repair

---

[11] *John Deere's poor dealership decision making IMO.*, post by Diggin It, TractorByNet Forum (Aug. 18, 2018), https://www.tractorbynet.com/forums/threads/john-deeres-poor-dealershipdecision-making-imo.400429/page-5.

John Deere agricultural equipment.

71.     Deere has a history of fighting customers' access to the onboard technology on Deere Tractors.  In an effort to stop owners and non-authorized independent service technicians from accessing the Software on a Deere Tractor, Deere claimed that the Digital Millennium Copyrights Act gave it power to prevent purchasers of Deere Tractors from bypassing Technical Protection Measures ("TPMs") "for the purposes of lawful diagnosis and repair, or aftermarket personalization, modification, or other improvement." This was, according to Deere, because the owners did not actually own the software that made the Tractor run. Deere argued that the owner only "receives an implied license for the life of the vehicle to operate the vehicle."[12]

72.     When this argument failed before the U.S. Copyright Office and bypassing TPMs on agricultural equipment for the purpose of repair was deemed to be fair use, Deere took another approach to blocking farmers from accessing Tractor Software. In 2016, Deere issued an end-user "License Agreement for John Deere Embedded Software" that forbade customers from accessing, reverse-engineering, or modifying the software running on its Tractors (the "EULA").[13] Deere states it "may terminate the license [to the embedded Tractor software] granted under this License Agreement . . . if you violate any material term of this License Agreement. . ."[14]

73.     As public awareness of and frustration with increasingly prohibitive repair restrictions grew, state lawmakers began to act. As of 2021, 27 states have introduced some form of "right to repair" legislation. A proposed bill in Minnesota would require manufacturers to "make

---

[12] Deere & Company, *Long Comment Regarding a Proposed Exemption Under 17 U.S.C. 1201*, https://copyright.gov/1201/2015/comments- 032715/class%2021/John_Deere_Class21_1201_2014.pdf (last accessed Jan. 4, 2022).

[13] *License Agreement for John Deere Embedded Software*, https://
[14] www.deere.com/assets/pdfs/common/privacy-and- data/docs/agreement_pdfs/english/2016-10-28-Embedded-Software-EULA.pdf (last accessed Jan. 4, 2022).
[18] *Id.*

available, on fair and reasonable terms, documentation, parts, and tools, inclusive of any updates to information or embedded software, to any independent repair provider or to the owner of digital electronic equipment manufactured by or on behalf of, or sold by, the original equipment manufacturer for purposes of diagnosis, maintenance, or repair."[15]

74.    In September 2018, the Equipment Dealers Association ("EDA"), a trade and lobbying group that represents John Deere and other manufacturers and often acts as Deere's mouthpiece, made a promise intended to stave off increasing pressure from customers and lawmakers to pass similar "right to repair" legislation pending around the country.[16]

75.    The EDA committed to make repair tools, Software, and diagnostics available to the public by January 1, 2021.[17]

76.    The EDA went so far as to put out a "Statement of Principles," laying out this promise. In a heavily-publicized ceremony and photo op, the EDA signed a "Memorandum of Understanding" with the California Farm Bureau that enshrined this statement of principles.[18]

77.    The Far West EDA president and CEO Joani Woelfel said in a 2018 press release that the statement of principles "says a lot about the relationship between dealers and their customers."

78.    The statement of principles reads:

---

[15] Digital Fair Repair, HF 1138, 91st Leg., 2nd Engrossment (Minn. 2020),
https://www.revisor.mn.gov/bills/text.php?number=HF1138&type=bill&version=2&session=ls9
1&session_year=2019&session_number=0.
[16] Koebler & Gault, *supra* note 3.

[17] *Agreement Streamlines Repair of High-Tech Farm Equipment*, Far West EDA (Sept. 9, 2018),
https://fweda.com/industry-news/agreement-streamlines-repair-of-high-tech-equipment (last accessed Jan. 4, 2022).
[18] Koebler & Gault, *supra* note 3.

**STATEMENT OF PRINCIPLES:**

To the extent not already available, the maintenance, diagnostic and repair information listed below will be made available to end users through authorized agricultural dealers at fair and reasonable terms, beginning with tractors and combines put into service on or after January 1, 2021. End users will also be able to purchase or lease diagnostic tools through authorized agricultural dealers. Certain information and tools may be available earlier. Agricultural dealers are committed to provide access to:

- Manuals (Operator, Parts, Service)
- Product Guides
- Product Service Demonstrations, Training, Seminars or Clinics

- Fleet Management Information
- On-Board Diagnostics via diagnostics port or wireless interface

- Electronic Field Diagnostic Service Tools and training on how to use them

- Other publications with information on service, parts, operation and safety

Using this information and these tools, which will be available for purchase, lease or subscription from dealers, farmers will be able to identify and repair numerous problems they may encounter with their equipment. FWEDA and CFBF support equipment users' ability to maintain, diagnose and repair their machinery. However, the ability to diagnose and repair does not mean the right to modify. For safety, durability, environmental and liability reasons, diagnostic and repair information and tools will not permit consumers to do the following:

- Reset an immobilizer system or security-related electronic modules.
- Reprogram any electronic processing units or engine control units.
- Change any equipment or engine settings negatively affecting emissions or safety compliance.
- Download or access the source code of any proprietary embedded software or code

79.     As journalists from the magazine Vice noted, the commitment "did not promise to actually sell repair parts, and it also contains several carve-outs that allow tractor manufacturers to continue using software locks that could prevent repair."[19]

80.     Three years later in mid-2021, farmers still struggle to get anything promised in the agreement with the EDA.

81.     Posing as a customer, Right to Repair advocate Kevin O'Reilly called 12 John Deere dealerships in six states. Of those, 11 told Mr. O'Reilly that they don't sell diagnostic software, and the last one gave him an email of someone to ask for the tools. When Mr. O'Reilly sent an email to the individual identified, he did not receive a response.[20]

82.     Similarly, journalists from Vice who attempted to assess the availability of the Software called nine dealerships in seven states and were told by representatives that the things promised by the EDA were not available. The journalists called three dealerships in California; two said no immediately, and a third told the journalists that the repair software and tools could not be sold to the public and required the purchaser to be a licensed dealer.[21]

---

[19]  Jason Koebler, Farmer Lobbying Group Sells Out Farmers, Helps Enshrine John Deere's Tractor Repair Monopoly, Vice Motherboard (Sept. 11, 2018), https://www.vice.com/en/article/kz5qgw/california-farm-bureau-john-deere-tractor-hacking- right-to-repair.

[20]  Koebler & Gault, supra note 3.

[21]  Id.

83. A spokesperson for the AEM, another manufacturers' lobbying and trade group that often represents Deere, told Vice that, "Comprehensive repair and diagnostic information is now available for the vast majority of the tractor and combine market through authorized dealers." However, the spokesperson failed to respond when Vice asked if the spokesperson could point to a single instance where this is actually the case, or a single manufacturer that explains to farmers where they can get this information or these tools.

84. If these tools were actually available to farmers and independent repair shops, then it would be simple for Deere to point to where they could be accessed and where they couldbe purchased. Although it cannot point to any real-world examples where this is the case, the company and its industry representatives insist that these tools are available.

85. As one example, David Ward, a spokesperson for Association of Equipment Manufacturers (AEM), told Vice that comprehensive repair and diagnostic equipment is now available through authorized dealers. Ward did not return emails when Vice followed up, asking for a single instance of where this is actually the case, or a single manufacturer that explains to farmers where they can get the information or the tools.

86. On the other hand, there are plenty of examples that demonstrate how the Software remains inaccessible, even to individuals and businesses who are by all accounts highly sophisticated parties familiar with the industry.

87. By implying that owning a Deere Tractor does not require farmers to rely on Dealerships for repairs, Deere intentionally obscures the fact that the Software is necessary for diagnosis and completion of a large number of these repairs. Deere's misleading statements fail to provide information on the scope of repairs and maintenance that can be accomplished withoutthe Software, preventing farmers from being able to accurately assess the overall cost of owning a

Deere Tractor.

88.     Even Rick Pate Alabama's Commissioner of Agriculture and Industries agrees that Alabama farmers presently don't have the ability to fix their Tractors: "There's plenty of laws that show this is a violation of anti-trust laws. I think if people spend that kind of money on a piece of equipment, they own that equipment. It's a pretty simple jump to say they outa be able to fix it," Pate said.[22]

## D.   To the Extent Deere Has Made Diagnostic and Repair Tools Available, They Are Insufficient to Restore Competition to the Deere Repair Services Market.

89.     Beginning sometime around June 2021, John Deere quietly created a web page on their main company site[36] for a product called Customer Service ADVISOR, with a form to "request more info" about a subscription. One dealer website describes Customer Service ADVISOR as a way for customers to access "much of the same" technical and diagnostic information used by dealership technicians.[37] However, this pared-down system explicitly does not include every feature that dealers have access to, and costs *start at* $8,500 for the first year alone.[38] If Deere charges customers the same amount per year, in six years this would amount to an extra $51,000 paid by customers who want to perform their own repairs. Over the course of the lifetime use of a Deere Tractor, the cost to maintain access to the Software necessary to individually perform repairs could amount to the total price of the Tractor itself.

90.     Furthermore, there is no indication that Deere will provide sufficient repair tools to independent repair shops or, for that matter, even to customers. The only apparent way to access materials is to place a request with an individual dealership, and there is no guarantee or timeline of when Customer Service ADVISOR is available.

---

[22] *See,* https://www.cbs42.com/alabama-news/alabama-farmers-at-odds-with-manufacturers-over-right-to-repair-technology-driven-equipment/

91.     It is also unclear if Deere is simply calling attention to the already-existing, extremely limited capability customer version of Service ADVISOR. This barebones version allows a customer to troubleshoot codes but offers minimal functionality otherwise. A farmer or independent repair shop is not able to use the software, for example, to replace a sensor and recalibrate a Tractor. As one employee of a Deere dealership described it in 2016, the customer version is "a waste of your money." The same employee also described the version of Customer Service Advisor as "similar to [Service Advisor] but they really give you only enough to help your dealer cut down on the labor if you troubleshoot it yourself. If they let you calibrate, us dealer guys wouldn't have any work".

92.     Deere continues to carefully guard access to the Software necessary to make repairs, and to the extent it has made a watered-down version of it available to its customers, it has priced it so high that the access to the Software will be an unattractive option to most customers, even in comparison to the high cost of paying Deere for Repair Services. This arrangement thus allows Deere to claim it has provided repair and diagnostic materials to its customers while posing virtually no risk to Deere's monopoly in the Deere Repair Services Market.

**E.  There Are No Legitimate Reasons to Restrict Access to Necessary Repair Tools.**

93.     In May 2021, the FTC issue a report regarding repair restrictions.[23] The FTC concluded there was "scant evidence to support manufacturers' justifications for repair restrictions" and that access to information, manuals, spare parts, and tools, were "well-supported by comments submitted for the record and testimony provided at the Workshop." Specifically, the FTC noted

---

[23] Federal Trade Commission, Nixing the Fix: An FTC report to Congress on Repair Restrictions (May 2021), available at https://www.ftc.gov/system/files/documents/reports/nixing-fix-ftc-report-congress-repair-restrictions/nixing_the_fix_report_final_5521_630pm-508_002.pdf (hereinafter "FTC Report").

that restricting repairs to authorized repair networks was not automatically justified just because of the existence of possible safety concerns. The FTC noted that manufacturers provided no factual support for their statements that "authorized repair persons are more careful or that individuals or independent repair shops fail to take appropriate safety precautions."

94.     Similarly, the FTC pointed out that manufacturers had failed to offer evidence that providing access to the same tools made available to authorized service providers created additional security risks. The FTC concluded "[m]anufacturers can provide others with the same parts and tools that they provide to their authorized service providers. And, by providing access to individuals and independent repair shops, manufacturers would have greater confidence in the repair activities that occur outside of their authorized networks."

95.     The FTC stated that, beyond bare assertions of liability exposure and reputational harm from allowing independent repairs, manufacturers "provided no empirical evidence to support their concerns about reputational harm or potential liability resulting from faulty third party repairs."[46] The report further noted that manufacturers' arguments regarding the "superior service" were anecdotal, whereas there was evidence that consumers were generally satisfied with repairs made by independent repair shops. The FTC concluded that "[t]he record does not establish that repairs conducted by independent repair shops would be inferior to those conducted by authorized repair shops if independent repair shops were provided with greater access to service manuals, diagnostic software and tools, and replacement parts as appropriate."

96.     There is no defensible basis for Deere to withhold the full spectrum of Dealer- level Software that a farmer or independent repair shop would need to diagnose or perform repairs. In fact, the automotive industry is an example of manufacturers agreeing to do just that. Industrywide, vehicle owners and independent repair shops have had access to Dealer-level diagnostic and repair

tools from the manufacturers for nearly eight years. In 2014, the automotive industry through representative trade organizations voluntarily agreed to

> make available for purchase by owners of motor vehicles manufactured by such manufacturer and by independent repair facilities **the same diagnostic and repair information**, including repair technical updates, **that such manufacturer makes available to its dealers** through the manufacturer's internet-based diagnostic and repair information system or other electronically accessible manufacturer's repair information system. All content in any such manufacturer's repair information system shall be **made available to owners and to independent facilities in the same form and manner and to the same extent as is made available to dealers** utilizing such diagnostic and repair information system for purchase by owners and independent repair facilities on a daily, monthly, and yearly subscription basis and upon fair and reasonable terms.[24]

## F. Deere Has Not Provided Farmers and Independent Repair Shops with the Necessary Software and Continues to Misrepresent the Issue.

97.     To the extent that Deere has made limited repair information and tools available, it has been insufficient to give farmers and independent repair shops the same opportunity to repair their Tractors and to open the Deere Repair Services Market to true competition.

98.     Deere must provide access to the same tools that the dealers have to both farmers and independent repair shops.

99.     Deere has also resisted making the Software and tools available to farmers and independent repair shops under the auspices of "ensur[ing] continued compliance with emissions, operator safety and other regulatory requirements."[25] Deere's claims that providing access to Software and repair tools would allow farmers to bypass emissions and safety controls

---

[24] Memorandum of Understanding, Automotive Aftermarket Industry Association, Coalition for Auto Repair Equality, Alliance of Automobile Manufacturers, and Association of Global Automakers (Jan. 15, 2014) (emphasis added), https://www.autocare.org/docs/defaultsource/government-affairs/r2r-mou-and-agreement-signed.pdf.

[25] Deere & Co Position Letter on Kansas HB 2122: Digital Electronic Repair Requirements, available at https://www.vice.com/en/article/mgxayp/source-apple-will-fight-right-to-repairlegislation.

misrepresents what farmers are asking for.

100.    There is a clear difference between resetting an error code and ignoring or overriding safety codes. Overriding emissions or safety controls requires a different set of modification tools, which are *not* the tools used for diagnosis and repair. The FTC pointed out that data submitted by the EDA ostensibly showing that modifications of agricultural equipment affected emissions was inapposite, "because [the data] concerns modifications to equipment as opposed to repairs." The FTC also noted conversations with AEM and EDA representatives confirmed the limitations of the submitted studies.

101.    In order to override emission controls on a Tractor, the entire operating system on the machine would have to be erased and then replaced with new, modified software that either does not have emissions and safety controls or allows a farmer to ignore them. This is an illegal practice separate from the issue of access to Software and is not what is being requested in this litigation.

102.    Deere and industry groups have latched onto this talking point—conflating "repair" and "modification"—in their successful attempt to foreclose others from the market and thereby maintain Deere's monopoly in the Deere Repair Services Market.

### G.  Defendant's Monopolization of the Deere Repair Services Market Has Led to Artificially High Prices and Record Profits for John Deere.

103.    Rent motivates Deere's restricting access to the Software and maintaining its unlawful tying arrangement and monopoly and attempted monopoly in the Deere Repair Services Market. For Deere and its Dealerships, parts and services are three to six times more profitable than sales of the original equipment, and the repair segment of Deere's business has also been growing faster than original equipment sales. From 2013 to 2019, Deere's annual parts sales went up 22%, while the company's total agricultural equipment sales went down 19% in this same

period.[26]

104.    During this period where Deere's Tractors with ECUs reached greater market penetration and as Deere systematically eliminated small Dealerships that were creating competition and undercutting profits for Deere's Big Dealers, the company's income skyrocketed. In 2000, Deere's net income was around a half billion dollars. Deere's projected 2021 net income is $5.7B, over 11 times its income from 2000, and over twice its net income of $2.75B in 2020. Although Deere does not break down the income received from the Dealerships' sales of Repair Services in its company filings, sales of "parts and maintenance services" are reported to account for a fifth of Deere's sales.[27] In the last several years, the reported profit margins not associates with direct sales increased dramatically, and the company stated to investors in 2020 that it was betting on its parts and maintenance services business to contribute 50 basis points in added profits over the next two years.

105.    Without access to the Software to perform repairs and clear fault codes, owners of Deere Tractors have been forced to give Deere and its Dealerships more money for Deere Repair Services that the farmers would have expended had they performed the repairs themselves or hired less expensive, and often more convenient, independent repair shops to perform. One farmer reported that he purchased a new Tractor for $300,000 and spent nearly $8000 into clearing fault codes over the course of a few years.

106.    The money that farmers sink into paying Deere to clear fault codes and approve repairs that they could have performed themselves cut into an already thin profit margin.

---

[26] Peter Waldman & Lydia Mulvany, Farmers Fight John Deere Over Who Gets to Fix an $800,000 Tractor, Bloomberg Businessweek (Mar. 5, 2020), https://www.bloomberg.com/news/features/2020-03-05/farmers-fight-john-deere-over-who-getsto-fix-an-800-000-tractor.
[27] Peter Waldman & Lydia Mulvany, Farmers Fight John Deere Over Who Gets to Fix an $800,000 Tractor, Bloomberg Businessweek (Mar. 5, 2020), https://www.bloomberg.com/news/features/2020-03-05/farmers-fight-john-deere-over-who-getsto-fix-an-800-000-tractor.

## VII.    CLASS ACTION ALLEGATIONS

107.    Plaintiff brings this action on behalf of himself, and as a class action under the FederalRules of Civil Procedure, Rule 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedures, seeking damages and equitable and injunctive relief on behalf of the following class (the "Class"):

> All persons and entities residing in Alabama and Tennessee who, during the Class Period of January 12, 2018 to the present, purchased DeereRepair Services for Deere Tractors from Defendant or Deere's authorized Dealers and/or technicians.

108.    Specifically excluded from the Class are Deere and its employees, affiliates, subsidiaries, and joint venturers, whether or not named in this Complaint.

109.    **Class Identity**. The above-defined Class is readily identifiable and is one for which records should exist.

110.    **Numerosity**. Plaintiff does not know the exact number of class members because such information presently is in the exclusive control of Defendant. Plaintiff believes that due to the nature of the trade and commerce involved, there are thousands of class members geographically dispersed throughout the United States, such that joinder of all class members is impracticable.

111.    **Typicality**. Plaintiff's claims are typical of the claims of the members of the Class because Plaintiff purchased Deere Repair Services from Defendant, and therefore Plaintiff's claims arise from the same common course of conduct giving rise to the claims of the Class and the relief sought is common to the Class.

112.    **Common Questions Predominate**. There are questions of law and fact common to the Class, including, but not limited to:

A.  Whether the Alabama, Mississippi and Tennessee Deere Repair

Services Market constitutes a Relevant Market (hereinafter "Tri State Market);

B. Whether Deere possesses market power in this Relevant Market;

C. Whether Deere colluded with Co-conspirator Dealerships to suppress competition for Deere Repair Services between Deere Dealerships in violation of Section 1 of the Sherman Act;

D. Whether Deere colluded with Co-conspirator Dealerships to prevent farmers and independent repair shops from having access to the Software in violation of Section 1 of the Sherman Act;

E. Whether Deere illegally tied the sale of Deere Repair Services to Deere Tractors in violation of Section 1 of the Sherman Act;

F. Whether Deere monopolized or attempted to monopolize the Deere Repair Services Market in the Tri State Market in violation of Section 2 of the Sherman Act;

G. Whether Deere engaged in monopoly leveraging by using its monopoly power in the Deere Software Market to gain or attempt to gain or maintain monopoly power in the Deere Repair Services Market in violation of Section 2 of the Sherman Act;

H. Whether Deere unjustly enriched itself to the detriment of the Plaintiff and the Class, thereby entitling Plaintiff and the Class to disgorgement of all benefits derived by Deere;

I. Whether the conduct of Defendant, as alleged in this Complaint, caused injury to the business or property of the Plaintiff and the other members of the Class;

J. The effect of Defendant's alleged monopolization or attempted monopolization on the prices of Deere Repair Services sold in the United States during the Class Period;

K. Whether Plaintiff and other members of the Class are entitled to, among other things, injunctive relief and if so, the nature and extent of such injunctive relief; and

L. The appropriate class-wide measure of damages.

These and other questions of law or fact, which are common to the members of the Class, predominate over any questions affecting only individual members of the Class.

113. **Adequacy**. Plaintiff will fairly and adequately protect the interests of the Class in that Plaintiff's interests are aligned with, and not antagonistic to, those of the other members of the Class who purchased Deere Repair Services from Defendant and Plaintiff has retained counsel competent and experienced in the prosecution of class actions and antitrust litigation to represent themselves and the Class.

114. **Superiority**. A class action is superior to other available methods for the fair and efficient adjudication of this controversy since individual joinder of all damaged members of the Class is impractical. Prosecution as a class action will eliminate the possibility of duplicative litigation. The relatively small damages suffered by individual members of the Class compared to the expense and burden of individual prosecution of the claims asserted in this litigation means that, absent a class action, it would not be feasible for members of the Class to seek redress for the violations of law herein alleged. Further, individual litigation presents the potential for inconsistent or contradictory judgments and would greatly magnify the delay and expense to all parties and to the court system. Therefore, a class action presents far fewer case management difficulties and will provide the benefits of unitary adjudication, economy of scale and comprehensive supervision by a single court.

115. The prosecution of separate actions by individual members of the Class would create the risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendant.

116. Plaintiff brings this case on behalf of the Class and all persons and entities similarly situated pursuant to Rule 23, on behalf of all persons and entities that purchased Deere Repair Services that Defendant provided during the Class Period.

117. Defendant has acted on grounds generally applicable to the Class, thereby making final injunctive relief appropriate with respect to the Class as a whole.

## VIII. NAMED PLAINTIFF ALLEGATIONS

118. Trinity Dale "Trent "wells has been a farmer, like his father before him, for decades.

119. Trent has a herd of about 75 cows that he grazes on approximately 150 acres of owned
and leased land.

28

120.     Like his father before him, Trent has always owned John Deere tractors. His family have been a loyal customers for over 50 years.

121.     Trent and his father used to do business with an independently owned dealership in Leeton Alabama owned by a legend in the farm industrial equipment world – Hubert Truelove.

122.     Well loved and respected throughout Northeast Alabama, Truelove was eventually forced to sell his dealership to a major conglomerate, TriGreen, as a result of John Deer's initiative to create a system consisting of only Big Dealers to consolidate wealth, stifle competition, and decrease service center opportunities.

123.     In 2015, Wells purchased a brand-new John Deere 5105 tractor from the only dealership within hundreds of miles – Tri-Green. He also purchased a variety of implements including a bush hog, seed spreader, hay rake, post hole digger, and a front end loader.

124.     Since he has owned the tractor, it has occasionally broken down. Due to John Deere's anti-competitive practices, Wells has not been able to use aftermarket parts or have any independent mechanics repair the equipment.

125.     In December 2021, the stop engine light came on and Wells' field hand was afraid to operate the equipment. Wells called the only servicing and repair option available to him, TriGreen.

126.     A TriGreen representative would only dispatch a service technician to his farm if he provided his debit card information in advance of the service.

127.     Having no choice, he did so. However, Trent was provided with neither a repair estimate nor any assurance that he would be able to approve charges to his card before they were made.

128.     When the technician arrived, he hooked up an ECU diagnostic machine, pulled the

cap off of an emission sensor, dried it out, and put it back on. He spoke with Wells for approximately 10 minutes about the weather and crops and then left.

129. About an hour later, Wells' card was charged $615 for approximately 2 1/2 minutes of work.

130. Due to John Deere and co-conspirator TriGreen's practices, Wells has no alternative other than to submit himself to this kind of fleecing.

131. Wells is bringing this case to help not only himself but the millions of small farmers like himself that have fallen prey to John Deere's anti-competitive practices.

## IX. ANTITRUST INJURY

132. Defendant's anticompetitive conduct had the following effects, among others:

    A. Price competition has been restrained or eliminated with respect to DeereRepair Services;

    B. The prices of Deere Repair Services have been fixed, raised, stabilized, ormaintained at artificially inflated levels;

    C. Purchasers of Deere Repair Services have been deprived of free and opencompetition; and

    D. Purchasers of Deere Repair Services, including Plaintiff, paid artificiallyinflated prices.

133. The purpose of Deere's conduct was to exclude competition and raise, fix, or maintain the price of Deere Repair Services. As a direct and foreseeable result, Plaintiff and the Class paid supracompetitive prices for Deere Repair Services during the Class Period.

134. By reason of the alleged violations of the antitrust laws, Plaintiff and the Class have sustained injury to their businesses or property, having paid higher prices for Deere Repair Services than they would have paid in the absence of Deere's illegal conduct, and as a result have suffered damages.

135. This is an antitrust injury of the type that the antitrust laws were meant to punish and prevent.

## X. CLAIMS FOR RELIEF

### COUNT ONE
**Violation of Section 1 of the Sherman Act**
**(Conspiracy in Restraint of Trade)**
**15 U.S.C. § 1**

136. Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

137. Beginning in or around 2000, Defendant entered into and engaged in unlawful contracts, combinations in the form of trust or otherwise, and/or conspiracies in restraint of trade and commerce with Co-conspirator Dealerships in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

138. Defendant engaged in predatory and anticompetitive behavior by restricting competition among its affiliated Dealerships, which unfairly suppressed price competition for Deere Repair Services and unreasonably restrained trade.

139. Defendant's conduct included concerted efforts, actions and undertakings among Defendant and the Co-conspirator Dealerships with the intent, purpose, and effect of artificially suppressing competition from smaller dealerships.

140. Defendant perpetrated the scheme with the specific intent of reducing competition in the Deere Repair Services market to the benefit of Defendant and the Co-conspirator Dealerships.

141. Defendant's conduct in furtherance of its contracts, combinations and/or conspiracies were authorized, ordered, or done by its respective officers, directors, agents, employees, or representatives while actively engaging in the management of Defendant's affairs.

31

142.    Plaintiff and Class Members paid higher rates for Deere Repair Services from Deere and its Co-Conspirator Dealerships than they otherwise would have in the absence of Defendant's unlawful conduct, and, as a result, have been injured in their property and have suffered damages in an amount according to proof at trial.

143.    Defendant's contracts, combinations, and/or conspiracies are per se violations of Section 1 of the Sherman Act.

144.    In the alternative, Defendant is liable under a "quick look" analysis where an observer with a rudimentary understanding of economics could conclude that the arrangements in question would have an anticompetitive effect on customers and markets.

145.    Defendant's contracts, combinations, and/or conspiracies have had a substantial effect on interstate commerce.

146.    As a direct and proximate result of Defendant's contract, combination, and/or conspiracy to restrain trade and commerce, Plaintiff and Class Members have suffered injury to their business or property and will continue to suffer economic injury and deprivation of the benefit of free and fair competition.

**COUNT TWO**
**Violation of Section 1 of the Sherman Act**
**(Group Boycott)**
**15 U.S.C. § 1**

147.    Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

148.    Beginning approximately in 2000 and continuing thereafter to the present, Defendant, by and through its officers, directors, employees, agents, or other representatives, have explicitly or implicitly colluded with Co-conspirator Dealerships to jointly boycott entities that would have introduced price-reducing sales of Deere Repair Services in the United States, in order

32

to artificially raise, fix, maintain, and/or stabilize prices in the Deere Repair Services market, in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

149. Defendant's and the Co-conspirator Dealerships' refusal to sell Software and repair tools to individual farmers and independent repair shops constitutes a per se violation of Section One of the Sherman Act.

150. Defendant's and the Co-conspirator Dealerships' boycott cut off access to the Software, a necessary resource that would enable farmers and independent repair shops to compete in the Deere Repair Services market.

151. Together, Defendant and the Co-conspirator Dealerships wholly control the market for Deere Repair Services.

152. No plausible pro-competitive arguments exist for Defendant's and the Co-conspirator Dealerships' refusal to sell the Software to farmer or independent repair shops.

153. As a direct and proximate result of Defendant's contract, combination, and/or conspiracy to restrain trade and commerce, Plaintiff and Class Members have suffered injury to their business or property and will continue to suffer economic injury and deprivation of the benefit of free and fair competition.

## COUNT THREE
### Violation of Section 1 of the Sherman Act
### (Unlawful Tying Arrangement)
### 15 U.S.C. § 1

154. Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

155. This cause of action is brough under Section 1 of the Sherman Act, 15 U.S.C. § 1.

156. A tying arrangement exists when a seller exploits power over one product (the tying product) to force the buyer to accept a second product (the tied product). *Batson v. Live Nation*

*Entm't*, 746 F.3d 827, 832 (7th Cir. 2014). Such an arrangement violates Section 1 of the Sherman Act if the seller has appreciable economic power in the tying product market and the arrangement affects a substantial volume of commerce in the tied market. *Eastman Kodak Co. v. Image Tech. Servs. Inc.*, 504 U.S. 451, 462 (1992).

157.    Deere Tractors and Deere Repair Services are distinct and separate products and services.

158.    Plaintiff and Class members through their purchase of Deere Tractors were coerced into purchasing a second tied product, Deere Repair Services, from Defendant and its Co-Conspirator Dealerships.

159.    Defendant's aggressive consolidation of its affiliated Co-conspirator Dealerships also materially changed the dynamics of the Deere Repair Services Market, drastically reducing the pressure of pricing competition even among the Dealerships.

160.    Furthermore, Defendant represented to Plaintiffs and the Class that most necessary repair tools were available and that almost all repairs could be done on the Tractors without the Software. These misleading statements meant that Plaintiff and the Class could not, from Deere's representations, engage in accurate lifecycle pricing for Deere Tractors before they were locked into purchasing Deere Repair Services from Defendant and the Dealerships.

161.    As set out above, Defendant has appreciable economic power in the relevant Tractor Markets, i.e., the "tying" markets.

162.    This tying arrangement affected a substantial amount of interstate commerce.

163.    Defendant's tying arrangement is a *per se* violation of Section 1 of the Sherman Act. The Defendant has substantial market power in both markets. Defendant's ability to substantially raise prices without a loss of market share demonstrates that it has market power in

both markets.

164.    Defendant's tying arrangement also violates Section 1 of the Sherman under a rule of reason theory. The Defendant's practices lock-in plaintiff and class members and coerces them into accepting unreasonable restrictions on the ability to service the Tractors they purchased from John Deere or a co-conspirator.

165.    There are no legitimate business justifications for Defendant's illegal tying arrangement.

166.    Defendant has a substantial economic interest in sales of Deere Repair Services.

**COUNT FOUR**
**Violation of Section 2 of the Sherman Act**
**(Monopolization)**
**15 U.S.C. § 2**

167.    Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

168.    This cause of action is brough under Section 2 of the Sherman Act, 15 U.S.C. § 2, which prohibits "monopoliz[ation of] any part of the trade or commerce among the several states, or with foreign nations."

169.    Deere has monopoly power in the Deere Repair Services Market, including the power to control prices and exclude competition.

170.    Deere has willfully and intentionally engaged in anticompetitive conduct in order to unlawfully maintain its monopoly in this market, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

171.    Deere has unreasonably restrained, and further threatens to unreasonably restrain competition in the Deere Repair Services Market by:

(a) restricting the availability of the Software necessary to perform

diagnostics and repairsfor Deere Tractors;

(b) knowingly misrepresenting the availability and necessity of the Software necessary fordiagnostics and repairs for Deere Tractors;

(c) tying the purchase of Repair Services through Deere to the purchase of Deere Tractors;and

(d) limiting farmers' rights over their own Tractors through the terms of the 2016 EULA with the aim of restricting farmers' ability to choose to perform Deere Repair Servicesthemselves or take their Tractor to an independent repair shop.

172.     While some of these anticompetitive acts themselves constitute an individual antitrust violation on a stand-alone basis, together they support a broader monopolization claim.

173.     As a direct and proximate result of Deere's anticompetitive and monopolistic conduct, Plaintiff and the Class have been damaged by, among other things: (i) the payment of supracompetitive prices for Deere Repair Services; and (ii) the lack of availability of independent Deere Repair Services and self-repair options.

<u>**COUNT FIVE**</u>
**Violation of Section 2 of the Sherman Act**
**(Monopoly Leveraging)**
**15 U.S.C. § 2**

174.     Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

175.     As detailed above, Deere has monopoly power over Deere Software.

176.     Deere has willfully and intentionally used its monopoly power over Deere Software to gain or attempt to gain or maintain monopoly power in the Deere Repair Services Market, specifically, by tying purchases of Deere Tractors to Deere-provided Repair Services through deliberate restriction of access to the full spectrum of Software necessary to run diagnostics, approve repairs, and perform maintenance. Deere's actions cannot be justified on the basis of any legitimate consumer benefit.

177.     Furthermore, Deere also leveraged its monopoly power over Deere Software to

36

effectuate the 2016 EULA, limiting farmers' ownership rights over their own Tractors and forcing farmers to purchase Deere-provided Repair Services. The EULA impermissibly restricts farmers' ability to perform Deere Repair Services themselves by prohibiting attempts to reverse engineer, adapt, or otherwise circumvent the Software. Deere threatens that it may terminate the license to the Software—and therefore access to a functional Tractor—if a farmer interacts with the Software in a way that Deere deems to be a violation of the EULA.

178.    Deere willfully has acquired or maintained monopoly power by the exclusionary conduct detailed above, rather than through legitimate business acumen, skill, efficiency, or legitimate innovation.

179.    As a direct and proximate result of Deere's anticompetitive and monopolistic conduct, Plaintiff and the Class have been damaged by, among other things, (i) the payment of supracompetitive prices for Deere Repair Services; and (ii) the lack of availability of independent Deere Repair Services and self-repair options.

## COUNT SIX
### Violation of Section 2 of the Sherman Act
### (Attempted Monopolization in the Alternative)
### 15 U.S.C. § 2

180.    Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

181.    As detailed above, Deere has monopoly power, or at a minimum, a dangerous probability of success in acquiring monopoly power, in the Deere Repair Services Market, including the power to control prices and exclude competition.

182.    Deere has willfully, knowingly, and with specific intent to do so, attempted to monopolize the Repair Services Markets, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

37

183.   Deere's anticompetitive conduct alleged herein has been directed at accomplishing the unlawful objective of controlling prices and/or preventing competition in the Repair Services Market. Deere's ongoing anticompetitive conduct presents a dangerous probability that Deere will succeed, to the extent it has not already, in its attempt to monopolize the Repair Service Market.

184.   As a direct and proximate result of Deere's anticompetitive and monopolistic conduct, Plaintiff and the Class have been damaged by, among other things, (i) the payment of supracompetitive prices for Deere Repair Services; and (ii) the lack of availability of independent Deere Repair Services and self-repair options.

**COUNT SEVEN**
**Violation of Section 2 of the Sherman Act**
**(Conspiracy to Monopolize)**
**15 U.S.C. § 2**

185.   Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

186.   Beginning approximately in 2000 and continuing thereafter to the present, Defendant, by and through its officers, directors, employees, agents, or other representatives, have explicitly or implicitly conspired with Co-conspirator Dealerships to jointly boycott entities that would have introduced price-reducing sales of Deere Repair Services and the Dealerships have willfully, knowingly, and with specific intent to do so, conspired to monopolize the Repair Services Markets, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

187.   No plausible pro-competitive arguments exist for Defendant's and the Co-conspirator Dealerships' refusal to sell the Software to farmer or independent repair shops.

188.   Defendant's and the Co-conspirator Dealerships' boycott cut off access to the Software, a necessary resource that would enable farmers and independent repair shops to compete

in the Deere Repair Services market.

189.    s a direct and proximate result of Deere and the Dealerships' conspiracy to restrain trade and commerce, Plaintiff and Class Members have suffered injury to their business or property and will continue to suffer economic injury and deprivation of the benefit of free and fair competition.

## COUNT NINE

### Promissory Estoppel

190.    Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

191.    Defendant made unambiguous promises through statements to Plaintiff and the Class that Deere Tractors could be repaired through software, tools, and resources made available by Deere and its Dealerships.

192.    Plaintiff and the Class relied on Defendant's promise by purchasing, leasing, and continuing to use and operate Deere Tractors, and that reliance was both expected and foreseeable.

193.    Plaintiff and Class members' reliance on Defendant's promises were to their detriment. Plaintiff and the Class have paid, and continue to pay, much higher rates for Deere Repair Services than they would have had Defendant fulfilled its promise to make necessary Software and resources to perform repairs available.

## COUNT TEN
### Unjust Enrichment

194.    Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

195.    Deere has benefitted from the monopoly profits on the sale of Repair Services resulting from the unlawful and inequitable acts alleged in this Complaint.

196.    Deere's financial benefit resulting from unlawful and inequitable conduct is traceable to overpayments for Repair Services by Plaintiff and the Class.

197.    Plaintiff and the Class have conferred upon Deere an economic benefit, in the nature of profits resulting from unlawful overcharges and monopoly profits, to the economic detriment of Plaintiff and the Class.

198.    The economic benefit of overcharges and unlawful monopoly profits derived by Deere through Plaintiffs' payment of supra-competitive and artificially inflated prices for Deere Repair Services is a direct and proximate result of Deere's unlawful practices.

199.    The financial benefits derived by Deere rightfully belong to Plaintiff and the Class, as Plaintiff and the Class paid anticompetitive and monopolistic prices during the Class Period, inuring to the benefit of Deere.

200.    It would be inequitable under unjust enrichment principles in the District of Columbia and each of the fifty states for Deere to be permitted to retain any of the overcharges for Repair Services derived from Deere's unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

201.    Deere is aware of and appreciated the benefits bestowed upon it by Plaintiff and the Class.

202.    Deere should be compelled to disgorge in a common fund for the benefit of Plaintiff and the Class all unlawful or inequitable proceeds it received.

203.    A constructive trust should be imposed upon all unlawful or inequitable sums received by Deere traceable to Plaintiff and the Class.

## XI.   REQUEST FOR RELIEF

WHEREFORE, Plaintiff, on behalf of himself and the Class of all others so similarly

situated,respectfully requests judgment against Defendant as follows:

204.    The Court determine that this action may be maintained as a class action under Rule 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, appoint Plaintiff as Class Representative and its counsel of record as Class Counsel, and direct that notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to the Class, once certified;

205.    The unlawful conduct herein be adjudged and decreed in violation of Section 1 and Section 2 of the Sherman Act.

206.    Plaintiff and the Class recover damages, to the maximum extent allowed, and that a joint and several judgment in favor of Plaintiff and the members of the Class be entered against Defendant in an amount to be trebled to the extent the laws permit;

207.    Defendant, its affiliates, successors, transferees, assignees and other officers, directors, partners, agents and employees thereof, and all other persons acting or claiming to act on their behalf or in concert with them, be permanently enjoined and restrained from in any manner continuing, maintaining or renewing the conduct alleged herein, or from engaging in other conduct having a similar purpose or effect, and from adopting or following any practice, plan, program, or device having a similar purpose or effect;

208.    Plaintiff and the members of the Class be awarded pre- and post-judgment interest as provided by law, and that such interest be awarded at the highest legal rate from and after the date of service of this Complaint;

209.    Plaintiff and the members of the Class recover their costs of suit, including reasonable attorneys' fees, as provided by law; and

210.    Plaintiff and the members of the Class have such other and further relief as the case

may require and the Court may deem just and proper.

## JURY TRIAL DEMANDED

211. Plaintiff demands a trial by jury, pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, of all issues so triable.

Submitted this the 19th day of January, 2022.

/s/ *Eric J. Artrip*
Eric J. Artrip (ASB-9673-I68E)
D. Anthony Mastando (ASB-0893-X32B)
MASTANDO & ARTRIP, LLC
301 Washington St., Suite 302
Huntsville, Alabama  35801
Phone: (256) 532-2222
Fax:          (256) 513-7489
artrip@mastandoartrip.com
tony@mastandoartrip.com

Richard P. Rouco  (ASB-6182-R76R)
Quinn, Connor, Weaver,  Davies & Rouco LLP
2- 20th Street North, Suite 930
Birmingham, Alabama 35203
Phone: (205) 870-9989
Fax:  (205) 803-4143
rrouco@qcwdr.com

Joe R. Whatley
Tucker Brown
Whatley Kallas, LLC
2001 Park Place Suite 1000
Birmingham, Alabama 35203
Phone: (205) 488-1200
Fax: (205) 800-922-4851
jwhatley@whatleykallas.com
tbrown@whatleykallas.com

**DEFENDANT TO BE SERVED**

**DEERE & CO. INC. (d/b/a JOHN DEERE)**

**C T CORPORATION SYSTEM**
**2 NORTH JACKSON ST., SUITE 605**
**MONTGOMERY, AL 36104**

# Exhibit 5

Query    Reports    Utilities    Help    Log Out

CEA2

# Live Database
## U.S. District Court - Eastern District of Tennessee (Winchester)
## CIVIL DOCKET FOR CASE #: 4:22-cv-00005-CEA-SKL

| | |
|---|---|
| Underwood v. Deere & Co. | Date Filed: 02/03/2022 |
| Assigned to: District Judge Charles E Atchley, Jr | Jury Demand: Plaintiff |
| Referred to: Magistrate Judge Susan K Lee | Nature of Suit: 410 Anti-Trust |
| Cause: 28:1331 Fed. Question: Anti-trust | Jurisdiction: Federal Question |

**Plaintiff**

**David Underwood**
*individually and on behalf of himself and all
others similarly situated*

represented by **Blake Hunter Yagman**
Milberg Coleman Bryson Phillips
Grossman, PLLC
405 E. 50th Street
New York, NY 10022
212-594-5300
Email: byagman@milberg.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Elizabeth McKenna**
Milberg Coleman Bryson Phillips
Grossman, PLLC
405 E. 50th Street
New York, NY 10022
212-594-5300
Fax: 212-868-1229
Email: emckenna@milberg.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**John D. Hughes**
Milberg Coleman Bryson Phillips
Grossman, PLLC
405 E. 50th Street
New York, NY 10022
866-252-0878
Fax: 212-868-1229
Email: jhughes@milberg.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**John C. Whitfield**
Milberg Coleman Bryson Phillips
Grossman, PLLC

800 S. Gay Street
Suite 1100
Knoxville, TN 37929
865-247-0080
Email: jwhitfield@milberg.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Michael Acciavatti**
Milberg Coleman Bryson Phillips
Grossman, PLLC
405 E. 50th Street
New York, NY 10022
610-842-5801
Fax: 212-868-1229
Email: macciavatti@milberg.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Peggy J. Wedgworth**
Milberg Coleman Bryson Phillips
Grossman, PLLC
405 E. 50th Street
New York, NY 10022
212-594-5300
Email: pwedgworth@milberg.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Greg Frederic Coleman**
Milberg Coleman Bryson Phillips
Grossman, PLLC
800 S. Gay Street
Suite 1100
Knoxville, TN 37929
865-247-0080
Fax: 865-522-0049
Email: gcoleman@milberg.com
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Deere & Co.**
*doing business as*
John Deere

represented by **Alexandra M. Ortiz Hadley**
Butler Snow, LLP (Nash)
The Pinnacle at Symphony Place
150 Third Avenue South
Suite 1600
Nashville, TN 37201
615-651-6728
Fax: 615-651-6701

Email: alexa.ortiz@butlersnow.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Corey A. Lee**
Jones Day (Cleveland)
901 Lakeside Avenue
North Point
Cleveland, OH 44114
216-586-3939
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 02/03/2022 | 1 | COMPLAINT against Deere & Co. (d/b/a John Deere) ( Filing fee $ 402 receipt number ATNEDC-4967662.), filed by David Underwood. (Attachments: # 1 Civil Cover Sheet, # 2 Proposed Summons)(Coleman, Greg) (Entered: 02/03/2022) |
| 02/04/2022 | | District Judge Charles E Atchley, Jr and Magistrate Judge Susan K Lee added. (GRE) (Entered: 02/04/2022) |
| 02/04/2022 | 2 | Summons Issued as to Deere & Co. (d/b/a John Deere). (GRE) (Entered: 02/04/2022) |
| 02/04/2022 | 3 | Order Governing Depositions Signed by District Judge Charles E Atchley, Jr on 2/4/22. (GRE) (Entered: 02/04/2022) |
| 02/04/2022 | 4 | Order Governing Motions To Dismiss Signed by District Judge Charles E Atchley, Jr on 2/4/22. (GRE) (Entered: 02/04/2022) |
| 02/04/2022 | 5 | Order Governing Sealing Confidential Information Signed by District Judge Charles E Atchley, Jr on 2/4/22. (GRE) (Entered: 02/04/2022) |
| 02/04/2022 | 6 | NOTICE of Deficiency (Pro Hac) as to Attorneys Peggy Wedgworth, Elizabeth McKenna, John Hughes, Blake Yagman, and Michael Acciavatti. (c/m to each attorney) (GRE) (Entered: 02/04/2022) |
| 02/04/2022 | 7 | NOTICE of Appearance by Greg Frederic Coleman on behalf of All Plaintiffs (Coleman, Greg) (Entered: 02/04/2022) |
| 02/11/2022 | 8 | MOTION for Leave to Appear Pro Hac Vice *for Peggy J. Wedgworth* ( Filing fee $ 90 receipt number ATNEDC-4976280.) by David Underwood. (Attachments: # 1 Certificate of Good Standing)(Coleman, Greg) (Entered: 02/11/2022) |
| 02/11/2022 | 9 | MOTION for Leave to Appear Pro Hac Vice *for Elizabeth McKenna* ( Filing fee $ 90 receipt number ATNEDC-4976308.) by David Underwood. (Attachments: # 1 Certificate of Good Standing)(Coleman, Greg) (Attachment 1 replaced on 2/14/2022-flattened) (BJL). Modified on 2/14/2022 (BJL). (Entered: 02/11/2022) |
| 02/11/2022 | 10 | MOTION for Leave to Appear Pro Hac Vice *for John Hughes* ( Filing fee $ 90 receipt number ATNEDC-4976313.) by David Underwood. (Attachments: # 1 Certificate of Good Standing)(Coleman, Greg) (Entered: 02/11/2022) |
| 02/11/2022 | 11 | MOTION for Leave to Appear Pro Hac Vice *for Michael Acciavatti* ( Filing fee $ 90 receipt number ATNEDC-4976320.) by David Underwood. (Attachments: # 1 Certificate of Good Standing)(Coleman, Greg) (Entered: 02/11/2022) |

| 02/11/2022 | [12](#) | MOTION for Leave to Appear Pro Hac Vice *for Blake Hunter Yagman* ( Filing fee $ 90 receipt number ATNEDC-4976389.) by David Underwood. (Attachments: # [1](#) Certificate of Good Standing)(Coleman, Greg) (Entered: 02/11/2022) |
| --- | --- | --- |
| 02/11/2022 | [13](#) | SUMMONS Returned Executed by David Underwood. Deere & Co. (d/b/a John Deere) served on 2/4/2022. (Coleman, Greg) (Entered: 02/11/2022) |
| 02/14/2022 | | Clerk's Verification of PHV Requirements is complete *regarding document: [8](#) MOTION for Leave to Appear Pro Hac Vice for Peggy J. Wedgworth ( Filing fee $ 90 receipt number ATNEDC-4976280.) filed by David Underwood, [10](#) MOTION for Leave to Appear Pro Hac Vice for John Hughes ( Filing fee $ 90 receipt number ATNEDC-4976313.) filed by David Underwood, [9](#) MOTION for Leave to Appear Pro Hac Vice for Elizabeth McKenna ( Filing fee $ 90 receipt number ATNEDC-4976308.) filed by David Underwood, [12](#) MOTION for Leave to Appear Pro Hac Vice for Blake Hunter Yagman ( Filing fee $ 90 receipt number ATNEDC-4976389.) filed by David Underwood, [11](#) MOTION for Leave to Appear Pro Hac Vice for Michael Acciavatti ( Filing fee $ 90 receipt number ATNEDC-4976320.) filed by David Underwood* (BJL) (Entered: 02/14/2022) |
| 02/15/2022 | 14 | ORDER granting [8](#) Motion for Leave to Appear Pro Hac Vice by Attorney Peggy J. Wedgeworth on behalf of Plaintiff David Underwood. This entry constitutes the complete Order of the Court. There is no document attached to this entry. You MUST register as an E-Filer here: https://pacer.psc.uscourts.gov/pscof/regWizard.jsf. Signed by Magistrate Judge Susan K Lee on 02/15/2022. (KRS) Modified on 2/15/2022 (BJL).*Mailed to Attorney Peggy J. Wedgeworth (Entered: 02/15/2022) |
| 02/15/2022 | 15 | ORDER granting [9](#) Motion for Leave to Appear Pro Hac Vice by Attorney Elizabeth McKenna on behalf of Plaintiff David Underwood. This entry constitutes the complete Order of the Court. There is no document attached to this entry. You MUST register as an E-Filer here: https://pacer.psc.uscourts.gov/pscof/regWizard.jsf. Signed by Magistrate Judge Susan K Lee on 02/15/2022. (KRS) Modified on 2/15/2022 (BJL).*Mailed to Attorney Elizabeth McKenna (Entered: 02/15/2022) |
| 02/15/2022 | 16 | ORDER granting [10](#) Motion for Leave to Appear Pro Hac Vice by Attorney John David Hughes on behalf of Plaintiff David Underwood. This entry constitutes the complete Order of the Court. There is no document attached to this entry. You MUST register as an E-Filer here: https://pacer.psc.uscourts.gov/pscof/regWizard.jsf. Signed by Magistrate Judge Susan K Lee on 02/15/2022. (KRS) Modified on 2/15/2022 (BJL). Mailed to Attorney John David Hughes (Entered: 02/15/2022) |
| 02/15/2022 | 17 | ORDER granting [11](#) Motion for Leave to Appear Pro Hac Vice by Attorney Michael Acciavatti on behalf of Plaintiff David Underwood. This entry constitutes the complete Order of the Court. There is no document attached to this entry. You MUST register as an E-Filer here: https://pacer.psc.uscourts.gov/pscof/regWizard.jsf. Signed by Magistrate Judge Susan K Lee on 02/15/2022. (KRS) Modified on 2/15/2022 (BJL).*Mailed to Attorney Michael Acciavatti (Entered: 02/15/2022) |
| 02/15/2022 | 18 | ORDER granting [12](#) Motion for Leave to Appear Pro Hac Vice by Attorney Blake Hunter Yagman on behalf of Plaintiff David Underwood. This entry constitutes the complete Order of the Court. There is no document attached to this entry. You MUST register as an E-Filer here: https://pacer.psc.uscourts.gov/pscof/regWizard.jsf. Signed by Magistrate Judge Susan K Lee on 02/15/2022. (KRS) Modified on 2/15/2022 (BJL). *Mailed to Attorney Blake Hunter Yagman (Entered: 02/15/2022) |
| 02/17/2022 | [19](#) | Unopposed MOTION for Extension of Time to File Answer *or Respond to Complaint* by Deere & Co.. (Hadley, Alexandra) (Entered: 02/17/2022) |
| 02/17/2022 | [20](#) | Certificate of Corporate Interest by Deere & Co.. (Hadley, Alexandra) (Entered: |

| | | |
|---|---|---|
| | | 02/17/2022) |
| 02/18/2022 | 21 | NOTICE of Deficiency (Pro Hac) (BJL)*Mailed to Attorney Corey A. Lee (Entered: 02/18/2022) |
| 02/18/2022 | 22 | MOTION for Leave to Appear Pro Hac Vice ( Filing fee $ 90 receipt number ATNEDC-4982954.) by Deere & Co.. (Attachments: # 1 Exhibit Certificate of Good Standing) (Hadley, Alexandra) (Entered: 02/18/2022) |
| 02/22/2022 | | Clerk's Verification of PHV Requirements is complete *regarding document: 22 MOTION for Leave to Appear Pro Hac Vice Attorney for Corey A. Lee ( Filing fee $ 90 receipt number ATNEDC-4982954.) filed by Deere & Co.* (BJL) (Entered: 02/22/2022) |
| 02/22/2022 | 23 | ORDER granting 19 Motion for Extension of Time to Answer re 19 Unopposed MOTION for Extension of Time to File Answer *or Respond to Complaint.* Signed by Magistrate Judge Susan K Lee on 2/22/2022. (BJL) Modified on 2/22/2022 (BJL). Mailed to Corey A. Lee Jones Day (Cleveland) 901 Lakeside Avenue North Point Cleveland, OH 44114 (Entered: 02/22/2022) |
| 02/22/2022 | 24 | ORDER granting 22 Motion for Leave to Appear Pro Hac Vice by Attorney Corey A. Lee on behalf of Defendant Deere & Co. This entry constitutes the complete Order of the Court. There is no document attached to this entry. You MUST register as an E-Filer here: https://pacer.psc.uscourts.gov/pscof/regWizard.jsf. Signed by Magistrate Judge Susan K Lee on 02/22/2022. (KRS) Modified on 2/23/2022 (BJL). *Mailed Copy to Corey A. Lee @ Jones Day (Cleveland) 901 Lakeside Avenue North Point Cleveland, OH 44114 (Entered: 02/22/2022) |

John Whitfield (TN 33123)
Gregory F. Coleman (TN 14092)
**MILBERG COLEMAN BRYSON**
**PHILLIPS GROSSMAN, PLLC**
800 S. Gay Street, Suite 1100
Knoxville, Tennessee 37929
Tel.:    865-247-0080
Email: jwhitfield@milberg.com
        gcoleman@milberg.com

*Additional Attorneys on Signature Page*

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TENNESSEE
## WINCHESTER DIVISION

| | |
|---|---|
| DAVID UNDERWOOD, individually and on behalf of himself and all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>DEERE & CO. (d/b/a JOHN DEERE),<br><br>Defendant. | Case No. _____<br><br>**CLASS ACTION COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

# **TABLE OF CONTENTS**

I.      NATURE OF THE ACTION ................................................................................ 1

II.     JURISDICTION AND VENUE ......................................................................... 4

III.    PARTIES ............................................................................................................ 5

   A.   Plaintiff.......................................................................................................... 5

   B.   Defendant & Co-Conspirators........................................................................ 5

IV.     FACTUAL ALLEGATIONS ............................................................................. 6

   A.   Deere & Co. Background ............................................................................... 6

   B.   Deere Tractor Technology ............................................................................. 8

   C.   Decades-Long Strategy of Consolidation has Drastically Reduced Competition Among John Deere's Dealerships ............................................................................ 11

   D.   The "Right to Repair" Movement and Deere's Failure to Provide its Promised Full Spectrum of Repair Tools ........................................................................... 16

   E.   Deere's Current Diagnostic and Repair Tools Are Insufficient...................... 24

   F.   Deere has No Legitimate Basis to Restrict Farmer Access to Necessary Repair Tools . 27

   G.   Deere's Monopolization of the Deere Repair Services Market Has Reaped Supracompetitive Profits and Record Profits for the Company ...................................... 29

V.      TRADE AND COMMERCE........................................................................... 30

VI.     RELEVANT MARKETS ................................................................................. 31

   A.   Deere Repair Services Market....................................................................... 31

   B.   Deere Software Market ................................................................................. 32

   C.   Tractor Markets ............................................................................................ 32

VII.    ANTITRUST INJURY .................................................................................... 32

VIII.   CLASS ACTION ALLEGATIONS ................................................................ 33

IX.     CLAIMS FOR RELIEF .................................................................................. 36

X.      PRAYER FOR RELIEF .................................................................................. 47

XI.     JURY TRIAL DEMAND ................................................................................ 48

i

Plaintiff David Underwood ("Plaintiff"). on behalf of himself and all others similarly situated, by and through his attorneys, brings this complaint against defendant Deere & Co (d/b/a John Deere) ("Deere" or "Defendant"), based upon personal knowledge as to himself and his own acts and experiences, and as to all other matters, upon information and belief, including investigation of counsel.

## I.    NATURE OF THE ACTION

### *"John Deere Promised Farmers It Would Make Tractors Easy to Repair. It Lied."*[1]

1.    Plaintiff brings this action on behalf of himself and as a class action seeking damages and equitable and injunctive relief on behalf of all persons and entities residing in the United States who, during the Class Period of February 3, 2018 to the present, purchased repair and maintenance services for Deere brand agricultural equipment with onboard central computers known as electronic control units ("ECUs") from Defendant or Deere's authorized Dealers and/or technicians.

2.    Farmers have always held a crucial place in the American economy, heavily dependent on the reliability of their farming equipment. In the $68 billion market for agricultural equipment, John Deere is undeniably the largest player in agricultural machinery market in the United States — responsible for over half of all U.S. farm machinery sales, selling twice as much

---

[1] Jason Koebler & Matthew Gault, *John Deere Promised Farmers It Would Make Tractors Easy to Repair. It Lied*, VICE / MOTHERBOARD (Feb. 18, 2021), https://www.vice.com/en/article/v7m8mx/john-deere-promised-farmers-it-would-make-tractors-easy-to-repair-it-lied.

machinery as its two next-largest competitors combined.[2] Deere controls 53 percent of the U.S.

market for large tractors and 60 percent of the U.S market for farm combines.[3]

3.      John Deere brand modern agricultural equipment are technologically complex

machines, referred to by Deere's Chief Technology Officer as "mobile sensor suites" or "gigantic

computers."[4] Essentially, "[a]nything a farmer does on a modern tractor, beginning with opening

the cab door, generates messages captured by its main onboard computer, which uploads the

signals to the cloud via a cellular transmitter located, in many Deere models, beneath the driver's

seat."[5]

4.      While generations of farmers had the right to repair their own farming equipment

— or had the option to bring that equipment to an independent mechanic — farmers today are

prohibited from accessing the proprietary software and related repair tools (collectively,

"Software") that control every aspect of their Deere equipment.

5.      Instead, Deere has unlawfully monopolized the market for repair and maintenance

services for Deere brand agricultural equipment with ECUs ("Deere Repair Services"). For the

purposes of this litigation, Deere agricultural equipment refers to all John Deere tractors,

combines, and other agricultural equipment with ECUs (collectively referred to herein as

---

[2] Peter Waldman & Lydia Mulvany, *Farmers Fight John Deere Over Who Gets to Fix an $800,000 Tractor*, BLOOMBERG BUSINESSWEEK (Mar. 5, 2020) https://www.bloomberg.com/news/features/2020-03-05/farmers-fight-john-deere-over-who-gets-to-fix-an-800-000-tractor.

[3] *Cheat to Win: The John Deere Story*, AMERICAN ECONOMIC LIBERTIES PROJECT (Oct 14, 2021), https://www.economicliberties.us/our-work/cheat-to-win-the-john-deere-story/

[4] Nilay Patel, *John Deere Turned Tractors Into Computers — What's Next?* THE VERGE (Jun. 15, 2021) https://www.theverge.com/22533735/john-deere-cto-hindman-decoder-interview-right-to-repair-tractors

[5] Waldman & Mulvany, *supra* n.2.

2

"Tractors"). "The[se] software barriers create corporate monopolies — and destroy the agrarian ethos of resiliency and self-reliance."[6]

6.     Software is only available to Deere's network of heavily-consolidated independent dealerships ("Dealers" or "Dealerships"). Pursuant to their agreements with Deere, these Dealerships are contractually bound not to sell or provide farmers or repair shops with the necessary software for ECUs and other tools to make repairs and upgrades to Tractors. Deere has effectively created a tying arrangement, whereby Deere customers' initial purchase of Tractors is tied to the purchase of Deere Repair Services.

7.     As a result of prohibiting Tractor owners and independent repair shops from accessing the necessary resources for repairs, Deere and their Dealerships have monopolized the Deere Repair Services Market in the United States for Tractors controlled by ECUs, reaping supracompetitive profits from Deere Repair Services every time a piece of farming equipment requires the Software to diagnose or make a repair.

8.     Deere stifles competition in the repair market by shutting out independent repair shops, thereby reducing customer choice in what would otherwise be a competitive repair aftermarket.

9.     If Deere had operated the Deere Repair Services Market in a competitive market, free of Deere's anticompetitive restraints, then the fees collected from Plaintiff and the proposed Class would have been far lower. Instead, Plaintiff and Class Members have suffered antitrust injury as a direct result of Defendant's unlawful conduct, paying supracompetitive prices for Deere Repair Services during the Class Period that far exceeded the amount they would have paid if prices had been determined by a competitive market.

---

[6] *Id.*

10.     Accordingly, Plaintiff, on behalf of himself and a class of persons and entities similarly situated, brings this antitrust class action pursuant to Sections 1 and 2 of the Sherman Act (15 U.S.C. §§ 1 and 2). Plaintiff seeks declaratory and injunctive relief, treble and exemplary damages, costs, and attorneys' fees.

## II.     JURISDICTION AND VENUE

11.     Plaintiff brings this action pursuant to Section 16 of the Clayton Act (15 U.S.C. § 26), to secure injunctive relief against Defendant for violating Sections 1 and 2 of the Sherman Antitrust Act (15 U.S.C. §§ 1 and 2), and to recover actual, compensatory, trebled, and other damages for injuries caused by the Defendant's unlawful conduct.

12.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1337 and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26.

13.     This Court also has subject matter jurisdiction pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2) because there are over 100 members of the proposed Class, the parties in this action are of different domiciles, and there is over $5,000,000 in damages, exclusive of costs and interest.

14.     Venue is appropriate in this District pursuant to Sections 4, 12, and 16 of the Clayton Act, 15 U.S.C. § 15(a) and 28 U.S.C. § 1391(b), (c) and (d) because Plaintiff is located in this District, the Defendant is licensed to do business or is doing business in this District, and because a substantial portion of the affected interstate commerce described herein was carried out in this District.

15.     Defendant's activities, as described in this complaint, were within the flow of, were intended to, and did have direct, substantial, and reasonably foreseeable effects on the foreign and interstate commerce of the United States.

III.   **PARTIES**

    A.    **Plaintiff**

    16.    Plaintiff David Underwood, a full-time farmer who resides in Tennessee, owns Deere agricultural equipment, including Tractors. During the Class Period, Plaintiff purchased Deere Repair Services in Tennessee from a Deere Dealership to diagnose and repair Tractor issues. Plaintiff's Tractors required numerous repairs and he incurred multiple repair bills. Plaintiff suffered antitrust injury as a result of Defendant's conduct alleged herein.

    B.    **Defendant & Co-Conspirators**

    17.    Defendant Deere & Co. (d/b/a John Deere) is a publicly-traded company headquartered in Moline, Illinois. Among its products and services offered, Deere manufactures agricultural machinery and heavy equipment. Deere also provides Deere Repair Services at issue in this litigation.

    18.    "Defendant" as used herein, includes, in addition to Deere, all of the named Defendant's predecessors, including companies that merged with or were acquired by Defendant, as well as Defendant's wholly-owned or controlled subsidiaries, dealerships, affiliated and/or authorized technicians, and/or co-conspirators that sold Deere Repair Services in interstate commerce, directly or through its wholly-owned or controlled affiliates, to purchasers in the United States during the Class Period.

    19.    Co-Conspirators include independently owned Dealerships that have agreements with Deere. giving the independently owned Dealerships the right to sell Tractors and Deere Repair Services. Based on recent data, out of the 1,544 Dealerships affiliated with Deere, 91% of these Dealerships are owned by a "Big Dealer," *i.e.*, a dealer that owns five or more individual locations,

5

leaving only 144 stores not part of a large organization.[7] The largest Dealership groups include Ag-Pro Companies, United Ag & Turf, C&B Operations, Papé Machinery, RDO Equipment, Brandt Holdings, Greenway Equipment, Van Wall Group, Quality Equipment, and TriGreen Equipment.

## IV.    FACTUAL ALLEGATIONS

### A.    Deere & Co. Background

20.    Deere agricultural equipment is ubiquitous throughout farming communities in the United States and farmer loyalty to the company is unparalleled. The company's logo (below) has become so recognizable it is memorialized on shirts, hats, and even as tattoos.



21.    According to Deere's 2021 Annual Report filed with the Securities and Exchange Commission ("SEC"), the company is divided into four major business segments:

> The *production and precision agriculture* segment defines, develops, and delivers global equipment and technology solutions to unlock customer value for production-scale growers of large grains, small grains, cotton, and sugar. The segment's main products include large and certain mid-size tractors, combines, cotton pickers, sugarcane harvesters and loaders, and soil preparation, seeding, application, and crop care equipment.

> The *small agriculture and turf* segment defines, develops, and delivers global equipment and technology solutions to unlock customer value for dairy and livestock producers, high-value crop producers, and turf and utility customers. The segment's primary products include certain mid-size and small tractors, as

---

[7] Kim Schmidt, *Is There Life Beyond Deere?*, FARM EQUIPMENT (May, 26, 2021) *https://www.farm-equipment.com/blogs/6-opinions-columns/post/19394-is-there-life-beyond-deere*

well as hay and forage equipment, riding and commercial lawn equipment, golf course equipment, and utility vehicles.

The *construction and forestry* segment defines, develops, and delivers a broad range of machines and technology solutions organized along the earthmoving, forestry, and roadbuilding production systems. The segment's primary products include crawler dozers and loaders, four-wheel-drive loaders, excavators, skid-steer loaders, milling machines, and log harvesters.

The products and services produced by the segments above are marketed primarily through independent retail dealer networks and major retail outlets, and, as it relates to roadbuilding products in certain markets outside the U.S. and Canada, primarily through Company-owned sales and service subsidiaries.

The *financial services* segment primarily finances sales and leases by John Deere dealers of new and used production and precision agriculture, small agriculture and turf, and construction and forestry equipment. In addition, the financial services segment provides wholesale financing to dealers of the foregoing equipment, finances retail revolving charge accounts, and offers extended equipment warranties.[8]

22.     In the first nine months of 2021, Deere recorded its highest profits in its history[9] —

despite COVID-related supply chain issues and decreased consumer spending, and a dearth of

semiconductor chips that most computer infrastructures require to function. Deere Chief Executive

Officer, John May, stated that company earnings were positive, despite the fact that Deere was

"enduring significant supply chain pressures."[10]

---

[8] Oct 31, 2021 10-K at 82, *supra* n.4.
https://s22.q4cdn.com/253594569/files/doc_downloads/2022/1/de-20211031x10k.pdf

[9] Donnelle Eller, *Deere says last 9 months of earnings already have beat full-year profits record set in 2013*, DES MOINES REGISTER (Aug. 20, 2021),
https://www.desmoinesregister.com/story/money/agriculture/2021/08/20/deere-annual-profits-record-broken-three-months-left-go/8209000002/.

[10] *Id.*

7

23.     Deere reported that "each quarter [in 2021] has set new quarterly earnings records. The company earned $1.2 billion in the first quarter [of 2021] and nearly $1.8 billion in the second quarter [of 2021]."[11]

24.     Deere remains so profitable, in large part because of its revenue from its monopolization of Tractor repairs — the basis for this action. "Farmers need to keep aging equipment running: that helped increase annual parts sales by 22%, to $6.7 billion, from 2013 to 2019, while Deere's total agricultural-equipment sales plunged 19%, to $23.7 billion."[12]

25.     Deere's repair services department is three to six times more profitable than its sales of original equipment to purchasers of that equipment.[13]

**B.     Deere Tractor Technology**

26.     Deere's Chief Technology Officer, Jahmy Hineman, was asked during an interview whether he saw a tractor, combine or construction equipment as "gigantic computers that have big mechanical functions as well[,]" Hineman responded:

> They absolutely are. That's what they've become over time. I would call them mobile sensor suites that have computational capability, not only on-board, but to your point, off-board as well. They are continuously streaming data from whatever it is — let's say the tractor and the planter — to the cloud. We're doing computational work on that data in the cloud, and then serving that information, those insights, up to farmers, either on their desktop computer or on a mobile handheld device or something like that.[14]

---

[11] *Id.*; *see also* John Deere, *2Q 2021 News Release and Financials*, https://s22.q4cdn.com/253594569/files/doc_financials/2021/q2/2Q_2021_News-Release-and-Financials.pdf; *John Deere, 1Q 2021 News Release and Financials*, https://s22.q4cdn.com/253594569/files/doc_financials/2021/q1/1Q_2021_News-Release-and-Financials.pdf

[12] Waldman & Mulvany, *supra* n.2.

[13] *Id.*

[14] Patel, *supra* n.3.

27.     Deere Tractors are technologically complex and run firmware that is essential in order for the machinery to perform even the most basic functions. Tractors cannot operate without the code that runs the internal engine and transmission components, which is necessary for Tractor functioning.

28.     Tractors contain an electronic control unit (previously referred to as "ECU") which "is an embedded system that controls one or more electrical systems or subsystems[.]"[15] The ECU determines how and whether the Tractor functions. There are various types of ECUs, including the engine control unit, the combined power transmission control unit, the transmission control unit, the brake control unit, the central control module, the central synchronization module, the main electric module, and the suspension control module.[16] Collectively, these systems comprise Tractor computer hardware — a system of several computers.[17] Tractors can include up to 80 ECUs.[18]

29.     Within each ECU is the software which makes the specific ECU run and each software differs "according to quantity, complexity and sophistication."[19]

30.     Tractors are outfitted with computer sensors which are constantly monitored by the ECU. "There [are] unique pieces of information that are coming in and routinely building to overall ecosystems of data that they have at their disposal."[20] When one of these sensors notices an error

---

[15] *John Deere Control Modules, Units – ECU, ECM*, HEAVY EQUIPMENT SPARE PARTS, https://en.hespareparts.com/news/systems/john-deere-ce/jd-ce-electrical-parts/jd-ecu-ecm/ (last accessed Feb. 1, 2022).

[16] *Id.*

[17] *Id.*

[18] *Id.*

[19] *Id.*

[20] Patel, *supra* n.3.

(such as a broken part), it reports the error back to the ECU, which then "puts the machine into 'limp mode.' This allows farmers to move the machine slowly but not operate it fully. When the problem is diagnosed and repaired, the error code is cleared and the machine can keep working."[21]

31.    According to U.S. PIRG, a nonprofit consumer advocate group addressing Right to Repair issues, the John Deere S760 combine harvester, for example, contains <u>125</u> different computer sensors. If those sensors begin "throwing" error codes, the combine will not operate, and Deere has refused to make the Software accessible to farmers in order to fix the problem. According to U.S. PIRG Right to Repair advocate, Kevin O'Reilly, "It doesn't matter how industrious they are, what their planting window looks like, or if their tractor goes down right as weather threatens to destroy their crop—modern farming equipment is designed so that farmers need to call the dealership to repair their machines[.]"

32.    Since approximately 2000, Deere began using a Controller Area Network system (also called a "CAN bus" system) in Tractors, an electrical system that allows different parts of the equipment to communicate with each other. According to Deere's sales manual, an advantage of the Controller Area Network system is that it "allows the technician at the dealership to plug into the system using the Service ADVISOR computer program. The Service ADVISOR program links up to the tractor's electrical system to read the communications between the controllers to determine where the problem is located and how it can be fixed."[22]

---

[21] Koebler & Gault, *supra* n.1.

[22] *See* John Deere & Co Sales Manual, Electrical, CAN bus electrical system (2017), https://www.dot.state.oh.us/Divisions/ContractAdmin/Contracts/PurchDocs/207-19/DeerComp01/6110M%20Product%20Info.pdf.

33.     This means that, even if Tractor owners have the knowledge and skill to fix their own equipment, they cannot do so – they must wait for a Deere authorized service technician with the necessary Software in order to, at the very least, clear the error message.

34.     Additionally, farmers who use Deere Repair Services report losing valuable time waiting for slow service from Dealerships to fix problems, which can lead to loss of crops and revenue. Tractor owners must rely on Deere Dealerships and technicians to travel to where the Tractor is located, which may lead to substantial charges for travel time, or, alternatively, are forced to pay for equipment to be hauled to a Dealership. And the price for repairs through a Dealership can be prohibitively expensive.[23] As of 2021, the reported cost for repair services from Deere or an authorized Dealer have been as high as $180+ per hour, with large and costly additional charges for travel, software, and parts.

35.     Moreover, if the proper Software is not used to replace parts on Tractors, this can result in the "bricking" of the machinery (shutting down due to a computer fault), essentially rendering it useless.[24] After a new part is installed on Tractors, the "Service Advisor" program needs to be connected to the ECU to authorize the new parts. If not authorized by the Software, the Tractor engine will not start. And an owner must pay a Deere technician to authorize the repair and restore the Tractor operation.

**C.      Decades-Long Strategy of Consolidation has Drastically Reduced Competition Among John Deere's Dealerships**

36.     Starting in or about 2002, Deere implemented an aggressive strategy that pressured dealerships to consolidate. This means that, in addition to forcing Tractor owners to purchase Repair Services only from Deere, the company increasingly also presents Tractor owners in many

---

[23] Koebler & Gault, *supra* n.1.

[24] Waldman & Mulvany, *supra* n.2.

areas of the country with limited or nonexistent choice of Deere Dealerships from which to purchase those Repair Services. Deere's efforts to force dealerships to consolidate or lose their affiliation with Deere occurred during the same period that it began the widespread installation of ECUs in its agricultural equipment.

37.     While Dealer consolidation took place across all brands of farm equipment in the early 2000s, the strongest push for consolidation came from John Deere in 2002. At that time, Deere introduced its "Dealer of Tomorrow" plan, an initiative which laid out its plan for the future of its dealership network. A memorandum circulated internally at Deere in 2002 put this in plain terms, stating, "How do we get to the point that makes sense and will lead to high performance? We believe the answer in many locations is through continued dealer consolidation. This new dealer structure may consist of 3-5 stores in contiguous trade areas and sales over $50 million."[25]

38.     Additionally in 2002, Deere brought this strategy to its dealerships in a series of meetings in Louisville, Kentucky, informing dealers they should plan on a future in which they would either be a buyer or a seller.[26] Later that year, Deere embarked on a campaign to push its smaller dealers to sell out. In one example, the former owner of a Virginia dealership recounted the experience of receiving letters, emails, and visits from Deere officials almost monthly urging him to either acquire another dealer or cash out.[27] The result of this strategy has been a massive consolidation of Deere Dealerships under a smaller number of owners and a reduction in the number of Deere Dealership locations over the last two decades.

---

[25] Kim Schmidt, *What's Driving Consolidation Among Farm Equipment Dealers*, FARM EQUIPMENT (Aug. 29, 2018) https://www.farm-equipment.com/articles/15963-whats-driving-consolidation-among-farm-equipment-dealers

[26] Ilan Brat & Timothy Aeppel, *Why Deere Is Weeding Out Dealers Even as Farms Boom*, WALL STREET JOURNAL (Aug. 14, 2007) https://www.wsj.com/articles/SB118705668767896842

[27] *Id.*

39.    Accounts of Deere forcing smaller dealerships to sell or shut their doors are commonplace:

    a.   In 2009, a former owner of a Deere-affiliated dealership, Roy Dufault, reported to AgWeek, a weekly agricultural newspaper, that representatives from Deere pressured him to sell his small dealership in Fosston, Minnesota. Deere told him that for the large Dealers in the area to continue to grow, Dufault needed to get out of the way, as his dealership was a hindrance to its profitability.[28] Deere's representatives told Dufault that there was no need for a location in Fosston, and that another dealership could cover the trade area remotely. At the time Deere terminated its dealer agreement with Dufault, customers expressed their concern about where they would have their Deere equipment serviced. As of 2021, there is not a Deere Dealership within 20 miles of Fosston, and none within 100 miles that are not owned by a Big Dealer.

    b.   In 2013, a single-location Dealership in New Hampshire, R.N. Johnson Inc., had its dealer agreement with Deere canceled after being in business 84 years. The former owner said that this action was part of Deere's corporate philosophy of "eliminat[ing] all the single-location small dealers."[29] After Deere terminated the dealership agreement, customers were forced to rely on a Dealership 60 miles away in Massachusetts to get their Tractors serviced.

---

[28] news@agweek.com, *John Deere leaves a dealer and his customers high and dry*, AGWEEK (Sept. 21, 2009) https://www.agweek.com/news/john-deere-leaves-a-dealer-and-his-customers-high-and-dry

[29] Meghan Foley, *Former John Deere Dealer Closing After 84 Years, Farm Equipment*, FARM EQUIPMENT (Feb. 28. 2013) https://www.farm-equipment.com/articles/8588-former-john-deere-dealer-closing-after-84-years

c. Similarly, in 2021, Deere terminated the contract of Tennessee's last remaining single-store Deere dealership, Tri-County Equipment, which had operated as a Deere dealership since 1977. Tri-County Equipment was the only single-store dealership in Tennessee for four years prior to Deere's termination of the agreement. Deere reportedly had specified a single potential buyer for the store, but the dealer chose to operate the store as a non-Deere dealership instead of selling the business.

40. In the last decade, the industry-wide number of agricultural equipment stores owned by Big Dealers (Dealerships that operate at least five locations) increased by 59%.[30] And while this large degree of consolidation among agricultural stores in general is substantial, Deere is a noticeable outlier in number of affiliated Dealerships owned by Big Dealers. The trend of consolidation has continued. As seen in the chart below, from 2011 to 2018, the number of John Deere Dealers with more than 10 agricultural equipment locations nearly tripled.[31]

| John Deere Dealers with 10+ Ag Equipment Stores | |
|---|---|
| 2011 | 24 |
| 2012 | 40 |
| 2013 | 41 |
| 2014 | 39 |
| 2015 | 42 |
| 2016 | 45 |
| 2017 | 49 |
| 2018 | 61 |

---

[30] 14 Kim Schmidt, *Big Dealers Continue to Get Bigger*, AG EQUIPMENT INTELLIGENCE (Apr. 22, 2021) https://www.agequipmentintelligence.com/articles/4798-big-dealers-continue-to-getbigger

[31] Schmidt, *supra* n.25.

14

41.     As of 2018, over 83% of John Deere's agricultural equipment dealership locations were operated by Big Dealers, leaving only 259 smaller operations.[32] In 2021, only 144 Dealerships are not owned by Big Dealers – very few single-location dealerships remain.[33]

42.     The trend of consolidation for Deere dealerships from smaller single store dealers to Big Dealers continues to present. In this respect, John Deere stands in contrast to its competitors in the market for Tractors. See the following chart:

| Dealer Network Comparison | | | | |
|---|---|---|---|---|
| All Ag Stores | | 'Big Dealers' – 5+ Stores | | |
| | | Owners | Stores | % |
| Deere (Ag) | 1,522 | 99 | 1,263 | 83 |
| Case IH | 815 | 46 | 431 | 53/45* |
| AGCO Brands | 650 | 20 | 206 | 32 |
| New Holland | 875 | 18 | 181 | 21/14* |
| Kubota | 1,260 | 10 | 145 | 13 |
| Total | 6,750 | 188** | 2,052 | 30 |

*Less Titan Machinery & Rocky Mt. Equip.          **Includes 2 shortline-only Big Dealers

[34]

43.     Not only does Deere push its smaller dealers to sell or consolidate, but it exercises immense control over those transactions. For instance, Deere prevents some smaller dealerships from passing on their business to members of their own family.[35] If a single-location dealer wants to sell the business, Deere dictates who the purchaser can be, funneling dealership sales to

---

[32] *Id.*

[33] Schmidt, *supra* n.7.

[34] Schmidt, *supra* n.25.

[35] Brat & Aeppel, *supra* n.26.

preferred Big Dealers. Deere will terminate its affiliation with the dealership altogether if the dealership refuses to sell to the specified buyers.

44.    Deere's consolidation increases the territory controlled by large Dealership groups. This in turn eliminates or reduces the chance of price competition among Deere Dealerships, which can and do charge high prices for Repair Services with little fear of a competitor undercutting their rates.

45.    By decreasing competition among its Dealerships, Deere also increases its own profitability. Deere benefits not only from forcing farmers to purchase Deere Repair Services from Deere Dealerships, but also from forcing farmers to buy these Repair Services in a market that Deere has painstakingly groomed to be less competitive.

D.    **The "Right to Repair" Movement and Deere's Failure to Provide its Promised Full Spectrum of Repair Tools**

46.    The "Right to Repair" movement has grown in recent years due to the increasing wrongful conduct of original equipment manufacturers ("OEMs"). OEMs, who can control warranties and their respective products' ability to be repaired, have seized on this opportunity to deprive consumers of the ability to fully fix and/or repair the equipment that they purchase. This conduct has drawn the scrutiny of federal authorities both in the United States and internationally.

47.    In the United States, the Federal Trade Commission ("FTC") published a report in May 2021 which discussed consumers' "right to repair."[36] This report, which discussed the nuances of OEMs and the legality of tying repair services to the purchase of the products that need

---

[36] Federal Trade Commission, *Nixing the Fix: An FTC Report to Congress on Repair Restrictions* (May 2021) https://www.ftc.gov/system/files/documents/reports/nixing-fix-ftc-report-congress-repair-restrictions/nixing_the_fix_report_final_5521_630pm-508_002.pdf. ("FTC Report").

to be repaired, specifically highlights the "comments and empirical research lamenting protracted repairs for … tractors."[37]

48.    The report proffers testimony that backs up those concerns:

In addition, during the 2016 right to repair hearing held by the Nebraska legislature's Committee on Judiciary, Kenny Roelofsen, a representative of an agricultural replacement company, testified that "if [a tractor is] down for one or two days during planting season or during harvest season, they're wasting money... if the only person who can repair that equipment is the OEM, then if they have a tech that's already out. They don't have another tech to get out there and essentially plug in a USB port and fix their tractor, then they're out. So they're essentially tying up all the market into a monopoly to themselves, not allowing competition which drives prices up."[38]

49.    And, as the report states, "right to repair advocates argue that repair restrictions increase the cost of repair" by OEMs — including Deere.[39]

50.    After the report was submitted to Congress, the FTC voted unanimously to ratify its findings and to "ramp up law enforcement against repair restrictions that prevent small businesses, workers, consumers and even government entities from fixing their own products."[40]

51.    According to the FTC's report, "[m]anufacturer restrictions on aftermarket competition may be subject to claims under Section 1 or Section 2 of the Sherman [Antitrust] Act …."[41]

---

[37] *Id.* at 39.

[38] *Id*.

[39] *Id.* at 40.

[40] Federal Trade Commission, *FTC to Ramp Up Enforcement Against Illegal Repair Restrictions: Commission unanimously adopts policy statement aimed at restoring Right to Repair for small businesses, workers, consumers, and government entities*, (July 2021) https://www.ftc.gov/news-events/press-releases/2021/07/ftc-ramp-law-enforcement-against-illegal-repair-restrictions.

[41] *Id.* at 11.

52.     Additionally, the FTC's report discusses specific types of repair restrictions that "have the effect of limiting consumer repair choices."[42]  One such repair restriction is with respect to the intentional unavailability of "diagnostic software and tools."[43]  With respect to this type of repair restriction, the report states the following: "[d]iagnostic software and firmware are often necessary today to make repairs because they help repair shops diagnose problems with devices. Repair advocates have indicated that some manufacturers limit the availability of such software and in other instances institute code that prevents [independent repair shops] from developing alternative diagnostic software."[44]

53.     Deere's own actions have hindered the ability of farmers to make repairs, including but not limited to Deere's attempts to restrict customers from accessing the onboard technology on Tractors; and Deere's more recent failure to keep its promise to make certain repair related software, which allows the ECUs in Tractors to function properly, readily available to farmers.

54.     In 2015, Deere argued that the Digital Millennium Copyright Act ("DMCA") forbade consumers from bypassing Technical Protection Measures ("TPMs") when diagnosing or repairing Tractors. Deere argued that farmers only had an "implied license," but did not actually own the software that made the equipment run.[45]  The U.S. Copyright Office rejected this argument and deemed the access by farmers to the software, for the purpose of repairing the Tractor, to be fair use.

---

[42] *Id.* at 17.

[43] *Id.*

[44] *Id.* at 19.

[45] Deere & Company, *Long Comment Regarding a Proposed Exemption Under 17 U.S.C. 1201*, https://copyright.gov/1201/2015/comments-032715/class%2021/John_Deere_Class21_1201_2014.pdf (last accessed Feb. 2, 2022).

18

55.     Not to be deterred by this explicit rejection of its attempts to block farmers of the ability to access software necessary for repairs, in 2016 Deere issued an end-user license agreement ("EULA") for "John Deere Embedded Software" which attempted to, again, block farmers from accessing, reverse-engineering, or modifying the software running on Tractors.[46]

56.     Public awareness and frustration grew with the increasingly prohibitive repair restrictions implemented by OEMs like Deere, and state legislatures began to act.

57.     For example, in 2019 Minnesota proposed a bill that would require manufacturers to "make available, on fair and reasonable terms, documentation, parts, and tools*, inclusive of any updates to information or embedded software*, to any independent repair provider or to the owner of digital electronic equipment manufactured by or on behalf of, or sold by, the original equipment manufacturer for purposes of diagnosis, maintenance, or repair."[47]

58.     As of 2021, twenty-seven states introduced some form of "right to repair" legislation, including many with explicit language regarding embedded software.

59.     On September 7, 2018, feeling the increasing public awareness and impending legislative pressure, the Equipment Dealers Association ("EDA"), a trade and lobbying group that represents John Deere and other manufacturers, made a promise, memorialized in a "Statement of Principles," signed and endorsed by Joani Woelfel (The Far West EDA President and CEO) and Jamie Johansson (President of the California Farm Bureau Federation (CFBF)).[48]

---

[46] Deere & Company, *License Agreement for John Deere Embedded Software*, https://www.deere.com/assets/pdfs/common/privacy-and-data/docs/agreement_pdfs/english/2016-10-28-Embedded-Software-EULA.pdf (last accessed Feb. 2, 2022).

[47] Digital Fair Repair, HF 1138, 91st Leg., 2nd Engrossment (Minn. 2020), https://www.revisor.mn.gov/bills/text.php?number=HF1138&type=bill&version=2&session=ls91&session_year=2019&session_number=0. (emphasis added)

[48] *Agreement Streamlines Repair of High-Tech Farm Equipment*, FARWEST EQUIPMENT DEALERS ASSOCIATION (Sept. 7, 2018),

19

60.     In sum, the EDA committed to make repair tools, software, and diagnostics available to the public by January 1, 2021.[49]

61.     The promise was consummated with a ceremony and photo op taken in the shadow of a John Deere tractor.[50]



_____

https://web.archive.org/web/20210220104859/https://fweda.com/2018/09/09/agreement-streamlines-repair-of-high-tech-equipment/ (last accessed Feb. 2, 2022).

[49] *Id.*

[50] *Id.*

20

62.   The "Statement of Principles"[51] reads in full:

**STATEMENT OF PRINCIPLES:**

To the extent not already available, the maintenance, diagnostic and repair information listed below will be made available to end users through authorized agricultural dealers at fair and reasonable terms, beginning with tractors and combines put into service on or after January 1, 2021. End users will also be able to purchase or lease diagnostic tools through authorized agricultural dealers. Certain information and tools may be available earlier. Agricultural dealers are committed to provide access to:

- *Manuals (Operator, Parts, Service)*
- *Product Guides*
- *Product Service Demonstrations, Training, Seminars or Clinics*

- *Fleet Management Information*
- *On-Board Diagnostics via diagnostics port or wireless interface*

- *Electronic Field Diagnostic Service Tools and training on how to use them*

- *Other publications with information on service, parts, operation and safety*

Using this information and these tools, which will be available for purchase, lease or subscription from dealers, farmers will be able to identify and repair numerous problems they may encounter with their equipment. FWEDA and CFBF support equipment users' ability to maintain, diagnose and repair their machinery. However, the ability to diagnose and repair does not mean the right to modify. For safety, durability, environmental and liability reasons, diagnostic and repair information and tools will not permit consumers to do the following:

- *Reset an immobilizer system or security-related electronic modules,*

- *Reprogram any electronic processing units or engine control units,*

- *Change any equipment or engine settings negatively affecting emissions or safety compliance,*

- *Download or access the source code of any proprietary embedded software or code*



This commitment to providing maintenance, diagnostic and repair tools is a reaffirmation of the importance of seeking commonsense solutions to meet farmers' needs. FWEDA and CFBF are eager to continue working together to provide the most innovative and high-quality equipment to meet the needs of modern production agriculture.

*Signed and Endorsed this 7th Day of September, 2018*



CEO, Far West Equipment Dealers Association

President, California Farm Bureau Federation

63.   Jamie Johansson underscored the importance of keeping such a promise stating:

"[r]eliable farm equipment is crucial to the success of any farming operation, and farmers have

---

[51] FWEDA Right to Repair Statement Signed, FARWEST EQUIPMENT DEALERS ASSOCIATION (September 7, 2018), https://www.fweda.com/wp-content/uploads/2018/09/FWEDA-Right-to-Repair-Statement-Signed_090718.pdf (last accessed Feb. 2, 2022).

long depended on their ability to make repairs quickly in order to keep their equipment running during harvest and other key times."[52]

64.    Joani Woelfel commented that the Statement of Principles "says a lot about the relationship between dealers and their customers" and "[i]t is especially important because whenever we can resolve issues that concern us without passing laws, everybody wins."[53]

65.    With the EDA signing the Statement of Principles, companies like John Deere avoided right to repair legislation with an empty promise.

66.    Now, more than three years later, farmers still struggle to see those promises fulfilled as they are denied necessary repair related software as outlined in the agreement with EDA.

67.    Deere has unsurprisingly denied claims that farmers are hindered in any way from repairing their Tractors and has insisted that the promise made in the EDA Statement of Principles has been kept.[54]

68.    In June 2021, John Deere Chief Technology Officer, Jahmy Hindman, stated in response to questions about the allegations that Deere has not made necessary repair tools, including software, available to consumers that "98 percent of the repairs that customers want to do on John Deere [Agricultural Equipment] today, they can do. There's nothing that prohibits them from doing them."[55]

---

[52] *See supra* n.48.

[53] *Id.*

[54] *Id.*

[55] Patel, *supra* n.3

69.     Around that same time, Deere issued a company statement that "John Deere supports a customer's right to safely maintain, diagnose and repair their own equipment."[56]  Deere is also quoted as stating "When customers buy from John Deere, they own the equipment and can choose to personally maintain or repair the product."[57]

70.     However, there are plenty of real-world examples that demonstrate how many of the things, including software, as contemplated in the EDA Statement of Principles remains inaccessible to farmers.

71.     For example, in 2020, one owner of an independent equipment mechanic shop in Nebraska reported that about half of the repairs he sees involve code faults triggered by emission-control systems. The faults render vehicles inoperable, or "limp", and while the shop can replace the mechanical equipment that might throw the Tractor's code, the Dealerships would not provide the software necessary to restart the piece of equipment without hauling the machine to a Dealership or paying for Deere mechanic to make a house call.[58]

72.     In February 2021, Right to Repair advocate Kevin O'Reilly, posing as a consumer, called twelve John Deere Dealerships in six states to determine the availability of diagnostic software. Eleven of those Dealerships told Mr. O'Reilly that they don't sell diagnostic software, and the last one gave him an email address to contact and ask for the tools. When Mr. O'Reilly sent an email to the individual identified, he never received a response.[59]

---

[56] Tyne Morgan, *AEM, John Deere Respond to Biden's Planned Executive Order Over Right to Repair Equipment*, AGWEB FARM JOURNAL (July 7, 2021) https://www.agweb.com/news/policy/politics/aem-john-deere-respond-bidens-planned-executive-order-over-right-repair

[57] *Id.*

[58] Waldman & Mulvany, *supra* n.2

[59] Koebler & Gault, *supra* n.1.

73.     Mr. O'Reilly published a report highlighting how "[f]armers' inability to repair software-connected systems without proprietary software is a glaring example of how farm equipment is engineered to be dependent on dealership support."[60]

74.     Similarly in 2021, journalists inquiring about the availability of software called nine John Deere Dealerships in seven states and were told by representatives that software was not available.[61]

75.     If these software related tools were actually available, then it would be simple for Deere to point to where they could be accessed and where they could be purchased.

76.     Despite public facing comments implying that farmers need not rely on Dealerships for repairs, Deere has intentionally obscured the fact that the software, and access to it, are necessary for diagnosis and completion of many repairs.

77.     Deere's misleading statements fail to provide information on the scope of repairs and maintenance that can be accomplished without access to necessary software, which prevents farmers and others from being able to accurately assess the overall cost of owning Tractors.

**E.     Deere's Current Diagnostic and Repair Tools Are Insufficient**

78.     Where Deere has made diagnostic and repair tools available to consumers — like Plaintiff and members of the proposed Class — they are insufficient to cover either the entire scope of what is needed by farmers to make repairs on their Tractors or to restore competition to the Deere Repair Services Market.

---

[60] Kevin O'Reilly, U.S. PIRG, *Deere in the Headlights: How software that farmers can't access has become necessary to tractor repair* (Feb. 2021), https://uspirg.org/feature/usp/deere-headlights.

[61] Koebler & Gault, *supra* n.1

79.    One example is the release of the Customer Service ADVISOR program which debuted on Deere's main website (deere.com) on or around June of 2021.[62]

80.    According to Deere, "Customer Service ADVISOR is a digital database of Operator, Diagnostic, and Technical manuals for John Deere Products. [A Customer Service ADVISOR] subscription allows users to connect machines … to clear and refresh codes, take diagnostic readings, and perform limited calibrations."[63]

81.    However, this subscription is costly (starting at $8,500 for the first year of Customer Service ADVISOR)[64] and the subscription fails to provide the full scope of diagnostic and repair tools needed in order to service a machine — indeed, as per Deere website: it "performs *limited* calibrations."[65] Moreover, "not all of the features that dealers have access to in Service ADVISOR will be available to customers" according to one of the Dealerships.[66] Specifically, the Service ADVISOR program offers:

---

[62] Customer Service ADVISOR, JOHN DEERE, https://www.deere.com/en/parts-and-service/manuals-and-training/customer-service-advisor/ (last accessed Feb. 2, 2022).

[63] *Id.*

[64] *Id.*

[65] Customer Service ADVISOR, UNITED AG & TURF, https://www.unitedagandturf.com/service/customer-service-advisor/ (last accessed Feb. 2, 2022).

[66] *Id.*

| FEATURE | CUSTOMER CAPABILITY |
|---|---|
| Access Owner's and Technical Manuals | Yes |
| Look up diagnostic codes | Yes |
| Machine diagnostic connectivity with EDL | Yes |
| Perform machine calibrations that require EDL | Yes |
| Reprogram Machine Controllers | No |
| Access Dealer Technical Assistance Center | No |
| Utilize Service ADVISOR Remote | No |

67

82.     Thus, even if Tractor owners were to subscribe to the Service ADVISOR program, they would not receive the necessary scope of potential diagnostic or repair tools needed to keep their Tractor in working condition.

83.     This further stifles competition in the Deere Repair Services market because, even if farmers or independent repair servicers were to purchase the Service ADVISOR program, they would not receive the full scope of repair and diagnostic services needed.

84.     Dealerships themselves have acknowledged this.

85.     In 2016, a Deere authorized Dealership employee called the Service ADVISOR program "a waste of your money" for farmers and that the Dealership version of the Service

---

[67] *Id.*

ADVISOR program, which has the full scope of repair and diagnostic tools listed above, is "similar… If they let [consumers] calibrate, us dealer guys wouldn't have any work."[68]

### F.    Deere has No Legitimate Basis to Restrict Farmer Access to Necessary Repair Tools

86.    Deere does not make accessible the same repair information and tools to Tractor owners and independent repair shops as those that are available to Dealers. In so doing, Deere fails to provide the same opportunity for those parties to repair Tractors, as well as fails to foster any real competition in the Deere Repair Services Market.

87.    Deere offers only pretextual reasons why the software and tools available to Dealers are not also equally available to farmers and independent repair shops, including providing access to certain software and repair tools would allow farmers to bypass emissions and safety controls.

88.    Deere misleadingly claims that such restrictions are necessary to "ensure continued compliance with emissions, operator safety and other regulatory requirements."[69]

89.    Deere's Chief Technology Officer put it in the following basic terms:

> We've got a responsibility when we sell a piece of equipment to make sure that it's meeting the regulatory environment that we sold it into. And then I think the other one is in and around safety, critical systems, things that they can impact others in the environment that, again, in a regulated fashion, we have a responsibility to produce a product that meets the requirements that the regulatory environment requires.[70]

---

[68] *JD Service Advisor*, THE COMBINE FORUM, post by hake2651 (Feb. 29, 2016) https://www.thecombineforum.com/threads/jd-service-advisor.253730/.

[69] Deere & Co Position Letter on Kansas HB 2122: Digital Electronic Repair Requirements, SCRIBD, https://www.scribd.com/document/339340098/John-Deere-letter#from_embed (last accessed Feb. 2, 2022)

[70] Patel, *supra* n.3.

27

90.     In May 2021, as discussed previously, the FTC issued a report that examined, how repair restrictions implemented by various industries increase costs and limit consumer choice, and how these restrictions may implicate federal consumer protection and antitrust laws.[71]

91.     As to Deere's purported concern for safety, the FTC noted that manufacturers, relying upon research submissions and comments from the EDA and AEM, [72] provided no factual support for their statements that "authorized repair persons are more careful or that individuals or independent repair shops fail to take appropriate safety precautions."[73]

92.     Deere's proffered concern that restricting the availability of certain software and tools is necessary to stop customers from overriding emissions controls is similarly unfounded, as the FTC pointed out that data submitted by the EDA, from a 2019 survey, was inapposite, "because [the data] concerns *modifications* to equipment as opposed to *repairs*." [74] The FTC also noted conversations with representatives of the AEM and EDA that confirmed the limitations of the submitted studies.[75]

93.     In addition, there is a clear difference between resetting or clearing an error code in order to get a piece of equipment out of "limp" mode and ignoring or affirmatively overriding emissions or safety codes which requires a completely different set of tools, and are not the same tools used for diagnosis and repair.

---

[71] FTC Report, *supra* n.36.

[72] *Id.* at 37, n.204

[73] *Id.* at 28.

[74] *Id.* at 38. (emphasis added)

[75] *Id.* at 38, n.205.

94.    As Kevin O'Reilly of U.S. PIRG reported, overriding the emission and safety codes on a piece of agricultural machinery, would require the deleting and replacement of the entire operating system of a machine to a version where no such controls were in place.[76]

95.    Additionally, Deere proffers its justification for withholding repair related software from Tractor owners and independent repair shops as necessary to protect its copyright claims to the onboard technology of Tractors under the DMCA.[77]

96.    On October 28, 2015, the U.S. Copyright Office rejected Deere's position, stating "reproducing and altering the computer programs on ECUs for purposes of facilitating diagnosis, repair and modification of vehicles may constitute a non-infringing activity as a matter of fair use[.]"[78]

97.    As illustrated above, there is no defensible basis for Deere to withhold repair related software from a farmer or independent repair shop that is necessary to diagnose or perform repairs.

### G.    Deere's Monopolization of the Deere Repair Services Market Has Reaped Supracompetitive Profits and Record Profits for the Company

98.    Deere and co-conspirator Deere-authorized Dealerships are motivated to maintain their attempted monopolization and monopolization of the Deere Repair Services Market and unlawful tying arrangement as it is tremendously profitable for the company at farmers', other Tractor owners', and independent dealers' expense.

---

[76] O'Reilly, *supra* n.60.

[77] John Deere (2015) Long Comment Regarding a Proposed Exemption Under 17 U.S.C. 1201, https://copyright.gov/1201/2015/comments-032715/class%2021/John_Deere_Class21_1201_2014.pdf

[78] Federal Register, Vol. 80 No. 208 (October 28, 2015), U.S. Copyright Office, *Exemption to Prohibition on Circumvention of Copyright Protection Systems for Access Control Technologies,* Final Rule, at 65954 https://www.govinfo.gov/content/pkg/FR-2015-10-28/pdf/2015-27212.pdf (last accessed Feb. 2, 2022)

99.     As noted above, the Deere Repair Services market is three to six times more profitable than the sales of the original equipment[79] — thus, Deere profits far more from repairs to its Tractors than from the sale of the Tractors themselves. Indeed, at least one fifth of the total sales of Tractors, repairs and services, and other offerings is entirely predicated off of "parts and maintenance services."[80] And from 2013 to 2019, Deere's annual parts sales increased 22%, while the company's total agricultural equipment sales decreased 19% in the same period.[81]

100.     Without proper access to the Software needed to conduct the necessary repairs for their Tractors, farmers have been forced to pay Deere and its Dealerships a premium in order to keep their Tractors running in the event that a part needed to be replaced, or something even as simple as an error message to be cleared. Farmers, like Plaintiff and other members of the proposed Class, operate with thin profit margins — and the supracompetitive prices they're forced to pay to Deere and its Dealerships in the Deere Repair Services market create even more hardship for farmers.

## V.     TRADE AND COMMERCE

101.     During the Class Period, Defendant, directly or through its subsidiaries or affiliated Dealerships, sold Deere Repair Services in the United States in a continuous and uninterrupted flow of interstate commerce and foreign commerce, including through and into this judicial district.

---

[79] *See supra* n.13.

[80] Rajesh Kumar Singh, *Deere bets on cost cuts, services push to boost profits*, REUTERS (Jan. 8. 2020), https://www.reuters.com/article/us-deere-strategy/deere-bets-on-cost-cuts-services-push-to-boost-profits-idUSKBN1Z72TA

[81] Waldman & Mulvany, *supra* n.2.

102.    During the Class Period, Defendant controlled the entire market for Deere Repair Services in the United States.

103.    Defendant's business activities substantially affected interstate and commerce in the United States and caused antitrust injury in the United States.

## VI.    RELEVANT MARKETS

### A.    Deere Repair Services Market

104.    The principal relevant market to evaluate Defendant's anticompetitive conduct is the Deere Repair Services Market.

105.    The Deere Repair Services Market constitutes various services and labor to repair, maintain, and clear fault codes from Deere Tractors.

106.    There are no available substitutes for Deere Repair Services, and Deere Repair Services are not interchangeable with any other manufacturers' service.

107.    The relevant geographic market is the United States.

108.    Defendant Deere has market and monopoly power in the relevant market through its control over access to the Software.

109.    Any independent repair shops who desire to compete with Deere in the Deere Repair Services Market would face insurmountable barriers. Defendant's effective total control of the Software means that independent repair shops are unable to access the necessary resources to be able to meaningfully compete with Deere. Similarly, any farmers who wish to perform their own repairs and/or maintenance are also unable to access the resources necessary to do so.

110.    Independent repair shops and farmers cannot compete effectively in the Deere Repair Services Market without access to the Software.

## B.      Deere Software Market

111.     As discussed above, Defendant maintains market and monopoly power over the market for Deere Software. There is no available substitute for Deere Software, and it is not interchangeable with any other manufacturers' product.

## C.      Tractor Markets

112.     The Deere Repair Services market and the market for Tractors are distinct. The "Tractor Markets" includes, but is not limited to, the United States product markets for agricultural farm tractors, which include 2WD Farm Tractors, Compact Tractors, 4WD Farm Tractors, Row Crop Tractors, Scraper Tractors, Specialty Tractors, Utility Tractors, and Self-Propelled Combines. Defendant Deere is the largest agricultural machinery company in the world and has appreciable economic power in the U.S. Tractor Markets.

## VII.   ANTITRUST INJURY

113.     Defendant's anticompetitive conduct had the following effects, among others:

a.   Price competition has been restrained or eliminated with respect to Deere Repair Services;

b.   The prices of Deere Repair Services have been fixed, raised, stabilized, or maintained at artificially inflated levels;

c.   Purchasers of Deere Repair Services have been deprived of free and open competition; and

d.   Purchasers of Deere Repair Services, including Plaintiff, paid artificially inflated prices.

114.    The purpose of Deere's conduct was to exclude competition and raise, fix, or maintain the price of Deere Repair Services. As a direct and foreseeable result, Plaintiff and the Class paid supracompetitive prices for Deere Repair Services during the Class Period.

115.    By reason of the alleged violations of the antitrust laws, Plaintiff and the Class have sustained injury to their businesses or property, having paid higher prices for Deere Repair Services than they would have paid in the absence of Deere's illegal conduct, and as a result have suffered damages.

116.    This is an antitrust injury of the type that the antitrust laws were meant to punish and prevent.

## VIII.   CLASS ACTION ALLEGATIONS

117.    Plaintiff brings this action on behalf of himself, and as a class action under the Federal Rules of Civil Procedure, Rule 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedures, seeking damages and equitable and injunctive relief on behalf of the following class (the "Class"):

> All persons and entities residing in the United States who, during the Class Period of February 3, 2018 to the present, purchased Deere Repair Services for Deere Tractors from Defendant or Deere's authorized Dealers and/or technicians.

118.    Specifically excluded from the Class are Deere and its employees, affiliates, subsidiaries, and joint venturers, whether or not named in this Complaint.

119.    **Class Identity.** The above-defined Class is readily identifiable and is one for which records should exist.

120.    **Numerosity.** Plaintiff does not know the exact number of class members because such information presently is in the exclusive control of Defendant. Plaintiff believes that due to the nature of the trade and commerce involved, there are thousands of Class members

geographically dispersed throughout the United States, such that joinder of all Class members is impracticable.

121. **Typicality.** Plaintiff's claims are typical of the claims of the members of the Class because Plaintiff purchased Deere Repair Services from Defendant, and therefore Plaintiff's claims arise from the same common course of conduct giving rise to the claims of the Class and the relief sought is common to the Class.

122. **Common Questions Predominate.** There are questions of law and fact common to the Class, including, but not limited to:

a. Whether the United States Deere Repair Services Market constitutes a Relevant Market;

b. Whether Deere possesses market power in this Relevant Market;

c. Whether Deere colluded with Co-conspirator Dealerships to suppress competition for Deere Repair Services between Deere Dealerships in violation of Section 1 of the Sherman Act;

d. Whether Deere colluded with Co-conspirator Dealerships to prevent farmers and independent repair shops from having access to the Software in violation of Section 1 of the Sherman Act;

e. Whether Deere illegally tied the sale of Deere Repair Services to Deere Tractors in violation of Section 1 of the Sherman Act;

f. Whether Deere monopolized or attempted to monopolize the Deere Repair Services Market in the United States in violation of Section 2 of the Sherman Act;

g.  Whether Deere engaged in monopoly leveraging by using its monopoly power in the Deere Software Market to gain or attempt to gain or maintain monopoly power in the Deere Repair Services Market in violation of Section 2 of the Sherman Act;

h.  Whether the conduct of Defendant, as alleged in this Complaint, caused injury to the business or property of the Plaintiff and the other members of the Class;

i.  The effect of Defendant's alleged monopolization or attempted monopolization on the prices of Deere Repair Services sold in the United States during the Class Period;

j.  Whether Plaintiff and other members of the Class are entitled to, among other things, injunctive relief and if so, the nature and extent of such injunctive relief; and

k.  The appropriate class-wide measure of damages.

123.  These and other questions of law or fact, which are common to the members of the Class, predominate over any questions affecting only individual members of the Class.

124.  **Adequacy.** Plaintiff will fairly and adequately protect the interests of the Class in that Plaintiff's interests are aligned with, and not antagonistic to, those of the other members of the Class who purchased Deere Repair Services from Defendant and Plaintiff has retained counsel competent and experienced in the prosecution of class actions and antitrust litigation to represent themselves and the Class.

125.  **Superiority.** A class action is superior to other available methods for the fair and efficient adjudication of this controversy since individual joinder of all damaged members of the

35

Class is impractical. Prosecution as a class action will eliminate the possibility of duplicative litigation. The relatively small damages suffered by individual members of the Class compared to the expense and burden of individual prosecution of the claims asserted in this litigation means that, absent a class action, it would not be feasible for members of the Class to seek redress for the violations of law herein alleged. Further, individual litigation presents the potential for inconsistent or contradictory judgments and would greatly magnify the delay and expense to all parties and to the court system. Therefore, a class action presents far fewer case management difficulties and will provide the benefits of unitary adjudication, economy of scale and comprehensive supervision by a single court.

126.   The prosecution of separate actions by individual members of the Class would create the risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendant.

127.   Plaintiff brings this case on behalf of the Class and all persons and entities similarly situated pursuant to Rule 23, on behalf of all persons and entities that purchased Deere Repair Services that Defendant provided during the Class Period.

128.   Defendant has acted on grounds generally applicable to the Class, thereby making final injunctive relief appropriate with respect to the Class as a whole.

## IX.   CLAIMS FOR RELIEF

### COUNT ONE
#### Violation of Section 1 of the Sherman Act
#### Conspiracy in Restraint of Trade
#### 15 U.S.C. § 1

129.   Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

36

130.    Beginning in or around 2000, Defendant entered into and engaged in unlawful contracts, combinations in the form of trust or otherwise, and/or conspiracies in restraint of trade and commerce with Co-conspirator Dealerships in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

131.    Defendant engaged in predatory and anticompetitive behavior by restricting competition among its affiliated Dealerships, which unfairly suppressed price competition for Deere Repair Services and unreasonably restrained trade.

132.    Defendant's conduct included concerted efforts, actions and undertakings among Defendant and the Co-conspirator Dealerships with the intent, purpose, and effect of artificially suppressing competition from smaller dealerships.

133.    Defendant perpetrated the scheme with the specific intent of reducing competition in the Deere Repair Services market to the benefit of Defendant and the Co-conspirator Dealerships.

134.    Defendant's conduct in furtherance of its contracts, combinations and/or conspiracies were authorized, ordered, or done by its respective officers, directors, agents, employees, or representatives while actively engaging in the management of Defendant's affairs.

135.    Plaintiff and Class Members paid higher rates for Deere Repair Services from Deere and its Co-Conspirator Dealerships than they otherwise would have in the absence of Defendant's unlawful conduct, and, as a result, have been injured in their property and have suffered damages in an amount according to proof at trial.

136.    Defendant's contracts, combinations, and/or conspiracies are per se violations of Section 1 of the Sherman Act.

137.    In the alternative, Defendant is liable under a "quick look" analysis where an observer with a rudimentary understanding of economics could conclude that the arrangements in question would have an anticompetitive effect on customers and markets.

138.    Defendant's contracts, combinations, and/or conspiracies have had a substantial effect on interstate commerce.

139.    As a direct and proximate result of Defendant's contract, combination, and/or conspiracy to restrain trade and commerce, Plaintiff and Class Members have suffered injury to their business or property and will continue to suffer economic injury and deprivation of the benefit of free and fair competition.

## COUNT TWO
### Violation of Section 1 of the Sherman Act
### Group Boycott
### 15 U.S.C. § 1

140.    Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

141.    Beginning approximately in 2000 and continuing thereafter to the present, Defendant, by and through its officers, directors, employees, agents, or other representatives, have explicitly or implicitly colluded with Co-conspirator Dealerships to jointly boycott entities that would have introduced price-reducing sales of Deere Repair Services in the United States, in order to artificially raise, fix, maintain, and/or stabilize prices in the Deere Repair Services market, in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

142.    Defendant's and the Co-conspirator Dealerships' refusal to sell Software and repair tools to individual farmers and independent repair shops constitutes a per se violation of Section One of the Sherman Act.

143.    Defendant's and the Co-conspirator Dealerships' boycott cut off access to the Software, a necessary resource that would enable farmers and independent repair shops to compete in the Deere Repair Services market.

144.    Together, Defendant and the Co-conspirator Dealerships wholly control the market for Deere Repair Services.

145.    No plausible pro-competitive arguments exist for Defendant's and the Co-conspirator Dealerships' refusal to sell the Software to farmer or independent repair shops.

146.    As a direct and proximate result of Defendant's contract, combination, and/or conspiracy to restrain trade and commerce, Plaintiff and Class Members have suffered injury to their business or property and will continue to suffer economic injury and deprivation of the benefit of free and fair competition.

**COUNT THREE**
**Violation of Section 1 of the Sherman Act**
**Unlawful Tying Arrangement**
**15 U.S.C. § 1**

147.    Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

148.    This cause of action is brought under Section 1 of the Sherman Act, 15 U.S.C. § 1.

149.    "The typical tying case involve[s] a seller's attempt to exploit its economic power over one product or in one market to force a less desirable, tied product on a buyer." *Courtney Cates, et al. v. Crystal Clear Technologies, LLC*, 874 F.3d 530, 534 (6th Cir. 2017). Such an arrangement violates Section 1 of the Sherman Act if the seller has appreciable economic power in the tying product market and the arrangement affects a substantial volume of commerce in the tied market. *Eastman Kodak Co. v. Image Tech. Servs. Inc.*, 504 U.S. 451, 462 (1992).

150.    Deere Tractors and Deere Repair Services are distinct and separate products and services.

151.    Plaintiff and Class members through their purchase of Deere Tractors were coerced into purchasing a second tied product, Deere Repair Services, from Defendant and its Co-Conspirator Dealerships.

152.    Defendant's aggressive consolidation of its affiliated Co-conspirator Dealerships also materially changed the dynamics of the Deere Repair Services Market, drastically reducing the pressure of pricing competition even among the Dealerships.

153.    Furthermore, Defendant represented to Plaintiffs and the Class that most necessary repair tools were available and that almost all repairs could be done on the Tractors without the Software. These misleading statements meant that Plaintiff and the Class could not, from Deere's representations, engage in accurate lifecycle pricing for Deere Tractors before they were locked into purchasing Deere Repair Services from Defendant and the Dealerships.

154.    As set out above, Defendant has appreciable economic power in the relevant Tractor Markets, *i.e.*, the "tying" markets.

155.    This tying arrangement affected a substantial amount of interstate commerce.

156.    Defendant's conduct amounts to a *per se* tying violation, as Defendant has significant power in the tying markets which has led to a significant and actual impact on competition in the Deere Repair Services market.

157.    Alternatively, Defendant's conduct is illegal tying under the rule of reason, as Defendant's actions to coerce farmers to purchase Deere Repair Services from Defendant is an unreasonable restraint on competition in the market for Deere Repair Services.

40

158.     There are no legitimate business justifications for Defendant's illegal tying arrangement.

159.     Defendant has a substantial economic interest in sales of Deere Repair Services.

<div align="center">

**<u>COUNT FOUR</u>**
**Violation of Section 2 of the Sherman Act|**
**Monopolization**
**15 U.S.C. § 2**

</div>

160.     Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

161.     This cause of action is brought under Section 2 of the Sherman Act, 15 U.S.C. § 2, which prohibits "monopoliz[ation of] any part of the trade or commerce among the several states, or with foreign nations."

162.     Deere has monopoly power in the Deere Repair Services Market, including the power to control prices and exclude competition.

163.     Deere has willfully and intentionally engaged in anticompetitive conduct in order to unlawfully maintain its monopoly in this market, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

164.     Deere has unreasonably restrained, and further threatens to unreasonably restrain competition in the Deere Repair Services Market by:

     a.  restricting the availability of the Software necessary to perform diagnostics and repairs for Deere Tractors;

     b.  knowingly misrepresenting the availability and necessity of the Software necessary for diagnostics and repairs for Deere Tractors;

     c.  tying the purchase of Repair Services through Deere to the purchase of Deere Tractors; and

<div align="center">41</div>

    d.   limiting farmers' rights over their own Tractors through the terms of the EULA

with the aim of restricting farmers' ability to choose to perform Deere Repair

Services themselves or take their Tractor to an independent repair shop.

165.    While some of these anticompetitive acts themselves constitute an individual

antitrust violation on a stand-alone basis, together they support a broader monopolization claim.

166.    As a direct and proximate result of Deere's anticompetitive and monopolistic

conduct, Plaintiff and the Class have been damaged by, among other things: (i) the payment of

supracompetitive prices for Deere Repair Services; and (ii) the lack of availability of independent

Deere Repair Services and self-repair options.

<div align="center">

**COUNT FIVE**
**Violation of Section 2 of the Sherman Act**
**Attempted Monopolization in the Alternative**
**15 U.S.C. § 2**

</div>

167.    Plaintiff incorporates and realleges, as though fully set forth herein, each and every

allegation set forth in the preceding paragraphs of this Complaint.

168.    As detailed above, Deere has monopoly power, or at a minimum, a dangerous

probability of success in acquiring monopoly power, in the Deere Repair Services Market,

including the power to control prices and exclude competition.

169.    Deere has willfully, knowingly, and with specific intent to do so, attempted to

monopolize the Repair Services Markets, in violation of Section 2 of the Sherman Act, 15 U.S.C.

§ 2.

170.    Deere's anticompetitive conduct alleged herein has been directed at accomplishing

the unlawful objective of controlling prices and/or preventing competition in the Repair Services

Market. Deere's ongoing anticompetitive conduct presents a dangerous probability that Deere will

succeed, to the extent it has not already, in its attempt to monopolize the Repair Service Market.

171.    As a direct and proximate result of Deere's anticompetitive and monopolistic conduct, Plaintiff and the Class have been damaged by, among other things, (i) the payment of supracompetitive prices for Deere Repair Services; and (ii) the lack of availability of independent Deere Repair Services and self-repair options.

**COUNT SIX**
**Violation of Section 2 of the Sherman Act**
**Monopoly Leveraging**
**15 U.S.C. § 2**

172.    Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

173.    As detailed above, Deere has monopoly power over Deere Software.

174.    Deere has willfully and intentionally used its monopoly power over Deere Software to gain or attempt to gain or maintain monopoly power in the Deere Repair Services Market, specifically, by tying purchases of Deere Tractors to Deere-provided Repair Services through deliberate restriction of access to the full spectrum of Software necessary to run diagnostics, approve repairs, and perform maintenance. Deere's actions cannot be justified on the basis of any legitimate consumer benefit.

175.    Furthermore, Deere also leveraged its monopoly power over Deere Software to effectuate the EULA, limiting farmers' ownership rights over their own Tractors and forcing farmers to purchase Deere-provided Repair Services. The EULA impermissibly restricts farmers' ability to perform Deere Repair Services themselves by prohibiting attempts to reverse engineer, adapt, or otherwise circumvent the Software. Deere threatens that it may terminate the license to the Software—and therefore access to a functional Tractor—if a farmer interacts with the Software in a way that Deere deems to be a violation of the EULA.

176.     Deere willfully has acquired or maintained monopoly power by the exclusionary conduct detailed above, rather than through legitimate business acumen, skill, efficiency, or legitimate innovation.

177.     As a direct and proximate result of Deere's anticompetitive and monopolistic conduct, Plaintiff and the Class have been damaged by, among other things, (i) the payment of supracompetitive prices for Deere Repair Services; and (ii) the lack of availability of independent Deere Repair Services and self-repair options.

<div align="center">

**COUNT SEVEN**
**Violation of Section 2 of the Sherman Act**
**Conspiracy to Monopolize**
**15 U.S.C. § 2**

</div>

178.     Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

179.     Beginning approximately in 2000 and continuing thereafter to the present, Defendant, by and through its officers, directors, employees, agents, or other representatives, have explicitly or implicitly conspired with Co-conspirator Dealerships to jointly boycott entities that would have introduced price-reducing sales of Deere Repair Services in the United States, in order to acquire monopoly power in the Deere Repair Services market, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

180.     Defendant's and the Co-conspirator Dealerships' boycott cut off access to the Software, a necessary resource that would enable farmers and independent repair shops to compete in the Deere Repair Services market.

181.    Deere and the Dealerships have willfully, knowingly, and with specific intent to do so, conspired to monopolize the Repair Services Markets, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

182.    No plausible pro-competitive arguments exist for Defendant's and the Coconspirator Dealerships' refusal to sell the Software to farmer or independent repair shops.

183.    As a direct and proximate result of Deere and the Dealerships' conspiracy to restrain trade and commerce, Plaintiff and Class Members have suffered injury to their business or property and will continue to suffer economic injury and deprivation of the benefit of free and fair competition.

**COUNT EIGHT**
**Violation of Sections 1 and 2 of the Sherman Act**
**Declaratory and Injunctive Relief**
**15 U.S.C. §§ 1, 2**

184.    Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

185.    Plaintiff seeks declaratory and injunctive relief under the federal antitrust laws.

186.    Plaintiff's allegations described herein constitute violations of Sections 1 and 2 of the Sherman Act.

187.    Deere effectuated an illegal tying arrangement and a scheme to restrain trade and monopolize a market.

188.    There is, and was, no legitimate, non-pretextual, pro-competitive business justification for Deere's conduct that outweighs its harmful effect.

189.    As a direct and proximate result of Deere's illegal tying arrangement and anticompetitive scheme, as alleged herein, Plaintiff and the Class were harmed.

190.    The goal, purpose, and/or effect of the tying arrangement and anticompetitive scheme was to prevent competition or self-repair in order to continue charging supracompetitive prices for Repair Services.

191.    Plaintiff and the Class have been injured in their business or property by reason of Deere's antitrust violations as alleged in this Complaint. Their injury consists of paying higher prices for Repair Services than they would have paid in the absence of those violations. These injuries will continue unless halted.

192.    Plaintiff and the Class, pursuant to Fed. R. Civ. P. 57 and 28 U.S.C. § 2201(a), hereby seek a declaratory judgment that Deere's conduct constitutes a violation of Sections 1 and 2 of the Sherman Act.

193.    Plaintiff and the Class further seek equitable and injunctive relief pursuant to § 16 of the Clayton Act, 15 U.S.C. § 26, and other applicable law, to correct the anticompetitive effects caused by Deere's unlawful conduct.

## COUNT NINE
### Unjust Enrichment

194.    Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

195.    Deere has benefitted from the monopoly profits on the sale of Repair Services resulting from the unlawful and inequitable acts alleged in this Complaint. Deere's financial benefit resulting from unlawful and inequitable conduct is traceable to overpayments for Repair Services by Plaintiff and the Class.

196.    Plaintiff and the Class have conferred upon Deere an economic benefit, in the nature of profits resulting from unlawful overcharges and monopoly profits, to the economic detriment of Plaintiff and the Class.

197.    The economic benefit of overcharges and unlawful monopoly profits derived by Deere through Plaintiffs' payment of supra-competitive and artificially inflated prices for Deere Repair Services is a direct and proximate result of Deere's unlawful practices.

198.    The financial benefits derived by Deere rightfully belong to Plaintiff and the Class, as Plaintiff and the Class paid anticompetitive and monopolistic prices during the Class Period, inuring to the benefit of Deere.

199.    It would be inequitable under unjust enrichment principles in the District of Columbia and each of the fifty states for Deere to be permitted to retain any of the overcharges for Repair Services derived from Deere's unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

200.    Deere is aware of and appreciated the benefits bestowed upon it by Plaintiff and the Class.

201.    Deere should be compelled to disgorge in a common fund for the benefit of Plaintiff and the Class all unlawful or inequitable proceeds it received.

202.    A constructive trust should be imposed upon all unlawful or inequitable sums received by Deere traceable to Plaintiff and the Class.

## X.    PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of itself and the Class of all others so similarly situated, respectfully requests judgment against Defendant as follows:

203.    The Court determine that this action may be maintained as a class action under Rule 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, appoint Plaintiff as Class Representative and its counsel of record as Class Counsel, and direct that notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to the Class, once certified;

204.    The unlawful conduct herein be adjudged and decreed in violation of Section 1 and Section 2 of the Sherman Act.

205.    Plaintiff and the Class recover damages, to the maximum extent allowed, and that a joint and several judgment in favor of Plaintiff and the members of the Class be entered against Defendant in an amount to be trebled to the extent the laws permit;

206.    Defendant, its affiliates, successors, transferees, assignees and other officers, directors, partners, agents and employees thereof, and all other persons acting or claiming to act on their behalf or in concert with them, be permanently enjoined and restrained from in any manner continuing, maintaining or renewing the conduct alleged herein, or from engaging in other conduct having a similar purpose or effect, and from adopting or following any practice, plan, program, or device having a similar purpose or effect;

207.    Plaintiff and the members of the Class be awarded pre- and post-judgment interest as provided by law, and that such interest be awarded at the highest legal rate from and after the date of service of this Complaint;

208.    Plaintiff and the members of the Class recover their costs of suit, including reasonable attorneys' fees, as provided by law; and

209.    Plaintiff and the members of the Class have such other and further relief as the case may require and the Court may deem just and proper.

## XI.    JURY TRIAL DEMAND

210.    Plaintiff demands a trial by jury, pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, of all issues so triable.

Dated: February 3, 2022

/s/ Gregory F. Coleman
John Whitfield (TN 33123)
Gregory F. Coleman (TN 14092)
**MILBERG COLEMAN BRYSON**
**PHILLIPS GROSSMAN, PLLC**
800 S. Gay Street, Suite 1100
Knoxville, Tennessee 37929
Tel.:   865-247-0080
Email: jwhitfield@milberg.com
        gcoleman@milberg.com

Peggy J. Wedgworth*
Elizabeth McKenna*
John D. Hughes* (admitted only in Michigan)
Blake Hunter Yagman*
Michael Acciavatti* (admitted only in Pennsylvania)
**MILBERG COLEMAN BRYSON**
**PHILLIPS GROSSMAN, PLLC**
405 E. 50th Street
New York, New York 10022
Tel.:   212-594-5300
Email: pwedgworth@milberg.com
        emckenna@milberg.com
        jhughes@milberg.com
        byagman@milberg.com
        macciavatti@milberg.com

*pro hac vice* forthcoming

***Attorneys for Plaintiff and the Proposed Class***

# Exhibit 6

MITCHELL

# U.S. District Court
# Western District of Oklahoma[LIVE] (Oklahoma City)
## CIVIL DOCKET FOR CASE #: 5:22-cv-00157-G

| | |
|---|---|
| Ferrell et al v. Deere & Co | Date Filed: 02/22/2022 |
| Assigned to: Judge Charles Goodwin | Jury Demand: Plaintiff |
| Cause: 15:1 Antitrust Litigation | Nature of Suit: 410 Anti-Trust |
| | Jurisdiction: Federal Question |

**Plaintiff**

**Monty Ferrell**
*individually*

represented by    **Hammons P Hepner**
Sharp Law, LLP
4820 W. 75th Street
Prairie Village, KS 66208
913-901-0505
Email: hhepner@midwest-law.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Kyle B Hadwiger**
Hadwiger & Hadwiger
P O Box 306
120 S Grand Ave
Cherokee, OK 73728
580-596-3591
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Rex A Sharp**
Sharp Law, LLP
4820 W. 75th Street
Prairie Village, KS 66208
913-901-0505
Fax: 913-901-0419
Email: rsharp@midwest-law.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Ruth A French-Hodson**
Sharp Law LLP - PRAIRIE VILLAGE
4820 W 75th St
Prairie Village, KS 66208
913-901-0505
Fax: 913-901-0419
Email: rafrenchhodson@midwest-law.com
*LEAD ATTORNEY*

*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Monty Ferrell**                                      represented by    **Hammons P Hepner**
*on behalf of all others similarly situated*                          (See above for address)
                                                                      *LEAD ATTORNEY*
                                                                      *ATTORNEY TO BE NOTICED*

                                                                      **Kyle B Hadwiger**
                                                                      (See above for address)
                                                                      *LEAD ATTORNEY*
                                                                      *ATTORNEY TO BE NOTICED*

                                                                      **Rex A Sharp**
                                                                      (See above for address)
                                                                      *LEAD ATTORNEY*
                                                                      *ATTORNEY TO BE NOTICED*

                                                                      **Ruth A French-Hodson**
                                                                      (See above for address)
                                                                      *LEAD ATTORNEY*
                                                                      *PRO HAC VICE*
                                                                      *ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Deere & Co**
*doing business as*
John Deere

| Date Filed | # | Docket Text |
|---|---|---|
| 02/22/2022 | 1 | COMPLAINT against Deere & Co filed by Monty Ferrell(on behalf of all others similarly situated) and Monty Ferrell(individually). (Attachments: # 1 Civil Cover Sheet)(rr) (Entered: 02/22/2022) |
| 02/22/2022 | 2 | Summons Issued Electronically as to Deere & Co. (rr) (Entered: 02/22/2022) |
| 02/22/2022 |   | PAYMENT FOR A CIVIL CASE Filing fee $ 402, receipt number AOKWDC-3855728. (Sharp, Rex) (Entered: 02/22/2022) |

# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| MONTY FERRELL, individually and on behalf of all others similarly situated,<br><br>                 Plaintiff<br><br>v.<br><br>DEERE & CO. (d/b/a JOHN DEERE),<br><br>                 Defendant. | Case No. _CIV-22-157-G_<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

## <u>TABLE OF CONTENTS</u>

I.     **NATURE OF ACTION** ........................................................ 2

II.    **JURISDICTION AND VENUE** ........................................ 6

III.   **PARTIES** ........................................................................... 7

     A.    **Plaintiff** .................................................................. 7

     B.    **Defendant & Co-Conspirators** .............................. 8

IV.   **TRADE AND COMMERCE** ............................................. 8

V.    **RELEVANT MARKETS** .................................................. 9

VI.   **FACTUAL ALLEGATIONS** ........................................... 10

     A.    **Technology in John Deere Tractors** ..................... 10

     B.    **Deere's Longtime Strategy of Forced Dealership Consolidation** ................. 14

     C.    **Deere's Promise—and Failure—To Provide the Full Spectrum of Repair Tools** ........................................................... 17

     D.    **To the Extent Deere Has Made Diagnostic and Repair Tools Available, They Are Insufficient to Restore Competition to the Deere Repair Services Market.** ................................................. 21

     E.    **There Are No Legitimate Reasons to Restrict Access to Necessary Repair Tools** ............................................................ 23

     F.    **Deere Has Not Provided Farmers and Independent Repair Shops with the Necessary Software and Continues to Misrepresent the Issue** ..................... 25

     G.    **Defendant's Monopolization of the Deere Repair Services Market Has Led to Artificially High Prices and Record Profits for John Deere.** ................... 26

VII.  **CLASS ACTION ALLEGATIONS** ................................ 28

VIII. **ANTITRUST INJURY** .................................................. 30

IX.   **CLAIMS FOR RELIEF** ................................................. 31

X.    **REQUEST FOR RELIEF** ............................................... 40

XI.   **JURY TRIAL DEMANDED** ........................................... 41

Plaintiff alleges upon personal knowledge and upon information and belief, including the investigation of counsel as follows:

## I.   NATURE OF ACTION

1.      This case is about John Deere's monopolization of the repair service market for John Deere ("Deere") brand agricultural equipment with onboard central computers known as engine control units, or "ECUs." Farmers have traditionally had the ability to repair and maintain their own tractors as needed, or else have had the option to bring their tractors to an independent mechanic. However, in newer generations of its agricultural equipment, Deere has deliberately monopolized the market for repair and maintenance services of its agricultural equipment with ECUs ("Deere Repair Services") by making crucial software and repair tools inaccessible to farmers and independent repair shops. Furthermore, Deere's network of highly-consolidated independent dealerships (the "Dealerships") is not permitted through their agreements with Deere to provide farmers or repair shops with access to the same software and repair tools the Dealerships have. As a result of shutting out farmers and independent repair shops from accessing the necessary resources for repairs, Deere and the Dealerships have cornered the Deere Repair Services Market in the United States for Deere-branded agricultural equipment controlled by ECUs and have derived supracompetitive profits from the sale of repair and maintenance services.

2.      This is an antitrust class action pursuant to Sections 1 and 2 of the Sherman Act (15 U.S.C. §§ 1, 2) brought by Plaintiff Monty Ferrell on his own behalf and on behalf of a class of persons and entities similarly situated. Plaintiff seeks to represent those persons and entities who purchased repair services from Defendant Deere and Co. (d/b/a John Deere) and Deere- affiliated independent Dealerships and technicians in the Deere Repair Services Market for Deere agricultural equipment from January 12, 2018 to the present.

3.      John Deere is indisputably the biggest player in agricultural machinery markets in

2

the United States. Deere wields significant economic power in the market for large tractors and combine tractors in North America[1] and has a larger market share than that of the next two biggest tractor makers, Case New Holland and Kubota Corp., combined.[2]

4.      Modern John Deere tractors, combines, and other agricultural equipment with ECUs (collectively referred to herein as "Tractors") have grown increasingly technologically advanced. Tractors manufactured in the last two decades now require proprietary software and associated repair tools (collectively referred to as "Software") to perform or complete many repairs. For example, an owner of a Tractor may be able to replace the transmission on their equipment, but that Tractor will not operate unless proprietary John Deere Software "approves" the newly-installed part. A farmer or mechanic may have the necessary mechanical parts, knowledge, and the skill to repair a Tractor, but without access to the Software, the repair is not recognized by the Tractor's ECU, making the repair ineffective and the Tractor still unable to function properly.

5.      Despite the use of, and access to, this Software being essential to the continued functionality of its Tractors, Deere has deliberately made this necessary Software unavailable to individual owners and independent repair shops. Instead, Deere makes the full Software available only to Deere Dealerships and technicians, who are not permitted by Deere to sell it.

6.      Historically, farmers who owned Deere Tractors have had the option of repairing their Tractors themselves or taking them to an independent repair shop of their choosing. By

---

[1] Jennifer Reibel, *Manufacturer Consolidation Reshaping the Farm Equipment Marketplace*, Farm Equipment (Aug. 29, 2018), https://www.farm-equipment.com/articles/15962-manufacturer-consolidation-reshaping-the-farm-equipment-marketplace.

[2] Peter Waldman & Lydia Mulvany, *Farmers Fight John Deere Over Who Gets to Fix an $800,000 Tractor*, Bloomberg Businessweek (Mar. 5, 2020), https://www.bloomberg.com/news/features/2020-03-05/farmers-fight-john-deere-over-who-gets- to-fix-an-800-000-tractor.

3

making the Software, for all practical purposes, unavailable, Deere has succeeded in foreclosing competition in the multi-billion-dollar Deere Repair Services Market.

7.     Deere and the Dealerships are highly motivated to prevent competition, either from independent repair shops selling Deere Repair Services, or from farmers with the knowledge and skills to perform their own repairs. Deere's business for its Repair Services is three to six times more profitable than its sales of original equipment.

8.     Deere's monopolization of the Deere Repair Services Market allows Deere and the Dealerships to charge and collect supracompetitive prices for its services every time a piece of equipment requires the Software to diagnose or complete a repair. Consequently, Plaintiff and Class members have paid millions of dollars more for the repair services than they would have paid in a competitive market.

9.     John Deere has demonstrated that it understands that farmers have a right to repair their own Tractors, while at the same time misleading the public regarding how easy it is for farmers or independent repair shops to perform repairs.

10.     After a trade group representing Deere made a highly-publicized promise in 2018 to make the necessary Software and tools available by January 2021, Deere has failed to follow through on this promise. In 2021, multiple investigative journalists attempted to determine whether the Software was available. The Dealerships' response was that they did not sell the Software, that it was only available to licensed dealers, and the Dealership was not allowed to sell it to anyone else.[3]

11.     Deere continues to exploit its relationship with customers who have purchased

---

[3] Jason Koebler & Matthew Gault, *John Deere Promised Farmers It Would Make Tractors Easy to Repair. It Lied.*, Vice Motherboard (Feb. 18, 2021), https://www.vice.com/en/article/v7m8mx/john-deere-promised-farmers-it-would-make-tractors-easy-to-repair-it-lied.

extremely expensive Tractors, locking customers into paying for expensive and inconvenient Repair Services from Deere and its Dealerships. Deere has created an effective tying arrangement, whereby the purchase of Deere Repair Services is tied to the initial purchase of Deere Tractors.

12.     The motive behind restricting access to the Software is simple: Deere and its Dealerships did not want their revenue stream from service and repair—a far more lucrative business than original equipment sales—to end when the equipment is purchased, as it often did in the past when owners could perform their own repairs or rely on individual repair shops.

13.     Deere's scheme to prevent independent repairs creates additional revenue for Deere over the entire useful life of every piece of equipment it sells.

14.     Deere unlawfully stifles competition by blocking independent repair shops and reducing consumer choice in what would otherwise be a robust and competitive repair aftermarket, thereby artificially increasing Deere Repair Services prices to supracompetitive levels.

15.     Deere's aggressive, forced consolidation of its Dealerships also was implemented with the intent of further limiting price competition for Deere Repair Services, even among Deere Dealerships.

16.     As a result of Deere's unlawful withholding of the necessary Software to perform repairs from farmers and independent repair shops and its forced consolidation of the Dealerships, Plaintiff and the Class paid artificially inflated prices for Deere Repair Services during the Class Period. Prices in the Repair Services Market exceeded the amount they would have paid if the prices had been determined by a competitive market. Plaintiff and Class members were therefore injured by Defendant's conduct.

17.     Deere's illegal monopoly of the Deere Repair Services Market should be enjoined and dismantled, and Plaintiff and the Class should be reimbursed by Deere for the amount they

overpaid for Deere Repair Services.

18.     Deere violated Section 1 of the Sherman Act by forcing consolidation of its affiliated Dealerships to eliminate inter-brand competition for Repair Services. Deere also violated Section 1 of the Sherman Act through its arrangements with Co-conspirator Dealerships to not sell the Software to farmers and independent repair shops. Finally, Deere violated Section 1 of the Sherman Act through forcing Plaintiff and Class Members to purchase Deere Repair Services from Deere once they were locked into ownership of an expensive Deere Tractor. Deere's tying arrangement between Deere Tractors and Repair Services had both the intent and effect of harming competition in the market for Deere Repair Services.

19.     Deere also violated Section 2 of the Sherman Act by monopolizing or attempting to monopolize the Deere Repair Services Market in a manner that harmed competition and injured the purchasers of such services by reducing choice and increasing prices in this market to supracompetitive levels. Deere has also leveraged its monopoly power over Deere Software to tie sales of its Tractors to sales of Deere Repair Services, in violation of Section 2 of the Sherman Act.

20.     Deere has unjustly enriched itself by profiting from Plaintiffs' payment of supracompetitive prices for Deere Repair Services in violation of the antitrust laws and should be made to disgorge these profits.

21.     Plaintiff seeks declaratory and injunctive relief, treble and exemplary damages, costs, and attorneys' fees. As for equitable relief, Plaintiff seeks an order requiring Deere to make the necessary Software available, at reasonable cost, to individuals and repair shops.

## II.     JURISDICTION AND VENUE

22.     Plaintiff brings this action on behalf of itself and the Class under Section 16 of the Clayton Act (15 U.SC. § 26) to secure injunctive relief against Defendant for violating Sections 1

6

and 2 of the Sherman Act (15 U.S.C. §§ 1 and 2), and to recover actual and compensatory damage, treble damages, interest, costs, and attorneys' fee for the injury caused by Defendant's conduct.

23.     This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331, 1337 and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26.

24.     This Court also has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(d)(2) because sufficient diversity of citizenship exists between parties in this action, the aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs, and there are 100 or more members of the proposed class.

25.     Venue is appropriate in this District pursuant to Sections 4, 12, and 16 of the Clayton Act, 15 U.S.C. 28 U.S.C. §15(a), and 28 U.S.C. § 1391(b), (c) and (d) because Defendant Deere & Company transacted business in this District, is licensed to do business or is doing business in this District, and because a substantial portion of the affected interstate commerce described herein was carried out in this District.

26.     The activities of Defendant as described herein, were within the flow of, were intended to, and did have direct, substantial, and reasonably foreseeable effects on the foreign and interstate commerce of the United States.

### III.     PARTIES

#### A.  Plaintiff

27.     Plaintiff Monty Ferrell is a farmer located in Alfalfa County, Oklahoma. Plaintiff Monty Ferrell has a John Deere Tractor and/or John Deere Combine with ECUs. During the Class Period, Plaintiff Monty Ferrell purchased Deere Repair Services in Oklahoma from a John Deere dealership to diagnose and repair Tractor and Combine malfunctions and suffered antitrust injury as a result of Defendant's conduct alleged herein.

**B. Defendant & Co-Conspirators**

28.     Deere & Co. is a publicly traded company headquartered in Moline, Illinois.

29.     "Defendant" as used herein, includes, in addition to those identified specifically above, all of the named Defendant's predecessors, including companies that merged with or were acquired by the named Defendant, as well as Defendant's wholly-owned or controlled subsidiaries, dealerships, affiliated and/or authorized technicians, and/or Co-conspirators that sold Deere Repair Services in interstate commerce, directly or through its wholly-owned or controlled affiliates, to purchasers in the United States during the Class Period.

30.     Co-conspirators include independently owned dealerships with agreements with Deere giving them the right to sell Deere Tractors and Deere Repair Services. Based on recent data, out of the 1,544 Dealerships affiliated with Deere, 91% of these Dealerships are owned by a "Big Dealer," i.e., a dealer that owns 5 or more individual locations. Although not an exhaustive list, the largest Dealership groups are Ag-Pro Companies (75 locations in 8 states), United Ag & Turf (53 locations in 6 states), C&B Operations (36 locations in 6 states), Papé Machinery (35 locations in 5 states); RDO Equipment (32 locations in 9 states); Brandt Holdings (32 locations in 5 states); Greenway Equipment (31 locations in 2 states); Van Wall Group (31 locations in 4 states); and Quality Equipment (28 locations in 2 states).

## IV.     TRADE AND COMMERCE

31.     During the Class Period, Defendant, directly or through its subsidiaries or affiliated Dealerships, sold Deere Repair Services in the United States in a continuous and uninterrupted flow of interstate commerce and foreign commerce, including through and into this judicial district.

32.     During the Class Period, Defendant controlled all the market for Deere Repair Services in the United States.

33. Defendant's business activities substantially affected interstate trade and commerce in the United States and caused antitrust injury in the United States.

## V.    RELEVANT MARKETS

34. **Deere Repair Services Market.** The principal relevant market to evaluate Defendant's anticompetitive conduct is the Deere Repair Services Market.

35. The Deere Repair Services Market constitutes various services and labor to repair, maintain, and clear fault codes from Deere Tractors.[4]

36. There are no available substitutes for Deere Repair Services, and Deere Repair Services are not interchangeable with any other manufacturers' service.

37. The relevant geographic market is the United States.

38. Defendant Deere has market and monopoly power in the relevant market through its control over access to the Software.

39. Any independent repair shops who desire to compete with Deere in the Deere Repair Services Market would face insurmountable barriers. Defendant's effective total control of the Software means that independent repair shops are unable to access the necessary resources to be able to meaningfully compete with Deere. Similarly, any farmers who wish to perform their own repairs and/or maintenance are also unable to access the resources necessary to do so.

40. Independent repair shops and farmers cannot compete effectively in the Deere Repair Services Market without access to the Software.

41. **Deere Software Market.** As discussed above, Defendant maintains market and monopoly power over the market for Deere Software. There is no available substitute for Deere Software, and it is not interchangeable with any other manufacturers' product.

---

[4] As defined *supra*, Deere "Tractors" for purposes of this litigation include all John Deere tractors, combines, and other agricultural equipment with ECUs.

9

42. **Tractor Markets.** The Deere Repair Services market and the market for Tractors are distinct. The "Tractor Markets" include the United States product markets for agricultural farm tractors, which include 2WD Farm Tractors, Compact Tractors, 4WD Farm Tractors, Row Crop Tractors, Scraper Tractors, Specialty Tractors, Utility Tractors, and Self-Propelled Combines. Defendant Deere is the largest agricultural machinery company in the world and has appreciable economic power in the U.S. Tractor Markets.

## VI.     FACTUAL ALLEGATIONS

43. Farmers traditionally and historically have been able to perform their own repairs on their own tractors. However, as software has becoming increasingly intertwined with basic operations of farming equipment, John Deere has restricted access to the necessary tools to make repairs, thereby cutting out owners and independent repair shops from the ability to make repairs to newer equipment.

### A. Technology in John Deere Tractors

44. Modern Deere Tractors are technologically complex machines. These Tractors run firmware that is necessary for the Tractor to perform its basic functions. Without the firmware, the product is incomplete and will not run, making the firmware as vital a part to the basic functioning of a Tractor as a steering wheel or an engine. The code that runs the internal engine and the transmission components that are required to make the Tractor do anything are effectively part of the machine. The Tractors will not operate without that code.

45. The central computer on a Tractor is the Engine Control Unit, or "ECU." The ECU determines how—and if—the Tractor functions.

46. Like cars, John Deere Tractors use a large number of sensors throughout the equipment that are constantly monitored by the ECU. When a sensor notices an error, no matter how small or serious, it can put the machine into "limp mode," allowing farmers to move the

10

machine slowly but not operate it fully. When the problem is diagnosed and repaired, the error code is cleared and the machine can continue working.[5]

47.     According to a report from a U.S. Public Interest Research Group, the John Deere S760 combine harvester has 125 different computer sensors in it. If any one of those sensors throw an error code, the combine will enter limp mode.

48.     Troubleshooting Deere Tractors—e.g., interpreting the error codes—requires Software that Deere refuses to make available to farmers.

49.     Since about 2000, Deere Tractors began using what is known as "CAN bus" systems in their machinery, standing for Controller Area Network. CAN bus is essentially a central electrical system that allows communications between different parts of the machinery. Sales manuals for Deere Tractors explain that an advantage of the system "allows the technician at the dealership to plug into the system using the Service ADVISOR™ computer program. The Service ADVISOR program links up to the tractor's electrical system to read the communications between the controllers to determine where the problem is located and how it can be fixed."[6]

50.     Service ADVISOR, per John Deere's own sales manual materials, is

> a tool used by John Deere **dealerships** capable of providing technical and mechanical support for technicians and service managers through the use of a laptop computer. Service ADVISOR provides symptom-based diagnostics information, specific machine information, and electronic technical information. It also offers a connection to John Deere help and solutions through an extranet connection at the workshop and in the field.
>
> Service ADVISOR is a fast diagnostic testing system for all controller area network (CAN) bus tractors. This system is the cutting edge of service technology and will save time and money by faster equipment repair.

(emphasis added).

---

[5] Koebler & Gault, *supra* note 3.
[6] *See* John Deere & Co Sales Manual, Electrical, CAN bus electrical system, http://salesmanual.deere.com/sales/salesmanual/en_NA/tractors/2011/feature/electrical_and_l ights/6030p_7030p/6030_7030_can_bus_story.html (last visited Feb. 7, 2022).

51. Even if the farmer is able to interpret the error code and determine what the problem is with the Tractor, it doesn't matter how tech-savvy or experienced a mechanic a farmer is; without access to the necessary software tools, farmers must call the dealership to repair, or clear fault codes for, their machine.

52. Farmers report their Tractors shutting down from computer faults and having to sit and wait for a John Deere technician to arrive while they lose valuable time, which can lead to expensive crop losses.

53. Without access to the Software and other tools needed to diagnose and repair the error, farmers must rely on Deere dealerships and technicians to travel to where the equipment is, plug in the necessary tools, and clear the error codes.

54. Replacing parts on a Tractor also can result in "bricking" of the machine if the proper Software is not used. After a new part is installed on a Tractor, a program called Service Advisor needs to be connected to the ECU to authorize the new parts. If the new part is not "authorized" by the Software, the engine of the Tractor will not start, rendering the Tractor useless to its owner until the owner pays a Deere technician to authorize the repair and therefore restore operation of the Tractor.

55. During harvest time, when Tractors, including combines, are running at full throttle for weeks on end, it's common for mechanical issues to arise. Farmers who try to solve problems themselves or take their Tractors to more convenient repair shops are blocked from completing the repairs without the necessary Software. For example, one customer who hired an independent agricultural equipment repair shop to replace a faulty moisture meter on a combine still had to wait and pay for the dealer to come out and use Software to authorize the part.[7]

---

[7] Mae Anderson, *Without 'right to repair,' businesses lose time and money*, Associated

12

56.     As of 2021, the reported cost for Repair Services from Deere or an authorized Dealer could range from $150-180 per hour, with additional charges for travel and parts.

57.     Regardless of a farmer's own ability and knowledge regarding how to repair the Tractor they own, without the relevant Software, an authorized John Deere technician must be called to perform many repairs.

58.     Logistically, this is a nightmare for many farmers. When a farmer calls a dealer to perform a repair, the farmer is at the mercy of the dealer's schedule and must pay whatever the cost is—including travel expenses—even if the problem could be fixed in 15 minutes with access to the Software. Farmers also may work far away from the nearest dealership or technician, leading them to have to pay substantial amounts for travel time or the cost of having their equipment hauled to a dealership.

59.     Deere has made farmers dependent on Deere for repairs. Farmers, who often have a lifetime of skills built up enabling them to fix their own equipment, are forced to sit and wait for a service technician from Deere to arrive on site and charge $150 or more per hour for labor, on top of other costs.

60.     These additional costs paid to Deere by farmers cut into an already razor-thin profit margin on crops. Farmers in the United States are currently experiencing drastically increasing operating expenses while revenue and profits from crop yields remains stagnant. For example, between 1996 and 2020, total costs for growing corn increased by 193% while yields only increased by 13.7%. In that same period, costs for growing soybeans increased by 202% while yields increased only by 12.3%.

---

Press (Aug. 10, 2021), https://apnews.com/article/technology-business-9f84a8b72bb6dd408cb642414cd28f5d.

61.     As a result, farmers have had difficulty paying their outstanding operating debts—estimated at well over $400 billion in 2019—and the rate of farm bankruptcies has accelerated, with declared farm bankruptcies increasing by 24% from 2018 to 2019, the biggest yearly increase since the Great Recession.

62.     Furthermore, given farmers' investments in Deere Tractors, which can run upwards of half a million dollars, they have no reasonable choice but to pay for Deere's Repair Services. The farmers are locked in to using Deere Tractors, as switching costs are so high and farmers expect to be able to use a Tractor for decades.

63.     While some farmers own these expensive machines outright, many farmers lease the equipment. The leaseholder is often Deere itself.

**B.     Deere's Longtime Strategy of Forced Dealership Consolidation.**

64.     In addition to being forced to purchase Repair Services from Deere, farmers in many areas are faced with limited or nonexistent choice as to which Deere Dealership to purchase Repair Services from. This lack of meaningful choice is in large part due to Deere's concerted efforts to force Dealerships to consolidate or lose their affiliation with Deere.

65.     Starting approximately in the early 2000s (and coinciding with when ECUs were first being widely used in Deere Tractors), Deere implemented an aggressive strategy that pressured Dealerships to consolidate.

66.     In a series of meetings in Louisville, Kentucky, in the summer of 2002, Deere told dealers they should plan on a future in which they would either be a buyer or a seller.

67.     Deere's strategy worked. In 1996, the total number of Deere Dealership locations was approximately 3,400. By 2007, this number had decreased to 2,984. In 2021, only 1,544 Dealership locations remained. Only 144 of these Dealerships are not owned by "Big Dealers," i.e., Dealerships that operate five or more individual Dealership locations. Very few single-

14

location dealerships remain.

68.     In 2009, a former owner of a Deere-affiliated dealership, Roy Dufault, reported to AgWeek, a weekly agricultural newspaper, that representatives from Deere pressured him to sell his small dealership in Fosston, Minnesota. Deere told him that for the large dealers in the area to continue to grow, Dufault needed to get out of the way, as his dealership was a hindrance to their profitability.[8] Deere's representatives told Dufault that there was no need for a location in Fosston, and that another dealership could cover the trade area remotely. At the time Deere terminated its dealer agreement with Dufault, customers expressed their concern about where they would have their Deere equipment serviced. In 2021, there is not a Deere Dealership within 20 miles of Fosston, and none within 100 miles that are not owned by a Big Dealer.

69.     In 2013, a single-location Dealership in New Hampshire, R.N. Johnson Inc., had its dealer agreement with Deere canceled after being in business 84 years. The former owner said that this action was part of Deere's corporate philosophy of "eliminat[ing] all the single-location small dealers."[9] After Deere terminated the dealership agreement, farmers were forced to rely on a Dealership 60 miles away in Massachusetts to get their Tractors serviced.

70.     Similarly, in 2021, Deere terminated the contract of Tennessee's last remaining single-store Deere Dealership, Tri-County Equipment, which had operated as a Deere Dealership since 1977. Tri-County Equipment was the only single-store Dealership in Tennessee for four years prior to Deere's termination of the agreement. Deere reportedly had specified a single

---

[8] *John Deere leaves a dealer and his customers high and dry*, AgWeek (Sept. 21, 2009), https://www.agweek.com/news/3787513-john-deere-leaves-dealer-and-his-customers-high-and-dry.

[9] Meghan Foley, *Former John Deere Dealer Closing After 84 Years*, Farm Equipment (Feb. 28. 2013), https://www.farm-equipment.com/articles/8588-former-john-deere-dealer-closing-after-84-years.

potential buyer for the store, but the dealer chose to operate the store as a non-Deere dealership instead of selling the business.

71.     In the last decade, the industry-wide number of agricultural equipment stores owned by Big Dealers increased by 59%.[10] And while this large degree of consolidation among agricultural stores in general is substantial, Deere is a noticeable outlier in number of affiliated Dealerships owned by Big Dealers. In the entire industry, the total percentage of Big Dealer-owned Agricultural Equipment Stores is around 35%, whereas a full 91% of Deere's "Independent" Dealerships are owned by Big Dealers.

72.     The staggering amount of consolidation among Deere Dealerships is the result of Deere systematically picking off small Dealerships by coercing them to sell to a larger dealer. If a single-location Dealer wants to sell the business, Deere dictates who the purchaser can be, funneling Dealership sales to preferred Big Dealers. Deere will terminate its affiliation with the Dealership altogether if the Dealership refuses to sell to the specified buyers.

73.     One farmer complained: "I can go to a JD dealer 20 miles away. Or one 40 miles away in another direction. Or one 80 miles away in a different direction. But they all have the same name. All owned by the same franchise. So, I get 10 or 15 choices all of which are exactly the same."[11]

74.     Deere's consolidation has eliminated or reduced competition among Deere Dealerships, which charge for Repair Services with little fear of a competitor undercutting their

---

[10] Kim Schmidt, *Big Dealers Continue to Get Bigger*, Ag Equipment Intelligence (Apr. 22, 2021), https://www.agequipmentintelligence.com/articles/4798-big-dealers-continue-to-getbigger.

[11] *John Deere's poor dealership decision making IMO.*, post by Diggin It, TractorByNet Forum (Aug. 18, 2018), https://www.tractorbynet.com/forums/threads/john-deeres-poordealership-decision-making-imo.400429/page-5.

rates. This lack of competition boosts profitability for the Dealerships, and therefore also for Deere. Deere benefits not only from forcing farmers to purchase Deere Repair Services from Deere Dealerships, but also from forcing farmers to buy these Repair Services in a market that Deere has painstakingly groomed to be less competitive.

### C. Deere's Promise—and Failure—To Provide the Full Spectrum of Repair Tools.

75.    Because of how difficult and expensive Deere had made it for farmers to repair their Tractors, a growing "right to repair" movement began to focus on farmer's rights to repair John Deere agricultural equipment.

76.    Deere has a history of fighting customers' access to the onboard technology on Deere Tractors. In 2015, Deere argued that Section 1201 of the Digital Millennium Copyright Act gave it power to prevent purchasers of Deere Tractors from bypassing Technical Protection Measures ("TPMs") "for the purposes of lawful diagnosis and repair, or aftermarket personalization, modification, or other improvement." This was, according to Deere, because the owners did not actually own the software that made the Tractor run. Deere argued that the owner only "receives an implied license for the life of the vehicle to operate the vehicle."[12]

77.    When this argument proved unconvincing to the U.S. Copyright Office and bypassing TPMs on agricultural equipment for the purpose of repair was deemed to be fair use, Deere took another approach to blocking farmers from accessing Tractor Software. In 2016, Deere issued an end-user "License Agreement for John Deere Embedded Software" that forbade customers from accessing, reverse-engineering, or modifying the software running on its Tractors (the "EULA").[13] Deere states it "may terminate the license [to the embedded Tractor software]

---

[12] Deere & Company, *Long Comment Regarding a Proposed Exemption Under 17 U.S.C. 1201*, https://copyright.gov/1201/2015/comments-032715/class%2021/John_Deere_Class21_1201_2014.pdf (last accessed Jan. 4, 2022).

[13] *License Agreement for John Deere Embedded Software*,

granted under this License Agreement . . . if you violate any material term of this License Agreement . . . ."[14]

78.     As public awareness of and frustration with increasingly prohibitive repair restrictions grew, state lawmakers began to act. As of 2021, 27 states have introduced some form of "right to repair" legislation. A proposed bill in Minnesota would require manufacturers to "make available, on fair and reasonable terms, documentation, parts, and tools, inclusive of any updates to information or embedded software, to any independent repair provider or to the owner of digital electronic equipment manufactured by or on behalf of, or sold by, the original equipment manufacturer for purposes of diagnosis, maintenance, or repair."[15]

79.     In September 2018, the Equipment Dealers Association ("EDA"), a trade and lobbying group that represents John Deere and other manufacturers and often acts as Deere's mouthpiece, made a promise intended to stave off increasing pressure from customers and lawmakers to pass similar "right to repair" legislation pending around the country.[16]

80.     The EDA committed to make repair tools, Software, and diagnostics available to the public by January 1, 2021.[17]

81.     The EDA went so far as to put out a "Statement of Principles," laying out this promise. In a heavily-publicized ceremony and photo op, the EDA signed a "Memorandum of

---

https://www.deere.com/assets/pdfs/common/privacy-and-data/docs/agreement_pdfs/English/
2016-10-28-Embedded-Software-EULA.pdf (last accessed Feb. 3, 2022).

[14] *Id.*

[15] Digital Fair Repair, HF 1138, 91st Leg., 2nd Engrossment (Minn. 2020),
https://www.revisor.mn.gov/bills/text.php?number=HF1138&type=bill&version=2&session=ls
91&session_year=2019&session_number=0.

[16] Koebler & Gault, *supra* note 3.

[17] *Agreement Streamlines Repair of High-Tech Farm Equipment*, Far West EDA (Sept. 9, 2018),
https://fweda.com/industry-news/agreement-streamlines-repair-of-high-tech-equipment (last
accessed Feb. 3, 2022).

Understanding" with the California Farm Bureau that enshrined this statement of principles.[18]

82.     The Far West EDA president and CEO Joani Woelfel said in a 2018 press release that the statement of principles "says a lot about the relationship between dealers and their customers."

83.     The statement of principles reads:



84.     As journalists from the magazine Vice noted, the commitment "did not promise to actually sell repair parts, and it also contains several carve-outs that allow tractor manufacturers to continue using software locks that could prevent repair."[19]

85.     Three years later in mid-2021, farmers still struggle to get anything promised in the agreement with the EDA.

86.     Posing as a customer, Right to Repair advocate Kevin O'Reilly called 12 John Deere dealerships in six states. Of those, 11 told Mr. O'Reilly that they don't sell diagnostic

---

[18] Koebler & Gault, *supra* note 3.

[19] Jason Koebler, Farmer *Lobbying Group Sells Out Farmers, Helps Enshrine John Deere's Tractor Repair Monopoly*, Vice Motherboard (Sept. 11, 2018), https://www.vice.com/en/article/kz5qgw/california-farm-bureau-john-deere-tractor-hacking-right-to-repair.

software, and the last one gave him an email of someone to ask for the tools. When Mr. O'Reilly sent an email to the individual identified, he did not receive a response.[20]

87. Similarly, journalists from Vice who attempted to assess the availability of the Software called nine dealerships in seven states and were told by representatives that the things promised by the EDA were not available. The journalists called three dealerships in California; two said no immediately, and a third told the journalists that the repair software and tools could not be sold to the public and required the purchaser to be a licensed dealer.[21]

88. A spokesperson for the AEM, another manufacturers' lobbying and trade group that often represents Deere, told Vice that, "Comprehensive repair and diagnostic information is now available for the vast majority of the tractor and combine market through authorized dealers." However, the spokesperson failed to respond when Vice asked if the spokesperson could point to a single instance where this is actually the case, or a single manufacturer that explains to farmers where they can get this information or these tools.

89. If these tools were actually available to farmers and independent repair shops, then it would be simple for Deere to point to where they could be accessed and where they could be purchased. Although it cannot point to any real-world examples where this is the case, the company and its industry representatives insist that these tools are available.

90. As one example, David Ward, a spokesperson for Association of Equipment Manufacturers (AEM), told Vice that comprehensive repair and diagnostic equipment is now available through authorized dealers. Ward did not return emails when Vice followed up, asking for a single instance of where this happened, or a single manufacturer that explains to farmers

---

[20] Koebler & Gault, *supra* note 3.
[21] *Id.*

20

where they can get the information or the tools.

91.     On the other hand, there are plenty of examples that demonstrate how the Software remains inaccessible, even to individuals and businesses who are by all accounts highly sophisticated parties familiar with the industry.

92.     In 2020, one owner of an independent equipment mechanic shop in Nebraska reported that about half of the repairs he sees involve code faults triggered by emission-control systems. The faults render vehicles inoperable, and while the shop can replace the exhaust filters and particulate traps that might throw a Tractor's code, the dealerships would not provide the Software necessary to restart the Tractor. This forced the owner or the shop to haul the machine to a Deere dealership or pay for a Deere mechanic to make a house call with the Software.[22]

### D. To the Extent Deere Has Made Diagnostic and Repair Tools Available, They Are Insufficient to Restore Competition to the Deere Repair Services Market.

93.     Beginning sometime around June 2021, John Deere quietly created a web page on their main company site[23] for a product called Customer Service ADVISOR, with a form to "request more info" about a subscription. One dealer website describes Customer Service ADVISOR as a way for customers to access "much of the same" technical and diagnostic information used by dealership technicians.[24] However, this pared-down system explicitly does not include every feature that dealers have access to, and costs *start at* $8,500 for the first year alone.[25] If Deere charges customers the same amount per year, in six years this would amount to

---

[22] Waldman & Mulvany, *supra* note 2.

[23] Customer Service ADVISOR™, John Deere, https://www.deere.com/en/parts-and-service/manuals-and-training/customer-service-advisor/ (last accessed Jan. 4, 2022).

[24] Customer Service Advisor, United Ag & Turf, https://www.unitedagandturf.com/service/customer-service-advisor/ (last accessed Jan. 4, 2022).

[25] *Id*.

an extra $51,000 paid by customers who want to perform their own repairs. Over the course of the lifetime use of a Deere Tractor, the cost to maintain access to the Software necessary to individually perform repairs could amount to the total price of the Tractor itself.

94.    Furthermore, there is no indication that Deere will provide sufficient repair tools to independent repair shops or, for that matter, even to customers. The only apparent way to access materials is to place a request with an individual dealership, and there is no guarantee or timeline of when Customer Service ADVISOR is available.

95.    It is also unclear if Deere is simply calling attention to the already-existing, extremely limited capability customer version of Service ADVISOR. This barebones version allows a customer to troubleshoot codes but offers minimal functionality otherwise. A farmer or independent repair shop is not able to use the software, for example, to replace a sensor and recalibrate a Tractor. As one employee of a Deere dealership described it in 2016, the customer version is "a waste of your money."[26] The same employee also described the version of Customer Service Advisor as "similar to [Service Advisor] but they really give you only enough to help your dealer cut down on the labor if you troubleshoot it yourself. If they let you calibrate, us dealer guys wouldn't have any work."[27]

96.    Deere continues to carefully guard access to the Software necessary to make repairs, and to the extent it has made a watered-down version of it available to its customers, it has priced it so high that the access to the Software will be an unattractive option to most customers, even in comparison to the high cost of paying Deere for Repair Services. This arrangement thus

---

[26] *JD Service Advisor*, The Combine Forum, post by hake2651 (Feb. 26, 2016), https://www.thecombineforum.com/threads/jd-service-advisor.253730/.

[27] *JD Service Advisor*, The Combine Forum, post by hake2651 (Feb. 29, 2016), https://www.thecombineforum.com/threads/jd-service-advisor.253730/.

allows Deere to claim it has provided repair and diagnostic materials to its customers while posing virtually no risk to Deere's monopoly in the Deere Repair Services Market.

**E.  There Are No Legitimate Reasons to Restrict Access to Necessary Repair Tools.**

97.     In May 2021, the FTC issued a report titled "Nixing the Fix: An FTC Report to Congress on Repair Restrictions" that examined, among other things, how repair restrictions implemented by various industries increase costs and limit consumer choice, and how these restrictions might implicate federal consumer protection and antitrust laws.[28]

98.     The report synthesized knowledge gained from a July 16, 2019 workshop, as well as public comments, responses to a Request for Empirical Research and Data, and independent research.[29] The FTC concluded there was "scant evidence to support manufacturers' justifications for repair restrictions" and that access to information, manuals, spare parts, and tools, were "well-supported by comments submitted for the record and testimony provided at the Workshop."[30]

99.     The FTC received research submissions and comments from the EDA and AEM, as well as "the full spectrum of interested parties."

100.    More specifically, the FTC noted that restricting repairs to authorized repair networks was not automatically justified just because of the existence of possible safety concerns. The FTC noted that manufacturers provided no factual support for their statements that "authorized repair persons are more careful or that individuals or independent repair shops fail to take appropriate safety precautions."[31]

---

[28] Federal Trade Commission, *Nixing the Fix: An FTC report to Congress on Repair Restrictions* (May 2021), https://www.ftc.gov/system/files/documents/reports/nixing-fix-ftc-report-congress-repair-restrictions/nixing_the_fix_report_final_5521_630pm-508_002.pdf (hereinafter "FTC Report").
[29] FTC Report, p. 3.
[30] FTC Report, p. 6.
[31] FTC Report, p. 28

101.    Similarly, the FTC pointed out that manufacturers had failed to offer evidence that providing access to the same tools made available to authorized service providers created additional security risks. The FTC concluded "[m]anufacturers can provide others with the same parts and tools that they provide to their authorized service providers. And, by providing access to individuals and independent repair shops, manufacturers would have greater confidence in the repair activities that occur outside of their authorized networks."[32]

102.    The FTC stated that, beyond bare assertions of liability exposure and reputational harm from allowing independent repairs, manufacturers "provided no empirical evidence to support their concerns about reputational harm or potential liability resulting from faulty third party repairs."[33] The report further noted that manufacturers' arguments regarding the "superior service" were anecdotal, whereas there was evidence that consumers were generally satisfied with repairs made by independent repair shops. The FTC concluded that "[t]he record does not establish that repairs conducted by independent repair shops would be inferior to those conducted by authorized repair shops if independent repair shops were provided with greater access to service manuals, diagnostic software and tools, and replacement parts as appropriate."[34]

103.    There is no defensible basis for Deere to withhold the full spectrum of Dealer- level Software that a farmer or independent repair shop would need to diagnose or perform repairs. In fact, the automotive industry is an example of manufacturers agreeing to do just that. Industrywide, vehicle owners and independent repair shops have had access to Dealer-level diagnostic and repair tools from the manufacturers for nearly eight years. In 2014, the automotive industry through representative trade organizations voluntarily agreed to

---

[32] FTC Report, p. 31
[33] FTC Report, p. 33
[34] FTC Report, p. 38

make available for purchase by owners of motor vehicles manufactured by such manufacturer and by independent repair facilities **the same diagnostic and repair information**, including repair technical updates, **that such manufacturer makes available to its dealers** through the manufacturer's internet-based diagnostic and repair information system or other electronically accessible manufacturer's repair information system. All content in any such manufacturer's repair information system shall be **made available to owners and to independent facilities in the same form and manner and to the same extent as is made available to dealers** utilizing such diagnostic and repair information system for purchase by owners and independent repair facilities on a daily, monthly, and yearly subscription basis and upon fair and reasonable terms.[35]

### F. Deere Has Not Provided Farmers and Independent Repair Shops with the Necessary Software and Continues to Misrepresent the Issue.

104. To the extent that Deere has made limited repair information and tools available, it has been insufficient to give farmers and independent repair shops the same opportunity to repair their Tractors and to open the Deere Repair Services Market to true competition.

105. Deere must provide access to the same tools that the dealers have to both farmers and independent repair shops.

106. Deere has also resisted making the Software and tools available to farmers and independent repair shops under the auspices of "ensur[ing] continued compliance with emissions, operator safety and other regulatory requirements . . . ."[36] Deere's claims that providing access to Software and repair tools would allow farmers to bypass emissions and safety controls misrepresents what farmers are asking for.

107. There is a clear difference between resetting an error code and ignoring or

---

[35] Memorandum of Understanding, Automotive Aftermarket Industry Association, Coalition for Auto Repair Equality, Alliance of Automobile Manufacturers, and Association of Global Automakers (Jan. 15, 2014) (emphasis added), https://www.autocare.org/docs/default-source/government-affairs/r2r-mou-and-agreement-signed.pdf.

[36] Diego Flammini, *Supporting right to repair*, Farms.com (Jan. 2, 2020), https://www.farms.com/ag-industry-news/supporting-right-to-repair-644.aspx (quoting Deere & Co. Position Letter on Kansas's Fair Repair Act).

overriding safety codes. Overriding emissions or safety controls requires a different set of modification tools, which are *not* the tools used for diagnosis and repair. The FTC pointed out that data submitted by the EDA ostensibly showing that modifications of agricultural equipment affected emissions was inapposite, "because [the data] concerns modifications to equipment as opposed to repairs."[37] The FTC also noted conversations with AEM and EDA representatives confirmed the limitations of the submitted studies.[38]

108.    In order to override emission controls on a Tractor, the entire operating system on the machine would have to be erased and then replaced with new, modified software that either does not have emissions and safety controls or allows a farmer to ignore them.[39] This is an illegal practice separate from the issue of access to Software and is not what is being requested in this litigation.

109.    Deere and industry groups have latched onto this talking point—conflating "repair" and "modification"—in their successful attempt to foreclose others from the market and thereby maintain Deere's monopoly in the Deere Repair Services Market.

### G.  Defendant's Monopolization of the Deere Repair Services Market Has Led to Artificially High Prices and Record Profits for John Deere.

110.    Deere has an obvious motive for restricting access to the Software and maintaining its unlawful tying arrangement and monopoly and attempted monopoly in the Deere Repair Services Market: money. For Deere and its Dealerships, parts and services are three to six times more profitable than sales of the original equipment, and the repair segment of Deere's business has also been growing faster than original equipment sales. From 2013 to 2019, Deere's annual

---

[37] FTC Report, p. 38.
[38] FTC Report, p. 38, n. 205.
[39] Kevin O'Reilly, U.S. PIRG, *Deere in the Headlights: How software that farmers can't access has become necessary to tractor repair* (Feb. 2021), https://uspirg.org/feature/usp/deere-headlights.

parts sales went up 22%, while the company's total agricultural equipment sales went down 19% in this same period.[40]

111.    During this period where Deere's Tractors with ECUs reached greater market penetration and as Deere systematically eliminated small Dealerships that were creating competition and undercutting profits for Deere's Big Dealers, the company's income skyrocketed. In 2000, Deere's net income was around a half billion dollars. Deere's projected 2021 net income is $5.7B, over 11 times its income from 2000, and over twice its net income of $2.75B in 2020. Although Deere does not break down the income received from the Dealerships' sales of Repair Services in its company filings, sales of "parts and maintenance services" are reported to account for a fifth of Deere's sales.[41] In the last several years, the reported profit margins not associates with direct sales increased dramatically, and the company stated to investors in 2020 that it was betting on its parts and maintenance services business to contribute 50 basis points in added profits over the next two years.[42]

112.    Without access to the Software to perform repairs and clear fault codes, owners of Deere Tractors have been forced to give Deere and its Dealerships more money for Deere Repair Services that the farmers would have expended had they performed the repairs themselves or hired less expensive, and often more convenient, independent repair shops to perform. One farmer reported that he purchased a new Tractor for $300,000 and spent nearly $8000 into clearing fault codes over the course of a few years.[43]

---

[40] Waldman & Mulvany, supra note 2.
[41] Rajesh Kumar Singh, Deere bets on cost cuts, services push to boost profits, Reuters (Jan. 8. 2020), https://www.reuters.com/article/us-deere-strategy/deere-bets-on-cost-cuts-services-push-to-boost-profits-idUSKBN1Z72TA
[42] *Id.*
[43] *Id.*

113. The money that farmers sink into paying Deere to clear fault codes and approve repairs that they could have performed themselves cut into an already thin profit margin.

## VII. CLASS ACTION ALLEGATIONS

114. Plaintiff brings this action on behalf of itself, and as a class action under the Federal Rules of Civil Procedure, Rule 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedures, seeking damages and equitable and injunctive relief on behalf of the following class (the "Class"):

> All persons and entities residing in the United States who, during the Class Period of January 12, 2018 to the present, purchased Deere Repair Services for Deere Tractors from Defendant or Deere's authorized Dealers and/or technicians.

115. Specifically excluded from the Class are Deere and its employees, affiliates, subsidiaries, and joint venturers, whether or not named in this Complaint.

116. **Class Identity**. The above-defined Class is readily identifiable and is one for which records should exist.

117. **Numerosity**. Plaintiff does not know the exact number of class members because such information presently is in the exclusive control of Defendant. Plaintiff believes that due to the nature of the trade and commerce involved, there are thousands of class members geographically dispersed throughout the United States, such that joinder of all class members is impracticable.

118. **Typicality**. Plaintiff's claims are typical of the claims of the members of the Class because Plaintiff purchased Deere Repair Services from Defendant, and therefore Plaintiff's claims arise from the same common course of conduct giving rise to the claims of the Class and the relief sought is common to the Class.

119. **Common Questions Predominate**. There are questions of law and fact common to the Class, including, but not limited to:

A. Whether the United States Deere Repair Services Market constitutes a Relevant Market;

B. Whether Deere possesses market power in this Relevant Market;

C. Whether Deere colluded with Co-conspirator Dealerships to suppress competition for Deere Repair Services between Deere Dealerships in violation of Section 1 of the Sherman Act;

D. Whether Deere colluded with Co-conspirator Dealerships to prevent farmers and independent repair shops from having access to the Software in violation of Section 1 of the Sherman Act;

E. Whether Deere illegally tied the sale of Deere Repair Services to Deere Tractors in violation of Section 1 of the Sherman Act;

F. Whether Deere monopolized or attempted to monopolize the Deere Repair Services Market in the United States in violation of Section 2 of the Sherman Act;

G. Whether Deere engaged in monopoly leveraging by using its monopoly power in the Deere Software Market to gain or attempt to gain or maintain monopoly power in the Deere Repair Services Market in violation of Section 2 of the Sherman Act;

H. Whether Deere unjustly enriched itself to the detriment of the Plaintiff and the Class, thereby entitling Plaintiff and the Class to disgorgement of all benefits derived by Deere;

I. Whether the conduct of Defendant, as alleged in this Complaint, caused injury to the business or property of the Plaintiff and the other members of the Class;

J. The effect of Defendant's alleged monopolization or attempted monopolization on the prices of Deere Repair Services sold in the United States during the Class Period;

K. Whether Plaintiff and other members of the Class are entitled to, among other things, injunctive relief and if so, the nature and extent of such injunctive relief; and

L. The appropriate class-wide measure of damages.

These and other questions of law or fact, which are common to the members of the Class, predominate over any questions affecting only individual members of the Class.

120. **Adequacy**. Plaintiff will fairly and adequately protect the interests of the Class in that Plaintiff's interests are aligned with, and not antagonistic to, those of the other members of the Class who purchased Deere Repair Services from Defendant and Plaintiff has retained counsel competent and experienced in the prosecution of class actions and antitrust litigation to represent themselves and the Class.

121. **Superiority**. A class action is superior to other available methods for the fair and efficient adjudication of this controversy since individual joinder of all damaged members of the Class is impractical. Prosecution as a class action will eliminate the possibility of duplicative litigation. The relatively small damages suffered by individual members of the Class compared to the expense and burden of individual prosecution of the claims asserted in this litigation means that, absent a class action, it would not be feasible for members of the Class to seek redress for the violations of law herein alleged. Further, individual litigation presents the potential for inconsistent or contradictory judgments and would greatly magnify the delay and expense to all parties and to the court system. Therefore, a class action presents far fewer case management difficulties and will provide the benefits of unitary adjudication, economy of scale and comprehensive supervision by a single court.

122. The prosecution of separate actions by individual members of the Class would create the risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendant.

123. Plaintiff brings this case on behalf of the Class and all persons and entities similarly situated pursuant to Rule 23, on behalf of all persons and entities that purchased Deere Repair Services that Defendant provided during the Class Period.

124. Defendant has acted on grounds generally applicable to the Class, thereby making final injunctive relief appropriate with respect to the Class as a whole.

## VIII.    ANTITRUST INJURY

125. Defendant's anticompetitive conduct had the following effects, among others:

   A. Price competition has been restrained or eliminated with respect to Deere Repair Services;

   B. The prices of Deere Repair Services have been fixed, raised, stabilized, or maintained at artificially inflated levels;

C. Purchasers of Deere Repair Services have been deprived of free and open competition; and

D. Purchasers of Deere Repair Services, including Plaintiff, paid artificially inflated prices.

126. The purpose of Deere's conduct was to exclude competition and raise, fix, or maintain the price of Deere Repair Services. As a direct and foreseeable result, Plaintiff and the Class paid supracompetitive prices for Deere Repair Services during the Class Period.

127. By reason of the alleged violations of the antitrust laws, Plaintiff and the Class have sustained injury to their businesses or property, having paid higher prices for Deere Repair Services than they would have paid in the absence of Deere's illegal conduct, and as a result have suffered damages.

128. This is an antitrust injury of the type that the antitrust laws were meant to punish and prevent.

## IX. CLAIMS FOR RELIEF

### COUNT ONE
### Violation of Section 1 of the Sherman Act Conspiracy in Restraint of Trade
### 15 U.S.C. § 1

129. Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

130. Beginning in or around 2000, Defendant entered into and engaged in unlawful contracts, combinations in the form of trust or otherwise, and/or conspiracies in restraint of trade and commerce with Co-conspirator Dealerships in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

131. Defendant engaged in predatory and anticompetitive behavior by restricting competition among its affiliated Dealerships, which unfairly suppressed price competition for

Deere Repair Services and unreasonably restrained trade.

132. Defendant's conduct included concerted efforts, actions and undertakings among Defendant and the Co-conspirator Dealerships with the intent, purpose, and effect of artificially suppressing competition from smaller dealerships.

133. Defendant perpetrated the scheme with the specific intent of reducing competition in the Deere Repair Services market to the benefit of Defendant and the Co-conspirator Dealerships.

134. Defendant's conduct in furtherance of its contracts, combinations and/or conspiracies were authorized, ordered, or done by its respective officers, directors, agents, employees, or representatives while actively engaging in the management of Defendant's affairs.

135. Plaintiff and Class Members paid higher rates for Deere Repair Services from Deere and its Co-Conspirator Dealerships than they otherwise would have in the absence of Defendant's unlawful conduct, and, as a result, have been injured in their property and have suffered damages in an amount according to proof at trial.

136. Defendant's contracts, combinations, and/or conspiracies are per se violations of Section 1 of the Sherman Act.

137. In the alternative, Defendant is liable under a "quick look" analysis where an observer with a rudimentary understanding of economics could conclude that the arrangements in question would have an anticompetitive effect on customers and markets.

138. Defendant's contracts, combinations, and/or conspiracies have had a substantial effect on interstate commerce.

139. As a direct and proximate result of Defendant's contract, combination, and/or conspiracy to restrain trade and commerce, Plaintiff and Class Members have suffered injury to

their business or property and will continue to suffer economic injury and deprivation of the benefit of free and fair competition.

## COUNT TWO
## Violation of Section 1 of the Sherman
## Act Group Boycott
## 15 U.S.C. § 1

140.    Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

141.    Beginning approximately in 2000 and continuing thereafter to the present, Defendant, by and through its officers, directors, employees, agents, or other representatives, have explicitly or implicitly colluded with Co-conspirator Dealerships to jointly boycott entities that would have introduced price-reducing sales of Deere Repair Services in the United States, in order to artificially raise, fix, maintain, and/or stabilize prices in the Deere Repair Services market, in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

142.    Defendant's and the Co-conspirator Dealerships' refusal to sell Software and repair tools to individual farmers and independent repair shops constitutes a per se violation of Section One of the Sherman Act.

143.    Defendant's and the Co-conspirator Dealerships' boycott cut off access to the Software, a necessary resource that would enable farmers and independent repair shops to compete in the Deere Repair Services market.

144.    Together, Defendant and the Co-conspirator Dealerships wholly control the market for Deere Repair Services.

145.    No plausible pro-competitive arguments exist for Defendant's and the Co-conspirator Dealerships' refusal to sell the Software to farmer or independent repair shops.

146.    As a direct and proximate result of Defendant's contract, combination, and/or

33

conspiracy to restrain trade and commerce, Plaintiff and Class Members have suffered injury to their business or property and will continue to suffer economic injury and deprivation of the benefit of free and fair competition.

### COUNT THREE
**Violation of Section 1 of the Sherman
Act Unlawful Tying Arrangement
15 U.S.C. § 1**

147.     Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

148.     This cause of action is brough under Section 1 of the Sherman Act, 15 U.S.C. § 1.

149.     A tying arrangement exists when a seller exploits power over one product (the tying product) to force the buyer to accept a second product (the tied product). Such an arrangement violates Section 1 of the Sherman Act if the seller has appreciable economic power in the tying product market and the arrangement affects a substantial volume of commerce in the tied market.

150.     Deere Tractors and Deere Repair Services are distinct and separate products and services.

151.     Plaintiff and Class members through their purchase of Deere Tractors were coerced into purchasing a second tied product, Deere Repair Services, from Defendant and its Co-Conspirator Dealerships.

152.     Defendant's aggressive consolidation of its affiliated Co-conspirator Dealerships also materially changed the dynamics of the Deere Repair Services Market, drastically reducing the pressure of pricing competition even among the Dealerships.

153.     Furthermore, Defendant represented to Plaintiffs and the Class that most necessary repair tools were available and that almost all repairs could be done on the Tractors without the Software. These misleading statements meant that Plaintiff and the Class could not, from Deere's

representations, engage in accurate lifecycle pricing for Deere Tractors before they were locked into purchasing Deere Repair Services from Defendant and the Dealerships.

154.    As set out above, Defendant has appreciable economic power in the relevant Tractor Markets, i.e., the "tying" markets.

155.    This tying arrangement affected a substantial amount of interstate commerce.

156.    Defendant's conduct amounts to a per se tying violation, as Defendant has significant power in the tying markets which has led to a significant and actual impact on competition in the Deere Repair Services market.

157.    Alternatively, Defendant's conduct is illegal tying under the rule of reason, as Defendant's actions to coerce farmers to purchase Deere Repair Services from Defendant is an unreasonable restraint on competition in the market for Deere Repair Services.

158.    There are no legitimate business justifications for Defendant's illegal tying arrangement.

159.    Defendant has a substantial economic interest in sales of Deere Repair Services.

## COUNT FOUR
### Violation of Section 2 of the Sherman
### Act Monopolization
### 15 U.S.C. § 2

160.    Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

161.    This cause of action is brough under Section 2 of the Sherman Act, 15 U.S.C. § 2, which prohibits "monopoliz[ation of] any part of the trade or commerce among the several states, or with foreign nations."

162.    Deere has monopoly power in the Deere Repair Services Market, including the power to control prices and exclude competition.

35

163.    Deere has willfully and intentionally engaged in anticompetitive conduct in order to unlawfully maintain its monopoly in this market, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

164.    Deere has unreasonably restrained, and further threatens to unreasonably restrain competition in the Deere Repair Services Market by:

(a) restricting the availability of the Software necessary to perform diagnostics and repairs for Deere Tractors;
(b) knowingly misrepresenting the availability and necessity of the Software necessary for diagnostics and repairs for Deere Tractors;
(c) tying the purchase of Repair Services through Deere to the purchase of Deere Tractors; and
(d) limiting farmers' rights over their own Tractors through the terms of the 2016 EULA with the aim of restricting farmers' ability to choose to perform Deere Repair Services themselves or take their Tractor to an independent repair shop.

165.    While some of these anticompetitive acts themselves constitute an individual antitrust violation on a stand-alone basis, together they support a broader monopolization claim.

166.    As a direct and proximate result of Deere's anticompetitive and monopolistic conduct, Plaintiff and the Class have been damaged by, among other things: (i) the payment of supracompetitive prices for Deere Repair Services; and (ii) the lack of availability of independent Deere Repair Services and self-repair options.

## COUNT FIVE
### Violation of Section 2 of the Sherman Act
### Attempted Monopolization in the
### Alternative 15 U.S.C. § 2

167.    Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

168.    As detailed above, Deere has monopoly power, or at a minimum, a dangerous probability of success in acquiring monopoly power, in the Deere Repair Services Market, including the power to control prices and exclude competition.

169.     Deere has willfully, knowingly, and with specific intent to do so, attempted to monopolize the Repair Services Markets, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

170.     Deere's anticompetitive conduct alleged herein has been directed at accomplishing the unlawful objective of controlling prices and/or preventing competition in the Repair Services Market. Deere's ongoing anticompetitive conduct presents a dangerous probability that Deere will succeed, to the extent it has not already, in its attempt to monopolize the Repair Service Market.

171.     As a direct and proximate result of Deere's anticompetitive and monopolistic conduct, Plaintiff and the Class have been damaged by, among other things, (i) the payment of supracompetitive prices for Deere Repair Services; and (ii) the lack of availability of independent Deere Repair Services and self-repair options.

**COUNT SIX**
**Violation of Section 2 of the Sherman**
**Act Conspiracy to Monopolize**
**15 U.S.C. § 2**

172.     Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

173.     Beginning approximately in 2000 and continuing thereafter to the present, Defendant, by and through its officers, directors, employees, agents, or other representatives, have explicitly or implicitly conspired with Co-conspirator Dealerships to jointly boycott entities that would have introduced price-reducing sales of Deere Repair Services in the United States, in order to acquire monopoly power in the Deere Repair Services market, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

174.     Defendant's and the Co-conspirator Dealerships' boycott cut off access to the Software, a necessary resource that would enable farmers and independent repair shops to compete

37

in the Deere Repair Services market.

175.     Deere and the Dealerships have willfully, knowingly, and with specific intent to do so, conspired to monopolize the Repair Services Markets, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

176.     No plausible pro-competitive arguments exist for Defendant's and the Co-conspirator Dealerships' refusal to sell the Software to farmer or independent repair shops.

177.     As a direct and proximate result of Deere and the Dealerships' conspiracy to restrain trade and commerce, Plaintiff and Class Members have suffered injury to their business or property and will continue to suffer economic injury and deprivation of the benefit of free and fair competition.

<div align="center">

**COUNT SEVEN**
**Violation of Sections 1 and 2 of the Sherman**
**Act Declaratory and Injunctive Relief**
**15 U.S.C. §§ 1, 2**

</div>

178.     Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

179.     Plaintiff seeks declaratory and injunctive relief under the federal antitrust laws.

180.     Plaintiff's allegations described herein constitute violations of Sections 1 and 2 of the Sherman Act.

181.     Deere effectuated an illegal tying arrangement and a scheme to restrain trade and monopolize a market.

182.     There is, and was, no legitimate, non-pretextual, pro-competitive business justification for Deere's conduct that outweighs its harmful effect.

183.     As a direct and proximate result of Deere's illegal tying arrangement and anticompetitive scheme, as alleged herein, Plaintiff and the Class were harmed.

184.     The goal, purpose, and/or effect of the tying arrangement and anticompetitive scheme was to prevent competition or self-repair in order to continue charging supracompetitive prices for Repair Services.

185.     Plaintiff and the Class have been injured in their business or property by reason of Deere's antitrust violations as alleged in this Complaint. Their injury consists of paying higher prices for Repair Services than they would have paid in the absence of those violations. These injuries will continue unless halted.

186.     Plaintiff and the Class, pursuant to Fed. R. Civ. P. 57 and 28 U.S.C. § 2201(a), hereby seek a declaratory judgment that Deere's conduct constitutes a violation of Sections 1 and 2 of the Sherman Act.

187.     Plaintiff and the Class further seek equitable and injunctive relief pursuant to § 16 of the Clayton Act, 15 U.S.C. § 26, and other applicable law, to correct the anticompetitive effects caused by Deere's unlawful conduct.

## COUNT EIGHT
### Unjust Enrichment

188.     Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

189.     Deere has benefitted from the monopoly profits on the sale of Repair Services resulting from the unlawful and inequitable acts alleged in this Complaint.

190.     Deere's financial benefit resulting from unlawful and inequitable conduct is traceable to overpayments for Repair Services by Plaintiff and the Class.

191.     Plaintiff and the Class have conferred upon Deere an economic benefit, in the nature of profits resulting from unlawful overcharges and monopoly profits to the economic detriment of Plaintiff and the Class.

192. The economic benefit of overcharges and unlawful monopoly profits derived by Deere through Plaintiffs' payment of supra-competitive and artificially inflated prices for Deere Repair Services is a direct and proximate result of Deere's unlawful practices.

193. The financial benefits derived by Deere rightfully belong to Plaintiff and the Class, as Plaintiff and the Class paid anticompetitive and monopolistic prices during the Class Period, inuring to the benefit of Deere.

194. It would be inequitable under unjust enrichment principles in the District of Columbia and each of the fifty states for Deere to be permitted to retain any of the overcharges for Repair Services derived from Deere's unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

195. Deere is aware of and appreciated the benefits bestowed upon it by Plaintiff and the Class.

196. Deere should be compelled to disgorge in a common fund for the benefit of Plaintiff and the Class all unlawful or inequitable proceeds it received.

197. A constructive trust should be imposed upon all unlawful or inequitable sums received by Deere traceable to Plaintiff and the Class.

## X. REQUEST FOR RELIEF

WHEREFORE, Plaintiff, on behalf of itself and the Class of all others so similarly situated, respectfully requests judgment against Defendant as follows:

198. The Court determine that this action may be maintained as a class action under Rule 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, appoint Plaintiff as Class Representative and its counsel of record as Class Counsel, and direct that notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to the Class, once certified;

199.     The unlawful conduct herein be adjudged and decreed in violation of Section 1 and Section 2 of the Sherman Act.

200.     Plaintiff and the Class recover damages, to the maximum extent allowed, and that a joint and several judgment in favor of Plaintiff and the members of the Class be entered against Defendant in an amount to be trebled to the extent the laws permit;

201.     Defendant, its affiliates, successors, transferees, assignees and other officers, directors, partners, agents and employees thereof, and all other persons acting or claiming to act on their behalf or in concert with them, be permanently enjoined and restrained from in any manner continuing, maintaining or renewing the conduct alleged herein, or from engaging in other conduct having a similar purpose or effect, and from adopting or following any practice, plan, program, or device having a similar purpose or effect;

202.     Plaintiff and the members of the Class be awarded pre- and post-judgment interest as provided by law, and that such interest be awarded at the highest legal rate from and after the date of service of this Complaint;

203.     Plaintiff and the members of the Class recover their costs of suit, including reasonable attorneys' fees, as provided by law; and

204.     Plaintiff and the members of the Class have such other and further relief as the case may require and the Court may deem just and proper.

## XI.     JURY TRIAL DEMANDED

205.     Plaintiff demands a trial by jury, pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, of all issues so triable.

Dated: February 22, 2022.                    /s/ *Rex A. Sharp*
                                             Rex A. Sharp OBA #011990
                                             Isaac L. Diel

Greg M. Bentz
Ruth Anne French-Hodson
Hammons Hepner
**SHARP LAW, LLP**
4820 W. 75th Street
Prairie Village, KS 66208
(913) 901-0505
(913) 901-0419 fax
rsharp@midwest-law.com
idiel@midwest-law.com
gbentz@midwest-law.com
rafrenchhodson@midwest-law.com
hhepner@midwest-law.com

-and-

Kyle B. Hadwiger, OBA#11329
Hadwiger & Jungman, PLLC
120 S. Grand
P.O. Box 306
Cherokee, OK 73728
(580) 596-3591
kyle@hjoklaw.com

-and-

Tim Battin
BoiesBattin LLP
4041 University Drive, 5th Floor
Fairfax, VA 22030
Telephone: (703) 764-8700
Facsimile: (703) 764-8704
tbattin@straus-boies.com

***Attorneys for Plaintiff and
the Putative Class***